2015–1671

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LUMINARA WORLDWIDE, LLC,

*Plaintiff–Appellee*,

v.

LIOWN ELECTRONICS CO., LTD., SHENZHEN LIOWN ELECTRONICS CO., LTD.,
LIOWN TECHNOLOGIES/BEAUTY ELECTRONICS, LLC,
BOSTON WAREHOUSE TRADING CORP., ABBOTT OF ENGLAND (1981), LTD.,
BJ'S WHOLESALE CLUB, INC., VON MAUR, INC., ZULILY, INC.,
SMART CANDLE, LLC, TUESDAY MORNING CORP., AMBIENT LIGHTING, INC.,
THE LIGHT GARDEN, INC., and CENTRAL GARDEN & PET CO.,

*Defendants–Appellants*

Appeal from the United States District Court for the District of Minnesota
in case no. 14-cv-03103-SRN-FLN, Judge Susan Richard Nelson

**OPENING BRIEF OF DEFENDANTS–APPELLANTS (NONCONFIDENTIAL VERSION)**

Thomas N. Millikan
Joseph P. Reid
PERKINS COIE LLP
11988 El Camino Real, Suite 350
San Diego, California 92130–2594
Phone:  (858) 720–5723
E-mail:  TMillikan@perkinscoie.com

Kenneth J. Halpern
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, California 94304–1212
Phone:  (650) 838–4308
E-mail:  KHalpern@perkinscoie.com

Dan L. Bagatell
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012–2788
Phone:  (602) 351–8250
E-mail:  DBagatell@perkinscoie.com

Devan V. Padmanabhan
WINTHROP & WEINSTINE, P.A.
225 S. 6th Street, Suite 3500
Minneapolis, Minnesota 55402–4629
Phone:  (612) 604–6748
E-mail:  dpadhmanabhan@winthrop.com

Attorneys for Defendants–Appellants

June 19, 2015

## CERTIFICATES OF INTEREST

Counsel for the Liown appellants certifies the following:

The full names of every party represented by me are:

Liown Electronics Co., Ltd., Shenzhen Liown Electronics Co., Ltd.,
and Liown Technologies/Beauty Electronics, LLC

The name of the real parties in interest (if the parties named in the caption are not the real party in interest) represented by me is:

n/a

The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the parties represented by me are:

n/a

The names of all law firms and the lawyers that appeared for the parties represented by me in the trial court or are expected to appear in this Court are:

### PERKINS COIE LLP

| Dan L. Bagatell | Kenneth J. Halpern | Thomas N. Millikan |
| Joseph P. Reid | | |

### WINTHROP & WEINSTINE, P.A.

| Erin O. Dungan | Devan V. Padmanabhan | Brooks F. Poley |
| Lukas D. Toft | Paul J. Robbennolt | Nadeem W. Schwen |

Dated:  June 19, 2015            /s/Dan L. Bagatell
                                Dan L. Bagatell

Counsel for the non-Liown appellants certifies the following:

The full names of every party represented by me are:

Boston Warehouse Trading Corp., Abbott of England (1981), Ltd.,
BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC,
Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc.,
Central Garden and Pet Co.

The name of the real parties in interest (if the parties named in the caption are not the real party in interest) represented by me is:

n/a

The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the parties represented by me are:

Abbott Holdings Limited is the parent of Abbott of England (1981).
Beacon Holding Inc. is the parent of BJ's Wholesale Club, Inc.
Alibaba Group Holding Limited, by itself and through two subsidiaries, owns
    more than 10% of the stock of Zulily, Inc.

The names of all law firms and the lawyers that appeared for the parties represented by me in the trial court or are expected to appear in this Court are:

WINTHROP & WEINSTINE, P.A.

| | | |
|---|---|---|
| Erin O. Dungan | Devan V. Padmanabhan | Brooks F. Poley |
| Lukas D. Toft | Paul J. Robbennolt | Nadeem W. Schwen |

Dated:  June 19, 2015                    /s/Devan V. Padmanabhan
                                                    Devan V. Padmanabhan

## TABLE OF CONTENTS

Certificates of Interest.................................................................i

Table of Authorities ..................................................................i

Table of Abbreviations and Conventions .................................iv

Related Cases ............................................................................v

Introduction..............................................................................1

Jurisdictional Statement ............................................................3

Statement of the Issues .............................................................3

Statement of the Case ...............................................................5

    I.    Disney's patents on and licenses to artificial flame technology ...............5

        A.    The pivoting pendulum disclosed in the prior-art '455 patent ...........6

        B.    The pivoting pendulum claimed in the '166 patent..........................8

        C.    Disney's licenses to Candella and its reservation of rights to practice the patents and create new licensed Affiliates...................11

        D.    Candella's sublicense to Luminara................................................13

    II.    Liown and its relationship with Candella and Luminara ........................14

        A.    Liown's history of innovation in LED candles and its contracts with Candella and Luminara .........................................................14

        B.    Candella's 2012 lawsuit and the 2013 settlement ...........................15

        C.    Liown's termination of the 2013 settlement agreement for cause ...16

    III.    This lawsuit and the rulings on appeal ....................................................17

        A.    The complaints and the parties' cross-motions ...............................17

        B.    The district court's ruling that Luminara has standing to sue as Disney's exclusive licensee despite Disney's retained rights ..........18

C. The district court's grant of a preliminary injunction based on infringement of a single patent claim ................................................ 19

D. The district court's amendment of the preliminary injunction and denial of a stay .......................................................................... 23

Summary of Argument ........................................................................................ 25

Argument ............................................................................................................ 29

I. Luminara is unlikely to succeed on the merits ........................................ 30

A. Luminara lacks both constitutional and prudential standing ............ 30

1. Luminara lacks constitutional standing because Disney retains the right to license Defendants to practice the claimed invention ................................................................. 31

a. Disney Affiliates have the right to use the Artificial Flame Technology, and Disney may create a new Affiliate at any time by licensing "any other entity" ......................................................... 31

b. Licensed Affiliates need not be under Disney's corporate control and need not manufacture products for Disney ..................................................... 34

2. Even if Luminara has constitutional standing, it has no right to sue by itself, without joining Disney, because Disney retains substantial rights ............................................. 35

B. Claim 1 will be declared invalid over the '455 patent ..................... 38

1. Properly construed, "pivot[ing]" does not require chaotic motion in three dimensions ..................................... 40

2. Claim 1 is invalid whether or not it requires chaotic motion in three dimensions ..................................... 47

II. Luminara failed to prove irreparable injury from any infringement ........ 48

A. Past damages are compensable, and Luminara did not prove future price erosion or lost market share .......................................... 49

B.    The district court improperly found trademark confusion without supporting evidence on the relevant factors ........................51

C.    The district court's findings of reputational injuries to Luminara and Disney were legally flawed and factually unfounded ..............53

D.    Luminara did not show the required nexus between any infringement and any irreparable harm ............................................55

III.    The balance of hardships and the public interest favor Defendants ........57

A.    Luminara did not show it would suffer irreparable harm, and the district court recognized that the injunction will substantially harm Defendants ........................................................58

B.    The public interest favors competition, especially when the claimed invention is likely to be found invalid ................................59

Conclusion and Relief Requested ..........................................................................60

Addenda

    Order Denying Motion to Dismiss for Lack of Standing

    Order Granting Preliminary Injunction

    Order Modifying Preliminary Injunction and Denying Stay

    '166 Patent

    '455 Patent

Certificate of Compliance

Certificate of Authority and Proof of Service

Confidential information sealed in the district court pursuant to protective order has been highlighted in blue in the confidential version of this brief and redacted from the nonconfidential version.  This material appears at pages 22-23 and 58 and includes details regarding the harm that the preliminary injunction is causing to Defendants.

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Abbott Labs. v. Diamedix Corp.*,
  47 F.3d 1128 (Fed. Cir. 1995) ........................................................... 37

*Active Video Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) .......................................................... 51

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) .................................................... 29, 38

*Apple Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) ............................................ 54, 55, 56, 57

*Apple Inc. v. Samsung Elecs. Co.*,
  695 F.3d 1370 (Fed. Cir. 2012) .......................................................... 55

*Apple, Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013) .......................................................... 49

*AsymmetRx, Inc. v. Biocare Med., LLC*,
  582 F.3d 1314 (Fed. Cir. 2009) .......................................................... 37

*Azure Networks, LLC v. CSR PLC*,
  771 F.3d 1336 (Fed. Cir. 2014),
  *vacated on other grounds*, 135 S. Ct. 1846 (2015) ........................... 37

*ConAgra, Inc. v. George A. Hormel & Co.*,
  990 F.2d 368 (8th Cir. 1993) ............................................................. 52

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) .......................................................... 50

*Douglas Dynamics LLC v. Buyers Prods Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .......................................................... 55

*Hakim v. Cannon Avent Grp. PLC*,
  479 F.3d 1313 (Fed. Cir. 2007) .......................................................... 46

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
  906 F.2d 679 (Fed. Cir. 1990) ........................................................... 58

– i –

*Integrated Tech. Corp. v. Rudolph Tech., Inc.*,
   734 F.3d 1352 (Fed. Cir. 2013) ........................................................45

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
   995 F.2d 1566 (Fed. Cir. 1993) ........................................................58

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013) ........................................................38

*Morrow v. Microsoft Corp.*,
   499 F.3d 1332 (Fed. Cir. 2007) ...................................................30, 33

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................40, 46

*Prima Tek II, LLC v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000) ........................................................31

*Propat Int'l Corp. v. RPost, Inc.*,
   473 F.3d 1187 (Fed. Cir. 2007) ........................................................36

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) (en banc) ..........................................34

*Sciele Pharma Inc. v. Lupin Ltd.*,
   684 F.3d 1253 (Fed. Cir. 2012) ........................................................29

*Sicom Sys., Ltd. v. Agilent Techs., Inc.*,
   427 F.3d 971 (Fed. Cir. 2005) ..........................................................32

*Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*,
   No. 2015-1139, Dkt. 72 (Fed. Cir. Jan. 9, 2015) ..............................60

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   134 S. Ct. 1621 (2014) (Roberts, C.J., in chambers) .........................49

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) ................................................................40, 47

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ........................................................42

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
    778 F.3d 1365 (Fed. Cir. 2015) ........................................................40

*WiAV Solutions LLC v. Motorola, Inc.*,
    631 F.3d 1257 (Fed. Cir. 2010) ................................................31, 33

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................29

**Statutes**                                                          **Pages**

28 U.S.C. § 1292(a)(1) ..........................................................................3

35 U.S.C. § 1331 ...................................................................................3

35 U.S.C. § 1338(a) ..............................................................................3

### TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Candella | former plaintiff Candella, LLC, formerly a Disney licensee and now merged with Luminara |
| Defendants | defendants–appellants collectively |
| Disney | The Walt Disney Company and related companies including patent owner Disney Enterprises, Inc. |
| GKI | a name under which defendant Central Garden and Pet Co., a Liown distributor, does business |
| Liown | defendants Liown Electronics Co., Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co., Ltd. |
| Luminara | plaintiff Luminara Worldwide, LLC |
| Plaintiffs | Candella and Luminara collectively |
| TLG | defendant The Light Garden, Inc., a Liown distributor |
| (*x:yy-zz*) | column *x*, lines *yy* to *zz* of a patent |
| '166 patent | U.S. Patent No. 8,696,166 |
| '455 patent | U.S. Patent No. 7,261,455 |

**RELATED CASES**

No other appeals in or from the same civil action have previously been before this or any other appellate court. Defendants and their counsel are unaware of any cases pending in this or any other court that will directly affect or be directly affected by the decision in this case. Defendants note, however, that one defendant-appellant recently filed a petition for *inter partes review* challenging the validity of numerous claims of U.S. Patent No. 8,696,166, including the claim at issue in this appeal. *Shenzhen Liown Elecs. Co. v. Disney Enters., Inc.*, IPR2015–01352 (filed Jun. 5, 2015). This Court's ruling in this appeal may affect the Patent Trial and Appeal Board's decisions in that proceeding.

# INTRODUCTION

Defendants appeal from a preliminary injunction barring them from supplying moving flameless candle products to fifteen key customers. That injunction was premised on supposed infringement of one claim of one patent and supposed irreparable injury to the plaintiff, Luminara. But the district court's orders were infected with multiple errors of law that require reversal.

First, Luminara lacks standing to sue for infringement. Luminara is only a licensee of the patent owner, Disney Enterprises, which did not join the suit. The district court found that Disney's license to Luminara's predecessor, Candella, gave Luminara all substantial rights in the patent, including sole power to license or exclude Defendants. But the agreement's plain language reserved Disney's right to license anyone to practice the patents as long as the license covers more than just artificial flame technology. Thus, although Luminara purports to be an exclusive licensee, it does not hold all relevant exclusionary rights, much less all substantial rights in the patent, and it has no standing to sue to enforce the patent.

Second, the sole patent claim on which the injunction rests is clearly invalid. The district court agreed that a prior-art Disney patent disclosed every limitation except one requiring the pendulum to be free to "pivot" on a support member. The district court found that limitation lacking only because it narrowly construed "pivoting" to require "chaotic" (random, unpredictable, patternless) motion in all

three dimensions.  But the ordinary meaning of "pivot" requires no such thing, and the claim language, written description, and prosecution history all make clear that this broadly written claim contains no such requirement.  Under any reasonable construction, the claim will be found invalid.

Third, Luminara failed to prove irreparable harm from the supposed infringement.  The district court agreed that Luminara failed to establish *future* harm in the form of lost market share or price erosion.  The court found *past* economic harm based on lost sales to particular customers with sales histories, but that is classic monetary loss compensable by damages.  The court also found that Luminara and Disney would suffer reputational loss, but that was unsupported speculation and Disney is not even a party.  The court conclusorily suggested that an injunction would prevent trademark confusion because the name of Liown's "Illuminaires" product resembles "Luminara," but it failed to analyze the factors on which likely confusion depends because Luminara did not present evidence on those factors.  To top it off, Luminara did not show a nexus between the alleged infringement and the supposed harm, as this Court rigorously requires.

Finally, the balance of equities and public interest favored Defendants.  The district court thought the balance of equities was even, but that analysis was premised on its erroneous findings of irreparable harm to Luminara.  With that false weight removed, the balance tips markedly toward Defendants, which face

– 2 –

severe hardship because they are barred indefinitely from supplying key customers. The injunction is also against the public's interest, as the public benefits from the freedom to choose between competing products.

This Court should therefore dissolve the preliminary injunction and direct the district court to dismiss Luminara's patent infringement claim.

### JURISDICTIONAL STATEMENT

Luminara purported to bring its patent infringement claim under 35 U.S.C. §§ 1331 and 1338(a).  A211; A1720.  As shown below, however, Luminara had no standing to bring that claim and the district court thus lacked jurisdiction over it.

This appeal is from the district court's orders entering a preliminary injunction, A60-114, and modifying that injunction, A115-48.  Defendants filed timely notices of appeal from both orders.  A2832-34; A2847-49.  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

### STATEMENT OF THE ISSUES

1.     The '166 patent is owned by Disney Enterprises, Inc., which retains the right to license "any other entity … operated by or under license from The Walt Disney Company or any of its Affiliates" to practice it.  The only limitation is that such a license may not be "only a license to Artificial Flame Technology."  Without any textual basis, the district court read this provision to require new licensees not controlled by Disney to manufacture only for Disney rather than third parties.

On that basis, the court found that Disney could not license Defendants to make the accused products and that Luminara was an exclusive licensee with standing to sue for patent infringement. Did the district court err in construing Disney's retained license rights and concluding that Luminara has standing to sue?

2.      Claim 1 of the '166 patent requires a hole in the pendulum body that allows the body to be "free to pivot when supported by the flame support element." Neither the ordinary meaning of "pivot" nor the intrinsic evidence limits "pivot-ing" to chaotic motion in three dimensions. The district court nevertheless con-strued "pivot[ing]" to require such motion and found that the prior-art '455 patent did not invalidate the claim because it did not disclose such movement. The '455 patent described and depicted a pendulum body capable of freely rotating around two support-member axes. Did the district court err in construing the claim and ruling there was no substantial question of claim 1's validity?

3.      Although the district court found that Luminara had lost past sales to particular customers with established sales histories, it recognized that Luminara failed to prove future harm in the form of lost market share or future price erosion. Instead, it primarily found irreparable injury based on reputational injury to Disney and Luminara—even though Disney is a non-party and Luminara did not assert harm to Disney and even though the court rejected Luminara's claim that Liown's products were inferior. The district court also asserted that an injunction was

– 4 –

warranted because Liown's "Illuminaires" product name resembles "Luminara," but it never analyzed the factors that regional circuit law says must be considered to find likely confusion. The district court also did not make the necessary findings to support a nexus between the alleged infringement and the alleged irreparable harm. Did the district court err in finding the irreparable injury necessary for a preliminary injunction?

4.    The district court recognized that the preliminary injunction would severely injure Defendants, but it found that the balance of hardships was in equipoise based on its findings of irreparable harm to Luminara. It further found that the public interest supported the injunction based on its conclusion that the patent was likely valid and infringed and its assumption of trademark confusion. Given the errors discussed above, did the district court err in assessing the balance of hardships and the public interest?

STATEMENT OF THE CASE

## I.    Disney's patents on and licenses to artificial flame technology

This case involves techniques for making light from artificial electric candles flicker like the flames of real candles. Disney pursued this technology for its "Haunted Mansion" theme-park ride, but it did not purport to invent the concept. Rather, it claimed to have invented improved methods and mechanisms for simulating flickering flames. Disney licensed Candella (now merged into Luminara) to

commercialize its artificial flame technology, but Disney reserved full rights for all Disney Affiliates to make, have made, use, sell, offer for sale, and import products practicing its patents. And Disney ensured that "Disney Affiliates" were defined to include newly licensed entities neither controlled by nor related to Disney.

## A.    The pivoting pendulum disclosed in the prior-art '455 patent

Two families of Disney patents are pertinent to this appeal. The first includes U.S. Patent No. 7,261,455, issued in 2007 to Gary Schnuckle et al. The second includes the patent at issue, U.S. Patent No. 8,696,166, issued in 2014 to Schnuckle and Douglas Patton. The '455 patent, which was filed in January 2005, A1395, is undisputedly prior art to the '166 patent, which was filed in April 2013 and recites a family history dating back only to September 2008, A149.

The '455 patent is entitled "System and Method for Generating a Flickering Flame Effect," and it disclosed ways of "provid[ing] a realistic flickering flame effect that is safe and easy to manufacture." A1408 (1:57-58). In particular, the '455 patent taught mounting a pendular body with a flame-shaped top on a pivoting gimbal. Gimbals are ancient suspension mechanisms that are often used in gyroscopes and compasses. They include pivoting supports allowing the suspended object to rotate around one or more axes.



FIG. 2

FIG. 4

FIG. 6

FIG. 12

As shown in the patent figures above, the '455 patent disclosed a two-axis gimbal allowing flame element 12 to rotate around both rod 18 and pins 22 and 23.

– 7 –

A1409 (3:55-4:39).  The patent further taught to use magnetic fields or other

mechanisms to cause the gimbal structure to rotate in horizontal or vertical planes

so that light reflecting off the flame-shaped surface would appear to flicker.

A1410 (5:52-6:11).  The patent explained that this design allowed "a natural and

chaotic external or internal force (such as wind, magnetism) to cause the flame-

shaped reflector/ diffuser to "move[ ] randomly simulating blowing in the wind."

*Id.* (6:53-62).

> **B.    The pivoting pendulum claimed in the '166 patent**

The '166 patent, entitled "Kinetic Flame Device," teaches more complex

approaches to creating flickering flame devices, but the broad claim at issue here

does not require all the details disclosed in the specification.

The '166 patent describes a candle-shaped housing containing a pendulum

with a flame silhouette at the top.  The pendulum hangs on a support (e.g., a wire

or rod) that runs through a hole in the center of the pendulum.  When electricity is

applied to a coil beneath the pendulum, it creates a time-varying magnetic field

that causes the pendulum to pivot around the support.  That pivoting causes the

attached flame silhouette to move, and light reflected off the silhouette appears to

flicker randomly.  Figure 1 shows a two-stage housing with a lower pendulum

manipulating an upper pendulum, and Figure 7 shows a single-stage design:



See generally A161 (2:23-47).

Although the '166 specification discusses various ways of producing time-varying electromagnetic fields, different types of support members, different locations and sizes of the hole in the pendulum body, different kinds of lights, and a host of other variations, most of those variations are addressed in dependent claims or claims of other patents with the same specification. The preliminary injunction was based solely on claim 1 of the '166 patent. Although that claim is limited to the pendulum member, it recites that pendulum member broadly, requiring only a flame silhouette extending outward from the upper portion of the body and a hole below the silhouette through which a support member can pass in a way that allows the body to pivot freely around the support member:

> 1.  A pendulum member for generating a flickering flame effect, comprising:
>
> > a body with upper and lower portions;
> >
> > a flame silhouette element extending outward from the upper portion of the body; and
> >
> > a hole in the body below the flame silhouette element, wherein the hole is configured to receive a flame support element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

A172 (23:42-51).

Beyond requiring an upper and lower portion and a flame silhouette at the top, claim 1 does not require any particular shape for the pendulum body.  Nor does it require any particular kind of support member, or any particular relationship between the size of the hole in the body and the diameter of the support member.  Claim 1 does require the body to be "free to pivot when supported by the flame support element," but it does not mention pivoting "randomly" or "chaotically," and it does not state or suggest that the body must be free to pivot in any particular number of directions or dimensions.

By contrast, other claims of the '166 and related patents do impose such limitations.  Within the '166 patent, claim 4 requires an "elongated and planar" body, claim 14 requires the pivot hole to be "larger in diameter than an exterior dimension of the support element," claim 15 requires the support element to be "flexible or ha[ve] a range of travel, whereby [it] is adapted to move with the flame

– 10 –

body," and claim 16 requires the support element to "comprise[ ] a flexible wire, line, or thread." A172 (23:62-63, 24:29-39). And while claim 16 of the related '355 patent recites a motion engine that "generates chaotic motion at the coupling member in at least two dimensions," A895 (16:46-48), the '166 claims contain no such limitation.

### C. Disney's licenses to Candella and its reservation of rights to practice the patents and create new licensed Affiliates

Disney's flickering candle patents issued to Disney Enterprises, Inc., a subsidiary of The Walt Disney Company. In 2008, Disney Enterprises granted Candella a four-year worldwide license to "make, have made, use, sell, offer for s[a]l[e], and import" certain products practicing "Artificial Flame Technology," which was defined to include Disney's patents and know-how relating to artificially simulating the appearance of a flickering flame. A370 § 2.1. When the original Disney-Candella license expired in 2012, Disney and Candella entered into a second Intellectual Property License Agreement that extended the Candella's license until 2020 on similar terms. A420 § 1; A426 § 7.1.

Although Candella's rights were purportedly "exclusive," Candella did not in fact obtain the sole right to license third parties. Disney itself retained the right to license third parties under the broad contractual definition of Disney "Affiliates." Under Section 2.2 of the Disney-Candella agreement, Disney and Disney "Affiliates" retain worldwide rights to make, have made, use, sell, offer for sale

and import products that practice the patents.  A422 § 2.2.  And the Definitions
section of the agreement broadly defines Disney "Affiliates" to include not only
companies controlled or managed by Disney, but also

> ***any other entity***, theme park, or venue operated by or
> ***under license from The Walt Disney Company or any of
> its Affiliates***.

A420 § 1 (emphasis added).

Because the Disney-Candella agreement defines any "entity … operated …
under license from" Disney as an "Affiliate" entitled to practice Disney's patents,
Disney retains the power to create new Affiliates simply by granting new licenses.
The only limitation on that right is that Disney Affiliates must "not include an
entity operated under license from The Walt Disney Company where such license
is only a license to Artificial Flame Technology."  A422 § 2.2.  The Disney-Can-
della agreement also provides Disney remains sole owner of the patents, that
Disney remains responsible for maintenance of the patents, and that Disney is
entitled to a share of licensing revenues.  A423 § 5.1; A429 § 9.1; A431 § 12.

As originally signed, the Disney-Candella agreement placed numerous
restrictions on Candella's rights.  It prohibited Candella from assigning, sublicens-
ing or transferring ownership of rights in the Artificial Flame Technology without
Disney's written consent.  A422 § 2.1; A435 § 17.3.  Candella also could not sue
to enforce the patents or settle litigation without Disney's consent, and Disney

retained the option to sue for infringement if Candella did not.  A430 § 10.1;

A431-32 §§ 13.2, 13.3.  But in an effort to confer standing on Candella, the parties

amended the agreement in late 2012, just before Candella filed its first patent

infringement suit against Liown.  A439-46.  The amendment eliminated certain

field-of-use restrictions and authorized Candella to sublicense its interest according

to the terms of Candella's license from Disney.  A440 § 2(a), (b).  It also permitted

Candella to assign its rights with Disney's consent, not to be withheld unreason-

ably.  A441 § 2(c).  The amendment also granted Candella the right to sue to en-

force the artificial flame technology patents without Disney's consent, although

Disney is entitled to notice and a share of proceeds of any litigation and a share of

royalties from sublicenses and settlements.  A441 § 2(d); A442-43 § 3(a)-(c).

The 2012 amendment reiterated, however, that Disney and its Affiliates

retain the rights to practice the patent reserved by the original agreement:

> For the avoidance of doubt, [Disney Enterprises] retains
> for itself and its Affiliates, its rights in respect to the
> [Disney Patents] under <u>Section 2.2</u> of the [2012] License
> Agreement.

A440 § 2(b).  As a result, Disney may still freely create and license new Affiliates

to practice the patents pursuant to Section 2.2 of the Disney-Candella agreement.

### D.    Candella's sublicense to Luminara

During the term of the original Disney-Candella license, Candella entered

into an agreement with Luminara that made Luminara Candella's "exclusive sourc-

ing agent and distributor" for products licensed from Disney. That agreement divested Candella of all rights to practice the patent, but it did not grant Luminara any ownership rights in the Disney patents or any rights to license those patents. A409 §§ 2.01, 2.02; A412-13 § 11.01.

After Disney granted Candella the right to sublicense, Candella and Luminara agreed to give Luminara purportedly exclusive rights to practice the patents and sue infringers. A620 § 2.01; A624 § 11.03. But that agreement could not and did not negate Disney's retained rights to practice the patents and to create new Affiliates with rights to practice the patents.

## II.    Liown and its relationship with Candella and Luminara

Liown, the manufacturer of the accused products at issue here, is a leader in both the artificial candle industry and moving-flame technology in particular. Candella and Luminara accordingly turned to it to make moving-flame candles for them. Unfortunately, that arrangement proved contentious, resulting in litigation.

### A.    Liown's history of innovation in LED candles and its contracts with Candella and Luminara

Liown has been making and selling light-emitting diode (LED) candles for 15 years, as long as the products have existed. A1471 ¶ 2. From its inception, Liown has innovated in the development of realistic flameless candle technology. Its founder and principal, Xiaofeng "Mike" Li, invented the first LED candle and holds over 40 patents in the field. *Id.*; A2179 ¶ 5. Among those is U.S. Patent

No. 8,789,986, which claims a novel single-stage LED candle that uses a single pendulum to create moving-flame effects instead of the two-stage designs found in the prior art.  A1815-29.

In addition to its technological innovations, Liown is a leading manufacturer of LED candles.  A1471 ¶ 2.  Accordingly, when Candella and Luminara were seeking a manufacturer in early 2010, they approached Liown.  After extended meetings Candella agreed to make Liown its exclusive manufacturer and its exclusive distributor in China, Hong Kong, and Taiwan.  A1113-21; A1123-31.  At those meetings, Liown shared product design information about its single-stage moving-flame candles under non-disclosure agreements.  *See* A1344-45.  Luminara soon introduced its own candle product using a similar design.  *See* A1345.[1]

## B.    Candella's 2012 lawsuit and the 2013 settlement

In 2012, disagreements over price led Candella to break off relations with Liown, and Candella proceeded to sue Liown for patent infringement.  No. 12-cv-

---

[1] After Candella and Luminara met with Liown, drawings of and claims to single-stage designs began to appear in applications for the patents that Luminara asserts in this action.  Indeed, Figure 7 of the '166 patent depicts, and claims of that patent attempt to cover, single-stage designs.  A155.  But the 2008 provisional application to which the patents-in-suit claim priority does not teach the single-stage design, as the PTO recognized when it granted patents to Mike Li over that provisional application.  Luminara's copying and infringement of Liown's single-stage design has led Liown to counterclaim that Luminara's product infringes two Liown products.  Those claims are not at issue here, however.

2803 (D. Minn.).  Although the 2012 lawsuit accused Liown artificial candle prod-

ucts of infringing some of the same patents asserted here, Candella did not seek a

preliminary injunction in that case.  Candella did try to join Luminara as a plaintiff,

but the district court refused, finding that Luminara was merely Candella's non-

exclusive licensee.  *Id.* Dkt. 74 at 6-11.  Liown also moved to dismiss Candella's

claims on the ground that Candella lacked standing, but the case settled in Novem-

ber 2013 before any ruling on that motion and before claim construction.

Under the parties' settlement agreement, Candella and Luminara again made

Liown their global manufacturer.  In particular, they agreed to place all their pur-

chase orders with Liown and granted Liown the right of first refusal to make all

patented candles worldwide.  A1157 § 2(b), (c).

## C.    Liown's termination of the 2013 settlement agreement for cause

Relations again soured, however, and Liown notified Candella and Luminara

in mid-2014 that it was terminating the 2013 agreement due to their breach.  Can-

della and Luminara had engaged other manufacturers in China to make candles for

them while simultaneously reassuring Liown that the purchase orders to which

Liown was entitled were forthcoming.  Candella and Luminara retaliated by filing

this lawsuit against three Liown entities in August 2014.  A211-19.

## III.    This lawsuit and the rulings on appeal

### A.    The complaints and the parties' cross-motions

Plaintiffs' original complaint asserted two patents not at issue here and sought a declaration that Luminara did not infringe a Liown patent. *Id.* Neither that complaint nor the three later amended complaints named Disney as a plaintiff.

Candella and Luminara later filed an amended complaint adding two Liown customers and two new patents, including the '166 patent, which issued in April 2014. A220-31. Defendants responded by moving to dismiss Plaintiffs' infringement claims for lack of standing and subject-matter jurisdiction and moving to dismiss the declaratory-judgment claims as anticipatory. A234-67; A779-80.

While Defendants' motion to dismiss was pending, Plaintiffs moved for a preliminary injunction based on alleged infringement of claim 1 of the '166 patent. A783-827. Plaintiffs also filed a second amended complaint adding additional customer defendants and claims of breach of contract, tortious interference with contract, trade secret misappropriation, trademark infringement, and unfair competition. A1479-1509. Defendants moved to dismiss that complaint as well. A1510-11; A1687-1701; A1710-11; A1716-18.

Along the way, Candella and Luminara merged, and Luminara proceeded to file a third amended complaint naming it as sole plaintiff. A1719-53. Defendants moved to dismiss that complaint too. A1754-55.

**B.    The district court's ruling that Luminara has standing to sue as Disney's exclusive licensee despite Disney's retained rights**

The district court denied Defendants' motion to dismiss, reasoning that Candella had obtained all substantial rights from Disney.  A1-59.  The court acknowledged that Disney and Disney Affiliates retained the right to practice Disney's patents, but it concluded that Candella had the sole right to sue and license or exclude others.  A25-35.  The court rejected Defendants' argument that Disney retained the right to license third parties such as Defendants, reasoning that (1) although Disney could give Defendants the right to practice the patents by acquiring ownership or control of them, there was no indication that Disney intended to do so; and (2) although Disney and its Affiliates may make, use, sell, and import patented products and may authorize Defendants to make product for ***them***, they may not authorize Defendants to make products for ***others***.  A36-42.  The court did not grapple with one of Defendants' main points, which was that regardless of any corporate control, Disney may unilaterally make Liown an Affiliate with the right to sell to anyone simply by licensing Liown to Artificial Flame Technology and any other right owned by Disney.  The court further concluded that pre-merger Luminara had standing to sue with Candella and that post-merger Luminara had standing as successor to both companies' rights.  A46-50.  The court also ruled that Luminara's declaratory judgment claim was proper.  A50-58.

Following that ruling, Defendants answered Luminara's complaint, denying liability and raising various defenses. A1781-1845. Liown included a counter-claim seeking declarations of patent noninfringement and invalidity, trademark noninfringement, and trademark cancellation; requesting correction of inventorship of three Luminara patents; and accusing Luminara and certain Luminara customers of infringing two Liown patents. A1801-09. Another defendant, Central Garden & Pet (also known as "GKI"), counterclaimed for breach of contract by Luminara. A1809-11.

### C.    The district court's grant of a preliminary injunction based on infringement of a single patent claim

The district court next granted Luminara's preliminary injunction motion, enjoined Defendants from "manufacturing, distributing, offering for sale, or importing moving flameless candles to [Luminara's] customers," and directed them to "recall any and all moving flameless candles currently in Plaintiff's custo-mers' stores or distribution centers." A113. That order was premised on likely infringement of claim 1 of the '166 patent and irreparable harm therefrom.

***Infringement.*** The court first found that "Liown's '986 Patent Infringes Claim 1 of [Luminara's] '166 Patent," even though Luminara never asserted that Liown's patent infringed its patent. A75; *see also* A79. The court also "dis-agree[d] with the USPTO's decision to grant [Liown's] patent," even though that too was not at issue. A78. More to the point, the court found that Liown's accused

candles infringe claim 1, rejecting Defendants' arguments that they lacked a separate flame silhouette attached to a body and a hole in the body below the flame silhouette as contrary to its claim constructions.  A76-77.

*Invalidity.*  The court next found no substantial question of the validity of the claim, rejecting Defendants' arguments of anticipation and obviousness based on the prior-art '455 patent.  A80-88.  The court's ground for that conclusion was that the '455 patent did not disclose one claim element:

> a flame support element such that the flame support element passes through the hole and body [and] is free to *pivot* when supported by the flame element.

A82 (emphasis by court).  The court recognized that the parties agreed that "pivot" meant "to run on, or as if on, a pivot."  *Id.*  But it read the specification and non-asserted claim 14 to suggest that "pivoting" additionally required "'chaotic' motion" in "at least four different directions" and "three dimensions," whereas the pendulum described in the '455 patent supposedly "move[d] rhythmically, in only two dimensions."  A83; *see also* A87 (finding nonobviousness due to lack of "pivoting").

*Irreparable Harm.*  The district court next found irreparable harm based on some but not all of the theories raised by Luminara.  A88-102.

▪ **Lost Market Share.**  The court recognized that Luminara "d[id] not make 'a prima facie showing of lost market share" because Luminara "fail[ed] to

provide any evidence demonstrating its market share of the overall market of flameless candles that it had before and/or after the alleged infringement began." A91. The court likewise found that Luminara failed to prove up its theory that the market consisted of only two parties, such that customers had no alternative non-infringing supplier. *Id.*

- **Customer Loss.** The court further found that Luminara had not shown irreparable harm based on lost customers. Luminara contended that two customers (GKI/Bethlehem and The Light Garden) would have been required to buy from Luminara but for Liown's alleged tortious interference. But although the court found that Luminara had lost some sales to Liown, "Luminara did not present any evidence to substantiate its speculative claim of customer loss." A101.

- **Price Erosion.** The court similarly found no substantiation of Luminara's claim of future price erosion and noted that Luminara had not presented economic evidence "such as sales projections, market reports, or expert testimony." A97-98. The court thought there was evidence of *existing* price erosion, however, based on a handful of price comparisons from different distribution channels and without precise dates, and because "Luminara was likely cutting prices in order to compete with Liown's prices …." A98-99. The court also assumed that such existing price erosion would continue to harm Luminara in the future. A100. The

court did not explain why it would not be possible to measure damages from lower-priced sales to customers with known sales histories.

▪    **Goodwill and reputation.**  The court also found irreparable harm in the form of lost goodwill and reputation.  In its view, "Luminara suffers irreparable harm to its reputation and goodwill by 'being forced to compete against products that incorporate and infringe its own [products]."  A94.  The court further found that Luminara's suit protected its "reputation as the exclusive licensee of the products."  *Id.*  In addition, although Disney was not a party, the court feared that "Liown's infringement could certainly damage Disney's reputation as an 'innovator' if customers found the same innovations appearing in both Disney's and Liown's products."  *Id.* (emphasis added).  The Court also posited that "Liown's marketing of its flameless candles essentially infringes Plaintiff's 'LUMINARA' trademark" and confuses customers, but it did not address the factors that courts in the Eighth Circuit must use in analyzing secondary meaning, trademark confusion, and trademark infringement.  A95.  Although Luminara argued that Liown's products were inferior, the Court did not credit that evidence.  *Id.*

*Balance of Hardships.*  Despite finding irreparable injury to Luminara, the court found that the balance of hardships was neutral because Defendants faced substantial and irreparable harm if an injunction were granted.  Among other things, Liown presented unrebutted evidence that an injunction would  *REDACTED*

**REDACTED**  , and Liown had its own patent on artificial moving-flame candles. A102-05.

*Public Interest.*  Finally, the court concluded that the public interest supported an injunction because Luminara's patent was likely valid and infringed and an injunction "could prevent consumer confusion in the marketplace."  A107.

### D.    The district court's amendment of the preliminary injunction and denial of a stay

Liown sought leave to file a motion for reconsideration of the injunction order, identifying multiple legal errors in the district court's logic.  A2416-17. Liown also asked the district court to amend the injunction to clarify which Luminara "customers" were covered, to raise the bond amount, and to stay the injunction pending reconsideration and/or appeal.  A1851-84.  But the district court refused to reconsider its injunction order, A2418, and while it did clarify the affected "customers," it rejected Defendants' requests to adjust the bond amount and stay the injunction pending appeal, A115-48.  The amended injunction enjoins defendants from providing moving flameless candles to fifteen particular current and former customers of Luminara and requires them to recall such candles currently in those customers' stores or distribution centers.  A123.

On the merits, the court declined to revisit its construction of "pivot" and resulting finding that there was no substantial question of validity.  A136.  The court also did not revisit its ruling on standing, although it clarified its view of

Disney's retained rights to license, saying that an entity such as Liown could become a Disney Affiliate entitled to practice the patent only if Disney (1) acquired corporate or managerial control over it or (2) "grant[ed] the entity the right to make the moving candles *for* Disney, as long as Disney also bundled that right with other licensing rights." A139 n.5. The court maintained that Disney had no power to license others to make products for third parties, even if the license included more than Artificial Flame Technology. *Id.*

Although Defendants' additional evidence "bolster[ed] the [c]ourt's determination that the Defendants would suffer substantial harm if enjoined," the court remained unpersuaded that this outweighed the injury to Luminara that it previously found. A140. In particular, the court continued to rely on Luminara's President's statements that "Luminara's goodwill includes customer association of the Artificial Flame Technology with Luminara flameless candles" and would suffer because Luminara would no longer be the "exclusive source for the Artificial Flame Technology developed by Disney." A142. The court further suggested that "Luminara's reputation and consumer goodwill could be irreparably damaged if its customers believed it did not enforce its intellectual property rights." A144. The court found a causal nexus between harm and infringement on the theory that "Defendants' sale of these candles … caused Luminara to no longer be the only source for customers seeking moving flameless candles that incorporated Disney's

Artificial Flame Technology." *Id.* The court did not analyze whether the patented pendulum technology drove sales because Luminara produced no such evidence.

Defendants appeal from both preliminary injunction orders.[2]

SUMMARY OF ARGUMENT

The district court abused its discretion in granting a preliminary injunction because none of the four traditional factors in the analysis supported an injunction.

**1.    Luminara is highly unlikely to prevail on the merits.**

The sole basis for the preliminary injunction was likely infringement of claim 1 of the '166 patent, and Luminara is highly unlikely to prevail on that claim both because it lacks standing to sue and because claim 1 will be found invalid. The district court's contrary rulings were founded on errors in construing both Disney's rights under the Disney-Candella agreement and the meaning of "pivot[ing]" in the '166 patent.

a.    Disney's retained right to license any entity, including Defendants, to practice Artificial Flame Technology patents means that Luminara cannot unilaterally exclude Defendants. It follows that Luminara lacks standing to sue Defendants for patent infringement. Under the Disney-Candella agreement, Disney Affiliates have full rights to practice the licensed patents, and Disney need not

---

[2] Defendants have filed a motion asking this Court to stay the preliminary junction. This Court has not yet ruled on that motion.

have corporate or operational control over such Affiliates. Instead, the agreement expressly provides that Disney may license "any other entity" to practice the patents, as long as the license includes something in addition to Artificial Flame Technology. Luminara's argument that Disney must retain corporate or operational control is belied by the plain language of the agreement. And the district court's suggestion that third-party licensees may only manufacture for Disney likewise has no textual basis. In any event, whether or not Disney can license Defendants, Disney retained substantial rights in the patents and Luminara lacks standing to sue by itself, without joining Disney.

      b.    On the merits, claim 1 of the '166 patent is clearly invalid over Disney's prior-art '455 patent. The district court found only one limitation lacking in the '455 patent: a "body free to pivot when supported by the flame support element." But that finding depended on an erroneous claim construction equating "pivoting" with chaotic (random, unpredictable, or patternless) motion in three dimensions. In ordinary English, "pivoting" includes rotating around a fixed point, and nothing in the '166 patent justifies importing a requirement of chaotic motion in three dimensions. Although another claim in a related patent recites "chaotic motion in at least *two* dimensions," claim 1 of the '166 patent does not refer to chaotic motion at all, much less chaotic motion in ***three*** dimensions. The '166 patent does disclose optional structures that allow such motion, and other, depen-

dent claims require such structure. But claim 1 does not, and the patent makes clear that the support member may also be fixed, rigid, and the same size as the hole in the body, in which case the pivoting around the support will ***not*** be chaotic in all three dimensions. The prosecution history confirms the district court's error: during prosecution of the parent patent, the examiner found that the gimbal design of the '455 patent anticipated a claim requiring a "pivotally mounted" support member extending through a hole in the pendulum body, and Disney acceded to the rejection. Under *Teva* and *Phillips*, this Court need not and should not defer to Luminara's expert's misreading of the intrinsic evidence.

Under the correct construction, the '455 patent clearly anticipated claim 1. Even if claim 1 were read to require chaotic motion in two dimensions, the '455 patent still anticipated, as it disclosed chaotic motion around each of two axes. And even under the district court's misconstruction, claim 1 was at least obvious.

## 2.    **Luminara failed to prove irreparable injury.**

Reversal is also required because Luminara did not establish irreparable injury from the supposed infringement. Any past damages are compensable with money damages, and Luminara failed to prove both future price erosion and lost market share. Rather than proffering market-based economic evidence, Luminara cited damage from sales to particular customers with records of past purchases, and such harm is readily quantifiable. The district court's finding of likely trademark

confusion was wholly unfounded.  Contrary to regional circuit law, the court simply conflated similarity between names and likely confusion in the marketplace without examining the factors necessary to find likely confusion.

The district court's findings of injury to Disney's "reputation as innovator" and Luminara's "reputation and goodwill" as Disney's licensee were also legally flawed and factually unsupported.  Disney is not a party and did not assert any reputational or other injury.  Luminara did assert reputational injury, but the district court refused to find that Liown's products were inferior and Luminara's remaining evidence was a wholly conclusory, self-interested statement by its President, which was inadequate under *Apple v. Samsung*.  To make matters worse, Luminara failed to prove a nexus between the infringement and any irreparable harm, as *Apple v. Samsung* also requires.  In particular, Luminara did not prove that the patented feature drives demand for the supposedly infringing product.

### 3.    The other equitable factors also weigh against the injunction.

The district court's findings that the balance of hardships was neutral and that the public interest favored an injunction were based on its erroneous analyses of the other two factors in the calculus.  Even the district court recognized the severe injury that Defendants will suffer from the injunction, and once the false weight of Luminara's claimed irreparable injury is removed, the balance of hardships tilts strongly against an injunction.  The district court's finding that the public

interest supported an injunction was premised on its erroneous finding of patent validity.  The public interest in free competition becomes paramount once the weakness of Luminara's merits claim is taken into account.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Id.* at 20.

Preliminary injunction orders are reviewed for abuse of discretion, but "an abuse of discretion may be established by showing that the [district] court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  To the extent an injunction is based on an issue of law, this Court reviews *de novo.  Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012).

In this case, errors of law pervaded the district court's analysis.  The district court legally erred in finding that Luminara was likely to succeed on the merits

because Luminara lacks standing as a matter of law and because claim 1 is plainly invalid under the correct claim construction, which is a matter of law. The court also committed legal error in finding that Luminara would suffer irreparable injury uncompensable by money damages. And those errors in turn infected the court's analysis of the balance of hardships and the public interest.

## I.    Luminara is unlikely to succeed on the merits

The district court committed legal error in narrowly construing both Disney's retained rights in the '166 patent and the meaning of "pivot[ing]" in claim 1 of that patent. Under the correct constructions, Luminara will not prevail in this case both because it lacks standing to sue and because claim 1 is invalid.[3]

### A.    Luminara lacks both constitutional and prudential standing

A plaintiff seeking to enforce patent rights must have both constitutional and prudential standing to sue. To have constitutional standing, the plaintiff must have the right to exclude the defendant from practicing the patent. *See, e.g.*, *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007). In some cases, an exclusive licensee may have constitutional standing to sue. But even then, the exclusive

---

[3] Defendants also disagree with the district court's finding of likely infringement of claim 1 and the provisional claim constructions on which that finding rested, but space constraints prevent full discussion of those issues here. If those constructions are maintained, Defendants reserve the right to challenge them and any resulting infringement finding after any adverse final judgment.

licensee normally must join the patent owner in order to sue.  For an exclusive licensee to sue alone, in its own name, the nominal patent owner must have conveyed "all substantial rights" in the patent to the licensee.  *See*, *e.g.*, *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1377-78 (Fed. Cir. 2000).  In this case, Luminara has neither constitutional nor prudential standing.

> ### 1.   Luminara lacks constitutional standing because Disney retains the right to license Defendants to practice the claimed invention

Disney's retained right to freely license any entity, including Defendants, to practice the Artificial Flame Technology patents means that Luminara lacks constitutional standing to sue on those patents.  Under *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed. Cir. 2010), a licensee may have constitutional standing to sue a defendant for infringement even if the licensee cannot exclude all possible competitors, so long as the licensee alone has authority to exclude that particular defendant from practicing the patent.  *Id.* at 1266-67.  Conversely, however, when the owner retains the right to license the defendant, the licensee does ***not*** have standing.  *Id.* That is the case here.

> ### a.   Disney Affiliates have the right to use the Artificial Flame Technology, and Disney may create a new Affiliate at any time by licensing "any other entity"

Under the Disney-Candella agreement, both Disney and Disney Affiliates have full rights to practice the patent—to make, have made, use, sell, offer to sell

and import patented products.  A422 § 2.2.  Although the word "affiliate" typically connotes a corporate relationship, this agreement defines the term far more broadly.  *See Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) (court must examine substance of rights granted because "[e]ach license and assignment is unique").  In particular, Affiliates of Disney Enterprises include not only entities controlling, controlled by, or under common control with it, but also

> (1) any other entity with respect which Licensor or any of its Affiliates has management or operational responsibility (even though Licensor or its Affiliate may own less than 50% of the equity of such entity; *and (2) any other entity*, theme park, or venue *operated* by or *under license from The Walt Disney Company* or any of its Affiliates.

A420 § 1 (emphasis added).  Because any "entity … operated … under license from" Disney qualifies as an Affiliate entitled to practice the patent, Disney may at any time authorize Defendants and others to practice the '166 patent simply by granting them a license to do so.

The only limitation on that right is that Disney Affiliates

> do[ ] not include an entity operated under license from the Walt Disney Company *where such license is only a license to Artificial Flame Technology*.

A422 § 2.2 (emphasis added).  But that language necessarily implies that Disney *may* license any entity to use Artificial Flame Technology (including the '166 patent) when any other technology *is* included within the license—no matter how

trivial that technology may be and no matter whether the licensee pays any extra consideration for the additional technology.

As a matter of law, Disney's continued right to license Defendants to practice the '166 patent means that neither Candella nor Luminara had the power to exclude Defendants, and as a result neither of them had standing to sue Defendants for infringement.  That is true even though Candella and Luminara may have been "exclusive licensees" in some sense and even though the 2012 amendment no longer requires Disney to consent to infringement suits.  As *WiAV* recognizes, "an exclusive licensee lacks standing to sue a party who has the ability to obtain such a license from another party with the right to grant it" because in this scenario "the exclusive licensee does not have an exclusionary right with respect to the alleged infringer and thus is not injured by that alleged infringer."  631 F.3d at 1266-67; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (en banc) ("To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.").

Thus, regardless of Luminara's contractual authority to sue without Disney's consent, Luminara has no constitutional standing and cannot sue Defendants—with or without Disney as a co-plaintiff.  *See Morrow*, 499 F.3d at 1342 (nominal trans-

fer of the right to sue does not provide standing even to participate in suit if owner

may license others within the field of exclusivity).

### b.    Licensed Affiliates need not be under Disney's corporate control and need not manufacture products for Disney

In an effort to overcome this problem, Luminara has argued that Disney has

no right to license Defendants because Disney supposedly must own or operation-

ally control all Affiliates.  In so arguing, Luminara reads the Disney-Candella

agreement to require Disney Affiliates to satisfy more than one of the criteria listed

in the definition of "Affiliate."  But the plain language of the definitions paragraph

provides three *alternative* ways for a company to qualify as an Affiliate of Disney.

First, "Affiliates" may share common corporate control, defined as at least 50%

ownership of equity.  A420 § 1.  Second, Disney Affiliates include entities subject

to common management or operational control.  *Id.*  And third, Disney Affiliates

include "*any other entity … operated under license from Disney*."  *Id.*  Under this

third option, only a license from Disney is needed.

Beyond this unambiguous language, logic dictates that the different ways to

become an "Affiliate" must be alternatives to one another because the first is based

on party ownership of at least 50% of equity and the second is based on managerial

or operational control even with less than 50% of equity.  If the second criterion

were cumulative to the first, the language permitting less than 50% of equity would

be nonsensical. The third definition is set off by the same phrase as the second ("any other entity"), and so must also be read as an alternative.

The district court recognized that a license from Disney suffices by itself to create an Affiliate entitled to practice the '166 patent. It ruled, however, that the contract permits Disney to license others as Affiliates only if they manufacture *for Disney*. A139 n.5. But the definition of "Affiliate" contains no such "make for" limitation, and the rest of the agreement says no such thing, either. Under the proper reading of the agreement, all Disney Affiliates, including licensees, possess "have made" rights under Section 2.2. And that right does not limit the other rights that Section 2.2 expressly provides, including unlimited rights to "make, … use, sell, offer for sale, and import" patented products. A422 § 2.2. Notably, Section 2.2 provides that licensee Affiliates may include non-Disney theme parks, and such companies would not be in the business of making candles for Disney.

### 2.    Even if Luminara has constitutional standing, it has no right to sue by itself, without joining Disney, because Disney retains substantial rights

Even if Luminara could establish constitutional standing as an exclusive licensee, that would merely give it the right to sue along with patent owner Disney. To have the right to sue by itself, without joining Disney, Disney must have transferred "all substantial rights" to Luminara, effectively making Luminara its

assignee and the true owner. *See*, *e.g.*, *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1189-93 (Fed. Cir. 2007). Disney did not do so.

Section 2.2 of the Disney-Candella agreement reserved substantial rights to Disney. Indeed, that section is entitled "Reservation of Rights" and reserved important rights, including both the unlimited right for Disney and all Affiliates (existing or newly created) to practice the claimed inventions in all fields and, in addition, all other rights not expressly granted to Candella:

> 2.2    <u>Reservation of Rights</u>. Notwithstanding the exclusive license grant above, Disney expressly reserves for itself and its Affiliates the right throughout the world to make, have made, use, sell, offer for sale and import the Licensed Products, within and outside the Product Categories. All rights not expressly granted to Licensee in this Agreement are reserved to Licensor. …

A422 § 2.2. Disney also retains title to the patents, responsibility to pay maintenance fees to keep the patents in force, a financial interest in litigation and licensing, and a right to notice of litigation and licensing activities. A423 § 5.1; A429 § 9.1; A431 § 12; A441 § 2(d); A442-43 § 3(a)-(c). *Cf. Propat*, 473 F.3d at 1191. The 2012 amendment did not change these provisions. Indeed, the retained rights were so important to Disney that the 2012 amendment expressly reiterated Disney's reservation of its rights under Section 2.2 to avoid any doubt about those rights:

> For the avoidance of doubt, [Disney Enterprises] retains for itself and its Affiliates, its rights in respect to the [Disney Patents] under <u>Section 2.2</u> of the [2012] License Agreement.

A440 § 2(b).

A patent owner's retention of the right to practice its patent normally shows that the owner has reserved substantial rights. *See*, *e.g.*, *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) (citing Diamedix's retained right to make, use, and sell to certain customers); *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1320 (Fed. Cir. 2009) (citing Harvard's retained right to make and use antibodies and provide them to others for research). Of course, if the owner has no reason to practice the patent, a retained right to practice may be insignificant. *See Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1344 (Fed. Cir. 2014) (charitable foundation's retained right to practice was meaningless because it did not make or sell products), *vacated on other grounds*, 135 S. Ct. 1846 (2015). But here, Disney's retained right to practice is very significant because Disney uses moving flameless candles at its theme parks.

Furthermore, under Section 2.2 and the definition of "Affiliates," Disney retains the right to authorize independent theme parks and other entities to practice the patents. Even if this Court concludes that Disney may not freely license these Defendants, Disney clearly retains substantial rights to authorize others to practice the patents. As a result, even if Luminara might have standing to sue ***with*** Disney, Luminara does not have standing to sue ***without*** Disney, and its patent infringement claims must be dismissed for lack of jurisdiction.

**B.    Claim 1 will be declared invalid over the '455 patent**

In a patent case, a preliminary injunction is inappropriate when a defendant "raises a substantial question concerning either infringement or validity." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1366 (Fed. Cir. 2013); *Amazon.com*, 239 F.3d at 1350.  In this case, even assuming infringement, Defendants raised more than a substantial question of validity.

Luminara conceded that the '455 patent disclosed every element of claim 1 of the '166 patent except one:

> a hole in the body below the flame silhouette element, wherein the hole is configured to receive a flame support element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

A172 (23:47-51).  As to that, the '455 patent undisputedly disclosed flame support elements (rod 18 and pins 22 and 23) passing through holes in a pendulum body below a flame silhouette element.  It was also undisputed that the pendulum body was free to rotate around those elements, as the figures showed just that:



FIG. 4

FIG. 6

A1398-99; *see also* A1409 (4:28-39) (corresponding written description).  The

only dispute was whether rotating around a support qualified as "pivot[ing]"

around that support.  Validity thus turned on claim construction (a legal deter-

mination), not on what the '455 patent disclosed (a factual determination).

    In its preliminary injunction order, the district court narrowly construed

"pivot[ing]" to require chaotic motion in three dimensions, and on that basis found

no substantial question regarding claim 1's validity.  A82-88.  That construction

was wrong, and this Court should now reverse it and hold that Defendants estab-

lished a high likelihood that claim 1 is invalid.

### 1. Properly construed, "pivot[ing]" does not require chaotic motion in three dimensions

Claim terms are generally given their ordinary and customary meaning in view of their surrounding text, the specification as a whole, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). In this case, the ordinary and customary meaning of "pivot" includes rotation around a pin, and the claim language, the written description, and the prosecution history are consistent with that construction. This Court should reject the district court's importation of an additional limitation requiring chaotic motion in three dimensions because that was an optional feature of a preferred embodiment.

This Court reviews a district court's ultimate claim construction *de novo*. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839, 841-42 (2015). This Court also reviews the district court's analysis of the intrinsic evidence *de novo*. *Id.* at 841; *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1369 (Fed. Cir. 2015). To the extent a district court resolves factual disputes regarding extrinsic evidence, this Court reviews those findings for clear error. *Teva*, 135 S. Ct. at 842. Here, however, the district court did not resolve any factual disputes based on extrinsic evidence, so this Court's review is entirely *de novo*. *See* A71 ("Here, intrinsic evidence clarifies any ambiguity in the claim terms, and therefore, the Court need not look to any extrinsic evidence."); A82-83.

Neither side has argued that "pivot" has a special meaning in this art.  It is an ordinary English word, and the patent uses it according to that ordinary meaning, which merely requires movement around a fixed pivot point.

Based on ordinary English usage, the parties agreed that "to pivot" (the verb) means "to run on, or as if on, a pivot," and the district court accepted that stipulation.  A82.  It was also undisputed that the ordinary meaning of "a pivot" (the noun) is "a pin or shaft on which a mechanical part turns."  *See* A1866 (citing the *Merriam-Webster Dictionary*); A808 (dictionary cited by Luminara similarly reciting that a "pivot" is "a shaft or pin on which something turns").  Thus, simple rotational motion around a fixed point is all that is required under the ordinary meaning of the ordinary English verb "to pivot."  When a door pivots on its hinges, it does not exhibit chaotic motion in three dimensions.  The same is true of a dancer turning on a pivot foot, a lever pivoting on a fulcrum, and a forearm pivoting around an elbow joint.

The specification of the '166 patent is consistent with this definition.  To be sure, the patented invention ultimately aims to produce "real but chaotic physical movements," A161 (2:25), with "chaotic" meaning random, unpredictable, or pattern-less, *see* A164 (7:22-62), A166 (11:63-67), A167(14:19-22).  But the specification describes multiple ways to achieve that end result, including two-stage mechanisms with complex interactions.  A161 (2:27-3:15), A162(4:62-65),

– 41 –

A163 (5:13-19).  It certainly does not suggest that the pendulum body of the broadest claim (claim 1) must move chaotically in ***all three*** dimensions around the support member.  To the contrary, the patent teaches that a variety of "support members" may be used, including a "rod, axle, [or] wire" that is "rigid or semi-rigid and does not move with the pendulum member."  A164 (7:19-22, 35-37); *see also* A162 (3:32-35) ("The first support member may include a rigid body (such as a wire, rod, shaft, or the like) that extends across the interior space of the housing and through a hole at the first location in the first stage pendulum member.").  It follows that even if the claimed "pivoting" must be random, the pivoting movement itself may include rotating around a fixed pin or shaft.

Of course, patentees are free to act as their own lexicographers and depart from a term's ordinary meaning.  But that requires clear language of exclusion or restriction, *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012), and no such manifest exclusion appears in the '166 patent.

The district court derived its narrow interpretation in part from claim 14 of the '166 patent, A82, but that claim actually supports giving "pivot" its ordinary meaning.  Claim 14 depends from claim 13 and further requires that the

> ***pivot hole [be] larger in diameter*** than an exterior dimension of the support member, whereby the flame body swings or pivots freely about the support element.

A172 (24:29-32) (emphasis added).  Because independent claims are broader than

their dependents, claim 13's "pivot hole" need *not* be "larger in diameter" than the support member. And when the "pivot hole" has the same diameter as the support member, the flame body will simply rotate around the support member; it will not perform the three-dimensional chaotic motion that the district court envisioned.

The district court also cited the patent's discussion of an embodiment corresponding to claim 14. A82. In particular, the specification describes an embodiment in which the hole in the pendulum body is "sufficiently larger than the diameter of support wire 113" such that the pendulum can "flutter" as well as "move back and forth." A164 (8:7-16). But that discussion describes an ***optional embodiment***. *See also* A162 (3:39-44), A164 (7:22-37) (likewise describing the ***option*** of using a flexible string or thread with slack to allow greater chaotic movement, but recognizing that in other embodiments a rigid, unmoving support is preferable). Claims 1 and 13 do ***not*** require that the hole in the body be substantially larger than the diameter of the support member and thus do ***not*** require "fluttering" or wobbling as well as movement back and forth. The district court committed the classic error of importing a limitation from a sometimes-preferred embodiment into a claim broadly drafted to cover a wider range of embodiments.

Notably, when Disney wanted its claims to require chaotic motion in a particular number of dimensions, it said so. Claim 16 of the related '355 patent, which has a similar specification and is also asserted in this lawsuit, requires that "the

motion engine generates chaotic motion at the coupling member in at least two dimensions." A895 (16:46-48). Claim 1 of the '166 patent does not recite chaotic motion at all, but even if "pivoting" must include some sort of chaotic motion, it does not require full freedom of movement in *three* dimensions, as the district court demanded. As '355 claim 16 reflects, the specification also describes chaotic motion in *two* dimensions, and '166 claim 1 should not be read to require more.

Contrary to the district court's suggestion, A83-84, the '166 specification does not exclude gimbal structures. Figure 1 shows one kind of pivotal mounting (a pendulum body hanging from a wire through the pivot hole), but the written description observes that "[o]ther mechanisms, such as a gimbal or other joint[s], allowing multi-axis movement may be used as an alternative to the pivotal mounting provided by the combination of the pivot hole 112 and support element 113" shown in Figure 1. A164 (7:58-62). Claim 1 thus covers two-axis gimbal mechanisms as long as they include a flame support element that passes through the hole in the body and the body is free to pivot when supported by the support element.

The prosecution history confirms that being free to "pivot" around a support element does not require an ability to produce chaotic motion in three dimensions. When pursuing the parent '869 patent, which shares the same written description and is also asserted in this lawsuit, Disney included a claim requiring, among other things, a pendulum member "pivotally mounted within the interior space using a

pendulum support member that extends through a hole in the pendulum member."
*See* A2232-33.  The PTO rejected that claim as anticipated by the '455 patent.  *Id*.
Disney did not traverse the rejection or otherwise contend that the '455 patent did
not disclose a pendulum that pivoted around a support member.  Instead, Disney
accepted the rejection and amended the claim to add other limitations that do not
appear in claim 1 of the '166 patent.  The PTO thus found, and Disney did not
contest, that "pivoting" in this family of patents includes rotational pivoting as
disclosed in the '455 patent.  To allow Luminara to distinguish the pivoting in
claim 1 from the pivoting in the '455 patent would improperly permit it to retract
Disney's concession and recapture surrendered claim scope.  *See Integrated Tech.
Corp. v. Rudolph Tech., Inc.*, 734 F.3d 1352, 1357-58 (Fed. Cir. 2013) (where
patentee amends to overcome patentability rejection, it presumptively "surrender[s]
the territory between the original and issued claims").

In denying a stay, the district court discounted this prosecution history
because the '455 patent appeared in the prosecution file for the '166 patent and the
examiner nonetheless issued the '166 patent.  A136.  The reality, however, is that
busy examiners sometimes overlook prior art and forget earlier rejections.  It is not
surprising that the examiner did so in this case, in which some 60 references were
of record.  In any event, such an oversight does not permit an applicant to recapture
scope disclaimed during prosecution of a parent patent.  To do that, an applicant

must clearly inform the examiner what scope it is attempting to recover in the child application. *See Hakim v. Cannon Avent Grp. PLC*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007) (disclaimer applied where applicant informed examiner it was broadening claims but did not identify the particular limiting feature that it intended to recapture). Disney did not do so.

To the extent the district court relied on expert testimony to contradict the ordinary meaning of "pivot" and the intrinsic record, A82-84, it erred. Courts may consider expert testimony, but they should "discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history ....'" *Phillips*, 415 F.3d at 1318. Here, the district court cited the declaration of Luminara's expert, Dr. Brown, but Dr. Brown misread the specification. Dr. Brown contended that "each pendulum is suspended using a V-shaped wire passing through a larger hole," providing a "loose suspension" allowing movement in four directions and three dimensions. A1548-49 ¶¶ 8-9. But as discussed above, claim 1 includes no larger-hole suspension requirement. Moreover, when describing the "pivotal support" more generally, the '166 patent makes clear that the support element need ***not*** be a loose V-shaped wire and instead may be a rigid, unmoving rod or axle. A162 (3:32-35), A164 (7:14-22, 35-57). Simply put, Dr. Brown invented a non-existent claim limitation, and the district court erred in following his lead. This Court, of course,

owes no deference when a district court relies on an expert's misreadings of the intrinsic evidence. *Teva*, 135 S. Ct. at 841-42.

### 2. Claim 1 is invalid whether or not it requires chaotic motion in three dimensions

Under the correct claim construction, under which a pendulum body free to rotate around a support member qualifies as a body free to "pivot" around that support member, there is not just a substantial question about claim 1's validity—the claim will surely be declared invalid. The '455 patent undisputedly disclosed "[a] pendulum member for generating a flickering flame effect," A1395 (Abstract), comprising "a body with upper and lower portions," A1399 (Fig. 6), A1403 (Fig. 12), and "a flame silhouette element extending outward from the upper portion of the body," A1410 (6:47-49), A1399 (Fig. 6), A1403 (Fig. 12). The only dispute was whether it disclosed "a hole in the body below the flame silhouette element, wherein the hole is configured to receive a flame support element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element." But under the correct construction, it surely did: in the '455 gimbal structure, rod 18 and pins 22 and 23 ran through holes in the columnar pendulum body, supported that body, and allowed it to freely rotate on two axes. *See* A1409 (4:1-3, 28-39), A1410 (5:1-12, 6:48-52), A1398 (Fig. 4), A1399 (Fig. 6), A1403 (Fig. 12).

Even if claim 1 is read to require chaotic motion in at least two dimensions, the '455 patent still anticipated it. The '455 patent plainly showed two-dimensional rotation around the rod and pins, and it specifically explained that the body of the pendulum was "articulated by a natural and *chaotic* external or internal force (such as wind, magnetism)" and that the integrated reflector/ diffuser (the flame silhouette) "move[d] *randomly* simulating blowing in the wind." A1410 (6:53-62) (emphasis added).

Finally, even under the district court's construction requiring chaotic motion in three dimensions, claim 1 was still anticipated or at least obvious. The '455 patent's gimbal mechanism allowed random rotation around each of two pins placed at 90° angles, producing three-dimensional movement around the two axes. A designer preferring even more flexibility could simply loosen the mountings, use looser wires instead of a rigid rod and pins, or use the three-axis gimbal design known since antiquity. Nothing in the '166 patent suggests that its loose-wire embodiment was an inventive advance, and the patent recognized that multi-axis gimbals were an alternative to the hanging wire design depicted, A164 (7:58-62).

## II.    Luminara failed to prove irreparable injury from any infringement

Reversal is also required because Luminara failed to show irreparable harm as a matter of law. A mere showing that the plaintiff may lose sales to an accused infringer is not enough to establish irreparable harm; the plaintiff must show that

monetary damages could not adequately compensate for its potential losses. *Apple, Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1368 (Fed. Cir. 2013); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 134 S. Ct. 1621 (2014) (Roberts, C.J., in chambers) (denying injunction pending Supreme Court review on ground that patentee could recover damages for any infringement during that review). Here, Luminara had no proof of damage beyond a specific list of customers whose historical relationships with Luminara and Liown made any possible harm readily quantifiable.

### A. Past damages are compensable, and Luminara did not prove future price erosion or lost market share

In attempting to show irreparable injury, Luminara alleged loss of market share and price erosion, but it submitted only (a) contracts with two distributors that had switched their business to Liown, and (b) a declaration from its President claiming reputational injury without any support from surveys, expert reports, or economic data. A828-66. That evidence was legally insufficient.

The district court agreed that Luminara failed to show that it will suffer future irreparable harm from lost market share because it presented no evidence to define the market for flameless candles or prove its market share. A90-92. The court also correctly recognized that the record lacked evidence of likely future price erosion. A98. The court instead relied on *past* price erosion, citing "hand-picked examples" of price cuts and a statement by Liown's CEO that Luminara sold to large retailers at lower prices than to small gift shops in the same year that

Liown began selling moving flameless candles in the United States. A98-99. This evidence was inadequate as a matter of law to establish past price erosion of any kind—much less price erosion uncompensable by money damages.

As a matter of law, a "patentee's price erosion theory must account for the nature, or definition, of the market, similarities between any benchmark market and the market in which price erosion is alleged, and the effect of the hypothetically increased price on the likely number of sales at that price in that market." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). Luminara presented no evidence on the scope of the market for its product or its share of that market, much less the sort of economic evidence of causation that this Court requires. Luminara thus failed as a matter of law to establish past price erosion, much less a likelihood of future price erosion.

Indeed, the skimpiness of Luminara's evidence illustrates the wisdom of this Court's requirement of proof of market definition, market share, and future sales effects. There are just three examples of Liown prices in the record, and Luminara provided no date for any of them. A876; A1184; A1187. As noted above, the scant evidence of Luminara's prices referred only to a price at some unspecified point in an entire calendar year (2014) and compared prices between different channels (large retailers vs. small specialty shops). A98 (citing A1473 ¶ 7). This

evidence permits no conclusion about what occurred in any market segment at any time, and certainly did not justify a finding of likely future harm.

Apparently realizing that it could not prove market-wide impacts, Luminara claimed that the alleged infringement had adversely affected its relationships with specific customers. Indeed, Luminara sought and received an injunction limited to existing customers. A113; A123-24. In granting relief, the district court cited Luminara's loss of two distributors with which it previously contracted: defendants GKI and TLG. A100-01; A120-22. But losses of particular customers with records of past purchases are readily quantifiable, compensable with damages, and cannot justify emergency relief. *See Active Video Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1338-39 (Fed. Cir. 2012) (clear error to find lost sales that caused irreparable harm when number of and fees paid by lost customers to which infringer offered service were quantifiable). The fact that the injunction applies only to known customers that previously purchased from Luminara confirms that that the injunction will at most prevent measurable injuries that do not qualify as irreparable harm.

### B. The district court improperly found trademark confusion without supporting evidence on the relevant factors

The district court also found irreparable harm based on the possibility of confusion between the "Luminara" trade name and Liown's "Illuminaires" trademark. A95-97. That finding, too, was unsupported.

– 51 –

To be sure, "Luminara" and "Illuminaires" contain the same root: "lumin." But it is neither surprising nor disturbing that two companies selling artificial candles would choose names with that root:  the Latin word "lumen" and root "lumin-" mean "light."  Nor is it surprising that Liown would pick "Illuminaires," which calls to mind "illuminate" and "luminary" (literally an artificial light and figuratively a leading light).

If Luminara wanted to rely on trademark confusion, it needed to prove up that claim with substantial evidence.  Luminara did not.  It failed to present substantial evidence on critical factors for determining likelihood of confusion under Eighth Circuit law such as the strength of its mark (distinctiveness or level of recognition in the marketplace), intent to pass off, incidents of actual consumer confusion, and the degree of care customers that exercise in the market for flameless candles.  *See ConAgra, Inc. v. George A. Hormel & Co.*, 990 F.2d 368, 369-70 (8th Cir. 1993).  "In deciding whether there is a likelihood of confusion, 'each factor must be considered and excessive weight should not be given to any one factor to the exclusion of others.'"  *Id.* at 371 (citation omitted).  Here, the district court ignored these factors; it simply, and mistakenly, conflated similarity between names with likely confusion in the marketplace.[4]

---

[4] The district court dismissed Liown's evidence that there were many similar

(footnote continued on next page)

### C.    The district court's findings of reputational injuries to Luminara and Disney were legally flawed and factually unfounded

The district court also found irreparable harm in the form of injury to Disney's "reputation as an innovator" and Luminara's "reputation and goodwill" as Disney's licensee.  A92-95.  Specifically, the district court found harm to Luminara's reputation as (i) exclusive licensee under the patents and (ii) enforcer of its intellectual property rights.  *Id.*  But any such injuries were both unproven and legally irrelevant.

To begin with, the irreparable harm factor considers harm to the ***plaintiff***.  Because Luminara chose not to join Disney as a plaintiff, Luminara cannot rely on harm to Disney.  Moreover, the supposed reputational harm to Disney was speculative.  Luminara did not even allege a threat of injury to Disney; the district court surmised one on its own.

As to the supposed harm to Luminara's reputation as exclusive licensee, there was no supporting evidence beyond two bare assertions by a principal of

---

marks for candle products containing the word-element "lumen" or the word "illuminate" on grounds that those products did not practice the patent.  A95 n.11.  But as discussed above, Luminara did not show that the market is limited to products that practice the patent, as opposed to, say, artificial candles generally.  The preliminary injunction order refers to "the overall market of flameless candles," A91, which by its terms includes stationary flameless candles that lack the accused feature.  There was no basis to conclude that the "Luminara" mark has a strong secondary meaning or that it is associated with the patented technology.

Luminara that were insufficient both legally and factually. First, Luminara's President asserted that Liown products were of inferior quality, but the district court itself refused to credit that assertion. A95. Second, Luminara's President asserted that Liown's sales would cause "immeasurable lost goodwill and market share value by weakening Luminara's brand as the exclusive source for the Artificial Flame Technology." A832. But that was nothing more than a conclusory statement of injury to the patentee, which this Court held insufficient in *Apple Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). Indeed, an assertion of loss of "reputation as an exclusive licensee" merely recharacterizes an accused infringer's entry into the market as a reputational harm. That is a far weaker claim than the dilution of design distinctiveness that Apple asserted. *See id.* at 1325 (without evidence of an adverse effect on customers' perception of Apple's patented design, there was no basis to find harm to Apple's reputation as an innovator). Furthermore, if a loss of reputation for ***exclusivity*** sufficed, any known infringement would presumptively cause irreparable reputational injury. This Court rejected that proposition in *Apple v. Samsung* when it held that reputational injury from infringement must be proven, not simply assumed. *Id.* In this case, there is no reason to think that any infringement would damage either Luminara's name or Disney's.

Finally, although Luminara never asserted harm to its reputation as a patent enforcer and there was no evidence of such harm, the district court hypothesized such injury based on language in *Douglas Dynamics LLC v. Buyers Products Co.*, 717 F.3d 1336 (Fed. Cir. 2013). *See* A94; A146. But in that case, the plaintiff had a reputation as a superior manufacturer and innovator and the defendant's reputation was inferior in both respects. 717 F.3d at 1344-45. In this case, the district court made no such findings, and the facts would not have supported them. Again, irreparable injury must be proven, not assumed.

### D.    Luminara did not show the required nexus between any infringement and any irreparable harm

In *Apple v. Samsung*, this Court also made clear that a patentee seeking a preliminary injunction must prove a causal nexus between the infringement and the claimed irreparable harm. 678 F.3d at 1324. In particular, the patentee must show the patented feature drives demand for the infringing product, as "sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Id.* (affirming finding of no irreparable harm); *see also Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012) (reversing preliminary injunction due to lack of irreparable harm).

Here, Luminara failed to prove that the presence of the accused feature affected its sales. The '166 patent recognizes that moving flameless candles existed in the prior art; it merely claims an improvement to the method for simulating

flame that allegedly creates a more convincing effect.  A161 (1:66-2:13, 2:23-37).  Assuming that customers for products such as flameless candles base their purchasing decisions on how the flame silhouette pivots, as opposed to say, price, shape, or color, is a far greater leap than assuming that design features of Apple's iPhone products drove sales.  Indeed, the Court in *Apple v. Samsung* found that even evidence of some loss of market share due to the infringement would not be enough for the required "clear showing" of a risk of ***irreparable*** harm.  678 F.3d at 1324-25.  Here, Luminara did not prove even that much:  it offered no evidence of any effect on its market share.

Because there was no evidence defining a relevant sub-market, the preliminary injunction order did not refer to a market limited to patent products, but instead referred to "the overall market of flameless candles."  A91.  The district court thus assumed that the relevant market is for any kind of flameless candle, and accordingly that the patented and accused products compete with numerous non-infringing products.  But that can be true only if non-patented attributes drive demand.  In any event, Defendants were not obliged to show what drives demand.  ***Luminara*** bore the burden to define a market and show that the patented feature drove demand, and Luminara failed to offer any evidence on these points.

The sole record evidence on which the district court relied to find the required causal nexus was a loss of market exclusivity—that Liown's sale of

allegedly infringing candles "caused Luminara to no longer be the only source for customers and distributors seeking" patented candles. A144. But the same would be true whenever a competitor infringes. The district court's theory thus presumes that the patented feature caused irreparable harm from the fact of infringement—the very notion that this Court rejected in *Apple v. Samsung*. 678 F.3d at 1324.

Luminara has contended that Liown conceded a nexus by asserting that Liown and its customers will suffer irreparable harm if unable to sell the accused products. But Liown's evidence showed only that purchasers prefer Liown's products, not that the patented feature was the reason for that preference. As recognized in *Apple v. Samsung*, the fact that the plaintiff's product has lost sales to an infringing product is just the starting point for the nexus analysis: the plaintiff must also show that the patented feature was what drove demand. *Id.* ("[S]ales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature."). In this case, Luminara utterly failed to make that showing.

## III.    The balance of hardships and the public interest favor Defendants

The district court also erred in analyzing the remaining two factors in the preliminary injunction calculus: the balance of hardships and the public interest.

A.    **Luminara did not show it would suffer irreparable harm, and the district court recognized that the injunction will substantially harm Defendants**

The district court found that the balance of hardships "favors neither party" because "the harms to Luminara would likely be substantial and irreparable if a preliminary injunction was denied … and the harms to Liown would be similarly substantial and irreparable if a preliminary injunction was granted." A105. Once the errors identified above are taken into account, however, the balance tips heavily in favor of Defendants.

The district court was well grounded in finding substantial and irreparable harm to Defendants. The injunction bars Liown from selling all moving flameless candles to 15 major customers—a severe limitation on its business. *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) ("The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating."); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568, 1570 (Fed. Cir. 1993) (balance of hardships favored defendant where preliminarily enjoined product was critical to its business). If not stayed or lifted, the injunction would cause Liown                    *REDACTED*

. A1471-73. In addition, co-defendant distributors GKI and TLG would                    *REDACTED*

*REDACTED*                    . A2259; A1885-86; *see also* A140

("The additional evidence recently submitted about … expected lost profits, only bolsters the Court's determination that the Defendants would suffer substantial harm if enjoined.").

By contrast, the district court's finding of irreparable harm to Luminara was legally flawed and factually unsupported.  When that false weight is removed from the scale, the balance of hardships tips strongly toward Defendants.  Importantly, lifting the injunction will not drive Luminara out of the marketplace; it will remain free to compete with Liown, and it will have a damages remedy in the unlikely event that Defendants are ultimately found to infringe a valid patent.  Luminara apparently wants to force GKI, TLG and other Liown customers to buy candles from it, but unrebutted evidence showed that Luminara lost GKI and TLG as customers due to Luminara's own failure to deliver products on time and in safe condition—and that Luminara will not regain that lost business even if the injunction remains in place.  A2260-61; A1886-88 ¶¶ 3-6.

### B.   The public interest favors competition, especially when the claimed invention is likely to be found invalid

In finding that the public interest favored an injunction, the district court reasoned:

> Here, because proof of validity and infringement are strong, the public interest is served by a preliminary injunction that protects a patent owner's property rights, and the public's interest in permitting full and free competition is not squarely at stake.

A107.  The court further suggested that the injunction would serve the public interest because "it would enforce Luminara's valid trademark and could prevent consumer confusion in the marketplace between the 'LUMINARA' brand and the 'Illuminaires' brand." *Id.*

That analysis was mistaken.  As shown above, Luminara has no standing to sue, and it has not established likely infringement of a valid patent.  The public interest in full and free competition is therefore squarely at stake.  As to the district court's trademark confusion rationale, Luminara did not seek an injunction based on its trademark infringement claim, and the district court never analyzed the fact-intensive factors necessary to find trademark confusion.

## CONCLUSION AND RELIEF REQUESTED

The preliminary injunction should be lifted, and the district court should be directed to dismiss Luminara's infringement claim for lack of jurisdiction.  With the critical holiday season approaching, Defendants ask the Court to dissolve the injunction immediately, with opinion to follow.  *Cf. Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*, No. 2015-1139, Dkt. 72 (Fed. Cir. Jan. 9, 2015) (vacating injunction pending appeal on day of argument, with opinion following).

Respectfully submitted,

PERKINS COIE LLP                    WINTHROP & WEINSTINE, P.A.

by /s/Dan L. Bagatell              by /s/Devan V. Padmanabhan

   Dan L. Bagatell                 Devan V. Padmanabhan

Counsel for Defendants–Appellants

Order Denying Motion to Dismiss for Lack of Standing

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Luminara Worldwide, LLC, | Case No. 14-cv-3103 (SRN/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd., Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden & Pet Co., | **[FILED UNDER SEAL]** |
| Defendants. | |

Daniel R. Hall, Joseph W. Anthony, and Courtland C. Merrill, Anthony Ostlund Baer & Louwagie PA, 90 South 7th Street, Suite 3600, Minneapolis, MN 55402; Ryan S. Dean, Fish & Tsang LLP, 2603 Main Street, Suite 1000, Irvine, CA 92614, for Plaintiff.

Devan V. Padmanabhan, Erin O. Dungan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., The Light Garden, Inc., and Central Garden & Pet Co.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Michael J. Pape, Fish & Richardson PC, 60 South 6th

Street, Suite 3200, Minneapolis, MN 55402, for Defendant BJ's Wholesale Club, Inc.

Lukas Dustin Jonathon Toft and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendant Ambient Lighting, Inc.

---

SUSAN RICHARD NELSON, United States District Judge

## I.     INTRODUCTION

This matter is before the Court on (1) Defendants Liown Electronics Co. Ltd., Shenzhen Liown Electronics Co. Ltd., and Liown Technologies/Beauty Electronics, LLC's (collectively, "Liown" or the "Liown Defendants") Motion to Dismiss First Amended Complaint [Doc. No. 18]; (2) Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss First Amended Complaint [Doc No. 46]; (3) The Liown Defendants and Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 94]; (4) Defendant Tuesday Morning Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 111]; (5) Defendant Central Garden & Pet Co.'s Motion to Dismiss Second Amended Complaint [Doc. No. 113]; (6) Defendant Zulily, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 114]; (7) Defendant The Light Garden, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 116]; (8) Defendants BJ's Whole Sale Club, Inc., Smart Candle, LLC, and Von Maur, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 128]; and (9) Defendants' Motion to Dismiss Third Amended Complaint [Doc. No. 135].  For the reasons set forth below, the Court denies all nine motions.

**A2**

## II.    BACKGROUND

### A. The Parties and Claims

Originally, two Plaintiffs, Candella, LLC (hereinafter, "Candella") and Luminara Worldwide, LLC (hereinafter, "pre-merger Luminara"), filed this patent infringement lawsuit against Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd. (hereinafter, "the Liown Defendants"). (See Compl. ¶ 12 [Doc. No. 1].)  The Liown Defendants are all companies formed under the laws of the People's Republic of China, and have places of business in China.  (See Third Am. Compl. ¶ 8 [Doc. No. 131].)

Until December 31, 2014, Candella was a California limited liability company that was the "exclusive licensee possessing all substantial right, title and interest to patents issued by the United States Patent and Trademark Office for inventions relating to flameless candles."  (See id. ¶ 5.)  Pre-merger Luminara was a Delaware limited liability company that "obtained from Candella the exclusive right to make, use and sell products utilizing Candella's licensed flameless candle technology."  (See id. ¶ 6.)  Candella owned 50% of pre-merger Luminara, and Candella's only revenues came from 60% of pre-merger Luminara's profits from selling the patented products at issue.  (See Merrill Decl., Ex. 14 "Motion Hearing Transcript" at 11:5–6 [Doc. No. 37-4].)

On September 10, 2014, Plaintiffs filed a First Amended Complaint, which amended the list of Defendants and the list of patents-in-suit.  (See generally First Am. Compl. [Doc. No. 13].)  The newly added Defendants included Boston Warehouse Trading Corp. and Abbott of England (1981), Ltd.  (See generally First Am. Compl.

3

**A3**

[Doc. No. 13].)  Boston Warehouse Trading Corp. and Abbott of England (1981), Ltd. both import into the United States and sell throughout the United States flameless candles manufactured by Liown, which allegedly infringe Plaintiffs' patents.  (See id. ¶¶ 9, 10.)

Plaintiffs alleged three counts against Defendants.  In Count I, they stated a claim for patent infringement, alleging that Defendants "have been, and still are, directly infringing, either literally or under the doctrine of equivalents," claims of four patents: (1) United States Patent No. 7,837,355 ("the '355 patent"), (2) United States Patent No. 8,070,319 ("the '319 patent"), (3) United States Patent No. 8,534,869 ("the '869 patent"), and (4) United States Patent No. 8,696,166 ("the '166 patent").  (See id. ¶ 16 [Doc. No. 13].)

In Count II, Plaintiffs sought a declaratory judgment of non-infringement.  (See id. ¶¶ 21–34.)  Specifically, they sought a judgment from the Court that its candles do not infringe any valid claim of the Liown Defendants' U.S. Patent No. 8,789,986 ("the '986 patent").  (See id. ¶ 33.)  Plaintiffs claim that the '986 patent is based on the exact Artificial Flame Technology that Candella disclosed to the Liown Defendants in a non-disclosure agreement.  (See Pl.'s Mem. at 16 [Doc. No. 36].)  Because Liown threatened to enforce its '986 patent against Plaintiffs, and because Plaintiffs argue that the intellectual property underlying the '986 patent was stolen from them, Plaintiffs seek a declaratory judgment of non-infringement.  (See First Am. Compl. ¶ 33 [Doc. No. 13].)

In Count III, Plaintiffs sought a declaratory judgment of invalidity.  (See id. ¶¶ 35–39.)  Specifically, Plaintiffs argue that because the intellectual property underlying the '986 patent was stolen from them, the '986 patent is "invalid for failure to satisfy one or

4

**A4**

more of the conditions of patentability set forth in Title 35 of the United States Code."
(See id. ¶ 37.)

## B. Underlying Contracts

### 1. Disney-Candella Contract

Candella became the "exclusive licensee" for "Artificial Flame Technology" as a result of entering into an Intellectual Property License Agreement ("Agreement") with Disney Enterprises, Inc. (hereinafter, "Disney"). Candella and Disney first entered into the Agreement in 2008. (See Poley Decl., Ex. E "2008 Candella-Disney Agreement" [Doc. No. 22-2].) The parties renewed and updated their Agreement in 2012. (See Poley Decl., Ex. H "2012 Candella-Disney Agreement" [Doc. No. 22-4].)

Disney and Candella have updated the 2012 Agreement through four separate amendments. (See Poley Decl., Ex. I "First Amendment" [Doc. No. 22-4]; Merrill Decl., Ex. 1 "Second Amendment" [Doc. No. 37-1]; Ex. 3 "Third Amendment" [Doc. No. 37-1]; Ex. 2 "Fourth Amendment" [Doc. No. 37-1].) Each amendment consecutively builds on the others. Therefore, in order to interpret the Agreement accurately, the Court references the 2012 Agreement, and all four amendments, as needed.

When the parties first executed the 2012 Agreement, the licensed patents covered by the Agreement included the Disney Patents related to the Artificial Flame Technology, "including, but not limited to [the '455 patent], together with any and all corresponding patents." (See Ex. H, "2012 Agreement" at 2 [Doc. No. 22-4].) Therefore, any other patents that Disney had, which related to the Artificial Flame Technology, were automatically subject to this Agreement and its subsequent amendments. As of

5

**A5**

September 9, 2014, the date the Fourth Amendment was fully executed, Disney's

Artificial Flame Technology patents included (1) United States Patent No. 7,837,355

("the '355 patent"), (2) United States Patent No. 8,070,319 ("the '319 patent"), (3) United

States Patent No. 8,534,869 ("the '869 patent"), and (4) United States Patent No.

8,696,166 ("the '166 patent").  (See Merrill Decl., Ex. 2 "Fourth Amendment" at 5 [Doc.

No. 37-1]; see also Third Am. Compl. ¶ 20 [Doc. No. 131].)  The parties refer to these

four patents as the "Schedule A Patents" or the "Disney Patents."

Pursuant to the 2012 Agreement and the four subsequent amendments, Candella

was assigned a bundle of rights, and Disney retained certain rights.  Below, the Court

separately outlines the rights of Candella and Disney.

### a.  Candella's Rights

Pursuant to the 2012 Agreement, Disney granted Candella the right to a

"worldwide . . . exclusive license, with the exception of Disney's reserved rights in

Section 2.2 . . . only to the limited extent necessary to make, have made, use, sell, offer

for sell, and import the [patents-in-suit]."  (See Poley Decl., Ex. H "2012 Disney-

Candella Agreement" § 2.1 [Doc. No. 22-4].)  Although the Agreement initially provided

that this exclusive license was non-assignable, non-sublicensable, and non-transferable,

the First Amendment to the Agreement omitted this limitation from the Agreement. (See

Poley Decl., Ex. I "First Amendment" §§ 2(b), (c) [Doc. No. 22-4].)

Now, Candella has the right to "grant sublicenses under the Schedule A Patents

provided that as to each sublicense, Candella provides [Disney] with at least thirty (30)

days prior written notice of an intention to grant the sublicense including the identity of

the sublicensee and a copy of the sublicense agreement to be executed, and provides

[Disney] with a fully executed copy of the sublicense agreement . . . within thirty (30)

days after its execution." (See id. § 2(b).) Candella also has the right to assign its rights

"with the consent of [Disney]," but Disney cannot unreasonably withhold its consent.

(See id. § 2(c).) Candella must also provide Disney "with a fully executed copy of the

assignment agreement . . . within thirty (30) days after its execution." (See id.)

   Additionally, Candella has the "sole and exclusive right to enforce the [patents-in-

suit] against third parties, including the sole and exclusive right to sue . . . in its own

name and without joining [Disney], for past, present or future infringement of the

[patents-in-suit].... Candella agrees to provide [Disney] with at least thirty (30) days

prior written notice of an intention to sue a third party including the identity of the third

party." (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)

Although Candella must provide Disney with prior written notice of its intent to sue,

Candella does not need prior written approval from Disney in order to sue an alleged

infringer. (See Poley Decl., Ex. I, "First Amendment" § 13(d) (stating that section 13.2

of the 2012 Agreement, which mandated that Candella receive prior written approval

from Disney in order to sue, no longer applies) [Doc. No. 22-4].)

   If Candella successfully sues for patent infringement, Disney is entitled to REDACTED

▮▮▮▮ royalty on monies paid to Candella via settlement or judgment. (See id. § 3(b).)

Candella also agreed to keep Disney "fully informed of the progress of any litigation

relating to Candella's enforcement" of the patents-in-suit; "to promptly provide [Disney]

with copies of all substantive papers filed and orders issued in such litigation;" and to

7

**A7**

provide Disney "with a reasonable opportunity to review and provide comments on any papers prior to being filed by Candella that relate to a challenge to the validity or enforceability of the [patents-in-suit]." (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)  Although the Agreement provides for Disney to remain apprised of the state of the litigation, Candella still has the "sole and exclusive right to sue" and has the "discretion to select legal counsel to represent itself and [must] pay all legal fees and costs of enforcement."  (See id.)  Also, Disney agreed to be bound "by any judgment that may be rendered in any suit with respect to the validity, the enforceability, and infringement" of any of the Schedule A Patents.  (See id.)

The Agreement is set to expire on April 30, 2020, but either party is permitted to terminate the Agreement if both parties agree to do so, or if either party "material[ly] breach[es]" a term of the contract.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" §§ 7.2.1, 7.2.2 [Doc. No. 22-4].)  Candella may also choose to renew its license for the remainder of the lives of the patents, plus six years.  (See Merrill Decl., Ex. 1 "Second Amendment" § 2 (amending § 7.1 of the 2012 Disney-Candella Agreement) [Doc. No. 37-1].)

### b.  Disney's Retained Rights

Although Candella acquired several rights through the 2012 Agreement and subsequent amendments, Disney also retained certain rights.  For instance, Disney retained formal "ownership" of, or "title to," the patents-in-suit.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 9.1 [Doc. No. 22-4].)  Disney also retained responsibility for maintenance of the patents-in-suit.  Specifically, it controlled and

remained responsible for "all costs and expenses related to the preparation, prosecution,
maintenance and all other activities related to the patent applications and issued patents
associated with the Licensed Intellectual Property (as applicable)." (See id. § 12.)

Pursuant to the Agreement, Disney also retained the right to receive royalty
payments:



equal to REDACTED of Licensee's Gross Revenue for all Licensed
Products manufactured during the Term (the "**Royalty Payments**"). The
Royalty Payments [were] reduced to REDACTED for all Licensee's
cumulative Gross Revenue in excess of REDACTED
and [were further] reduced to REDACTED for all
Licensee's cumulative Gross Revenue in excess of REDACTED
."

(See id. § 5.1) (bold in original). Candella also was required to make additional REDACT
royalty payments to Disney on any "'Sub-licensee's Gross Revenue' from any
products made or sold by or for the sublicensee under the sublicensee granted by
Candella." (See Poley Decl., Ex. I, "First Amendment" § 3(a) [Doc. No. 22-4].)
Additionally, as noted above, Disney also had the right to receive REDACTED royalties
on any monies paid to Candella to satisfy a settlement or judgment as a result of litigation
Candella entered to enforce the patents-in-suit. (See id. § 3(b).)

Most importantly, Disney retained the nonexclusive right for itself, and its
Affiliates, to "make, have made, use, sell, offer for sale and import the Licensed
Products, within and outside the Product Categories" throughout the world. (See Poley
Decl., Ex. H, "2012 Disney-Candella Agreement" § 2.2 [Doc. No. 22-4].) The
Agreement defined the term "Affiliate" to mean:

any entity controlling or controlled by or in common control with a Party,

9

**A9**

where "control" is defined as the ownership of at least 50% of the equity or beneficial interest of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity.

(See id. § 1.)  Furthermore, for purposes of determining which entities retained the right to make, use and sell the products at issue, "the term 'Affiliate' [did] not include an entity operated under license from the Walt Disney company where such license [was] only a license to Artificial Flame Technology."  (See id. § 2.2.)  In other words, Disney was not permitted to license the Artificial Flame Technology to a company merely for the purposes of licensing the patents.

## 2.  Candella-Luminara Contract

After acquiring the rights outlined above, Candella entered into an Exclusive Sourcing and Distribution Agreement with pre-merger Luminara on October 6, 2010, which was later replaced with an agreement dated March 31, 2011.  (See Pl.'s Mem. at 7 [Doc. No. 36].)  On February 3, 2014, Candella, the Principal, and pre-merger Luminara, the Distributor, entered into an Amended and Restated Exclusive Sourcing and Distribution Agreement (hereinafter, "the Sublicense"), which superseded and replaced any prior agreement between the two parties.  (See generally Merrill Decl., Ex. 4 "Sublicense" [Doc. No. 37-1].)

## a.  Pre-Merger Luminara's Rights

The Sublicense provided that pre-merger Luminara "hereby accepts appointment, as [Candella's] exclusive sourcing agent and exclusive distributor during the term of this Agreement with the exclusive right to manufacture, have manufactured, sell, promote, and otherwise distribute Products to Customers in the Territory."  (See id. § 2.01.)

10

**A10**

Candella also granted to pre-merger Luminara the "right to exclude all others, from making, using, or selling any product that uses any Intellectual Property licensed by [Candella] under the Disney License or any Intellectual Property owned or otherwise held by [Candella]." (See id.) Specifically, the Sublicense provided that pre-merger Luminara "may institute any proceedings against . . . third party infringers and join [Candella] as a plaintiff in such action." (See id. § 11.03.) According to the Sublicense:

> [e]ach party agrees to cooperate fully with the other party in any action taken against such third parties, provided that all expenses of such action shall be borne by the party instigating the action and all damages which may be awarded or agreed upon in settlement of such action shall accrue first to the party taking the action in an amount sufficient to cover all costs and expenses of such action, and thereafter to [Candella.]

(See id.) Therefore, even if pre-merger Luminara had successfully brought suit against an infringer, Candella would have the rights to all damages, excluding the amount needed to cover pre-merger Luminara's costs and expenses of litigation. Moreover, the Court notes that pre-merger Luminara's right to exclude all others was shared with Candella. The Sublicense gave Candella *and* pre-merger Luminara both the right to sue for patent infringement. (See id. § 11.03.)

Additionally, the Sublicense prohibited either party from assigning or otherwise transferring its rights and obligations "except with the prior written consent of the other party." (See id. § 16.02.) Withholding of consent need not be reasonable. (See id.) Accordingly, Candella could have chosen to unreasonably withhold consent for pre-merger Luminara to transfer its rights, and vice-versa. (See id.)

11

**A11**

Finally, the Sublicense provided that either party could terminate the Sublicense "in the event the other party [was] in material breach." (<u>See</u> <u>id.</u> § 12.02(a).) Either party could also terminate the Sublicense if the other party filed for bankruptcy or became insolvent. (<u>See</u> <u>id.</u> § 12.02(b).)

### b. Candella's Retained Rights

As for Candella's rights, the Sublicense explicitly stated that "[Candella] shall own all rights and licenses to Intellectual Property." (<u>See</u> <u>id.</u> §11.01.) Pre-merger Luminara "acknowledge[d] that under no circumstances [would] it acquire any ownership rights of any Intellectual Property owned by [Disney], which [was] licensed to [Candella] under the Disney License." (<u>See</u> <u>id.</u>)

Candella also agreed to, at its own expense, "defend [pre-merger Luminara] and its affiliates . . . against all claims that are based upon allegations (i) that the Artificial Flame Technology and any related Intellectual Property infringes any third party's intellectual property." (<u>See</u> <u>id.</u> § 9.02.) As part of this agreement, Candella promised to "indemnify" pre-merger Luminara "against any and all costs, losses, damages and expenses arising from or related to such claims." (<u>See</u> <u>id.</u>)

As noted above, Candella also retained its right to "institute any proceedings against such third party infringers and join [pre-merger Luminara] as a plaintiff in such action." (<u>See</u> <u>id.</u> § 11.03.) Although pre-merger Luminara also had the right to sue to enforce the patents, Candella kept all damages from successful litigation, excluding litigation costs and expenses. (<u>See</u> <u>id.</u>) The Sublicense also required pre-merger Luminara to pay "Distribution Payments" or royalties to Candella on its cumulative gross

12

**A12**

revenue.  (See id. § 7.01.)

Finally, in addition to having the right to terminate the Sublicense in the event that pre-merger Luminara materially breached the contract, filed for bankruptcy, or became insolvent, Candella also had the right to terminate this Sublicense if the Disney License was terminated.  (See id. § 12.02(c).)

### 3. Plaintiffs' Relationship with the Liown Defendants

Plaintiffs explain in their response brief that, in "February 2010, Candella sought a factory capable of manufacturing its flameless candles."  (See Pl.'s Mem. at 9 [Doc. No. 36].)  "On February 16, 2010, Candella entered into a non-disclosure agreement ('NDA') with Liown to facilitate negotiations for Liown to manufacture Luminara's candle."  (See id.)  In the following weeks, Candella showed Liown a prototype candle, discussed the candle's design, and shared detailed design drawings with Liown as part of the negotiations process.  (See id.)

By June 2010, negotiations with Liown "broke down," and "Liown [allegedly] surreptitiously filed a patent application in China on June 28, 2010 claiming ownership of the Artificial Flame Technology that Candella had disclosed to Liown under the terms of the NDA."  (See id.)  Liown also filed for patent protection in the United States and was eventually issued the '986 patent.  (See id.)  Plaintiffs argue that the '986 patent claims "the same features Candella disclosed to Liown under the NDA in 2010."  (See id. at 10 (citing Poley Decl., Ex. O "'986 Patent" [Doc. No. 22-6]).)  In previous patent infringement litigation, Liown conceded that the earliest conception date for the invention underlying the '986 patent was February 25, 2010.  (See Merrill Decl., Ex. 21,

"Interrogatories and Answers" at 7 [Doc. No. 37-4].)

Liown allegedly began selling flameless candles in the United States in 2012. (See Pl.'s Mem. at 10 [Doc. No. 36].) Candella filed a lawsuit against the Liown Defendants alleging patent infringement in November 2012. (See id.) Liown moved to dismiss the action on standing grounds. (See id.) Before the district court judge assigned to the case could issue a ruling, the parties entered into a settlement agreement in November 2013. (See id. (citing Merrill Decl. ¶ 3 [Doc. No. 37]).) Soon after, the '986 patent was issued on July 29, 2014. (See Poley Decl., Ex. O "'986 Patent" [Doc. No. 22-6].) A few days later, on August 5, 2014, Liown notified pre-merger Luminara by letter that it would no longer comply with the terms of the settlement because it felt it was "time to part ways." (See Merrill Decl., Ex. 22 "Letter from Liown to David Baer" [Doc. No. 37-4].) Plaintiff read this letter as Defendants threatening to sue Plaintiffs for infringing Liown's '986 patent. (See Third Am. Compl. ¶ 33 ("In the [August 2012] letter, counsel for Liown . . . threatened enforcement of future patent rights.") [Doc. 131].)

The same day, Plaintiffs filed this suit. (See generally Compl. [Doc. No. 1].) The next day, on August 6, 2014, Liown filed its own Complaint in an action titled Shenzhen Liown Electronics Co., Ltd. v. Luminara Worldwide, LLC, et al., No. 14-cv-3112 (SRN/FLN). The Liown Complaint includes two causes of action: a claim for infringement of the '986 patent against all defendants, and a claim against the Luminara Defendants for tortious interference with existing and prospective business relationships. See Shenzhen Liown Elecs. Co., Ltd. v. Luminara Worldwide, LLC, et al., No. 14-cv-

14

**A14**

3112, Second Am. Compl. [Doc. No. 60].

## C. Procedural Posture

On September 24, 2014, the Liown Defendants filed a Motion to Dismiss Plaintiffs'
First Amended Complaint [Doc. No. 18].  Liown argued that the Court lacked subject
matter jurisdiction because Candella and Luminara lacked standing to sue for patent
infringement, and because Plaintiffs' claims for declaratory judgment relating to Liown's
patent were anticipatory.  (See Liown's Mot. to Dismiss at 1 [Doc. No. 18].)

On November 7, 2014, Defendants Abbott of England (1981), Ltd. ("Abbott") and
Boston Warehouse Trading Corp. ("Boston Warehouse") also filed a Motion to Dismiss
Plaintiffs' First Amended Complaint [Doc No. 46].  Abbott and Boston Warehouse joined
Liown's Motion to Dismiss and based their motion of the Liown Defendants' briefs,
declaration, and exhibits.  (See Boston Warehouse and Abbott's Mot. to Dismiss at 1 [Doc.
No. 46].)

On January 14, 2015, Magistrate Judge Franklin L. Noel granted Plaintiffs'
Motion for Leave to File a Second Amended Complaint [Doc. No. 65].  (See MJ's Order
[Doc. No. 87].)  On the same day, Plaintiffs filed a Second Amended Complaint, in
which Plaintiffs named several additional Defendants and alleged five new counts.  (See
generally Second Am. Compl. [Doc. No. 88].)  The newly named Defendants included:
BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday
Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden &
Pet Co.  (See id.)  Like Boston Warehouse and Abbott, all of the newly added Defendants
also allegedly sold flameless candles that were manufactured by Liown, in violation of

Plaintiffs' patents.  (See id. ¶¶ 11–18.)

Plaintiffs' new claims included: Count IV, in which Plaintiffs allege that Defendant Central Garden & Pet Co., doing business through its Bethlehem Lights division GKI/Bethlehem Lighting, breached its contract with pre-merger Luminara; Count V, in which Plaintiffs allege that the Liown Defendants and Boston Warehouse tortiously interfered with a contract; Count VI, in which Plaintiffs allege that the Liown Defendants breached a non-disclosure contract; Count VII, in which Plaintiffs allege that the Liown Defendants misappropriated trade secrets; and Count VIII, in which Plaintiffs allege that the Liown Defendants, Boston Warehouse, and Tuesday Morning are liable for trademark infringement/unfair competition.  (See id. ¶¶ 50–112.)  Plaintiffs also clarified in their Second Amended Complaint that Count I, the patent infringement claim, was alleged against all Defendants, while the declaratory judgments sought in Count II and Count III were only alleged against the Liown Defendants.  (See id. ¶¶ 24–49.)

On February 11, 2015, the Liown Defendants, Abbott, and Boston Warehouse jointly filed a Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. No. 94], based on the Liown Defendants' briefs [Doc. Nos. 20, 45], declaration and exhibits [Doc. No. 22] that were initially filed in support of Liown's first Motion to Dismiss.  Relying on the same underlying briefs and exhibits, Defendants Tuesday Morning Corp., Central Garden & Pet Co., Zulily, Inc., The Light Garden, Inc.,  BJ's Whole Sale Club, Inc., Smart Candle, LLC, and Von Maur, Inc. all filed Motions to Dismiss Plaintiffs' Second Amended Complaint [Doc. Nos. 111, 113, 114, 116, 128].

On January 12, 2015, Plaintiffs filed a letter informing the Court that "Candella

16

and Luminara have merged effective December 31, 2014." (See Merrill Letter at 1 [Doc. No. 83].)  The companies merged and left "Luminara Worldwide, LLC as the surviving entity" that exists under the laws of the State of Delaware.  (See id.)  As a result of the merger, Candella was eliminated as a named Plaintiff in this case and post-merger Luminara was left as the sole Plaintiff.

Consequently, the Court ordered the parties to submit briefing to address the effect, if any, the merger had on the pending motions before the Court.  (See 1/14/15 Order [Doc. No. 85].)  Plaintiff filed supplemental briefing arguing that since "[a]t the outset of this case both Candella and [pre-merger] Luminara had standing," the merger "does not affect [post-merger] Luminara's standing."  (See Pl.'s Supp. Brief at 2 [Doc. No. 97].)  Defendants similarly argued in their supplemental brief that the merger did not affect their Motion to Dismiss because just as Candella and Luminara separately lacked standing, post-merger Luminara also lacks standing.  (See Liown's Supp. Brief at 1 [Doc. No. 112].)

Finally, on March 2, 2015, Plaintiff Luminara filed a Third Amended Complaint that reflected the merger of Candella and pre-merger Luminara in the caption of the case and within the Complaint itself.  (See Third Am. Compl. ¶ 7 [Doc. No. 131].)  Plaintiff specifically alleged that as a result of the merger, "Luminara is the exclusive licensee possessing all substantial right, title and interest to those patents to which Candella previously held exclusive rights."  (See id.)  In all other respects, however, the Third Amended Complaint was consistent with the facts and claims alleged in the Second Amended Complaint.  (See generally id.)  Defendants then collectively filed a single

17

**A17**

Motion to Dismiss Third Amended Complaint [Doc. No. 135], and based the motion on the Liown Defendants' briefing, declaration, and exhibits [Doc. Nos. 20, 22, 45]. All of these Defendants simply "join" Liown's Motions to Dismiss. Because all of the pending motions rely on the Liown Defendants' initial briefs [Doc. Nos. 20, 45], declaration, and exhibits [Doc. No. 22], the Court's discussion below engages with the arguments raised in those materials.

## III.  DISCUSSION

### A.  Standard of Review

Defendants move to dismiss the First, Second, and Third Amended Complaints, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, because Plaintiff allegedly lacks standing. Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). When considering a Rule 12(b)(1) motion, a district court may consider matters outside the pleadings. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947); Satz v.. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990). Accordingly, in this case, Plaintiff must prove that it has standing.

"A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit." See Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364

(Fed. Cir. 2010); see also Graffiti Entm't, Inc. v. Speed Commerce Inc., No. 14-cv-752

(ADM/FLN), 2014 WL 5795477, at *3 (D. Minn. Nov. 6, 2014).  Therefore, if either (1)

Candella, or (2) pre-merger Luminara had standing on the date the lawsuit was filed, then

post-merger Luminara also has standing, as it has subsumed the rights of both Candella

and pre-merger Luminara.  See ISI Int'l v. Borden Ladner Gervais, LLP, No. 98 C 7614,

2002 WL 230904, at *1 (N.D. Ill. Feb. 15, 2002) aff'd sub nom. ISI Int'l, Inc. v. Borden

Ladner Gervais LLP, 316 F.3d 731 (7th Cir. 2003) (stating that "[a] transfer of interest

includes a corporate acquisition where the original party no longer exists and a new entity

has unreservedly assumed its rights and obligations.") (citing Moore's Federal Practice

3d, § 25.30).

### B.  Candella Received "All Substantial Rights" From Disney

Defendants contend that Candella and pre-merger Luminara lack standing. (See

Liown's Mem. at 1 [Doc. No. 20].)  Defendants argue that "[t]he single most important

factor in the determination of who has standing to sue as the effective owner of a patent is

whether the owner retained any rights to practice the patent." (See id. at 18.)  Defendants

further argue that, here, Disney reserved for itself and its Affiliates the right to practice

the patent by reserving the "right throughout the world to make, have made, use, sell,

offer for sale and import" products covered by the Disney Patents without limitation.

(See Poley Decl., Ex. H § 2.2 [Doc. No. 22-4].)  Defendants explain that Disney's

retained rights are "simply incompatible with a transfer of all substantial rights under the

Disney Patents to Candella."  (See Liown's Mem. at 19 [Doc. No. 20].)  The Court

disagrees.  Below, the Court explains the standard for determining whether a party

19

obtained all substantial rights, and applies that standard to the facts of this case to find that Candella, in fact, obtained all substantial rights to the Disney Patents.

### 1. Standard for Determining Transfer of "All Substantial Rights"

As the Court noted above, post-merger Luminara has standing only if either Candella or pre-merger Luminara had standing to sue for patent infringement on the date that the Complaint was filed. The Patent Act provides that "[a] patentee" is entitled to bring a civil action "for infringement of his patent." 35 U.S.C. § 281 (2012). The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." Id. § 100(d). The United States Court of Appeals for the Federal Circuit has interpreted those provisions of the Patent Act as requiring a party bringing suit for patent infringement to have legal title to the patent.[1] See Propat Intern. Corp. v. Rpost, Inc., 473 F.3d 1187, 1189 (Fed. Cir. 2007); Sicom Sys. Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 976 (Fed. Cir. 2005); Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc); Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1130 (Fed. Cir. 1995).

"Even if the patentee does not transfer formal legal title, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights in the

---

[1]  Although procedural aspects of patent cases are typically controlled by the law of the circuit in which the case is filed, if the "issue [is] unique to patent law," then Federal Circuit case law controls. See Madey v. Duke Univ., 307 F.3d 1351, 1358 (Fed. Cir. 2002) (explaining that "[o]n procedural issues, this Court follows the rule of the regional circuit, unless the issue is unique to patent law and therefore exclusively assigned to the Federal Circuit."). As the issue of standing under the Patent Act is an issue unique to patent law, Federal Circuit precedent controls in this case. See Toshiba Corp. v. Wistron Corp., 270 F.R.D. 538, 540–41 (C.D. Cal. 2010).

patent to the transferee." See Propat, 473 F.3d at 1189 (citing Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000); Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874 (Fed. Cir. 1991)).  One of those substantial rights must include an "exclusive license" to practice the patent at issue.  See Propat, 473 F.3d at 1193.  In the event that a transferee obtains an exclusive license *and* all substantial rights, "the transferee is treated as the patentee and has standing to sue in its own name." See id. at 1189.  "Such a licensee is in effect an 'assignee' and therefore a patentee." Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1484 (Fed. Cir. 1998).  "When this happens," the de facto assignee, or exclusive licensee, "has sole standing to sue those suspected of infringing the patents' claims."  Alfred E. Mann Found. For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1359 (Fed. Cir. 2010); see Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1343 (Fed. Cir. 2006) (explaining that a patent may not have multiple separate owners for purposes of determining standing to sue).  The Federal Circuit explains that one of two possibilities exists:

> Either the licensor did not transfer "all substantial rights" to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer "all substantial rights" to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own.

Mann, 604 F.3d at 1359–60.

In patent infringement suits, a plaintiff must satisfy the requirements for both: (1) constitutional standing; and (2) prudential standing.  See Morrow v. Microsoft Corp., 499 F.3d 1332, 1338–40 (Fed. Cir. 2007).  Constitutional standing derives from a plaintiff's

21

**A21**

proprietary, and exclusionary, interest in a patent because through this interest the party may suffer a cognizable injury under <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  In contrast, prudential standing concerns which parties must participate in litigation.  <u>See Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.</u>, 248 F.3d 1333, 1348 (Fed. Cir. 2001).

In <u>Morrow</u>, the Federal Circuit explained that if a plaintiff suing for patent infringement has an exclusive license *and* "all substantial rights," then it has both (1) constitutional standing because it suffers injury-in-fact; and (2) prudential standing because it has "all substantial rights."  <u>See</u> 499 F.3d 1332, 1340 (Fed. Cir. 2007).

However, if the Court finds that the plaintiff holds only some exclusionary rights and interests, but not all substantial rights to the patent, then the party is deemed to have constitutional standing but not prudential standing.  <u>See</u> <u>id.</u>  Accordingly, in these instances, the patentee who transferred the exclusionary interests must usually be joined to satisfy prudential standing concerns.  <u>See</u> <u>id.</u> (citing <u>Indep. Wireless Tel. Co. v. Radio Corp. of Am.</u>, 269 U.S. 459, 467, 469 (1926)); <u>Propat</u>, 473 F.3d at 1193; <u>Waterman v. Mackenzie</u>, 138 U.S. 252, 255 (1891).  "The patentee is joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer."  <u>See</u> <u>Morrow</u>, 499 F.3d at 1340 (citing <u>Intellectual Prop. Dev., Inc.</u>, 248 F.3d at 1347 (indicating that joining the patentee satisfies a prudential not constitutional standing requirement); <u>Propat</u>, 473 F.3d at 1193; <u>Indep. Wireless</u>, 269 U.S. at 469 (stating that when a contract provides no express covenant by the patent owner to sue infringers, the contract necessarily includes an implied obligation

to allow use of the licensor's name, because that right is indispensable to the enjoyment of the patent monopoly)).

In contrast, nonexclusive licensees, or bare licensees, lack standing to sue for patent infringement and cannot cure their lack of standing by joining the patent owner as a plaintiff.  See Propat, 473 F.3d at 1193–94; Fieldturf, Inc. v. Sw. Recreational Indus., Inc., 357 F.3d 1266, 1269 (Fed. Cir. 2004) (explaining that because the transferee was not granted the right to enforce the patent, the agreement conveyed no more than a bare license).

The Court's inquiry, therefore, begins with determining whether the agreement between the parties constitutes a transfer of all substantial rights.  To complete this inquiry, the Court "'must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted.'"  See Mann, 604 F.3d at 1359 (quoting Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001)); see also Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1011 (Fed. Cir. 1967).

## 2.  "All Substantial Rights" Factors

The Court determines whether the original patent owner conveyed all substantial rights based on the "totality" of the rights transferred.  See AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1321 (Fed. Cir. 2009) (explaining that "[w]hile any [individual] . . . restriction[] alone might not have been destructive of the transfer of all substantial rights, their totality is sufficient to do so").

The Federal Circuit has "never purported to establish a complete list of the rights

whose holders must be examined to determine whether a licensor has transferred away sufficient rights to render an exclusive licensee the owner of a patent." Mann, 604 F.3d at 1360. Nonetheless, the Federal Circuit has compiled a non-exhaustive list of rights for determining whether a licensor has transferred "all substantial rights" to the licensee. The list includes the following factors:

> (1) the nature and scope of the right to bring suit; (2) the exclusive right to make, use, and sell products or services under the patent; (3) the scope of the licensee's right to sublicense; (4) the reversionary rights to the licensor following termination or expiration of the license; (5) the right of the licensor to receive a portion of the proceeds from litigating or licensing the patent; (6) the duration of the license rights; (7) the ability of the licensor to supervise and control the licensee's activities; (8) the obligation of the licensor to continue paying maintenance fees; and (9) any limits on the licensee's right to assign its interests in the patent.

Azure Networks, LLC v. CSR PLC, 771 F.3d 1336, 1343 (Fed. Cir. 2014), petition for cert. filed, _ U.S.L.W. _ (U.S. Feb. 12, 2015) (No. 14-976) (citing Mann, 604 F.3d at 1360–61.)

Generally, transfer of several of these rights is necessary in order for a court to determine that "all substantial rights" were transferred. See Mann, 604 F.3d at 1360–61 (finding that transferring the exclusive right to make, sell, or use products under the patents is vitally important, transferring the right to enforce the patents is frequently most important, and acknowledging the importance of transferring the right to recover licensing royalties, control over activities, limits on the duration of the rights, and limits on assigning the patents); accord AsymmetRx, Inc., 582 F.3d at 1321 (requiring joinder of licensor where contract allowed licensor to retain right to make and use invention for limited purposes, required licensee to consider public interest in granting sublicenses,

imposed restrictions on licensee's sale of invention, and permitted licensor to retain a share of royalties from sublicenses); Abbott Labs., 47 F.3d at 1132–33 (requiring joinder of co-owner because the co-owner retained a limited right to make, use or sell the invention, to bring suit if the licensee refused, and to limit assignment to only successors in business); Propat, 473 F.3d at 1190–91 (requiring joinder of co-owner because co-owner retained implicit right to use invention, right to proceeds from litigation and licensing, ability to reasonably veto licensing and litigation decisions, and to limit assignment of rights).

### 3. Candella Received "All Substantial Rights"

The Agreement provided that Candella had: (1) a proprietary interest in the patent because it had an exclusive license to make, use and sell the products; (2) the sole and exclusive right to enforce the patents-in-suit; (3) the right to sublicense; and (4) the right to assign. Based on a totality of the rights transferred, the Court finds that Candella received "all substantial rights" from Disney. The Court discusses each of these factors below.

### a. Proprietary Interest: Exclusive License to Make, Use, and Sell

For a plaintiff to have standing, "a licensee must have beneficial ownership of some of the patentee's proprietary rights." Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1034 (Fed. Cir. 1995). Here, the 2012 Agreement provides that Candella had such a proprietary right. According to the 2012 Agreement, Candella had the right to a "worldwide . . . exclusive license . . . to make, have made, use, sell, offer for sell, and

25

**A25**

import the [patents-in-suit]." (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 2.1 [Doc. No. 22-4].)

In Vaupel, the Federal Circuit explained that "[i]t is well settled that '[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions.'" See 944 F.2d at 875 (holding that exclusive licensee had all substantial rights because it had the exclusive right to make, use, and sell; the right to sue as long as the patentee was informed of the suit; and the right to sublicense with written consent from the patentee) (citing Waterman, 138 U.S. at 256.) Therefore, although the Agreement characterizes Candella's right to make, use, and sell the products, as an "exclusive license," the term "exclusive license" is not by itself dispositive of whether Candella's right was in fact "exclusive."

Defendants argue that Candella lacks standing because its rights are not exclusive, as Disney maintained the right to practice its patents.[2] (See Liown's Mem. at 23 [Doc. No. 20].) The Court disagrees. The Federal Circuit recently explained that a licensee may have an "exclusive license," even though others, like the patent owner, may retain a license to practice the patent as well. See WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 1266 (Fed. Cir. 2010). In WiAV, the Federal Circuit stated that in order "for a licensee to be an exclusive licensee of a patent," the licensee need not be "the *only* party with the ability to license the patent." See id. (emphasis original); see also Mann, 604 F.3d 1354 (Fed. Cir. 2010) (concluding that a licensee was an exclusive licensee of a

---

[2]     The Court addresses Defendants' argument in more detail in Part III(B)(4)(a).

patent despite the licensor retaining the ability to license the patent to settle lawsuits). The Federal Circuit explained that there is no "indication that the court [in Textile Productions, 134 F.3d 1481, 1484 (Fed. Cir. 1998),] created a bright-line rule that a party cannot be an exclusive licensee of a patent if others have the right to license the patent." See WiAV, 631 F.3d at 1266. Rather, the WiAV Court explained that the validity of a licensee's exclusionary right rests on the licensee's right to exclude a particular defendant, as opposed to the right to exclude all others. See id. at 1267. Therefore, Federal Circuit precedent suggests that the term "exclusive" must not necessarily imply "sole" or "only."

Here, while Disney retained the nonexclusive right to make, use, and sell the products, it affirmatively granted Candella the sole "exclusive license" to make, use, and sell the products. (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 2.1 [Doc. No. 22-4].) As WiAV demonstrates, it is not inconsistent for a licensee to have an "exclusive license," while the patentee concurrently retains a nonexclusive license. Therefore, Candella clearly has beneficial ownership of some of the proprietary rights of the patents-in-suit. See Morrow, 499 F.3d at 1339 (citing Lujan, 504 U.S. at 560–61).

In addition to having beneficial ownership of proprietary rights of the patents-in-suit, Candella also allegedly suffers injury-in-fact. See id. (citing Lujan, 504 U.S. at 560–61). Because Candella's only revenues were 60% of pre-merger Luminara's profits from selling the candles, pre-merger Luminara, and therefore Candella, was injured when customers purchased allegedly infringing candles from Defendants, as opposed to purchasing similar candles from pre-merger Luminara/Candella. (See Pl.'s Mem. at 19

27

[Doc. No. 36].)  Therefore, the Court finds that Candella has constitutional standing as an "exclusive licensee," because it has beneficial ownership in the patents and suffers an injury-in-fact.

### b.  Sole and Exclusive Right to Enforce the Patents-in-Suit

While Candella had constitutional standing as an exclusive licensee, in order to determine whether Candella obtained all substantial rights from Disney, and thus had prudential standing to bring suit without joining Disney as a co-plaintiff, the Court must analyze the other rights that Candella obtained through the Agreement.  According to the Agreement, Candella was given the "sole and exclusive right to enforce the [patents-in-suit] against third parties, including the sole and exclusive right to sue . . . in its own name and without joining [Disney], for past, present or future infringement of the [patents-in-suit]."  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)

The Federal Circuit has explained that "the right to sue for infringement . . . is particularly dispositive" when determining whether a patentee transferred all substantial rights to a licensee.  See Vaupel, 944 F.2d at 875–76.  In Vaupel, the licensee was granted the "exclusive right to make, use, and sell" the product and "the right to sue rested solely with [the licensee]."  Id. at 875–76.  The patentee only retained the right to be informed of the course of litigation on the patent.  See id. at 874.  Thus, the Federal Circuit held that the licensing agreement transferred all substantial rights to the licensee.  Id. at 875–76.  The Vaupel Court explained that the licensee had constitutional standing because it was an exclusive licensee.  See id.  As for the court's prudential standing

28

analysis, it held that the licensee's sole right to sue was particularly dispositive for finding that the licensee had prudential standing because there was no concern that a single infringer could be sued twice on the same patent. See id. Similarly, in Speedplay, the Federal Circuit held that the exclusive licensee had all substantial rights because the licensee had complete effective control over litigation and assignment decisions. See 211 F.3d at 1251–52.

Defendants contend that "[a]lthough the Federal Circuit often emphasizes the importance of the right to sue . . . the patent owner's retention of the right to practice the invention appears to be more dispositive." (See Liown's Mem. at 21 [Doc. No. 20].) The Court disagrees. Most recently, in Mann, the Federal Circuit reiterated that "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor, is the most important consideration," when determining whether all substantial rights were transferred. Mann, 604 F.3d at 1361 (citing AsymmetRx, Inc., 582 F.3d at 1320–21; Sicom Sys. Ltd., 427 F.3d at 979–80; Abbott Labs., 47 F.3d at 1132). The Mann Court explained that "[w]here the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee." Mann, 604 F.3d at 1361. The court clarified, however, that if a licensor retains the right to sue infringers, this right does not preclude a finding that all substantial rights were transferred "if the licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers." Id. (citing Speedplay, 211 F.3d at 1251).

Here, Disney relinquished any and all right to sue to Candella.  In return, Disney contracted for the right to receive prior written notice of Candella's intent to sue.  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1]; see Poley Decl., Ex. I, "First Amendment" § 13.3 (stating that section 13.2 of the 2012 Agreement, which mandated that Candella receive prior written approval from Disney in order to sue, no longer applies) [Doc. No. 22-4].)  Disney also contracted for the right to remain "fully informed of the progress of any litigation relating to Candella's enforcement" of the patents-in-suit.  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)  As part of Disney's right to remain fully informed about the litigation, Candella must provide Disney "with copies of all substantive papers filed and orders issued," and must provide Disney "with a reasonable opportunity to review and provide comments on any papers" before Candella files those papers.  (See id.)

Although the Agreement provides for Disney to remain apprised of the state of the litigation, Candella still has the "sole and exclusive right to sue" and has the "discretion to select legal counsel to represent itself and [must] pay all legal fees and costs of enforcement."  (See id.)  In fact, Disney agreed to be bound "by any judgment that may be rendered in any suit with respect to the validity, the enforceability, and infringement" of any of the patents-in-suit.  (See id.)  Therefore, the Agreement sufficiently transferred the sole, exclusive, and unfettered right to enforce the patents to Candella.  For these reasons, the Agreement between the parties is similar to the agreements between the parties in Vaupel and Speedplay.  Like the patentee in Vaupel, Disney only retained the right to be informed about any litigation.  See 944 F.2d at 874.  And like the exclusive

30

**A30**

licensee in <u>Speedplay</u>, Candella obtained complete effective control over any litigation. <u>See</u> 211 F.3d at 1250.

In contrast, this case is distinguishable from <u>Mann</u> and <u>Propat</u>, two cases in which the Federal Circuit held that all substantial rights were not transferred to the licensee. In <u>Mann</u>, the Federal Circuit held that the licensor retained all substantial rights because it retained the secondary right to sue, following the licensee's right of first refusal. <u>See</u> <u>Mann</u>, 604 F.3d at 1361–62. If the licensor exercised its right to sue, it had the "final say regarding all decisions, including decisions about whether and how to settle the litigation." <u>See id.</u> at 1361. Similarly, in <u>Propat</u>, the Federal Circuit held that the original holder of the patent did not convey all substantial rights because, among other things, it retained the right to veto litigation decisions, as long as that veto power was exercised reasonably. <u>See Propat</u>, 473 F.3d at 1191. The court held that because the licensee was obligated to obtain the original holder's consent for all litigation decisions, the original holder "retain[ed] substantial ongoing control of the sort [of decisions] typically associated with the retention of an ownership interest in the patent." <u>See id.</u>

Here, Disney relinquished any right to sue on its own or veto Candella's litigation decisions. Rather, it merely retained the right to remain informed about Candella's litigation efforts. Accordingly, Candella's right to sue is unfettered by Disney.[3] As the

---

[3]     Although the right to sue is often the most important consideration for determining whether all substantial rights have been transferred, "a right to sue clause cannot negate the requirement that [in order to have standing] . . . a licensee must have beneficial ownership of some of the patentee's proprietary rights. A patentee may not give a right to sue to a party who has no proprietary interest in the patent." <u>Ortho</u>, 52 F.3d at 1034; <u>Propat</u>, 473 F.3d at 1192 (stating that "[i]t has long been held that a 'right to sue' clause

Federal Circuit recognizes the sole right to enforce the patents as "the most important

consideration" for determining whether all substantial rights were conveyed, this factor

weighs heavily in favor of the Court's determination that Candella obtained all

substantial rights.  See Mann, 604 F.3d at 1361.

### c.  Right to Sublicense

Although the Court could reasonably end its "all substantial rights" analysis at this

point because it determined that Candella obtained the sole and exclusive right to sue, the

Court's finding that Candella obtained all substantial rights is bolstered by the fact that

---

in a contract, unaccompanied by the transfer of other incidents of ownership, does not
constitute an assignment of the patent rights that entitles the transferee to sue in its own
name.").
    This principle reflects the requirement that in order for a plaintiff to have standing
to sue, it must have constitutional standing, or an injury-in-fact.  See also Morrow v.
Microsoft Corp., 499 F.3d 1332, 1342 (Fed. Cir. 2007) (holding that while the plaintiff
obtained the right to sue, it did not obtain exclusionary, or proprietary, rights in the
patent, and therefore, the plaintiff lacked constitutional standing to sue for patent
infringement).  Without having beneficial ownership of some of the proprietary rights in
the patent, a plaintiff necessarily does not experience an injury-in-fact, and lacks
constitutional standing.  See id. at 1339 (citing Lujan v. Defenders of Wildlife, 504 U.S.
555, 560–61 (1992)).
    The Federal Circuit explained that this "principle sensibly reflects that a patent
owner may give another responsibility to select targets for suit – a power of attorney, in
effect – without surrendering ownership of the patent."  Propat, 473 F.3d at 1192
(holding that while the right to sue and grant licenses accords the plaintiff broad authority
to act as the patentee's agent for purposes of licensing and litigation, the plaintiff lacked
standing because it did not have any proprietary interest in the patent); see Penril
Datacomm Networks, Inc. v. Rockwell Int'l Corp., 934 F. Supp. 708, 711 (D. Md. 1996)
(holding that the plaintiff lacked standing it did "not dispute that it ha[d] nonexclusive
rights to the patent," and therefore lacked a proprietary interest in the patent for purposes
of standing).
    As the Court held above, the Agreement between Disney and Candella sufficiently
conveys a proprietary interest in the patents to Candella.  Therefore, the right to sue
clause was not unaccompanied by the transfer of other incidents of ownership.  See
Propat, 473 F.3d at 1192; Ortho, 52 F.3d at 1034.

32

**A32**

the Agreement also permitted Candella the right to "grant sublicenses under [all four patents-in-suit]," as long as it gave Disney thirty days prior written notice. (See Poley Decl., Ex. I "First Amendment" § 2(b) [Doc. No. 22-4].) In Morrow v. Microsoft Corp., the Federal Circuit held that the plaintiff-liquidating trust lacked standing because, among other reasons, its lacked the right to sublicense. See 499 F.3d 1332, 1342 (Fed. Cir. 2007). The Morrow Court explained that "the right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded." See id. (citing Textile Prods., Inc., 134 F.3d at 1485; Prima Tek II, LLC v. A-Roo Co., 222 F.3d 1372, 1379 (Fed. Cir. 2000)). In other words, according to the court, the right to sublicense is considered part and parcel of a party's exclusionary rights because the party could choose to grant a sublicense to an infringer, as opposed to suing that infringer. See Morrow, 499 F.3d at 1342. Because the licensee in Morrow lacked the right to indulge infringers by granting sublicenses, the licensee lacked the full right to exclude. See id. at 1343.

The Federal Circuit has held that even if a licensee obtains the right to sublicense, if that right is not unfettered, the licensee likely has not obtained all substantial rights. For instance, in Propat, although the licensee had the right to sublicense, the court held that all substantial rights were not transferred because the sublicensing right was subject to the licensor's veto power, which had to be exercised reasonably. See 473 F.3d at 1191. The Propat Court explained that the licensee's obligation to obtain consent for licensing decisions was inconsistent with a transfer of all substantial rights. See id. (citing Sicom Sys., 427 F.3d 971, 979 (Fed. Cir. 2005); Intellectual Prop. Dev., 248 F.3d

33

**A33**

at 1345).

Here, in stark contrast to the <u>Morrow</u> plaintiff that completely lacked the right to sublicense, Candella obtained the unfettered right to grant sublicenses. <u>See</u> <u>Morrow</u>, 473 F.3d at 1342–43. Candella's right to sublicense is also significantly greater than the licensee's right in <u>Propat</u> because Candella's right is not subject to Disney's veto. <u>Cf.</u> <u>Propat</u>, 473 F.3d at 1191. Although Candella must provide Disney with prior written notice of its intent to sublicense, its obligation is simply to inform Disney as to how it will exercise its right. Disney's consent to sublicense is not required.

### d. Right to Assign

Finally, the bundle of rights Candella received from its Agreement with Disney included the right to assign. (<u>See</u> Poley Decl., Ex. I "First Amendment" § 2(c) [Doc. No. 22-4].) Although Disney was required to consent to Candella's assignment, Disney was prohibited from unreasonably withholding its consent. (<u>See</u> <u>id.</u>) Similar to the weight given to the right to sublicense, the Federal Circuit has explained that the right to assign is also an important right that must be considered when determining whether a licensee obtained all substantial rights. <u>See</u> <u>Azure Networks, LLC</u>, 771 F.3d at 1343. In <u>Sicom Systems</u>, the Federal Circuit explained that the licensee lacked standing because, among other reasons, the original patent owner retained "the right to veto [the licensee's] reassignment of its rights." <u>See</u> <u>Sicom Sys., Ltd.</u>, 427 F.3d at 978. The court found that the restriction on the licensee's right to assign was a "fatal reservation of rights by [the patent owner]." <u>See</u> <u>id.</u> at 979.

In contrast, in <u>Speedplay</u>, the Federal Circuit held that although the plaintiff-

34

**A34**

licensee could not assign its interest in the license without the consent of the patent holders, the licensee still obtained all substantial rights because the patent owners could not withhold their consent unreasonably. See 211 F.3d at 1251–52. Because the patent owners' consent could not be withheld unreasonably, the Federal Circuit found that the "consent requirement [did] not significantly restrict the scope of [the plaintiff's] rights in the . . . patent." See id. at 1252. Similarly, in Biopolymer Eng'g, Inc. v. Immunocorp, a court in this District held that the "[p]laintiff's inability to transfer the agreement unless [the patent owner] consent[ed]," was "not sufficiently restrictive to require" the court to conclude that all substantial rights had not been transferred, because the agreement provided that the patent owner's consent could not be "unreasonably withheld." See No. 05-cv-536 (JNE/SRN), 2007 WL 627859, at *3 (D. Minn. Feb. 27, 2007).

Like the patent owners in Speedplay and Biopolymer, Disney was not permitted to unreasonably withhold its consent if Candella sought to transfer or assign its rights under the Agreement. (See Poley Decl., Ex. I "First Amendment" § 2(c) [Doc. No. 22-4].) Therefore, the Court finds that this consent requirement is "not sufficiently restrictive to require" the Court to conclude that all substantial rights were not transferred to Candella. See Biopolymer, 2007 WL 627859, at *3.

In sum, the Court finds that because Candella obtained a proprietary interest in the patents-in-suit via an exclusive license to make, use, and sell, the products; the sole and exclusive right to sue; the unfettered right to sublicense; and the right to assign its rights under the Agreement, the Court finds that Disney granted to Candella all substantial rights in the Disney Patents.

### 4. Disney's Retained Rights Do Not Negate the Court's Finding that Candella Has All Substantial Rights

Defendants claim that Candella did not obtain all substantial rights, and therefore lacks standing, because Disney retained several rights pursuant to the Agreement. (See Liown's Mem. at 23 [Doc. No. 20].) The Court finds that Disney's retained rights do not negate the Court's holding that, based on a totality of the factors, Candella was granted all substantial rights.

### a. Disney's Retained Right to Practice the Patent

First, Defendants argue that Candella was not granted all substantial rights as its rights are not "exclusive," because Disney maintained the right to practice its patents. (See id.) Defendants correctly note that Disney retained the nonexclusive right for itself, and its Affiliates, to "make, have made, use, sell, offer for sale and import the Licensed Products, within and outside the Product Categories" throughout the world. (See Poley Decl., Ex. H, "2012 Disney-Candella Agreement" § 2.2 [Doc. No. 22-4].)

The Liown Defendants contend that under this provision, "Disney effectively retained an unrestricted right to license third parties to practice the Disney Patents." (See Liown's Mem. at 20 [Doc. No. 20].) The Court disagrees.

The Liown Defendants misread the relevant provision of the Agreement. Rather, Disney could authorize Liown and the other Defendants to manufacture and sell the products covered by the patents only under two unique circumstances, neither of which exists here. First, Disney could acquire control of Defendants by either owning at least 50% equity or beneficial interest of Defendants, or by acquiring the right to vote for or

36

**A36**

appoint a majority of the board of directors or other governing bodies of Defendants.

(See Poley Decl., Ex. H, "2012 Disney-Candella Agreement" § 1 [Doc. No. 22-4].) If

this were the case, and Disney granted Liown more licenses than simply the Artificial

Flame Technology licenses (see id. § 2.2), then Defendants would qualify as Affiliates of

Disney that could practice the Schedule A Patents. However, there is no indication in the

record that Disney has acquired, or intends to acquire, Defendants and license several

patents to them. See WiAV, 631 F.3d at 1267 (explaining that "the ability of [the

original patent holder] to license its 'Affiliates' is also immaterial, as there is no

argument or evidence suggesting that the Defendants are [the original patent holder's]

Affiliates.").

Second, as Defendants correctly note, Disney could ask Defendants to "have [the

products] made" for Disney or its Affiliates. (See Poley Decl., Ex. H, "2012 Disney-

Candella Agreement" § 2.2 [Doc. No. 22-4]; Liown's Mem. at 20 [Doc. No. 20].)

However, Disney could not permit Liown to make the candles for others, such as

Defendant Boston Warehouse, as Liown does currently. (See Pl.'s Mem. at 30 [Doc. No.

36].) The Agreement plainly states that "Disney expressly reserves for itself and its

Affiliates the right throughout the world to . . . make, have made, use, sell, offer for sale

and import the Licensed Products" throughout the world. (See Poley Decl., Ex. H, "2012

Disney-Candella Agreement" § 2.2 [Doc. No. 22-4].) The Court interprets this contract

language to mean that (1) Disney and its Affiliates could make, use, or sell the products,

and (2) Disney and its Affiliates could have the products made *for themselves*, but could

not have the products made *for third parties*. (See id.) However, nothing in the record

37

**A37**

before the Court indicates that Disney has asked, or intends on asking, Liown to make the products for Disney.  Cf. WiAV, 631 F.3d at 1267.

The Agreement does not permit Disney to license Liown to make the products *for* Defendants, which in turn directly sell the products to the end customer.  If Disney attempted to create a contract permitting Liown to do so (without first acquiring control of Liown), then Candella, would have the right to sue both Disney and Liown for infringing on Candella's exclusive license.  See Alnylam Pharm., Inc. v. Tekmira Pharm. Corp., No. CIV.A. 12-10087-RWZ, 2012 WL 4857580, at *2 (D. Mass. Sept. 24, 2012) (explaining that because the plaintiff was granted the right to exclude all parties, including the patentee-defendant, from using the patents at issue in the plaintiff's field, the plaintiff has constitutional standing to sue the defendant for infringement in this field).  In sum, Disney did not retain "an unrestricted right to license third parties to practice the Disney Patents."  (Cf. Liown's Mem. at 20 [Doc. No. 20].)

Defendants rely exclusively on language from Textile Productions, to support their argument that "if a patentee-licensor is free to grant licenses to others, licensees under that patent are not exclusive licensees."  (See Liown's Mem. at 25 (citing Textile Productions, 134 F.3d at 1484) [Doc. No. 20]).  The Court disagrees with Defendants' characterization of the law.  In WiAV, the Federal Circuit clarified that Textile Productions does *not* stand for the proposition "that a party cannot be an exclusive license of a patent if others have the right to license the patent."  See WiAV, 631 F.3d at 1266 (finding that an exclusive licensee had standing to pursue infringement claims for a collection of patents that were subject to several prior nonexclusive licenses, with the

38

**A38**

prior licensees having the right to transfer their rights and the right to sublicense to their affiliates and a few other third parties, because none of the named defendants were in the scope of the affiliates or third parties to whom those prior licensees could grant sublicenses).

Rather, Federal Circuit precedent establishes that a patentee may retain the right to make, use, and sell a patent and may lack standing, while an exclusive licensee may simultaneously have standing because it obtained all substantial rights to the patent. See Azure, 771 F.3d at 1344, 1347. In Azure, the court found that the patentee's retained right to practice the patent "ha[d] little force," because in addition to not practicing the patent as a matter of fact, the patentee's retained right to make, use, and sell the patent was nonexclusive. See id. The Federal Circuit explained that, "[w]e have held that a nonexclusive license confers no standing *on the licensee* because the licensee does not have a legally protected interest conferred by the Patent Act . . . That same logic applies even if it is the patent owner holding the nonexclusive right and the licensee holds the exclusionary rights." Azure, 771 F.3d at 1344 (emphasis original). Therefore, under Azure, Candella may hold an exclusionary license and have standing while Disney concurrently holds a nonexclusive license and lacks standing.[4]

It is precisely for this reason that this case is distinguishable from Ortho Pharm.

---

[4]     As Disney's license to practice is nonexclusive, Disney lacks constitutional standing to even be joined as party in this suit. See Azure, 771 F.3d at 1347 (holding that because the patentee transferred all substantial rights in the patent to the licensee, including all exclusionary rights, the patentee "serves effectively as a nonexclusive licensee," and therefore "lacks standing to bring suit" and lacks standing "to even join the suit.").

Corp. v. Genetics Inst., Inc., where the Federal Circuit held that a nonexclusive licensee lacked standing to pursue an infringement action. See 52 F.3d 1026, 1032–35 (Fed. Cir. 1995). In Ortho, the licensee "concede[d]" that it shared a nonexclusive right to make, use and sell the products with the patentee, because the patentee had the "right to license others to do the same." See id. at 1033. For this reason, the Federal Circuit held that the licensee did not have "beneficial ownership of some of the patentee's proprietary rights." Id. at 1034. In contrast, here, Candella does not concede that it had a nonexclusive license, nor does it concede that Disney had the unrestricted right to license others to make, use, and sell the product. Instead, Candella claims that it had an exclusive license and Disney only retained the limited right to practice the patent for itself and its Affiliates.

Defendants contend that Candella lacks all substantial rights because of this case's similarity to (1) Abbott Labs. v. Diamedix Corp., 47 F.3d 1128 (Fed. Cir. 1995); (2) AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314 (Fed. Cir. 2009); (3) Pfizer Inc. v. Elan Pharmaceutical Research Corp., 812 F. Supp. 1352 (D. Del. 1993); (4) Agrashell, Inc. v. Hammons Products Co., 352 F.2d 443 (Fed. Cir. 1965); and (5) Toshiba Corp. v. Wistron Corp., 270 F.R.D. 538 (C.D. Cal. 2010). (See Liown's Reply at 4–6 [Doc. No. 45].) However, like Ortho, all of these cases are distinguishable.

In all five of the cases Defendants rely on, the court held that the licensee did not obtain all substantial rights. But, unlike the patentees in Abbott Labs., Pfizer, and Agrashell, Disney relinquished its complete right to sue. See Abbott Labs., 47 F.3d at 1132 (explaining that the patentee retained the right to sue if the licensee failed to do so,

40

and the patentee also had the right to join litigation brought by licensee); Pfizer, 812 F.

Supp. at 1374 (stating that the patentee had the right of first refusal to enforce the patent);

Agrashell, 352 F.2d at 446 (explaining that the patentee could participate in infringement

litigation brought by the licensee). Disney does not have the right to sue for infringement

if Candella fails to do so, nor does it have the right to join a suit for infringement initiated

by Candella. Cf. Abbott Labs., 47 F.3d at 1132; Pfizer, 812 F. Supp. at 1374; Agrashell,

352 F.2d at 446.

Also, unlike the patentee in Toshiba, Disney only retained the nonexclusive, as

opposed to exclusive, right to practice the patents. Cf. Toshiba, 270 F.R.D. at 540

(explaining that both the patentee and the licensee had the "non-exclusive right to make,

sell and use the covered inventions under the [a]greement"). And unlike the licensee in

Toshiba, Candella obtained an *exclusive* license to the patents. Cf. id.

Moreover, Disney's retained rights to the patents are so minimal that, unlike the

patentees in Agrashell and AsymmetRx, Disney cannot grant licenses to third parties.

See Agrashell, 352 F.2d at 446; AsymmetRx, 582 F.3d at 1320 (stating that the patentee

had the right to provide the product to non-profit or governmental institutions for

research purposes). Rather, Disney only retained the right to make, use, and sell the

products, or have the products made for itself and its Affiliates. As Disney's Affiliates

are controlled by Disney, the Court considers the Affiliates to be the same entity as

Disney for purposes of standing. See Kalman v. Berlyn Corp., 914 F.2d 1473, 1480 (Fed.

Cir. 1990) opinion clarified, No. 89-1371, 1991 WL 345039 (Fed. Cir. Mar. 4, 1991)

(explaining that it was "clear from the record that" the plaintiff and his company, of

41

which the plaintiff owned 50%, were a "single entity" for purposes of standing).

Disney also is prohibited from unreasonably withholding its consent if Candella wishes to assign its rights, unlike the patentee in Abbott Labs., 47 F.3d at 1132. Furthermore, Disney has absolutely no control over how Candella practices the patents, unlike the patentee in AsymmetRx. Cf. AsymmetRx, 582 F.3d at 1320 (explaining that the patentee had the right to control how the licensee used the product).

And finally, unlike the patentee in Toshiba, Disney did not retain the unilateral and absolute right to terminate the Agreement with Candella. Cf. Toshiba, 270 F.R.D. at 543. Rather, both parties had the mutual right to terminate their contract if both parties agreed to terminate, or if either party committed a material breach. (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 7.2.2 [Doc. No. 22-4].)

In sum, this case is sufficiently distinguishable from other cases in which courts have held that the patentee's retained right to practice the patent indicated that all substantial rights had not been transferred.

### b. Disney's Retained Right to Terminate the Agreement

As the Court noted above, the Agreement permits either party to terminate the contract if the parties mutually agree, or if either party "material[ly] breach[es]" a term of the contract. (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 7.2.2 [Doc. No. 22-4].) However, Disney's retained right to terminate the Agreement upon specified conditions is "not dispositive" of whether all substantial rights were transferred to Candella. See Azure, 771 F.3d at 1344–45 (explaining that the patentee's power to terminate the agreement if the licensee fails to satisfy the specified benchmarks is not

42

dispositive of whether all substantial rights were transferred); <u>Propat</u>, 473 F.3d at 1191–92 (same).

Rather, if a contract provides the parties with a rolling renewal option, then that contractual provision may suggest that all substantial rights were transferred to the licensee. <u>See</u> <u>Azure</u>, 771 F.3d at 1347 (explaining that a short patent term life, coupled with a rolling renewal cycle that can extend to the end of the patent's term, may provide another indicator that the patentee transferred all substantial rights to the licensee). Here, the Agreement permitted Candella to renew its license for the remainder of the life of the patent, plus six years. (<u>See</u> Merrill Decl., Ex. 1 "Second Amendment" § 2 (amending § 7.1 of the 2012 Disney-Candella Agreement) [Doc. No. 37-1].)

Thus, the Court's conclusion that all substantial rights were transferred to Candella is bolstered by the fact that the Agreement allowed Candella to renew the contract, even though the Agreement also allowed Disney to terminate the contract upon specified conditions.

### c. Disney's Retained Right to Receive Royalties

Disney also retained the right to receive royalty payments. (<u>See</u> Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 5.1 [Doc. No. 22-4]; Poley Decl., Ex. I, "First Amendment" § 3(a), (b) [Doc. No. 22-4].) Nonetheless, the Federal Circuit has held that "economic interest alone does not defeat a transfer of substantial rights in the face of the factors . . . that strongly indicate [a licensee's] ownership." <u>See</u> <u>Azure</u>, 771 F.3d at 1344 (citing <u>Propat</u>, 473 F.3d at 1191 (explaining that "the fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent . . . does

not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent.")); see also Biopolymer, 2007 WL 627859, at *3.

In Vaupel, the Federal Circuit explicitly held that "the right to receive infringement damages" can be considered "merely [as] a means of compensation under the agreement," and thus the receipt of infringement damages is "not inconsistent with an assignment [to the licensee]." Vaupel, 944 F.2d at 875 (citing Rude v. Westcott, 130 U.S. 152, 162–63 (1889) (explaining that retention of a portion of "sales, royalties, or settlements, or other sources" does not limit the assignment of a patent)). Thus, the mere fact that Disney retained the right to receive royalty payments does negate that the most significant factors indicate that all substantial rights were transferred to Candella.

### d. Disney's Right to Remain Informed About Candella's Sublicensing Agreements

According to the Agreement, Candella was obligated to inform Disney of its intent to grant a sublicense at least thirty days before doing so. (See Poley Decl., Ex. I "First Amendment" § 2(b) [Doc. No. 22-4].) The Federal Circuit has held that even a patentee's right to veto sublicenses was only a "minor derogation" from the substantial rights that the licensee was granted. See Vaupel, 944 F.2d at 875 (explaining that the patentee's sublicensing veto power "did not substantially interfere with the full use by [the licensee] of the exclusive rights under the patent"). Here, Disney was not granted the power to veto Candella's sublicenses. Rather, Candella merely had the obligation to inform Disney about its sublicensing agreements. Since a patentee's power to veto a licensee's sublicenses does not necessarily indicate that the patentee retained ownership

44

**A44**

of the patent for standing purposes, here, Disney's right to remain informed about Candella's sublicenses certainly does not indicate that Disney retained ownership of the patent.

### e.  Disney's Formal "Title to" the Patents

Finally, the fact that the Agreement states that Disney retained formal "title to" the patents and was responsible for maintaining the patents does not necessarily indicate that Disney is the owner of the patent for purposes of standing.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" §§ 9.1, 12 [Doc. No. 22-4].)  As the Federal Circuit explained in Speedplay, "[a] party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights."  See 311 F.3d at 1250.  Accordingly, the Agreement's characterization of Disney as the "owner" of the patent is insufficient to reverse the Court's finding that Candella was granted all substantial rights.  The Court also notes that although formal retention of ownership in an agreement between the parties sometimes bolsters a court's finding that all substantial rights were not transferred, here, the balance of factors weighs in favor of finding that Candella was in fact granted all substantial rights.  But see Propat, 473 F.3d at 1191 (holding that all substantial rights had not been transferred, because the licensor received royalties and had veto power over licensee's litigation and assignment decisions; and finding that the agreement's express characterization of the licensor as "the owner of the patent" offered more support for the court's holding).

On balance, the Court finds that because Disney's retained rights do "not

**A45**

substantially interfere with the full use of [Candella's] exclusive rights under the patent," AsymmetRx, 582 F.3d at 1320, Candella was granted all substantial rights.

### C. Candella Had Standing to Bring Suit and Pre-Merger Luminara Had Standing to Sue as a Co-Plaintiff

Before entering into a sublicense agreement with pre-merger Luminara, Candella had obtained all substantial rights in the patents-in-suit from Disney. The Court must now determine whether the Sublicense between Candella and pre-merger Luminara altered the distribution of these rights in any substantive way. When determining whether all substantial rights were transferred from Candella to pre-merger Luminara, the Court treats Candella as the de facto "assignee" of the patent, and pre-merger Luminara as the "licensee."

According to the Sublicense, Candella appointed pre-merger Luminara as its "exclusive sourcing agent and distributor . . . with the exclusive right to manufacture, have manufactured, sell, promote and otherwise distribute Products to Customers in the Territory, subject to the terms and conditions of this Agreement." (See Merrill Decl., Ex. 4 "Sublicense" § 2.01 [Doc. No. 37-1].) Therefore, by the terms of the Sublicense itself, pre-merger Luminara had a proprietary interest in the patents-in-suit because it obtained Candella's exclusive license to make, use, and sell the products.[5]

---

[5]     The Court notes that at the same time that pre-merger Luminara was granted an exclusive sublicense, Disney still retained its nonexclusive license. Although both licenses were valid at the same time, Federal Circuit law permits their co-existence because one party may maintain an exclusive license while another party practices a nonexclusive license for the same patent. See WiAV, 631 F.3d at 1266.

46

Pre-merger Luminara also received the right to bring suit to enforce the patents. (See id. § 11.03.)  However, Candella similarly maintained the right to bring suit to enforce the patents.  (See id.)  The Sublicense additionally provided that Candella was entitled to "all damages[, not including litigation costs,] which may be awarded or agreed upon in settlement," regardless of whether pre-merger Luminara or Candella initiated the infringement suit.  (See id.)

Although pre-merger Luminara obtained a proprietary interest in the patents, it did not receive all substantial rights.  As the Court explained above, "the right to sue for infringement . . . is particularly dispositive" when determining whether a transfer of all substantial rights has occurred.  See Vaupel, 944 F.2d at 875–76.  According to the Federal Circuit, "[w]here the licensor[,Candella,] retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee[,pre-merger Luminara.]"  See Mann, 604 F.3d at 1361.  Here, although pre-merger Luminara was granted the right to bring suit to enforce the patents, Candella concurrently retained the right to sue.  Therefore, because Candella retained this right, the Court is precluded from finding that all substantial rights were transferred to pre-merger Luminara.  The Court's holding is supported by the fact that Candella not only maintained the right to sue, but it also retained the right to recover all of the profits from a suit, regardless of which entity initiated suit.  Given the fact that the most dispositive factor indicates that Candella retained all substantial rights, the Court need not discuss the other rights that were assigned or retained under the Sublicense.

47

**A47**

Accordingly, when this suit was filed, Plaintiff Candella maintained all substantial rights in the patents-in-suit and had both constitutional and prudential standing to bring suit. See Mann, 604 F.3d at 1359 (explaining that if the licensor did not transfer all substantial rights, then it retained the right to sue for infringement). Plaintiff pre-merger Luminara, on the other hand, only had constitutional standing because although it had a proprietary interest in the form of an exclusive sublicense, it lacked prudential standing because it did not have all substantial rights. Nonetheless, because pre-merger Luminara brought suit jointly with Candella, the prudential standing requirement was satisfied. See Prima Tek II, 222 F.3d at 1377; Intellectual Prop. Dev., Inc., 248 F.3d at 1347–48. As the Court noted above, an exclusive licensee without all substantial rights may sue as long as the patentee who retains all substantial rights is joined as a co-plaintiff. See Morrow, 499 F.3d at 1340. Therefore, both Plaintiffs had standing to bring suit when the Complaint was first filed.[6]

Moreover, the Court notes that simply because Candella exercised its right to sublicense, by granting an exclusive sublicense to pre-merger Luminara, does not suggest that Candella relinquished its proprietary interest in the patents-in-suit. (See Pl.'s Mem. at 25 [Doc. No. 26].) This principle is evidenced by the fact that the Federal Circuit has consistently held that if a party is solely an exclusive licensee that lacks all substantial

---

[6]     Plaintiffs argue that Candella and pre-merger Luminara had standing to bring suit because of the "commonality in ownership" between the two entities. (See Pl.'s Mem. at 37 (citing Kalman v. Berlyn Corp., 914 F.2d 1473 (Fed. Cir. 1990) [Doc. No. 36].) Because the Court finds that pre-merger Luminara had standing to bring suit as a co-Plaintiff of Candella, the Court need not reach Plaintiffs' argument about the commonality of ownership between the two companies.

rights, then the patent owner must be joined to satisfy prudential standing concerns. See Prima Tek II, 222 F.3d at 1377; Abbott Labs., 47 F.3d at 1131; Rite-Hite, 56 F.3d at 1552; Mentor H/S, 240 F.3d at 1017; Textile Prods., 134 F.3d at 1484. Because every plaintiff must have constitutional standing in order to be joined as a co-plaintiff, the joined patent owner must necessarily also have constitutional standing; and thus, the patent owner must maintain a proprietary interest in the patents, even though it previously granted an exclusive license or sublicense.[7] See Morrow, 499 F.3d at 1342. In sum, when this suit was initially filed, Candella had standing to bring suit independently, and pre-merger Luminara had standing to sue as Candella's co-plaintiff.

### D. Post-Merger Luminara Has Standing

When pre-merger Luminara merged with Candella, post-merger Luminara was created and subsumed both entities' rights. Because Candella maintained all substantial rights, and thus had constitutional and prudential standing to bring suit, post-merger Luminara, necessarily continues to have constitutional and prudential standing to bring suit. Federal Rule of Civil Procedure 25(c) provides that, "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." See Fed. R. Civ. P. 25(c). Therefore, Rule 25(c) suggests that the newly created company, post-merger Luminara, may be properly substituted as the sole Plaintiff in this action. Cf.

---

[7]    Although situations may exist in which no party has standing to sue (see Liown's Reply at 9 [Doc. No. 45]), such as when a nonexclusive licensee is given the exclusive right to enforce the patent against a particular defendant, Fairchild Semiconductor Corp. v. Power Integrations, Inc., 630 F. Supp. 2d 365, 372–73 (D. Del. 2007), this is not such a case.

ISI Int'l, 2002 WL 230904, at *1. Therefore, post-merger Luminara sufficiently satisfied its burden of proving that it has standing in this case. See Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990).

### E. Plaintiff's Declaratory Judgment Claims Are Not Anticipatory

Finally, the Court addresses Defendants' argument that Plaintiff post-merger Luminara's[8] declaratory judgment claims are anticipatory and should accordingly be dismissed. (See Liown's Mem. at 29–32 [Doc. No. 20].) Plaintiff alleges two declaratory judgment claims against the Liown Defendants. (See Third Am. Compl. ¶¶ 31 –50 [Doc. No. 131].) In Count II, Plaintiff seeks a declaratory judgment that it is not infringing on Liown's '986 patent. (See id. ¶¶ 31–45.) In Count III, Plaintiff seeks a declaratory judgment that Liown's '986 patent is invalid. (See id. ¶¶ 46–50.) Although Defendants seek dismissal of these claims, Plaintiff argues that its claims for declaratory judgment are not anticipatory and should not be dismissed. The Court agrees.

### 1. Jurisdiction under the Declaratory Judgment Act

The Supreme Court has interpreted the Declaratory Judgment Act to grant federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). However, such discretion must be grounded in an actual controversy under "all the circumstances." See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

---

[8]     Whereas the Court referred to "Plaintiffs," in the plural form, when discussing the transfer of all substantial rights to Candella and pre-merger Luminara, from this point forward, the Court refers to "Plaintiff," in the singular form, now that post-merger Luminara is the only remaining plaintiff in this case.

The Declaratory Judgment Act (DJA) states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." See 28 U.S.C. § 2201(a) (2012). The Supreme Court has interpreted the "actual controversy" requirement in the DJA to be identical to the cases and controversies requirement in Article III. See MedImmune, Inc., 549 U.S. at 127; see also Teva Pharms. USA, Inc. v. Novartis Pharmas. Corp., 482 F.3d 1330 (Fed. Cir. 2007).

Under the DJA, the plaintiff has the burden of demonstrating that "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" See Teva, 482 F.3d at 1337 (quoting MedImmune, 549 U.S. at 127). Therefore, to survive dismissal, Plaintiff must show that the threat of injury is sufficiently (1) immediate, and (2) real, to warrant the issuance of a declaratory judgment. See id. at 1338 (quoting MedImmune, 549 U.S. at 127). Moreover, even assuming Plaintiff shows the immediacy and reality of the controversy, the Court must also determine whether it wishes to exercise its discretion to grant jurisdiction for these declaratory judgment claims. See Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 883 (Fed. Cir. 2008).

### 2. Defendants' Actions Present an Actual Controversy

Here, Plaintiff sufficiently alleges facts showing a substantial controversy between the parties. Below, the Court discusses the immediacy of the controversy, the reality of

51

**A51**

the controversy, and the Court's discretion to grant jurisdiction.

### a. Immediacy of the Controversy

In <u>Sandoz, Inc. v. Amgen, Inc.</u>, the Federal Circuit addressed the "immediacy" requirement. <u>See</u> 773 F.3d 1274, 1278 (Fed. Cir. 2014). The court explained that when determining whether the controversy is immediate, courts should consider "how far in the future the potential infringement is, whether the passage of time might eliminate or change any dispute, and how much if any harm the potential infringer is experiencing, at the time of the suit, that an adjudication might redress." <u>See</u> <u>id.</u>

> Although the controversy must be immediate:
>
> Article III does not mandate that the declaratory judgment defendant have threatened litigation or otherwise taken action to enforce its rights before a justiciable controversy can arise, and the Supreme Court has repeatedly found the existence of an actual case or controversy even in situations in which there was no indication that the declaratory judgment defendant was preparing to enforce its legal rights.

<u>Danisco U.S. Inc. v. Novozymes A/S</u>, 744 F.3d 1325, 1330 (Fed. Cir. 2014) (citing <u>MedImmune</u>, 549 U.S. at 132 n.11).

For instance, in <u>Danisco</u>, the Federal Circuit weighed the "history of the patent litigation between the same parties involving related technologies, products, and patents in another circumstance . . . in favor of the existence of subject matter jurisdiction . . . ." <u>Id.</u> at 1331. The <u>Danisco</u> Court accordingly held that the patent owner's "activities . . . demonstrate[d] that it ha[d] 'engaged in a course of conduct that show[ed] a preparedness and willingness to enforce its patent rights.'" <u>Id.</u> at 1332 (quoting <u>SanDisk Corp. v. STMicroelectronics, Inc.</u>, 480 F.3d 1372, 1383 (Fed. Cir. 2007) (concluding that the

patent owner, in "[h]aving approached SanDisk, having made a studied and considered determination of infringement by SanDisk, having communicated that determination to SanDisk, and then saying that it [did] not intend to sue, [the patent owner was] engaged in the kinds of 'extra-judicial patent enforcement with scare-the-customers-and-run tactics' that the Declaratory Judgment Act intended to obviate.")).

On the other hand, the Federal Circuit has held that "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties . . . ." Hewlett-Packard Co. v. Acceleron LLC, 587 F.3d 1358, 1362 (Fed. Cir. 2009). Nonetheless, in Hewlett-Packard, the Federal Circuit found that an actual controversy existed because the patent owner "took the affirmative step of twice contacting HP directly, making an implied assertion of its rights under the . . . patent against HP's . . . products, and HP disagreed." Id. at 1364.

Here, Plaintiff alleges that when negotiations regarding the use and manufacture of the Artificial Flame Technology broke down with Liown, Defendants threatened to sue for infringement of Liown's '986 patent. (See Third Am. Compl. ¶ 33 ("In the [August 2012] letter, counsel for Liown . . . threatened enforcement of future patent rights.") [Doc. 131]; Merrill Decl., Ex. 22 "Letter from Liown to David Baer" [Doc. No. 37-4].) As a result, Candella and pre-merger Luminara immediately filed this lawsuit, including declaratory judgment claims. Defendants' willingness to enforce their patent is further evidenced by Liown's concession that it "put Luminara on notice that if negotiations . . . were unsuccessful, Liown would sue Luminara for infringement of the '986 patent."

(See Liown's Mem. at 10 [Doc. 20]). Therefore, Plaintiff has shown that Defendants threatened immediate litigation to enforce its rights. See Danisco, 744 F.3d at 1330. And, at the very least, Plaintiff has demonstrated that Defendants took an affirmative step, demonstrating their "preparedness and willingness to enforce [their] patent rights," id. at 1332, by sending the aforementioned letter and terminating the parties' prior settlement agreement.

The Court also notes that the dispute between the parties in this case is neither remote, nor speculative. In Matthews Intern. Corp. v. Biosafe Eng'g, LLC, the Federal Circuit held that because the plaintiff failed to allege facts that its device would be used in a manner that infringed the defendant's method patents, "its dispute . . . [was] too remote and speculative to support the exercise of declaratory judgment jurisdiction." See 695 F.3d 1322, 1329 (Fed. Cir. 2012). In contrast, here, Plaintiff has alleged sufficient facts to show that Defendants believed that the Disney Patents were currently being used in a way that infringed Liown's '986 patent. (See Pl.'s Mem. at 9–13 [Doc. 36]; Compl. ¶ 23 [Doc. 13].) Thus, the threat of suit was not remote.

Additionally, neither party argues that "the passage of time might eliminate or change [the] dispute." Sandoz, Inc., 773 F.3d at 1278. If Defendants correctly assert that Plaintiff is infringing on the '986 patent, then the passage of time will only increase the amount of damages for which Plaintiff is potentially liable. See Micron Technology, Inc. v. Mosaid Technologies, Inc., 518 F.3d 897, 902 (Fed. Cir. 2008). Allowing these damages to accrue while Plaintiff waits for Defendants to file suit is in stark contrast to the objective of the DJA. See id. (explaining that "'[t]he purpose of the Declaratory

54

**A54**

Judgment Act . . . in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights.'") (quoting Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 956 (Fed. Cir. 1987)). Therefore, the Court finds that Plaintiff's potential injury is both imminent and redressable.

### b. Reality of the Controversy

In addition to showing that the controversy is immediate, Plaintiff must allege that the threat of injury is "real," so as to avoid the Court issuing an advisory opinion. See MedImmune, 549 U.S. at 127. A patent controversy satisfies this "reality" requirement if the plaintiff alleges facts showing that the patents-at-issue conflict or overlap in some way. "In the context of patent litigation, the reality requirement is often related to the extent to which the technology in question is 'substantially fixed' as opposed to 'fluid and indeterminate' at the time declaratory relief is sought.'" See Matthews, 695 F.3d at 1330. This is because, "[t]he greater the variability of the subject of a declaratory-judgment suit . . . the greater the chance that the court's judgment will be purely advisory." Id.

Accordingly, here, Plaintiff satisfies the "reality" requirement for bringing a declaratory judgment claim because it presents facts and supporting documents that show that Liown's '986 patent has the same features as the Disney Patents. (See Pl.'s Mem. at 10 [Doc. No. 36]; Poley Decl., Ex. O "'986 Patent" [Doc. No. 22-6].) Moreover, the technology in question is not "fluid and indeterminate" because both parties use fixed technology. Given the "reality" of this dispute, if the Court issues a declaratory judgment about the parties' patents, it will not be an advisory opinion.

55

**A55**

### c. District Court Discretion

"Even assuming that the immediacy and reality prerequisites for declaratory judgment relief have been met, the district court's exercise of its declaratory judgment authority is discretionary." See Cat Tech LLC, 528 F.3d at 883. "When there is no actual controversy, the court has no discretion to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary." Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991). The Court may exercise this discretion if "resolving the case serves the objectives for which the Declaratory Judgment Act was created." Cat Tech LLC, 528 F.3d at 883.

Here, as the Court established above, the immediacy and reality prerequisites are satisfied in this case. Thus, the Court may exercise its discretion if resolving this case serves the objectives of the DJA. See id. By threatening to sue, Defendants have left Plaintiff with the "choice between abandoning [its] rights or risking prosecution." See MedImmune, 549 U.S. at 773. And the DJA was meant to ameliorate this very dilemma. See id. (citing Abbott Labs. v. Gardner, 387 U.S. 136, 152 (1967)). Therefore, the Court exercises its discretion and grants jurisdiction for Plaintiff's Counts II and III.

Defendants contend that the Court should deny jurisdiction because although generally the first-filed rule provides that "in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case,'" Nw. Airlines, Inc. v. Am. Airlines, Inc., 989 F.2d 1002, 1005 (8th Cir. 1993), here, several compelling circumstances exist that weigh in favor of denying jurisdiction. (See Liown's Mem. at 29–31 [Doc. No. 20].) As the Court noted above, immediately after Candella and pre-

merger Luminara filed suit in this case, Liown filed suit against Luminara, <u>Shenzhen</u> <u>Liown Electronic Co., Ltd. v. Luminara Worldwide, LLC, et al.</u>, No. 14-cv-3112 (SRN/FLN). Defendants contend that Liown's suit should take precedence over this first-filed action. Specifically, Defendants argue that the first-filed rule "is not intended to be rigid, mechanical, or inflexible," but rather must "be applied in a manner best serving the interests of justice," and when compelling circumstances exist, the first-filed rule should not apply. <u>See</u> <u>Nw. Airlines, Inc.</u>, 989 F.2d at 1005.

In <u>Northwest Airlines</u>, the United States Court of Appeals for the Eighth Circuit explained that "[t]o conserve judicial resources and avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing *among possible venues* when parallel litigation has been instituted in *separate courts*, to the party who first establishes jurisdiction." <u>Nw. Airlines</u>, 989 F.2d at 1006 (emphasis added). Therefore, the first-filed rule, and the compelling circumstances exception to the first-filed rule, do not apply here because both lawsuits were filed in the same District and are before the same district court judge. <u>See</u> <u>Arctic Cat, Inc. v. Polaris Indus. Inc.</u>, Nos. 13-cv-3579 and 13-cv-3595 (JRT/FLN), 2014 WL 5325361, *14 (D. Minn. Oct. 20, 2014) (explaining that "the first-filed rule is not intended to govern the resolution of two lawsuits filed in the same district and assigned to the same judge"). The rule and the exception to the rule were developed to address situations in which two cases were filed concurrently in two different districts. <u>See</u> <u>id.</u>; <u>Nw. Airlines</u>, 989 F.2d at 1006. Defendants concede as much in the second-filed action. <u>See</u> <u>Shenzhen Liown Elecs. Co., Ltd. v. Luminara Worldwide, LLC, et al.</u>, No. 14-cv-3112, Liown's Mem. at 8 [Doc. No. 25] (arguing that the first-filed rule does not

57

apply in this case because "the cases are filed in the same (rather than separate) judicial districts").

In sum, because Plaintiff has alleged sufficient facts to show that its potential for injury is actual, imminent, and capable of redress, its declaratory judgment claims are not anticipatory. Therefore, Defendants' Motions to Dismiss Plaintiff's Counts II and III as anticipatory are denied.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. The Liown Defendants' Motion to Dismiss First Amended Complaint [Doc. No. 18] is **DENIED**.

2. Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss First Amended Complaint [Doc No. 46] is **DENIED**.

3. The Liown Defendants' and Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 94] is **DENIED**.

4. Defendant Tuesday Morning Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 111] is **DENIED**.

5. Defendant Central Garden & Pet Co.'s Motion to Dismiss Second Amended Complaint [Doc. No. 113] is **DENIED**.

6. Defendant Zulily, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 114] is **DENIED**.

7. Defendant The Light Garden, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 116] is **DENIED**.

8. Defendants BJ's Whole Sale Club, Inc., Smart Candle, LLC, and Von Maur, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 128] is **DENIED**.

9. Defendants' Motion to Dismiss Third Amended Complaint [Doc. No. 135] is **DENIED**.

10. The parties are ordered to show cause ten days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.

Dated:  April 3, 2015                                    s/Susan Richard Nelson

                                                        SUSAN RICHARD NELSON
                                                        United States District Judge

**A59**

Order Granting Preliminary Injunction

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Luminara Worldwide, LLC, | Case No. 14-cv-3103 (SRN/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd., Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden & Pet Co., | **[FILED UNDER SEAL]** |
| Defendants. | |

Daniel R. Hall, Joseph W. Anthony, and Courtland C. Merrill, Anthony Ostlund Baer & Louwagie PA, 90 South 7th Street, Suite 3600, Minneapolis, MN 55402; Ryan S. Dean, Fish & Tsang LLP, 2603 Main Street, Suite 1000, Irvine, CA 92614, for Plaintiff.

Devan V. Padmanabhan, Erin O. Dungan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., The Light Garden, Inc., and Central Garden & Pet Co.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Michael J. Pape, Fish & Richardson PC, 60 South 6th

Street, Suite 3200, Minneapolis, MN 55402, for Defendant BJ's Wholesale Club, Inc.

Lukas Dustin Jonathon Toft and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendant Ambient Lighting, Inc.

---

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [Doc. No. 50].  For the reasons set forth below, the Court grants Plaintiff's motion.

## II.    BACKGROUND

### A. The Parties and Plaintiff's Claims

Luminara Worldwide, LLC, ("Luminara" or "Plaintiff") alleges that Defendants are offering for sale and selling flameless candles that infringe Plaintiff's patents.  (See Pl.'s Mem. at 1 [Doc. No. 52].)  "Luminara's Artificial Flame Technology was originally developed by Disney."  (See id. at 2 [Doc. No. 52].)  Although Disney initially licensed the Artificial Flame Technology to Candella, LLC in 2008 (see id.), after Candella and Luminara merged on December 31, 2014, Luminara became the exclusive licensee for the Artificial Flame Technology, with standing to enforce, without joinder of Disney, a number of patents, including (1) United States Patent No. 7,837,355 ("the '355 patent"), (2) United States Patent No. 8,070,319 ("the '319 patent"), (3) United States Patent No. 8,534,869 ("the '869 patent"), and (4) United States Patent No. 8,696,166 ("the '166 patent").   (See 4/3/15 Order Filed Under Seal [Doc. No. 143].)

Plaintiff seeks a preliminary injunction that (1) enjoins Defendants from

2

manufacturing, distributing, offering for sale, selling, or importing any moving flameless candles to any of Plaintiff's customers, and (2) orders Defendants to recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers.  (See Pl.'s Mem. at 13 [Doc. No. 52].)

Although this lawsuit was initially filed against Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd. (hereinafter, "Liown" or "the Liown Defendants") (see Compl. ¶ 12 [Doc. No. 1]), Plaintiff later amended its Complaint to add several additional Defendants that sell flameless candles manufactured by Liown throughout the United States.  (See generally First Am. Compl. [Doc. No. 13]; Second Am. Compl. [Doc. No. 88].)

Plaintiff alleges nine counts against Defendants, including but not limited to patent infringement, tortious interference, and trademark infringement.  (See generally Third Am. Compl. [Doc. No. 131].)  For purposes of its Motion for Preliminary Injunction, Plaintiff focuses solely on two of its claims.  Specifically, Luminara argues that the Court should grant a preliminary injunction because it is likely to succeed on (1) its claim that Defendants are infringing the '166 patent; and/or (2) its claim that the Liown Defendants and Boston Warehouse tortiously interfered with Luminara's contracts.  (See Pl.'s Mem. at 14–15 [Doc. No. 52]; Third Am. Compl. ¶¶ 26, 60–67 [Doc. No. 131].)

### B.  Patent Infringement Claim

Luminara argues that Liown's moving flameless candles utilize every aspect of claim 1 of its '166 patent, and therefore literally infringe claim 1.  Plaintiff contends that claim 1 of the '166 patent "claims the core invention of Disney's Artificial Flame

3

**A62**

Technology." (See Pl.'s Mem. at 4 [Doc. No. 52].)  Claim 1 claims a pendulum with a

"flame silhouette" that pivots on a support element through a hole in the body of the

pendulum to create a realistic flickering flame effect.  (See Merrill Decl., Ex. 5, "'166

Patent" [Doc. No. 55-1].)  Claim 1 provides as follows:

> 1. A pendulum member for generating a flickering flame effect, comprising:
>
> a [1] **body** with upper and lower portions;
>
> a [2] **flame silhouette** element extending outward from the upper portion of the body;
>
> and [3] **a hole** in the body below the flame silhouette element, wherein the hole is configured to receive [4] **a flame support** element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

(Id. at claim 1 (bold and bracketed numbering added).)  However, claim 1 does not claim

the specific mechanism or manner for causing the pendulum to pivot.  (See Patton Decl. ¶

6 [Doc. No. 54].)  Therefore, as Doug Patton, the co-inventor of the '166 patent, explains,

"the invention can be practiced with one, or two, or ten pendulums."  (See id.)

Figure 1 of the '166 patent shows a two-stage, or two pendulum design for a

flameless candle made in accordance with the invention claimed in claim 1.  (See id. ¶ 5.)

However, the invention "can also be implemented in a single-stage design using a single

pendulum."  (See id.)  In fact, Figure 7 of the '166 patent shows a single-stage, or single

pendulum design that utilizes the technology claimed in claim 1.  (See Merrill Decl., Ex.

5, "'166 Patent," Fig. 7 [Doc. No. 55-1].)  Plaintiff explains that the full scope of claim 1

of the '166 patent is supported by the written disclosure of the earlier-filed provisional

application filed on September 30, 2008.  (See Pl.'s Mem. at 5 (citing Patton Decl. ¶ 6)

4

**A63**

[Doc. No. 52].) Claim 1 describes the technology visually depicted inside the circle below:



**FIG. 1**

**Fig. 1 from Sept. 30, 2008 Provisional Pat. Appl. 61/101,611**

(Merrill Decl., Ex. 7, "Provisional Application 61/101,611," Fig. 1 [Doc. No. 55-1].)

Luminara granted Liown the right to distribute candles using the Artificial Flame Technology in China and parts of Asia. (See Merrill Decl., Ex. 15, "NDA" at 1 [Doc. No. 55-5].) However, Liown was not authorized to sell flameless candles using Disney's Artificial Flame Technology. (See id.) Luminara argues that Liown copied Disney's Artificial Flame Technology after it obtained details about the technology in a non-disclosure agreement ("NDA"). (See Pl.'s Mem. at 6 [Doc. No. 52]; Merrill Decl., Ex.

5

**A64**

14, "Product Development and Supply Agreement" [Doc. No. 55-5]; Merrill Decl., Ex.

15 "NDA" [Doc. No. 55-5].)

Plaintiff explains that in June 2010, the parties were unable to agree on a price for

the candles, and Liown subsequently filed a patent application in China claiming

ownership to a moving flameless candle. (See Pl.'s Mem. at 7 [Doc. No. 52].) Luminara

alleges that these flameless candles rely on exactly the same technology as Disney's

Artificial Flame Technology. (See id.) In 2012, Liown began selling its own flameless

candles and Plaintiff filed suit against Liown in November 2012 for patent infringement.

See Candella, LLC v. Liown Elecs. Co. Ltd., No. 12-cv-2803 (PJS/JJK) (D. Minn. Nov.

2, 2012) [Doc. No. 1]. Although the parties initially reached a settlement in 2013,

negotiations fell apart, and on August 5, 2014, Liown's counsel notified Luminara that

Liown would no longer comply with the terms of the November 2013 settlement. (See

Merrill Decl., Ex. 20, "Letter from Liown to David Baer" [Doc. No. 55-9].)

Liown's termination of its settlement with Luminara occurred a few days after

United States Patent No. 8,789,986 ("the '986 patent") was issued. (See Third Am.

Compl. ¶ 32 [Doc. No. 131].) The '986 patent is entitled "Electric Lighting Device and

Method of Manufacturing Same." (See id.) It was issued to Mr. Xioafeng Li, and was

assigned to Liown. (See id.) Plaintiff alleges that the '986 patent infringes the Artificial

Flame Technology patents, including the '166 patent. Thus, Luminara and Liown appear

to have dueling patents for similar technology.

6

## C. Tortious Interference Claim

While Liown's sales of its flameless candles largely consisted of sales to non-Luminara customers in 2012, Liown's sales strategy allegedly changed in 2014. (See Pl.'s Mem. at 10 [Doc. No. 52].) According to Jerry Cain, the President of Luminara, in 2014, "Liown began aggressively offering infringing flameless candles for sale to customers who had previously purchased flameless candles from Luminara, or who were under contract to purchase flameless candles using the licensed Artificial Flame Technology exclusively from Luminara." (Cain Decl. ¶ 3 [Doc. No. 53].) Plaintiff claims that Defendant Boston Warehouse Trading Corp. ("Boston Warehouse") sold a "Forever Flame" Candle that was made by Liown and infringed on claim 1 of the '166 patent. (See Pl.'s Mem. at 6 [Doc. No. 52].) Luminara argues that, currently, Liown and Boston Warehouse are selling flameless candles called "Illuminaires," in "an obvious attempt to make a false affiliation with Luminara's successful brand and registered trademark." (See id. at 10.)

Luminara's contracts with Defendant GKI/Bethlehem and Defendant The Light Garden, Inc. ("Light Garden") prohibit GKI/Bethlehem and Light Garden from purchasing for resale any products incorporating the Artificial Fame Technology, or products with confusingly similar technology, without Luminara's pre-approval. (See Cain Decl. ¶ 5 (citing GKI/Bethlehem Distribution Agreement § 2.04) [Doc. No. 53]; Cain Decl., Ex. B "Light Garden Distribution Agreement" §§ 1.08, 2.01 [Doc. No. 53-1].) Nonetheless, in November 2014, GKI/Bethlehem purchased flameless candles from Liown. (See Cain Decl. ¶ 6 [Doc. No. 53].) Plaintiff believes that GKI/Bethlehem may

7

continue purchasing additional candles from Liown in the future. (See Merrill Decl. ¶ 3 [Doc. No. 55].) In October 2014, Light Garden also began purchasing flameless candles from Liown. (See Cain Decl. ¶ 7 [Doc. No. 53].)

Plaintiff requests that the Court issue a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(d)(2), ordering (1) Defendants to "cease manufacturing, distributing, selling or offering for sale infringing flame candles to Luminara's customers;" and (2) Defendants to "recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers." (See Pl.'s Mem. at 13 [Doc. No. 52].)

## III. DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted). A district court must consider four factors in determining whether preliminary injunctive relief is warranted: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)); see Trebro Mfg. v. Firefly Equip., LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014) (citing Winter, 555 U.S. at 20). The burden of establishing the four Dataphase factors lies with the moving party. Watkins Inc., 346 F.3d at 844 (citation omitted). The United States Court of Appeals for the Federal Circuit explains that "a movant cannot be granted a preliminary injunction unless

8

**A67**

it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm." See Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citing Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1088 (Fed. Cir. 1998)). In analyzing all four factors, "'a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene.'" Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998)).[1]

## A. Likelihood of Success on the Merits

While "no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113, the likelihood of success factor is the most important, Barrett v. Claycomb, 705 F.3d 315, 320 (8th Cir. 2013) (citation omitted). Therefore, in order to obtain a preliminary injunction, the moving party must show that he has a "fair chance of prevailing" on his claims. Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008). "[A]n injunction cannot issue if there is no chance of success on the merits." Mid-Am. Real Estate Co. v. Iowa Realty Co., Inc., 406 F.3d 969, 972 (8th Cir. 2005) (citations omitted). However, the question is not whether the moving party has "'prove[d] a greater than fifty per cent [sic] likelihood that he will prevail.'" PCTV

---

[1] The Court notes that although Luminara and Liown currently hold allegedly dueling patents for moving flameless candles, the Court's preliminary injunction analysis remains the same. See C & A Plus, Inc. v. Pride Solutions, LLC, No. Civ. A3-02-118, 2003 WL 25278133, *6 (D. N.D. Feb. 7, 2003) (granting the plaintiff's motion for a preliminary injunction, and explaining that the plaintiff demonstrated a likelihood of success even though the defendant had a patent to sell its product); see also Amgen, Inc. v. Chugai Pharm. Co., Ltd., 927 F.2d 1200, 1205 (Fed. Cir. 1991) (same).

Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting Dataphase

Sys., Inc., 640 F.2d at 113). Rather, the question is whether any of the movant's claims

provide "fair ground for litigation." Watkins Inc., 346 F.3d at 844 (citation and internal

quotation marks omitted).

To satisfy the first Dataphase factor, Plaintiff must only demonstrate a likelihood

of success on the merits for one of its two claims, either its patent infringement claim, or

its tortious interference claim. In order to establish a likelihood of success on its patent

infringement claim, Luminara must show a likelihood of success with respect to both (a)

Defendants' infringement of Plaintiff's patent, and (b) the validity of Plaintiff's patent.

See Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1363 (Fed. Cir.

2001).

However, if Defendants present evidence which raises a "'substantial question'

concerning validity, enforceability, or infringement, [Plaintiff must] . . . produce

countervailing evidence demonstrating that these defenses 'lack[] substantial merit.'"

See id. (quoting Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir.

1997)); Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1377–78 (Fed. Cir.

2009) (explaining that if the alleged infringer challenges the validity of the movant's

patent, "it is the patentee, the movant, who must persuade the court that, despite the

challenge presented to validity, the patentee nevertheless is likely to succeed at trial on

the validity issue," because "the invalidity defense 'lacks substantial merit.'"). In the

Court's view, Luminara has demonstrated that it is likely to prevail with its patent

infringement claim. As Luminara must show likelihood of success with respect to only

one of its claims, the Court does not address the likelihood of success of Plaintiff's

tortious interference claim.

### 1. Claim Construction of Claim 1 of the '166 Patent

"The first step of the infringement analysis is claim construction." Nazomi

Commc'ns, Inc. v. Nokia Corp., 739 F.3d 1339, 1343 (Fed. Cir. 2014) (citing Cybor

Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc)). A court

begins its claim interpretation by examining intrinsic evidence, *i.e.*, the words and terms

of the claim, "the rest of the specification, and, if in evidence, the prosecution history."

CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). A court

"indulge[s] a 'heavy presumption' that a claim term carries its ordinary and customary

meaning." See id. (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d

985, 989 (Fed. Cir. 1999)).

According to Federal Circuit precedent, a claim term's ordinary meaning may be

derived from dictionary definitions. See, e.g., Rexnord Corp. v. Laitram Corp., 274 F.3d

1336, 1344 (Fed. Cir. 2001) (using Random House Unabridged Dictionary to define the

ordinary meaning of "portion" as encompassing both a one-piece and a two-piece

structure); Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed.

Cir. 1998) (noting that the meaning of a claim term may come from a "relevant

dictionary" so long as the definition does not fly "in the face of the patent disclosure");

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)

(explaining that "[a]lthough technical treatises and dictionaries fall within the category of

extrinsic evidence, as they do not form a part of an integrated patent document, they are

11

worthy of special note.  Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

"[I]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, [the Court] will generally construe the term to cover all known types of that structure" that the patent disclosure supports.  Renishaw, 158 F.3d at 1250.  A patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." Rexnord Corp., 274 F.3d at 1344 (citations omitted).

Only if the intrinsic evidence alone does not resolve any ambiguity in a disputed claim term, "[c]ourts may also use extrinsic evidence (*e.g.,* expert testimony, treatises) to resolve the scope and meaning of [the] claim term." CCS Fitness, Inc., 288 F.3d at 1366 (citing Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998); Kegel Co., Inc. v. AMF Bowling, Inc., 127 F.3d 1420, 1426 (Fed. Cir. 1997)).  However, "it is improper to rely on extrinsic evidence" if intrinsic evidence resolves all ambiguity. See Boss Control, Inc. v. Bombardier Inc., 410 F.3d 1372, 1377 (Fed. Cir. 2005) (internal quotations and citation omitted).

Here, intrinsic evidence clarifies any ambiguity in the claim terms, and therefore, the Court need not look to any extrinsic evidence.  As the Court noted above, claim 1 provides as follows:

   1. A pendulum member for generating a flickering flame effect, comprising:

a [1] **body** with upper and lower portions;

a [2] **flame silhouette** element extending outward from the upper portion of the body;

and [3] **a hole** in the body below the flame silhouette element, wherein the hole is configured to receive [4] **a flame support** element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

(See Merrill Decl., Ex. 5, "'166 Patent," claim 1 (bold and bracketed numbering added) [Doc. No. 55-1].)

For the purposes of this motion only, Liown assumes that Luminara's proposed claim construction for each term is correct. (See Defs.' Mem. at 14 n.2 [Doc. No. 76].) Thus, the Court also accepts Luminara's proposed claim construction. Salient to the dispute in this case, Plaintiff proposes that the term "pivot" means "to run on, or as if on, a pivot." (See Pl.'s Mem. at 19 [Doc. No. 52].) Luminara explains that the specification shows the invention pivotally mounted in that it can sway, twist or move on the support wire in multiple dimensions. (See Merrill Decl., Ex. 5, "'166 Patent," Col. 3:27–37 [Doc. No. 55-1].) Moreover claim 14 states that "the flame body swings or pivots freely about the support element." (See id. at claim 14.)

Plaintiff also proposes that the term "body" means "a pendulum member to which a flame silhouette is *attached*." (See Pl.'s Mem. at 18 (emphasis added) [Doc. No. 52].) Additionally, Plaintiff proposes that the Court interpret the term "flame silhouette" to mean "a shaped material, *attached* to the flame body, on which light is projected from a light source and reflected off the surface of the silhouette." (See id. at 19) (emphasis

13

**A72**

added).  Defendants accordingly argue that, under Plaintiff's own claim construction, the "'body' and the 'flame silhouette' must be two separate pieces that are attached to each other."  (See Defs.' Mem. at 14 [Doc. No. 76].)  Liown's primary basis for reading the claim as requiring two separate components is Figure 1 in the specification of the '166 patent, which appears to depict the body and flame silhouette as two separate pieces.  (See Defs.' Mem. at 15 (citing Fig. 1 of the '166 Patent) [Doc. No. 76].)[2]

Here, the parties dispute the role of Figure 1 in the specification in construing claim 1.  Although claims must be read in view of the specification, see Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), limitations from the specification should not be read into the claims, see Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).  See also Raytheon Co. v. Roper Corp., 724 F.2d 951, 957 (Fed. Cir. 1983) (explaining that simply because "claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims.").  In fact, the Federal Circuit held in Teleflex, Inc. v. Ficosa North America Corp., that "the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms."  See 299 F.3d

---

[2]      Defendants' expert, Kenneth W. Fernald, an engineer for Silicon Laboratories, also relies upon the dictionary definition of "attach" in order to reach his conclusion that the body and the flame silhouette must be two, detachable, separate pieces.  (See Fernald Decl. ¶ 4 [Doc. No. 79].)  Mr. Fernald contends that according to Merriam-Webster Dictionary, to "attach" means to "to fasten or join one thing to another."  (See Fernald Decl., Ex. B [Doc. No. 79-2].)  Mr. Fernald fails to note, however, that Merriam-Webster Dictionary also defines "attach" to mean "to be or become joined or connected," and/or "to associate or connect one thing with another."  (See id.)  These additional definitions support a construction of the term "attach," which includes an embodiment of the invention in which the flame silhouette and body are permanently joined to one another, or permanently connected to one another, without the need to fasten one part to the other.

14

**A73**

1313, 1327 (Fed. Cir. 2002). "[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." See id. (citing CSS Fitness, 288 F.3d at 1366). Unless a patentee demonstrates intent to deviate from the plain meaning of a term by "using words or expressions of manifest exclusion or restriction," the Court must construe the claim term to take on its ordinary and accustomed meaning. See id.

In this case, nothing in the intrinsic evidence indicates that the body and flame silhouette must be two, detachable pieces. Therefore, the Court disagrees with Defendants' interpretation of claim 1 and construes claim 1 consistent with the plain and ordinary meaning of the terms used. Pursuant to the language in claim 1, the body, one separately defined component, may be attached to, but not *de*tachable from, the flame silhouette, another separately defined component.[3] Figure 1 of the specification describes only one embodiment of the claimed body and flame silhouette, but in the circumstances of this case, the record is devoid of "clear statements of scope" that define the body and the flame silhouette as two separate, detachable components. See id. Absent such clear statements of scope, the Court is constrained to follow the language of the claim, rather than the depiction in Figure 1. See SRI Intern v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985); Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n, 805

---

[3]     The Court recalls that during oral argument, Plaintiff's counsel provided a helpful analogy for understanding the attached, but not detachable concept. As counsel explained, a human arm is attached, but not detachable from an individual's torso or body.

F.2d 1558, 1563 (Fed. Cir. 1986) (cautioning "against limiting the claimed invention to preferred embodiments or specific examples in the specification.").

Moreover, the Court notes that Figure 11 in the specification depicts a unitary body and flame silhouette element. (See Merrill Decl., Ex. 5 "'166 Patent," Fig. 11 [Doc. No. 55-1].) Therefore, Defendants' reliance on the depiction in Figure 1 is further undermined by the depiction in Figure 11. In sum, the Court rejects Defendants' construction requiring two detachable components, and construes claim 1 as encompassing an integrated structure that has both a body section and flame silhouette section.

## 2. Liown's '986 Patent Infringes Claim 1 of '166 Patent

The next step in the Court's infringement analysis requires the Court to determine whether the particular accused device infringes under the claim construction. See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1443 (Fed. Cir. 1997). "Literal infringement exists if each of the limitations of the asserted claim(s) read[s] on, that is, [is] found in, the accused device." Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1583 (Fed. Cir. 1995), cert. denied, 516 U.S. 906 (1995). "Infringement may be found under the doctrine of equivalents when, absent estoppel, every limitation of the asserted claim, or its equivalent, is found in the accused subject matter, the latter differs from what is literally claimed only insubstantially, and it performs substantially the same function in substantially the same way to achieve substantially the same result." Wright Med. Tech., Inc., 122 F.3d at 1444 (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 39–40 (1979); Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339

16

**A75**

U.S. 605, 608–09 (1950)).

Plaintiff contends that Liown's flameless candles utilize every aspect of claim 1 of the '166 patent, and therefore, Liown's candles literally infringe claim 1. (See Pl.'s Mem. at 20 [Doc. No. 52].) In opposition, Defendants argue that the Liown candles do not infringe because (1) unlike the '166 patent, Liown's candles incorporate an "integrated flame silhouette/body structure, rather than a separate flame silhouette attached to a body," and (2) they do not include a hole in the body below the flame silhouette element. (See Defs.' Mem. at 13–17 [Doc. No. 76].) The Court disagrees with both of Defendants' arguments.

First, contrary to Defendants' argument, the '166 patent does not require the "flame silhouette" to be a separate, detachable piece from the "body." (Cf. id. at 14.) As the Court noted above, it construes claim 1 as not requiring two separate, detachable pieces for the body and the flame silhouette. See supra Part III(A)(1). Simply because Luminara describes a portion of the structure, "the body," as attached to another portion of the structure, "the flame silhouette," does not mean that the portions must be detachable components. Rather, the body and flame silhouette may be separately defined parts of a single, unitary structure. Therefore, even though Liown's accused products "comprise an integrated flame silhouette/body structure," this integrated, unitary structure does not differ from the structure described in claim 1. (Cf. Defs.' Mem. at 14 [Doc. No. 76].)

Second, contrary to Defendants' argument, Liown's accused products do in fact include a hole in the body below the flame silhouette. (Cf. id. at 16.) Defendants' expert,

17

**A76**

Mr. Fernald, contends that in Liown's candles the hole runs "through the upper flame-shaped portion of the unified structure, rather than running through a 'body' located below an attached flame silhouette element." (See Fernald Decl. ¶ 7 [Doc. No. 79].)  The Court disagrees with Mr. Fernald's and Defendants' characterization of the distinction between the locations of the holes in the two products.  Both products have a hole located below the flame-shaped structure, as is evidenced by the illustration that Mr. Fernald relies upon in his declaration.  (See Fernald Decl. at 4 [Doc. No. 79].)

It is immaterial that Liown characterizes the hole as located in "the upper flame-shaped portion of the unified structure," and Luminara characterizes the hole as located "in the body below the flame silhouette element," because both definitions permit for the same interpretation.  Defendants do not dispute Luminara's proposed construction that (1) the "body" is the "pendulum member to which a flame silhouette is attached;" and (2) the "flame silhouette" is the "flame shaped material, attached to the flame body, on which light is projected."  (See Pl.'s Mem. at 18–19 [Doc. No. 52]; Defs.' Mem. at 14 n.2 [Doc. No. 76].)  Accordingly, Defendants must necessarily accept that the hole in Luminara's products is also in the upper-flame shaped portion of the structure.  Simply because Liown argues that its candles use a "unified" body/flame silhouette structure does not distinguish it from Luminara's candles, because, as the Court explained above, claim 1 of the '166 patent includes candles that have a unified, or integrated body/flame silhouette structure.

The Court finds that patent infringement is likely, despite the fact that the United States Patent and Trademark Office ("USPTO") granted Mr. Li a patent for a moving

A77

flameless candle, and considered one of Disney's prior patents for Artificial Flame Technology. Although the '166 patent was not listed in the References Cited section of Mr. Li's '986 patent, the '355 patent, one of Disney's other Artificial Flame Technology patents, was considered by the USPTO examiner. (See Merrill Decl., Ex. 19 "'986 patent," References Cited [Doc. No. 55-9].) In addition to the '355 patent, the examiner also considered Disney's September 30, 2008 provisional application, which served as the basis for all four of Disney's Artificial Flame Technology patents. (See id., Other Publications.)

Generally, the USPTO is entitled "'the deference that is due to a qualified government agency presumed to have properly done its job.'" See PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting Am. Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359 (Fed. Cir. 1984)). In this case, however, the Court disagrees with the USPTO's decision to grant Mr. Li's patent. Although the examiner considered the '355 patent and the September 30, 2008 provisional patent application,[4] the Court disagrees with the USPTO because of the Court's underlying claim construction of claim 1 of the '166 patent. Here, the Court construed claim 1 of the

---

[4]     While a provisional patent application does not grant patent rights, according to 35 U.S.C. § 119 (e)(1), if a non-provisional patent application is filed no later than twelve months after the date on which the provisional application was filed and if it contains a specific reference to the provisional application, then the non-provisional application may claim the benefit of the provisional application's earlier filing date. See 35 U.S.C. § 119(e)(1). Here, Disney filed its '355 patent, its first non-provisional patent application based on the 2008 provisional application, on July 21, 2009, and the patent issued on November 23, 2010. (See Merrill Decl., Ex. 2 "'355 patent" [Doc. No. 55-1].) Thus, because the '355 patent was filed less than one year after the provisional application was filed, the '355 patent is entitled to the benefit of the 2008 filing date.

19

**A78**

'166 patent as including an embodiment of the patent that had a unitary body and flame silhouette element. As Plaintiff explains, claim 1 of the '166 patent is based on the earlier-filed September 30, 2008 provisional application. (See Pl.'s Mem. at 5 (citing Patton Decl. ¶ 6) [Doc. No. 52].) Therefore, the Court's construction of claim 1 of the '166 patent transfers to construing the claims of the 2008 provisional application. Accordingly, the 2008 provisional application also covers an embodiment of the technology that includes a unitary body and flame silhouette element. (See Merrill Decl., Ex. 7 "Provisional Application 61/101,611" [Doc. No. 55-1].)

Based on the Court's claim construction, the Court concluded above that the '986 patent likely infringes claim 1 of the '166 patent. Thus, in this case, the Court's claim construction is at odds with the USPTO's determination, and the Court does not defer to the agency's decision. See C & A Plus, Inc. v. Pride Solutions, LLC, 2003 WL 25278133, *6 (D. N.D. Feb. 7, 2003) (granting the plaintiff's motion for a preliminary injunction, and explaining that the plaintiff demonstrated a likelihood of success even though the defendant had a patent to sell its product); see also Amgen, Inc. v. Chugai Pharm. Co., Ltd., 927 F.2d 1200, 1205 (Fed. Cir. 1991) (same).

In sum, the Court finds that Luminara demonstrated a substantial likelihood that Liown infringed the '166 patent and Defendants failed to raise a substantial question about whether the '986 patent infringes claim 1. See Purdue Pharma L.P., 237 F.3d at 1365 (holding that the accused product infringes under the court's claim construction, and the district court did not err in finding that the plaintiff made a "strong showing of a reasonable likelihood that it would succeed on the merits of its infringement claim.").

20

**A79**

### 3. No Substantial Question of Validity of Luminara's '166 Patent

In addition to arguing that a substantial question exists as to whether the '986 patent infringes claim 1, Defendants also argue that a substantial question exists as to the validity of the '166 patent. "[T]he alleged infringer at the preliminary injunction stage does not need to prove invalidity by the 'clear and convincing' standard that will be imposed at trial on the merits." See Titan Tire Corp., 566 F.3d at 1379. Rather, the Court "must decide whether to grant a preliminary injunction in light of the burdens the parties will bear at trial." See id.

In Oakley, Inc. v. Sunglass Hut Int'l, the Federal Circuit explained that "[i]n the context of a preliminary injunction, while 'the burden of proving invalidity is with the party attacking validity,' the party seeking the injunction 'retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail.'" See 316 F.3d 1331, 1339 (Fed. Cir. 2003) (quoting H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 387 (Fed. Cir. 1987)). Therefore, Luminara must show that an attack on its patent's validity would likely fail.

However, if Defendants raise "a substantial question concerning infringement or validity, meaning that [they] assert[] a defense that [Luminara] cannot prove lacks substantial merit," the Court should not issue the preliminary injunction. Tate Access Floors v. Interface Architectural Resources, 279 F.3d 1357, 1365 (Fed. Cir. 2002) (internal quotation marks omitted); see New Eng. Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 883 (Fed. Cir. 1992) (explaining that "[w]hile it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks

21

**A80**

substantial merit"). Here, Defendants argue that claim 1 of the '166 patent is invalid

because (a) it was anticipated by the '455 patent to Gary Schnuckle, a co-inventor of the

'166 patent; and/or (b) it is invalid as obvious under 35 U.S.C. § 103(a). The Court

addresses both arguments below.

### a. Luminara's '166 Patent Not Anticipated by '455 Patent

"A claim is anticipated only if each and every element as set forth in the claim is

found, either expressly or inherently described, in a single prior art reference." Verdegaal

Bros., Inc. v. Union Oil Co. of Cal., 814 F.2d 628, 631 (Fed. Cir. 1987) (internal citations

omitted); see also Liberty Ammunition, Inc. v. United States, 119 Fed. Cl. 368, 392–93

(Fed. Cir. 2014); Schering Corp. v. Geneva Pharm., 339 F.3d 1373, 1377 (Fed. Cir.

2003). Accordingly, Defendants must raise a substantial question that prior art

anticipated every element of claim 1.

Here, Defendants contend that the '455 patent constitutes prior art and anticipated

claim 1 of the '166 patent. Specifically, Defendants argue that, under 35 U.S.C. § 102(b),

the '455 patent is prior art to the '166 patent because the '455 patent shares one common

inventor with the '166 patent, and was issued more than a year before the purported

priority date of the '166 patent. [5] (See Defs.' Mem. at 18 [Doc. No. 76].) Plaintiff does

not take issue with Defendants' assertion that the '455 patent constitutes prior art, under

the definition provided by 35 U.S.C. § 102. [6] Rather, Plaintiff contends that although the

---

[5]     The definition of prior art, and exceptions to the definition are outlined in 35
U.S.C. § 102. See 35 U.S.C. § 102(a), (b).

[6]     As Plaintiff does not disagree that the '455 patent constitutes prior art, the Court
assumes that the '455 patent satisfies the definition of prior art pursuant to 35 U.S.C. §

22

**A81**

'455 patent is prior art, it does not anticipate claim 1 because each and every element of claim 1 is not found, either expressly or inherently, in the '455 patent.  (See Pl.'s Reply at 8–11 [Doc. No. 101].)  While Defendants rely on a declaration from their expert, Mr. Fernald, Plaintiff relies on the declaration of its expert, Stuart Brown, the Managing Principal and co-founder of Veryst Engineering, LLC.  (See generally Brown Decl. [Doc. No. 102].)

The Court agrees with Luminara and finds that Defendants fail to raise a substantial question that the '455 patent anticipates claim 1 of the '166 patent because it does not contain all of the required elements.  See Verdegaal Bros., Inc., 814 F.2d at 631. Specifically, the '455 patent does not anticipate the final element of claim 1 – "a flame support element such that the flame support element passes through the hole and body is free to *pivot* when supported by the flame element."  (See Miller Decl., Ex. 5 "'166 Patent," claim 1 (emphasis added) [Doc. No. 55-1].)

According to the other claims in the '166 patent and the specification, the pendulum pivots by moving in a "chaotic" motion, which creates the realistic "flickering flame effect" required by claim 1.  (See id.; id. at Col. 2:24–27.)  For instance, claim 14 states that "the flame body swings or pivots freely about the support element."  (See id. at claim 14.)  Both parties agree that the term "pivot" means "to run on, or as if on, a pivot." (See Pl.'s Mem. at 19 [Doc. No. 52].)  Additionally, the specification clarifies that "[t]he chaotic motion is possible because each pendulum is suspended using a V-shaped wire passing through a larger hole."  (See Brown Decl. ¶ 8 [Doc. No. 102]; see also Merrill

102.

Decl., Ex. 5, "'166 Patent," Col. 8:7–16 ("Hole in pendulum member is sufficiently larger than the diameter of support wire such that pendulum swing or pivots freely about support wire . . . In this manner, pendulum member is able to move back and forth . . . as well as flutter.") [Doc. No. 55-1].)  Plaintiff's expert, Mr. Brown, explains that the "relatively loose suspension allows the pendulum to rotate around three axes, slide along the wire, and translate the pendulum where it passes through the wire."  (See Brown Decl. ¶ 8 [Doc. No. 102].)  Therefore, the pendulum in the '166 patent moves in at least four different ways, and moves in a random, unpredictable manner, "much like a candle flame."  (See id. ¶ 9.)

While the pendulum described in claim 1 of the '166 patent moves chaotically, in at least four different directions, the pendulum described in the '455 patent moves rhythmically, in only two directions.  According to claim 1 of the '455 patent, the "simulated flame portion [has] a longitudinal axis . . . [and] said flame portion is movable toward and away from its longitudinal axis when subjected to air currents."  (See Poley Decl., Ex. 2 "'455 Patent," claim 1 [Doc. No. 78-2].)  The '455 patent describes this design as a "gimbal structure."  (See id. at Col. 3:55–62.)  The specification states that "[t]he movement of the magnetic base towards or away from the electromagnets will induce a rotational motion of the gimbal structure about the horizontal (or vertical) plane."  (See id. at Col. 6:4–7.)

Mr. Brown explains that "[u]nlike the invention in claim 1 of the '166 patent, the gimbal mechanism described in the '455 patent is unable to 'pivot' in three dimensions; the gimbal is limited to two rotations around two horizontal axes."  (See Brown Decl. ¶

24

**A83**

13 [Doc. No. 102].) The '455 patent gimbal mechanism "cannot 'twist' like the pendulum member in claim 1 of the '166 patent, and, therefore, is not 'free to pivot when supported by the flame support element.'" (See id.)

In contrast, Defendants claim that that the gimbal mechanism in the '455 patent moves in the same way as the pivoting system described in the '166 patent. (See Defs.' Mem. at 21 [Doc. No. 76].) The Court disagrees. Defendants state that according to the specification of the '455 patent, the rotation of the gimbal mechanism allows the flame shaped element to be displaced from its stationary position to other positions illustrated in Figures 4 and 6 in the '455 patent. (See id.) However, upon close inspection of Figures 4 and 6, it is evident that the illustrations demonstrate that the flame shaped element only moves in two different directions, toward and away from the longitudinal or vertical axis. (See Poley Decl., Ex, 2 "'455 Patent," Figs. 4, 6 [Doc. No. 78-2].)[7] This limited movement is in stark contrast to the "pivot," or freely chaotic pendulum movement that is required by claim 1 of the '166 patent. Therefore, the Court finds that the '455 patent does not anticipate at least one element of claim 1 of the '166 patent. See Purdue Pharma L.P., 237 F.3d at 1366.

The Court's holding is bolstered by the fact that the '455 patent was specifically

---

[7]    The Court notes that it is not limiting the '455 patent to "preferred embodiments or specific examples in the specification." See Comark, 156 F.3d at 1186. Rather, here the Court's interpretation is based on a holistic reading of the specification and the illustrations, which demonstrate that the gimbal mechanism and its two-dimensional rotation of the artificial flame is a core concept on the claimed design of the patented product. See SRI Intern., 775 F.2d at 1121; (see, e.g., Poley Decl., Ex. 2. "'455 Patent," Col. 3:55–62; 4:17–18, 27–32; 5:1–9, 33–38; 6:4–7, 58–61 (describing the consistent function and purpose of the gimbal mechanism in different embodiments) [Doc. No. 78-2]).

considered by the USPTO during examination of the '166 patent.  (See Pl.'s Reply at 11 [Doc. No. 101]; Merrill Decl., Ex. 5, "'166 Patent," References Cited [Doc. No. 55-1].) In PowerOasis, the Federal Circuit held that "'[w]hen no prior art other than that which was considered by the [US]PTO examiner is relied on by the attacker, [the attacker] has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job.'"  See 522 F.3d at 1304 (quoting Am. Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359 (Fed. Cir. 1984)); see also Tokai Corp. v. Easton Enterprises, Inc., 632 F.3d 1358, 1367 (Fed. Cir. 2011).

Here, Liown, the party attacking the validity of the '166 patent, relies solely on the '455 patent.  Although Liown must only raise a substantial question as to the validity of the '166 patent at this stage in the proceedings, the Court bears in mind the deference that the USPTO is due.  Given the Court's analysis of the two patents and the fact that the USPTO examiner considered the '455 patent in its list of references when determining whether to grant the '166 patent, Liown's argument about the invalidity of the '166 patent lacks substantial merit.  See Purdue Pharma L.P., 237 F.3d at 1363.  Accordingly, the Court holds that Liown failed to raise a substantial question concerning the validity of the '166 patent, because at least one element of claim 1 was *not* anticipated by the '455 patent.[8]

---

[8]     Luminara also argues that the '455 patent did not anticipate another element of claim 1.  Specifically, Plaintiff contends that the hole in the '455 patent serves a different purpose than the hole discussed in claim 1 of the '166 patent.  (See Pl.'s Reply at 11 [Doc. No. 101].)  The hole in claim 1 of the '166 patent serves as the location from which the pendulum pivots.  (See id.)  The gimbal mechanism in the '455 patent, however, pivots not at the hole in the body, but, instead, around points connecting the rod to the

CASE Case 0:14-cv-05631-SRN-FLN Document 30merit 164 Filed 05/01/06/19/20127 of 55

### b. Luminara's '166 Patent Not Obvious Because of '455 Patent

Defendants also argue that "[e]ven if [c]laim 1 was not found to be anticipated, it would still be invalid as 'obvious' under 35 U.S.C. § 103(a)." (<u>See</u> Defs.' Mem. at 22 [Doc. No. 76].) Under § 103, a patent may not issue "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." <u>See</u> 35 U.S.C. § 103.

"Obviousness is a question of law based on underlying factual determinations, including: (1) the scope and content of prior art; (2) differences between prior art and claims; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness." <u>PAR Pharm., Inc. v. TWI Pharm., Inc.</u>, 773 F.3d 1186, 1193 (Fed. Cir. 2014) (citing <u>Graham v. John Deere Co.</u>, 383 U.S. 1, 17–18 (1966)). At trial, Liown will be required to demonstrate "by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention[, or the elements of claim 1 of the '166 patent], and that the skilled artisan would have had a reasonable expectation of success from doing so." <u>Procter & Gamble Co. v. Teva Pharm. USA, Inc.</u>, 566 F.3d 989, 994 (Fed. Cir. 2009)); <u>see also</u> <u>Microsoft</u>

ring-shaped member and on the housing of the flameless candle. (<u>See</u> <u>id.</u>) (citing Brown Decl. ¶ 14 [Doc. No. 102].) Therefore, Luminara argues that although both patents refer to a hole in the "body," the holes serve different purposes. Because the Court has already held that the '455 patent did not anticipate the "pivoting" required by claim 1, it need not determine the merits of Plaintiff's argument about the purpose of the "hole" in the "body."

27

**A86**

Corp. v. i4i Ltd. P'ship, _U.S._, 131 S. Ct. 2238, 2242 (2011) (confirming that an invalidity defense must meet the clear-and-convincing evidence standard of proof); In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) (same).

At this stage of the proceedings, however, Defendants need not satisfy the "clear and convincing" evidence standard. Rather, when deciding whether to grant the preliminary injunction, the Court simply keeps in mind the burden Liown will ultimately face. See Titan Tire Corp., 566 F.3d at 1379. The Court's obviousness inquiry "must be expansive and flexible." In re Cyclobenzaprine, 676 F.3d at 1068 (citing KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 415, 419 (2007)).

Here, Liown claims that "[o]ne skilled in the art of flameless candles would certainly find the overbroad [c]laim 1 invalid in view of the '455 [p]atent." (See Defs.' Mem. at 22 [Doc. No. 76].) The Court begins its obviousness analysis by ascertaining the differences between (1) the prior art, the '455 patent, and (2) the claim at issue, claim 1 of the '166 patent. See PAR Pharm., Inc., 773 F.3d at 1193. As the Court explained in detail above, the "pivoting" required by claim 1 was not anticipated by the '455 patent because that prior art utilizes a gimbal mechanism, which enables the flame silhouette to only move in a limited, controlled fashion, as opposed to moving in a three-dimensional, chaotic fashion. See supra Section III(A)(3)(a); (Brown Decl. ¶ 13 [Doc. No. 102]). Based on this significant difference between the prior art and the claim at issue, Graham, 383 U.S. at 17–18, the Court finds that Defendants failed to raise a substantial question as to whether claim 1 is invalid as obvious because of prior art. See Procter, 566 F.3d at

28

**A87**

994.

In sum, Luminara established a substantial likelihood of success on the merits of its patent infringement claim, and Defendants failed to raise substantial doubt about the validity of the '166 patent, and about whether the '986 patent infringes claim 1. See Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1168 (Fed. Cir. 2014) (reversing district court's denial of preliminary injunction because the district court erroneously construed the terms of the movant's patent, and holding that the movant "established that it [was] 'more likely than not' to succeed on infringement," and finding that there was no substantial question as to the movant's patent's validity). The Court need not discuss the likelihood of success of Luminara's tortious interference claim because Luminara must only establish substantial likelihood of success for one of its claims in order for a preliminary injunction to issue.

### B. Risk of Irreparable Harm

Although the likelihood of success is the most important factor, Barrett, 705 F.3d at 320, the Court also considers the other three Dataphase factors to determine whether a preliminary injunction should issue. The Court presently considers the threat of irreparable harm to Luminara in the absence of relief. See Watkins Inc., 346 F.3d at 844 (citing Dataphase Sys., Inc., 640 F.2d at 114)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's LLC, 563 F.3d

**A88**

312, 319 (8th Cir. 2009).[9] An injunction may only issue if the irreparable injury is

"imminent." See <u>ASICS Corp. v. Target Corp.</u>, 282 F. Supp. 2d 1020, 1031 (D. Minn.

2003) (citing <u>In re Travel Agency Com'n Antitrust Litig.</u>, 898 F. Supp. 685, 689 (D.

Minn. 1995) (stating that "an injunction cannot issue based on imagined consequences of

an alleged wrong.  Instead, there must be a showing of imminent irreparable injury.")).

    Plaintiff argues that it will suffer immediate, irreparable harm because without a

preliminary injunction Luminara will (1) lose its market share; (2) lose goodwill and

suffer harm to its reputation; (3) suffer from price erosion; and (4) lose customers and

sales to its direct competitor, Liown.  (See Pl.'s Mem. at 30–33 [Doc. No. 52].)

Defendants contend that Luminara will not suffer irreparable harm absent an injunction

because Plaintiff alleges nothing more than "the possibility of future harm," which is

entirely compensable by money damages.  (See Defs.' Mem. at 26 [Doc. No. 76].)

---

[9]    The Court notes that Defendants correctly assert that "[u]nder the current law, patentees who demonstrate a reasonable likelihood of success on the merits are no longer entitled to a presumption of irreparable harm in a preliminary injunction analysis."  (See Defs.' Mem. at 26–27 [Doc. No. 76].)  As another court in this District explained, "[i]n light of the Supreme Court's decision in <u>eBay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388 (2006) . . . the Court finds that it may not presume that a patentee who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a preliminary injunction."  See <u>Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.</u>, 491 F. Supp. 2d 871, 881 (D. Minn. 2007).  Defendants argue that since <u>eBay</u> invalidated the presumption of irreparable harm, all cases that Plaintiff relies upon, which predate <u>eBay</u>, should be disregarded.  (See Defs.' Mem. at 27 [Doc. No. 76].)  The Court disagrees.  As Luminara explains, it cited cases, which predate <u>eBay</u>, for propositions that remain good law.  (See Pl.'s Reply at 4 [Doc. No. 101].)  Therefore, the Court cites to cases that Plaintiff relies upon as needed throughout this Order.

### 1. Loss of Market Share

Plaintiff contends that, without preliminary injunctive relief, it will suffer irreparable harm from losing its significant market position. (See Pl.'s Mem. at 31 [Doc. No. 52].) "[L]ost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the patentee practices the invention.'" Automated Merch. Sys., Inc. v. Crane Co., 357 Fed. App'x 297, 301 (Fed. Cir. 2009) (quoting Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991)). In Automated Merchandising Systems, the Federal Circuit noted that, in some circumstances, a non-compensable loss may include the loss of even a single distributor. Cf. id. (holding that although loss of a single distributor may amount to an irreparable injury in some cases, in this case, "the defection of a single distributor from the patentee's camp to the accused infringer's camp" was insufficient to demonstrate irreparable harm). Thus, Luminara must present at least some evidence demonstrating that its "potential losses cannot be compensated by monetary damages." See id.

Luminara argues that it will not have the same opportunity to recapture its market share once the market matures. (See Pl.'s Mem. at 31 [Doc. No. 52].) Specifically, according to Jerry Cain, the President of Luminara, Liown's sales of its allegedly infringing candles will cause a significant decrease in Luminara's "market share value." (See Cain Decl. ¶ 12 [Doc. No. 53].) In his declaration, Mr. Cain stated that in 2013, "GKI/Bethlehem accounted for over 40% of Luminara sales." (See id. ¶ 4.) Plaintiff

31

**A90**

then implies that because GKI/Bethlehem re-directed its business from Luminara to Liown, Luminara's percentage of sales from GKI/Bethlehem has necessarily also decreased.[10] (See Pl.'s Mem. at 31 [Doc. No. 52].) Although Plaintiff presents evidence demonstrating Luminara's percentage of sales to GKI/Bethlehem before Liown allegedly began infringing, Plaintiff fails to provide any evidence demonstrating its market share of the overall market of flameless candles that it had before and/or after the alleged infringement began. Therefore, Luminara does not make a "prima facie showing of lost market share." Cf. Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1154 (Fed. Cir. 2011) (explaining that the plaintiff successfully made a prima facie showing of lost market share through indirect evidence because it presented evidence showing that the Wal-Mart account, which the plaintiff had before Wal-Mart redirected its business to the defendant, accounted for a substantial portion of the entire market).

Luminara appears to argue that because there are no other non-infringing alternatives for consumers to purchase flameless candles, Liown's continued sale of allegedly infringing candles will unavoidably decrease Luminara's overall market share. (See Pl.'s Mem. at 31 [Doc. No. 52].) Defendants disagree, and argue that "[t]here are several other flameless candle makers on the market which GKI/Bethlehem and The

---

[10]    The Court notes that according to Defendants, GKI only purchased *non*-moving flame candles from Liown "when Liown began working with GKI." (See Yang Decl. ¶ 9 [Doc. No. 80].) Liown CEO, John Yang, does admit however that by the end of 2014, Liown sold moving flameless candles to GKI. (See id.) Yang's concession aligns with Luminara's contention that in November 2014 (the end of 2014), Luminara learned that GKI may have been purchasing infringing candles from Liown. (See Cain Decl. ¶ 6 [Doc. No. 53].) Therefore, Defendants' argument that GKI/Bethlehem did not purchase moving flameless candles until the end of 2014 is inapposite.

A91

Light Garden could have sought flameless candles from other than Liown." (See Defs.'
Mem. at 29 [Doc. No. 76].)  However, neither party substantiates their claims with any
corroborating evidence.  As "lost market share must be proven (or at least substantiated
with some evidence) in order for it to support entry of a preliminary injunction,"
Automated Merch. Sys., Inc., 357 Fed. App'x at 301, the Court accordingly finds that, in
this case, Luminara does not sufficiently establish that it would suffer irreparable harm
from lost market share.

### 2.  Loss of Goodwill and Harmed Reputation

In addition to alleging irreparable harm in the form of lost market share, Luminara
also claims that without a preliminary injunction it will suffer irreparable loss of goodwill
and a harmed reputation.  (See Pl.'s Mem. at 32 [Doc. No. 52].)  Plaintiff's argument is
two-fold, as it contends that (1) Liown's alleged infringement renders Luminara's
exclusive license of Disney's Artificial Flame Technology a waste; and (2) Liown's
branding of its "Illuminaires" flameless candles essentially infringes Plaintiff's
"LUMINARA" trademark; and therefore, harms Plaintiff's reputation by associating
Luminara's product in customers' minds with Liown's allegedly inferior product.  (See
id.)  Luminara argues that "[a]bsent an injunction, there is nothing to stop Liown from
similarly marketing in the future and further diminishing the reputation of Luminara
candles by associating them in the minds of customers with Liown's inferior product."
(See id.)

The Federal Circuit and United States Court of Appeals for the Eighth Circuit
have both held that loss of goodwill and injury to reputation often constitutes irreparable

harm.  See Iowa Utils. Bd. v. F.C.C., 109 F.3d 418, 426 (8th Cir. 1996) (explaining that

"potential loss of consumer goodwill qualifies as irreparable harm."); Bio-Technology

Gen. Corp. v. Genentech, Inc., 80 F.3d 1553, 1566 (Fed. Cir. 1996) (finding that loss of

revenue and goodwill constitute irreparable harm); EZ Gard Indus., Inc. v. XO Athletic

Co., No. 07-cv-4769 (JMR/FLN), 2008 WL 1827490, at *4 (D. Minn. Apr. 23, 2008)

aff'd, 302 Fed. App'x 920 (Fed. Cir. 2008) (finding that the plaintiff will likely suffer

irreparable harm absent an injunction because the defendant was marketing to the

plaintiff's customer and "touting" its product as the "superior product," and "thus

impairing plaintiff's goodwill and reputation.").  Loss of goodwill and reputation qualify

as irreparable harm because monetary damages are inadequate to compensate a plaintiff

injured in this manner.  See Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d

801, 805 (8th Cir. 2003) (stating that "[h]arm to reputation and goodwill is difficult, if not

impossible, to quantify in terms of dollars.").

 Loss of consumer goodwill qualifies as irreparable harm, "[e]ven absent consumer

confusion," because a patentee's "reputation as an innovator" could "certainly be

damaged if customers found the same 'innovations' appearing in competitors'

[products]."  See Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336, 1344–

45 (Fed. Cir. 2013) (holding that the plaintiff submitted enough evidence to establish

irreparable harm because, among other things, the plaintiff showed that its reputation as

an innovator would certainly be damaged if "customers found the same innovations

appearing in competitors' snowplows, particularly products considered less prestigious

and innovative.").  As the Federal Circuit explained in Douglas Dynamics, LLC,

"[w]here two companies are in competition against one another, the patentee suffers the harm [to its reputation] – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." See id. at 1345.

Here, Luminara alleges that Liown's alleged infringement harms Luminara's reputation as the exclusive licensee of Disney's Artificial Flame Technology. (See Pl.'s Mem. at 32 [Doc. No. 52].) Luminara also has the sole and exclusive right to enforce Disney's Artificial Flame Technology patents. (See 4/3/15 Order at 7, 49–50 [Doc. No. 143].) Therefore, when Luminara sues to enforce these patents, as it does in this case, Luminara not only protects its own reputation as the exclusive licensee of the products, but it also protects Disney's reputation as an innovator.

As to Luminara's own reputation, it argues that it would be irreparably "damaged if its dealers and distributors believed it did not enforce its intellectual property rights." See Douglas Dynamics, LLC, 717 F.3d at 1345. Assuming Plaintiff's allegations about Defendants' patent infringement are correct, Luminara suffers irreparable harm to its reputation and goodwill by "being forced to compete against products that incorporate and infringe its own [products]." See id.

As to Disney's reputation, Liown's alleged infringement could certainly damage Disney's reputation as an "innovator" if customers found the same innovations appearing in both Disney's and Liown's products. See id. at 1344–45. Here, Disney's reputation is injured because with Liown's products on the market, Disney is no longer the sole innovator known for the Artificial Flame Technology. Because a patent is a property right that "is an intangible asset that is part of a company's reputation," Disney's

reputation as an innovator, and Luminara's exclusive right to make, use, and sell the Artificial Flame Technology, are both harmed by Liown's alleged infringement. See id. at 1345. Therefore, Plaintiff has presented evidence of loss of goodwill, which establishes irreparable harm.

The Court's holding is bolstered by the fact that, as Plaintiff alleges, Liown's marketing of its flameless candles essentially infringes Plaintiff's "LUMINARA" trademark, and further harms Plaintiff's reputation by associating Luminara's product in customers' minds with Liown's allegedly inferior product.[11] (See Pl.'s Mem. at 32 [Doc. No. 52].) While Plaintiff alleges that Liown's candles are inferior to Luminara's candles (see Pl.'s Mem. at 32 [Doc. No. 52]), this allegation is based solely on the Luminara President's assertion of this alleged fact, and the President's contention that customers and consumers "generally agree" with him (see Cain. Decl. ¶ 11 [Doc. No. 53]). In response, the CEO of Liown contends that Liown's products are superior to Luminara's, because "on information and belief, Luminara's manufacturers source materials . . . do not have a Material Safety Data Sheet and/or [do not] meet certification standards." (See Yang Decl. ¶ 6–7 [Doc. No. 80].) The Court is cautious to credit either party's non-expert, self-serving evidence regarding the superiority of either product.

---

[11]    Defendants argue that Liown's "Illuminaires" candles cannot create trademark confusion with Plaintiff's "LUMINARA" candles because "[a] simple search for trademarks associated with candles containing a variation of 'illuminate' or 'lumen' reveals many hits." (See Defs.' Mem. at 29 [Doc. No. 76].) The Court notes, however, that none of the "many hits," which Defendants reference, are flameless moving candle products. (See Poley Decl., Ex. 4 [Doc. No. 78-4].) Therefore, product confusion between Plaintiff's and Liown's candles is much more likely than product confusion with other products.

However, even assuming that Liown's product is superior to Luminara's, because Liown chose to name its candles "Illuminaries," consumers could plausibly confuse Liown's product with the "LUMINARA" branded product. See Douglas Dynamics, LLC, 717 F.3d at 1344; Medicine Shoppe Int'l, Inc., 336 F.3d at 805 (finding irreparable harm because the plaintiff had presented sufficient evidence to show that de-identification of the plaintiff's pharmacy created consumer confusion and eroded consumer confidence). Similar to Disney's patents for Artificial Flame Technology, Plaintiff's "LUMINARA" trademark "represent[s] intangible assets of goodwill and reputation." See 3M Co. v. Mohan, No. 09-cv-1413 (ADM/FLN), 2010 WL 5095676, at *24 (D. Minn. Nov. 24, 2010) aff'd, 482 Fed. App'x 574 (Fed. Cir. 2012) (citing Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987); Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 881 (D. Minn. 2010)). Therefore, regardless of the quality of Liown's product compared to Luminara's product, Luminara incurs irreparable harm because its reputation is harmed by this confusion. See Mohan, 2010 WL 5095676, at *24 (explaining that regardless of the quality of the defendant's product compared to the plaintiff's product, the defendant's "incursion on the reputation of the [plaintiff's] brand has caused irreparable injury.") (citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195–96 (3d Cir. 1990) (stating that "[i]f another uses [the plaintiff's mark], he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use.")). Accordingly, although Plaintiff's motion for a preliminary injunction does not rest on its likelihood of success on the merits for trademark

37

**A96**

infringement, the Court's finding of irreparable harm is bolstered by the fact that Liown

chose to market its moving flameless candles with a brand name that is substantially

similar to Luminara's.[12]

### 3. Price Erosion

Plaintiff also argues that "without preliminary injunctive relief, [it] will be forced

to reduce the price of its flameless candles to offset competition from Liown."  (See Pl.'s

Mem. at 33 [Doc. No. 52].)  In order for price erosion to serve as a basis of irreparable

harm, Luminara must present some substantive evidence demonstrating that price erosion

will occur.  See Purdue Pharma L.P., 237 F.3d at 1368 (holding that the district court

properly credited the plaintiff's economics expert testimony that price erosion was likely,

and therefore upholding the district court's finding of irreparable harm).  The Federal

Circuit explained in Polymer Technologies, Inc. v. Bridwell that:

> Competitors change the marketplace. Years after infringement has begun, it
> may be impossible to restore a patentee's (or an exclusive licensee's)
> exclusive position by an award of damages and a permanent injunction.
> Customers may have established relationships with infringers.  The market
> is rarely the same when a market of multiple sellers is suddenly converted
> to one with a single seller by legal fiat.  Requiring purchasers to pay higher
> prices after years of paying lower prices to infringers is not a reliable
> business option.

See 103 F.3d 970, 975–76 (Fed. Cir. 1996).  Therefore, according to Federal Circuit case

law, price erosion may inflict irreparable harm when it is not compensable with money

---

[12]     Insofar as Defendants argue that "Luminara's candles are not sold under the
Luminara mark," the Court finds this argument unpersuasive.  (Cf. Defs.' Mem. at 29
[Doc. No. 76].)  Luminara has presented evidence demonstrating that its candles are sold
on its website and through its customers with the "LUMINARA" mark.  (See Merrill
Decl., Ex. 38, Ex. 41 [Doc. No. 103-1]; Merrill Decl., Ex. 33 [Doc. No. 55-10].)

38

**A97**

damages.  See also Automated Merch. Sys., Inc., 357 Fed. App'x at 301 (noting that a court may find irreparable harm sufficient to warrant a preliminary injunction if "failing to grant a preliminary injunction would permit [the defendant] to drop its prices in order to drive [the plaintiff] out of the market entirely").

Here, Luminara has presented weak or little evidence demonstrating that price erosion will likely occur in the future.  Plaintiff relies only on its President's contention that the company has received requests for price concessions due to the presence of Liown candles in the marketplace.  (See Cain Decl. ¶ 13 [Doc. No. 53].)  Although Mr. Cain claims that price erosion is a certainty, Plaintiff does not present evidence such as sales projections, market reports, or expert testimony to substantiate its claim of the likelihood of future price erosion.

While the likelihood of *future* price erosion is not strongly supported by evidence in the record, ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████  In contrast to Luminara's prices, Liown's "Illuminaires" candles are being sold for $19.99 each at Boston Warehouse and Tuesday Morning.  (See Merrill Decl., Ex. 22, Ex. 33 [Doc. No. 55-9].)

Therefore, while Yang contends that Luminara was voluntarily cutting its prices,

39

**A98**

(see Yang Decl. ¶ 7 [Doc. No. 80]), the Court finds that Luminara was likely cutting

prices in order to compete with Liown's prices, because Luminara lowered its prices

around the same time that it learned that GKI had purchased infringing candles from

Liown.  (See Cain Decl. ¶ 6 [Doc. No. 53].); cf. Travel Tags, Inc. v. UV Color, Inc., 690

F. Supp. 2d 785, 800 (D. Minn. 2010) (holding that irreparable harm because of price

erosion did not exist because there was no indication that the parties had entered into a

price war, or that the plaintiff's prior customer had considered only price when it decided

to contract with the defendant, instead of the plaintiff).

In opposition, Defendants argue that "[p]rice erosion is not found with a mere

citation to supposedly disparate prices for distinct products at hand-picked stores."  (See

Defs.' Mem. at 30 [Doc. No. 76].) ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████  Therefore,

Luminara has presented sufficient evidence demonstrating that price erosion has already

occurred.

However, in order for price erosion to constitute irreparable harm, the harm must

not be compensable by money damages.  The Federal Circuit explained in Polymer

Technologies, Inc. that "[r]equiring purchasers to pay higher prices after years of paying

lower prices to infringers is not a reliable business option," and it "may be impossible to

restore . . . an exclusive licensee's [] exclusive position by an award of damages."  See

40

103 F.3d at 975–76.  Here, Luminara is an exclusive licensee of Disney's Artificial Flame Technology and argues that its "opportunity to charge higher prices while Luminara candles are still relatively new and profit from its innovation will be irretrievably lost if Liown continues to sell infringing flameless candles."  (See Pl.'s Mem. at 33 [Doc. No. 52].)

As was the case in Polymer Technologies, Inc., it is unreasonable to assume that Luminara would be able to require its customers to pay higher prices in the future, if Liown is presently permitted to continue selling flameless candles to these customers at a consistently low price.  Thus, the Court finds that Plaintiff has presented adequate evidence demonstrating that existing price erosion serves as another basis for finding irreparable harm.

### 4.  Loss of Sales and Customers to Direct Competitor

Finally, Plaintiff argues that without preliminary injunctive relief, it will suffer a loss of customers and sales to its direct competitor, Liown.  (See Pl.'s Mem. at 30–31 [Doc. No. 52].)  As to lost sales, Luminara contends that but-for Liown's infringement and tortious interference, GKI/Bethlehem and Light Garden would have purchased Luminara candles instead of Liown candles.  (See id. at 30.)  Defendants contend that Luminara "failed to allege any facts that would support such a speculative statement." (See Defs.' Mem. at 28–29 [Doc. No. 76].)  The Court disagrees.  The contractual agreements between Luminara and GKI/Bethlehem and Light Garden prohibited these two Defendants from purchasing for resale any products incorporating the Artificial Fame Technology, or products with confusingly similar technology, without Luminara's

41

**A100**

pre-approval. (See Cain Decl. ¶ 5 (citing GKI/Bethlehem Distribution Agreement § 2.04) [Doc. No. 53]; Cain Decl., Ex. B "Light Garden Distribution Agreement" §§ 1.08, 2.01 [Doc. No. 53-1].) Therefore, the Court agrees with Luminara that but-for Liown's interference with these two contractual relationships, GKI/Bethlehem and Light Garden would have been required to purchase flameless candles from Luminara instead.

However, "lost sales standing alone are insufficient to prove irreparable harm; [because] if they were, irreparable harm would be found in every case." See Automated Merch. Sys., Inc., 357 Fed. App'x at 300–01. Here, Plaintiff alleges more than simply lost sales to substantiate its contention of irreparable harm. In addition to lost sales, Luminara alleges lost market share, loss of goodwill, harm to reputation, and price erosion. Therefore, although lost sales evidence "by itself could not support a finding of irreparable injury," id. at 301, here, Plaintiff alleges more than simply lost sales.

As to lost customers, Luminara argues that it suffers irreparable harm because "its customers may not come back to Luminara even if Liown's infringing moving candles are eventually taken off the market after a trial on the merits." (See Pl.'s Mem. at 30 [Doc. No. 52].) In Trebro Mfg., the Federal Circuit explained that loss of customers may constitute irreparable harm, particularly when the customer loss could result in the movant laying off its employees. See Trebro Mfg., Inc., 748 F.3d at 1170–71. Here, however, Luminara did not present any evidence to substantiate its speculative claim of customer loss.

Nonetheless, in sum, the Court finds that Luminara suffers a threat of irreparable harm in the absence of relief because Luminara has established that it will suffer lost

sales, loss of goodwill, harm to its reputation, and it has already suffered from price erosion. Therefore, the second Dataphase factor also weighs in favor of the Court granting the preliminary injunction.

### C. Balance of Hardships

Next, the Court considers the third Dataphase factor, and compares the harm that will result to Luminara if relief is denied with the harm that will result to the other litigants if the relief is granted. See Dataphase Sys., Inc., 640 F.2d at 114. The harm that Plaintiff will endure if a preliminary injunction is not granted is detailed in the Court's discussion of irreparable harm, above. See supra Part III(B). Plaintiff argues that while it will suffer irreparable harm without a preliminary injunction, "Liown and the other [D]efendants will suffer relatively little harm if an injunction were ordered." (See Pl.'s Mem. at 34 [Doc. No. 52].) Luminara contends that the harm to Liown would be minimal because the injunctive relief Luminara seeks is narrowly tailored. (See id.) Specifically, Luminara explains that it only seeks an injunction "barring Liown's sales to [Luminara's] customers, such as GKI/Bethlehem, Light Garden, and other existing Luminara customers." (See id.) Plaintiff additionally argues that given the limited nature of the injunction sought, Liown would only lose revenue that was "generated from [the alleged] infringement of Luminara's patents or . . . [from the alleged] breach of customers' contracts." (See id. at 35.)

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**A102**

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████ because these customers would likely "suffer from decreased sales and revenue"

and would "likely be forced to sell an [allegedly] inferior product such as Luminara's."

(See Defs.' Mem. at 32 [Doc. No. 76].)

> In Illinois Tool Works, Inc. v. Grip-Pak, Inc., the Federal Circuit explained that:

> The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating. On the other hand, the hardship on a patentee denied an injunction after showing a strong likelihood of success on validity and infringement consists in a frequently and equally serious delay in the exercise of his limited-in-time property right to exclude. Neither hardship can be controlling in all cases. Because the court must balance the hardships, at least in part in light of its estimate of what is likely to happen at trial, it must consider the movant's showing of likelihood of success. Yet, a court must remain free to deny a preliminary injunction, whatever be the showing of likelihood of success, when equity in the light of all the factors so requires.

See 906 F.2d 679, 683 (Fed. Cir. 1990) (citing Roper Corp. v. Litton Sys., Inc., 757 F.2d

1266, 1272–73 (Fed. Cir. 1985)). Accordingly, in Illinois Tool Works, Inc., the Federal

Circuit held that the plaintiff's "weak showing of likelihood of success tip[ped] the

balance of hardships toward [the defendant]." See id.

Applying a similar analysis, in Intel Corp. v. ULSI System Technology, Inc., the

Federal Circuit held that the plaintiff had failed to show a likelihood of success on the

merits and the balance of hardships tipped in the defendant's favor because the

defendant's product, which allegedly infringed the plaintiff's patent, was the defendant's

"only product" so the defendant "would in all likelihood be forced out of business if it

were enjoined." See 995 F.2d 1566, 1568 & 1571 (Fed. Cir. 1993) (internal quotations omitted).

Here, unlike the plaintiffs in Illinois Tool Works, Inc. and Intel Corp., Luminara has established a substantial likelihood of success on the merits. Also, unlike the defendant in Intel Corp., Liown stated in its response brief that its flameless moving candle is not its only product. (See Defs.' Mem. at 29 [Doc. No. 76].) Nonetheless, the harms to Liown may be substantial if injunctive relief is granted. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ ■ Moreover, unlike defendants in other patent infringement cases that did not seek a patent first, here, the USPTO granted Liown a patent for a flameless moving candle. Cf. Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006) (holding that the district court had not erred in finding that the balance of hardships tipped in the plaintiff's favor, because the defendant's harms were "'almost entirely preventable' and were the result of its own calculated risk to launch its product pre-judgment."); EZ Gard Indus., Inc., 2008 WL 1827490, at *5

---

[13]    Plaintiff contends that Liown's ███████████ annual sales loss estimate "presumes an injunction against *all* Liown sales, rather than the limited injunction against sales to Luminara customers." (See Pl.'s Reply at 13 (emphasis original) [Doc. No. 101].) However, Luminara offers no substantive evidence to support this claim, and Yang's declaration does not indicate that his estimate is based on an injunction against all Liown sales. (See Yang Decl. ¶ 3 [Doc. No. 80].)

45

**A104**

(explaining that the balance of hardships tipped in favor of the plaintiff seeking a preliminary injunction because the defendant did not have a patent for its product and acted as though it knew its product infringed the plaintiff's patent because once the defendant was notified by the plaintiff of a possible infringement, the defendant withdrew its original product and substituted a second product).

As the harms to Luminara would likely be substantial and irreparable if a preliminary injunction was denied (see supra Part III(B)), and the harms to Liown would similarly be substantial and irreparable if a preliminary injunction was granted, the Court finds that the balance of hardships analysis favors neither party.

### D. Public Interest

Finally, the Court considers the fourth Dataphase factor and determines whether the public interest weighs in favor of granting or denying a preliminary injunction. See Watkins Inc., 346 F.3d at 844 (citing Dataphase Sys., Inc., 640 F.2d at 114). The Federal Circuit explained in Hybritech Inc. v. Abbott Laboratories that "[t]ypically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." See 849 F.2d 1446, 1458 (Fed. Cir. 1988). In regards to the public's interest in protecting a movant's patent rights, "'the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to the invention itself and the very lifeblood of a competitive economy.'" See Figueroa v. United States, 466 F.3d 1023,

46

**A105**

1034 n.16 (Fed. Cir. 2006) (quoting <u>Bonito Boats, Inc. v. Thunder Craft Boats, Inc.</u>, 489 U.S. 141, 146 (1989)).

Plaintiff contends that unlike other cases that involve "life-saving drugs, disease testing kits, or other products designed to promote the public's health, safety and wellbeing," this case does not involve a critical public interest that would be injured by the grant of preliminary relief. (<u>See</u> Pl.'s Mem. at 35 [Doc. No. 52].) Rather, Luminara claims that the public interest weighs in favor of protecting its valid patent. (<u>See</u> <u>id.</u>).

Defendants disagree. Liown claims that public policy strongly favors free competition. (<u>See</u> Defs.' Mem. at 32 [Doc. No. 76].) In support of this argument, Liown cites <u>Lear, Inc. v. Adkins</u>, 395 U.S. 653, 656 (1969). (<u>See</u> <u>id.</u>) However, Liown mischaracterizes the holding in <u>Lear</u>. In <u>Lear</u>, the Supreme Court of the United States held that the plaintiff was not estopped from attacking the validity of the patent-at-issue and could avoid payment of all royalties accruing after the patent was granted if the plaintiff could prove patent invalidity. <u>See</u> <u>Lear</u>, 395 U.S. at 674. The <u>Lear</u> Court explained that if the patent was actually invalid, then enforcing a contractual provision, in which the plaintiff promised to pay royalties to the defendant at the very outset of their relationship, would "undermine the strong federal policy favoring the full and free use of ideas in the public domain." <u>See</u> <u>id.</u> Thus, <u>Lear</u> does not stand for the principle that the public policy favoring free competition outweighs the public policy favoring patent enforcement. (<u>Cf.</u> Defs.' Mem. at 32–33 [Doc. No. 76].) Rather, <u>Lear</u> clarifies that public policy favoring free competition is given the most weight when a patent is likely invalid. In instances of patent invalidity, "the equities of the licensor do not weigh

47

heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain." See Lear, 395 U.S. at 670.

Here, because proof of validity and infringement are strong, the public interest is served by a preliminary injunction that protects a patent owner's property rights, and the public's interest in permitting full and free competition is not squarely at stake. Cf. Pass & Seymour, Inc. v. Hubbell Inc., 532 F. Supp. 2d 418, 434–35 (N.D.N.Y. 2007) (denying the plaintiff's motion for a preliminary injunction because "there exist[ed] serious questions regarding the invalidity of the [] patent claims in issue in this case, and [the] plaintiff ha[d] presented insufficient evidence of irreparable harm," and explaining that "the public's interest [was] not in the end best served by removing what may well be a non-infringing product from the market") (internal quotations and citations omitted); Yamashita v. Wilbur-Ellis Co., No. C 06-01690 (WHA), 2006 WL 1320470, at *5, *8 (N.D. Cal. May 15, 2006) (explaining that the patents-in-suit were "vulnerable" to a challenge on invalidity grounds, and finding that the public interest weighed in favor of denying the preliminary injunction because it was in the customers' interest to have access to competitive products). Moreover, entry of a preliminary injunction may serve the public interest in this case because it would enforce Luminara's valid trademark and could prevent consumer confusion in the marketplace between the "LUMINARA" brand and the "Illuminaires" brand. See Mohan, 2010 WL 5095676, at *25 (explaining that "[o]nce a likelihood of confusion is shown, the public interest is damaged if such confusion is allowed to continue.")

48

**A107**

While Defendants correctly note that the public also has a paramount interest in seeing that patent monopolies are kept within their legitimate scope, (see Defs.' Mem. at 33 (citing Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S. Ct. 843, 851 (2014)) [Doc. No. 76]), Plaintiff does not appear to be litigating outside the scope of Disney's Artificial Flame Technology patents.  Accordingly, based on the evidence in the record, the Court finds that the public interest weighs in favor of granting the preliminary injunction motion.

### E.  Contours of Preliminary Injunction

Here, the totality of factors weighs in favor of granting Plaintiff's preliminary injunction.  Recently, in CyroLife, Inc. v. C.R. Bard, Inc., a district court in Delaware granted a motion for a preliminary injunction based on the fact that the totality of the Dataphase factors weighed in favor of the movant.  See CyroLife, Inc. v. C.R. Bard, Inc., No. CV 14-559-SLR, 2015 WL 1093543, at *3 (D. Del. Mar. 10, 2015), appeal docketed, No. 15-1517 (3d Cir. Apr. 3, 2015).  In CyroLife, Inc., the court explained that the movant demonstrated a likelihood of success on the merits in regards to the validity of its own patent and the likelihood that its competitor infringed the movant's patent.  See id. The movant also made "persuasive arguments for the loss of its customer base and damage to its goodwill," and for those reasons, the court held that the "balance of the hardships and the public interest weigh[ed] in [the movant's] favor."  See id.

In this case, Luminara similarly established a substantial likelihood of success on the merits of its patent infringement claim, and Liown failed to raise substantial doubt about the validity of the '166 patent.  Luminara also established likelihood of irreparable

harm and made persuasive arguments about the loss of its customer base and damage to its goodwill if a preliminary injunction is denied. The final <u>Dataphase</u> factor also favored granting a preliminary injunction because of the public's interest in enforcing valid patents. While the balance of hardships analysis favored neither party, in totality, the <u>Dataphase</u> factors weighed in favor of granting Plaintiff's Motion. <u>See</u> <u>Scholle Corp. v. Rapak LLC</u>, 35 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014) (granting plaintiff's motion for preliminary injunction on patent infringement claim because plaintiff demonstrated likelihood of success on the merits and likelihood of irreparable harm without the injunction, and the "balance of equities tip[ped] slightly in [the plaintiff's] favor"); <u>Won-Door Corp. v. Cornell Iron Works, Inc.</u>, 981 F. Supp. 2d 1070, 1079 (D. Utah 2013) (same). Therefore, "Defendants, any of their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation," are hereby enjoined from "manufacturing, distributing, selling or offering for sale" moving flameless candles to Luminara's customers. (<u>See</u> Pl.'s Mem. at 13 [Doc. No. 52].)

As to Luminara's request that Defendants recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers, the Court also grants Plaintiff's request. Federal district courts have general equitable power to fashion relief. <u>See</u> <u>Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 342 (1999) (Ginsburg, J.) (concurring-in-part, dissenting-in-part) (explaining that federal courts must rely on their 'flexible jurisdiction in equity . . . to protect all rights and do justice to all concerned,'") (quoting <u>Rubber Co. v. Goodyear</u>, 9 Wall. 805, 807 (1869)); <u>Carter v. Gallagher</u>, 452 F.3d 315, 324 (8th Cir. 1971) (explaining that courts of

50

equity have broad power to fashion an effective remedy).

In fact, the patent statute specifically provides that district courts have authority to grant injunctive relief "to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." See Reebok Int'l Ltd. v. Baker, Inc., 32 F.3d 1552, 1557 (Fed. Cir. 1994), abrogated on other grounds, eBay Inc., 547 U.S. 388, as recognized in Voile Mfg. Corp. v. Dandurand, 551 F. Supp. 2d 1301, 1305 (D. Utah 2008); see also Hybritech Inc., 849 F.2d at 1457.

Although the Court has not found authority from the Eighth Circuit asserting the legal standard required for ordering a defendant to recall a product,[14] the Court finds that in order to preserve Plaintiff's legal interests and protect Plaintiff's patent rights, it is necessary for Defendants to recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers. (See Pl.'s Mem. at 13 [Doc. No. 52].) Without this recall, the stores and distribution centers could continue selling and offering for sale moving flameless candles, which allegedly infringe the Artificial Flame Technology patents, if they have such candles in stock. The sale of this allegedly infringing product to end consumers would continue to irreparably damage Luminara's and Disney's reputations. Therefore, in order to curb the loss of goodwill and harm to

---

[14]    The Court was able to locate only one Eighth Circuit case mentioning product recall as part of a plaintiff's requested preliminary injunctive relief. See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 489 (8th Cir. 1993). However, in Sanborn Mfg.Co., the Eighth Circuit did not announce a standard for determining whether recall was appropriate. Rather, the Court simply stated that "[a]t the hearing on the preliminary injunction motion, [the plaintiff] withdrew its request for a product recall from consumers from the district court's consideration of its motion for preliminary injunction." See id. Therefore, the Court relies on its equitable powers when fashioning relief in this case.

reputation suffered by Luminara and Disney, the Court uses its equitable powers to order Defendants to recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers.

### F.  Luminara Must Post Bond

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  See Fed. R. Civ. P. 65(c).  "This bond requirement is designed to protect the enjoined party's interests in the event that future proceedings show the injunction issued wrongfully."  Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1339 (Fed. Cir. 2012) (O'Malley, J., concurring-in-part, dissenting-in-part) (citing Edgar v. MITE Corp., 457 U.S. 624, 649 (1982) (Stevens, J., concurring) (explaining that "[s]ince a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.");  Piambino v. Bailey, 757 F.2d 1112, 1143 (11th Cir. 1985) (noting that "Rule 65(c)'s bond requirement . . . was intended by Congress to protect enjoined parties from the losses that result from improvidently granted injunctions")).  "The requirement of a security bond imposed by [Rule] 65(c) is left to the sound discretion of the district judge."  Northwestern Bell Tel. Co. Bedco of Minnesota, Inc., 501 F. Supp. 299, 304 (D. Minn. 1980).  In fact, "this Court has found no authority

52

**A111**

from the Federal Circuit governing the parameters for the amount of the bond—and the parties have supplied none." See Sanofi-Synthelabo v. Apotex Inc., 488 F. Supp. 2d 317, 349 (S.D.N.Y. 2006) aff'd, 470 F.3d 1368 (Fed. Cir. 2006).

Plaintiff seeks either no bond, or a bond of only $10,000, because it contends that "granting a preliminary injunction will not cause any harm to Liown." (See Pl.'s Mem. at 36–37 [Doc. No. 52].) Defendants argue that because Liown stands to lose ███████ ████ due to interference with its sales and customer relationships, bond should be set at no less than $2 million. (See Defs.' Mem. at 34 [Doc. No. 76].)

The Court agrees with Defendants, insofar as Liown states that it risks suffering substantial harm if the Court wrongfully grants Plaintiff's motion. However, while Liown CEO John Yang claims that Liown may lose ██████████████████ ███████████████████████████████████ (See Yang Decl. ¶ 3 [Doc. No. 80].) Defendants fail to supplement the record with any expert testimony, sales data, or market reports. Although the precise value of lost sales is unsupported in the record, the Court is persuaded that Liown will unquestionably suffer a significant amount of lost sales because of this preliminary injunction.

When courts in this District are presented with little or no substantive evidence to support a specific bond value, they have ordered bond payments ranging from $5,000 to $1 million. See, e.g., Novus Franchising, Inc. v. Dean, No. 10-cv-2834 (JRT/SER), 2011 WL 1261626, *5 (D. Minn. Mar. 30, 2011) (ordering the plaintiff to post a bond in the sum of $5,000, but not explaining any basis for the bond value); Coca-Cola Co. v. Purdy, No. 02-cv-1782 (ADM/AJB), 2002 WL 31010285, *3 (D. Minn. Sept. 5, 2002) aff'd, 382

F.3d 774 (8th Cir. 2004) (same); United HealthCare Ins. Co. v. Advance PCS, No. 01-cv-2320 (RHK/JMM), 2002 WL 432068, *18 (D. Minn. Mar. 18, 2002) aff'd, 316 F.3d 737 (8th Cir. 2002) (explaining that while the defendant argues for a $54 million bond, "there [was] no basis for concluding that [the defendant] could have damages approaching such a high figure if it were later to appear that the injunction was erroneously entered," and instead ordering the plaintiffs to post a bond in the sum of $1 million); Gravity Guidance, Inc. v. Weseman, No. 4-82-1667, 1983 WL 51939, *4 & n.3 (D. Minn. Oct. 17, 1983) (finding that a bond in the amount of $30,000 was appropriate, because although the defendants' counsel initially requested a bond in the amount of $25,000, and later increased his request to $200,000, "[i]t was not clear how he arrived at these figures or the basis for the discrepancy [between the two values]").  Because Liown will unquestionably suffer lost sales as a result of this preliminary injunction, but Defendants failed to present substantive evidence substantiating their anticipated losses, the Court finds that a bond in the value of $100,000 is reasonable.

## IV.  ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Preliminary Injunction [Doc. No. 50] is **GRANTED**:
   a. Defendants are enjoined from manufacturing, distributing, offering for sale, selling, or importing moving flameless candles to Plaintiff's customers.
   b. Defendants must recall any and all moving flameless candles currently in Plaintiff's customers' stores or distribution centers.

2. In accordance with Rule 65(c) of the Federal Rules of Civil Procedure, Plaintiff shall post a bond with the Clerk of the Court in the amount of $100,000 for the payment of such costs and damages as may be incurred or suffered by Defendants

54

**A113**

in the event Defendants are found to have been wrongfully enjoined or restrained.

3. This Order shall go into effect upon the posting of the bond, and shall remain in effect until further order of this Court dissolving this Preliminary Injunction.

4. The parties are ordered to show cause ten days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.


Dated: April 20, 2015                        s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge

Order Modifying Preliminary Injunction
and Denying Stay

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Luminara Worldwide, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd., Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden & Pet Co.,<br><br>      Defendants. | Case No. 14-cv-3103 (SRN/FLN)<br><br><br>**MEMORANDUM OPINION AND ORDER**<br><br>**[FILED UNDER SEAL]** |
| Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd., Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden & Pet Co.,<br><br>      Counterclaim Plaintiffs,<br><br>v.<br><br>Luminara Worldwide, LLC, QVC, Inc., Darice, Inc., Bed Bath & Beyond, Inc., Williams-Sonoma Stores, Inc., PC Treasures, Inc., and Brookstone Stores, Inc.,<br><br>      Counterclaim Defendants. | |

Daniel R. Hall, Joseph W. Anthony, and Courtland C. Merrill, Anthony Ostlund Baer & Louwagie PA, 90 South 7th Street, Suite 3600, Minneapolis, MN 55402; Ryan S. Dean, Fish & Tsang LLP, 2603 Main Street, Suite 1000, Irvine, CA 92614, for Plaintiff and Counterclaim Defendant Luminara Worldwide LLC, and Counterclaim Defendants QVC, Inc., Darice, Inc., Bed Bath & Beyond, Inc., Williams-Sonoma Stores, Inc., PC Treasures, Inc., and Brookstone Stores, Inc.

Devan V. Padmanabhan, Erin O. Dungan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Thomas Nathan Millikan, Perkins Coie LLP, 11988 El Camino Real, Suite 350, San Diego, CA 92130-2594, for Defendants and Counterclaim Plaintiffs Liown Electronics Co. Ltd. and Liown Technologies/Beauty Electronics, LLC.

Devan V. Padmanabhan, Erin O. Dungan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Thomas Nathan Millikan and Joseph P. Reid, Perkins Coie LLP, 11988 El Camino Real, Suite 350, San Diego, CA 92130-2594, for Defendant and Counterclaim Plaintiff Shenzhen Liown Electronics Co. Ltd.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Thomas Nathan Millikan, Perkins Coie LLP, 11988 El Camino Real, Suite 350, San Diego, CA 92130-2594, for Defendants and Counterclaim Plaintiffs Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., The Light Garden, Inc., Central Garden & Pet Co., and BJ's Wholesale Club, Inc.

Lukas Dustin Jonathon Toft and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Thomas Nathan Millikan, Perkins Coie LLP, 11988 El Camino Real, Suite 350, San Diego, CA 92130-2594, for Defendant and Counterclaim Plaintiff Ambient Lighting, Inc.

---

SUSAN RICHARD NELSON, United States District Judge

# I.   INTRODUCTION

This matter is before the Court on (1) the Liown Defendants' Motion to Modify and to Stay the Preliminary Injunction Pending Reconsideration or Appeal [Doc. No. 166], and

(2) Plaintiff's Motion to Strike Memoranda of Law Filed in Violation of Local Rule 7.1 [Doc. No. 187]. For the reasons set forth below, the Court (1) grants, in part, and denies, in part, the Liown Defendants' Motion, and (2) denies Plaintiff's Motion.

## II. BACKGROUND

The Court has thoroughly detailed the facts of this case in its previous orders. Thus, the Court only recounts facts relevant to the pending motions.

On April 20, 2015, the Court issued an order granting Plaintiff's Motion for Preliminary Injunction. The Court ruled that "Defendants [were] enjoined from manufacturing, distributing, offering for sale, selling, or importing moving flameless candles to Plaintiff's customers." (4/20/15 Order at 55 [Doc. No. 147].) Additionally, the Court ordered Defendants to "recall any and all moving flameless candles currently in Plaintiff's customers' stores or distribution centers." (See id.) The Court also ruled that, pursuant to Fed. R. Civ. P. 65(c), Plaintiff was required to "post a bond with the Clerk of the Court in the amount of $100,000 for the payment of such costs and damages as may be incurred or suffered by Defendants in the event Defendants are found to have been wrongfully enjoined or restrained." (See id.)

On May 4, 2014, the Liown Defendants (Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd.) filed a Motion to Modify and to Stay the Preliminary Injunction Pending Reconsideration or Appeal [Doc. No. 166]. Defendants sought: (1) clarification about which customers are enjoined by the Court's April 20, 2015 order; (2) modification of the bond amount; and (3) a stay of the Court's preliminary injunction. (See generally Defs.'

3

**A117**

Mem. [Doc. No. 168].)  During a telephonic conference on May 6, 2015, the Court

clarified that any of Defendants' arguments pertaining to reconsideration of the merits of

the Court's April 20, 2015 Order would not be permitted.  Therefore, the only proper

issues before the Court are the three issues outlined above.

Plaintiff filed a response memorandum on May 12, 2015, addressing these three

issues [Doc. No. 184].  On the same day, Defendant The Light Garden, Inc. [hereinafter,

"The Light Garden"] and Defendant Central Garden & Pet Co. (GKI) [hereinafter,

"GKI"] filed their own separate briefs [Docs. No. 185, 186], in support of the Liown

Defendants' Motion.

In response to The Light Garden's and GKI's briefs, Plaintiff filed a Motion to

Strike Memoranda of Law Filed in Violation of Local Rule 7.1 [Doc. No. 187].

Luminara argues that The Light Garden's and GKI's briefs were untimely and "constitute

an impermissible attempt to file . . . otherwise prohibited memorand[a] of law."  (See

Pl.'s Mem. in Supp. of Mot. to Strike at 2 [Doc. No. 188].)  The Court heard oral

argument on the pending issues on May 14, 2015.  At the hearing, the Court sought

clarification and further briefing on the issue of (1) whether The Light Garden should

properly be considered a "customer" of Luminara's, and (2) whether Luminara could

satisfy purchase orders from The Light Garden going forward.  (See Minutes [Doc. No.

192].)  The parties duly filed these briefs on May 18, 2015 [Docs. No. 199, 201].

## III.    MOTION TO STRIKE

Plaintiff moves the Court, pursuant to District of Minnesota Local Rule 7.1, to

strike GKI's and The Light Garden's briefs [Docs. No. 185, 186].  (See Pl.'s Mot. to

4

**A118**

Strike [Doc. No. 187].)  Plaintiff claims that the briefs filed by GKI and The Light Garden are untimely and are in violation of District of Minnesota Local Rule 7.1(b)(3), which prohibits reply briefs "in support of non-dispositive motions," and Local Rule 7.1(i), which prohibits briefs that are not "expressly allowed."  See D. Minn. L.R. 7.1(b)(3), (i); (Pl.'s Mem. in Supp. of Mot. to Strike at 2 [Doc. No. 188].)

Although GKI's and The Light Garden's briefs appear to be memoranda that were not expressly allowed by the Court, for the sake of undertaking a full and complete review of Defendants' arguments and submissions, the Court denies Plaintiff's request to strike these briefs.  See, e.g., VanDyke v. Minneapolis Police Dep't, No. 14-cv-224 (SRN/SER), 2015 WL 138060, *2 n.5 (D. Minn. Jan. 7, 2015) (explaining that although the plaintiff's reply was filed in contravention to Local Rule 7.1(i), the Court considered the plaintiff's reply "to the extent it [was] helpful to explain [his legal position]"); Augustine v. United States, No. 13-cv-1417 (DWF/LIB), 2014 WL 1386378, *1 n.2 (D. Minn. Feb. 20, 2014) report and recommendation adopted, No. 13-cv-1417 (DWF/LIB), 2014 WL 1028358 (D. Minn. Mar. 14, 2014) (noting that although "[m]oving parties are not traditionally afforded the opportunity to submit reply memoranda for the Court's consideration of non-dispositive motions," the plaintiff was permitted to do so in this case "for the sake of undertaking a full and complete review of  [the p]laintiff's arguments and submissions"); George v. Uponor, Inc., 290 F.R.D. 574, 575 n.1 (D. Minn. 2013) (permitting a party to file a reply brief for a non-dispositive motion without prior permission from the court).  Therefore, Plaintiff's Motion to Strike is denied.

**A119**

## IV.     CLARIFICATION OF PRELIMARY INJUNCTION ORDER

The Liown Defendants request clarification of the Court's order as to which "customers" are enjoined.  (See Liown Defs.' Mem. at 2–5 [Doc. No. 168].)  Luminara does not object to clarification of the Court's preliminary injunction order to reflect the identity of Luminara's customers.  (See Pl.'s Mem. in Opp'n at 2 [Doc. No. 184].)  During the hearing, the parties purported to present a joint stipulation seeking to clarify the scope of the Court's April 20, 2015 preliminary injunction order.  However, Defendant The Light Garden opposed this joint stipulation, and argued that it was not properly considered a "customer" of Luminara's, and therefore should not be included in the list of customers that are enjoined.  (See Defs.' Joint Supp. Briefing at 2–4 [Doc. No. 201].)

In contrast, Luminara claims that because The Light Garden continued to submit purchase agreements throughout 2014, The Light Garden is properly considered a "customer" of Luminara's.  (See Pl.'s Supp. Mem. at 1 [Doc. No. 199].)  In fact, according to The Light Garden's own records, The Light Garden submitted eight purchase orders for Luminara candles from February 18, 2014, to June 11, 2014.  (See Padmanabhan Decl., Ex. A [Doc. No. 202-1].)  These purchase orders amounted to over █████ in moving flameless candles and related accessories.  (See Pl.'s Supp. Mem. at 1 [Doc. No. 199].)  Additionally, Plaintiff contends that although Luminara could not currently sell moving flameless candles to The Light Garden, The Light Garden would be able to purchase candles from Counterclaim Defendant Darice, Inc, Luminara's new exclusive distributor.  (See id. at 4.)

6

**A120**

The Court finds that because The Light Garden continued to submit purchase orders to Luminara for several months in 2014, The Light Garden is properly considered a "customer" of Luminara's for purposes of the preliminary injunction. While The Light Garden was subject to a restrictive covenant with Luminara until December 31, 2014, the remainder of the distribution agreement between the parties expired on December 31, 2013.[1] (See Cain Decl., Ex. B "The Light Garden Distribution Agreement" §§ 10.01, 2.04 [Doc. No. 53-1].) In other words, The Light Garden was not obligated to purchase moving flameless candles from Luminara after December 31, 2013, but The Light Garden was prohibited from purchasing "confusingly similar" candles from any other supplier until December 31, 2014. (See id.) Nonetheless, The Light Garden continued to purchase products from Luminara well into 2014, even though it was not contractually obligated to do so.

The Light Garden argues that because it stopped buying candles from Luminara after June 2014, it should not be considered Luminara's current customer. (See The Light Garden's Mem. at 5–6 [Doc. No. 186].) The Court finds that this recent change in buying habits does not negate The Light Garden's status as Luminara's "customer." Based on the face of the agreement between The Light Garden and Luminara, The Light Garden was not contractually permitted to purchase moving flameless candles from Liown or any supplier other than Luminara; and therefore, it appears that The Light Garden's purchases from Liown violated the restrictive covenant it had with Luminara.

---

[1] During the hearing, Plaintiff's counsel informed the Court that litigation is currently pending in Minnesota State Court about The Light Garden's alleged breach of this restrictive covenant.

Accordingly, had it not been for Liown's alleged infringement and sale of allegedly infringing candles, The Light Garden would have only purchased moving flameless candles from Luminara in 2014.

Plaintiff's counsel argued during the hearing that a contract requiring an entity to place purchase orders need not exist in order for an entity to be considered Luminara's "customer." As an example of this, Plaintiff's counsel pointed out that Defendant Ambient did not have a contract with Luminara, but was merely buying candles from Luminara in 2013, until Ambient began purchasing candles from Liown. Because Defendants do not contend that Ambient is not considered Luminara's customer, and Ambient has not purchased candles from Luminara since 2013, then The Light Garden is necessarily also considered a customer of Luminara's because it continued to buy candles from Luminara through 2014.

Thus, the Court uses its equitable powers to include The Light Garden in the list of Luminara's customers.[2] Consequently, the Court's grants Defendant's Motion insofar as it seeks clarification of the preliminary injunction order. The preliminary injunction order is clarified as follows:

---

[2] Insofar as The Light Garden argues that it should not be considered a customer because it was not added as a named Defendant to this case until January 2015 (see The Light Garden's Mem. at 5 [Doc. No. 186], The Light Garden misstates the relevant inquiry for the court. Plaintiff filed its Motion for Preliminary Injunction [Doc. No. 50] on November 26, 2014. In this motion, Plaintiff sought to enjoin the Liown Defendants, Boston Warehouse Trading Corp., and Abbott of England (1981), Ltd. (the only named Defendants at that time) from selling to Luminara's customers, and sought to remove the allegedly infringing candles from Luminara's customers' stores. Therefore, it is immaterial that The Light Garden was not a named Defendant when the preliminary injunction was filed. Rather, the Court need only determine if, on November 26, 2014, The Light Garden could have been considered Luminara's customer.

8

Plaintiff's Motion for Preliminary Injunction [Doc. No. 50] is **GRANTED**:

   a.  Defendants are enjoined from manufacturing, distributing, offering for sale, selling, or importing moving flameless candles to the following customers of Plaintiff Luminara:

      1.  Ambient Lighting, Inc.;
      2.  Balsam Hill Christmas Tree Co.;
      3.  Bed Bath & Beyond, Inc.;
      4.  Brookstone Stores, Inc.;
      5.  Costco Wholesale co.;
      6.  Darice, Inc./Lamrite West, Inc.;
      7.  Frontgate;
      8.  GKI/Bethlehem Lighting;
      9.  Kohl's Corp.;
     10. The Light Garden;
     11. Lowe's Companies, Inc.;
     12. One King's Lane, Inc.;
     13. PC Treasure, Inc.; and
     14. QVC, Inc.
     15. Williams-Sonoma Stores, Inc./Pottery Barn

   b.  Defendants who have sold moving flameless candles to any of the following entities must recall any and all moving flameless candles currently in the stores or distribution centers of the following customers of Plaintiff Luminara:

      1.  Ambient Lighting, Inc.;
      2.  Balsam Hill Christmas Tree Co.;
      3.  Bed Bath & Beyond, Inc.;
      4.  Brookstone Stores, Inc.;
      5.  Costco Wholesale co.;
      6.  Darice, Inc./Lamrite West, Inc.;
      7.  Frontgate;
      8.  GKI/Bethlehem Lighting;
      9.  Kohl's Corp.;
     10. The Light Garden;
     11. Lowe's Companies, Inc.;
     12. One King's Lane, Inc.;
     13. PC Treasure, Inc.; and
     14. QVC, Inc.
     15. Williams-Sonoma Stores, Inc./Pottery Barn

   c.  Except for the foregoing entities expressly identified herein, no other entities are enjoined by the Court's April 20, 2015 Opinion and Order, and in addition, Defendants are not enjoined by the Court's April 20, 2015 Opinion and Order from selling, offering to sell, or importing

**A123**

moving flameless candles to be sold to consumers in the general public.

## V.     MODIFICATION OF BOND VALUE

Defendants argue that the Court should increase the size of the bond because "the potential losses to the Defendants are far greater than those apparent when the Court originally granted the injunction here." (See Liown Defs.' Mem. at 6 [Doc. No. 168].) Specifically, Defendants' counsel argued during the hearing that projected sales reports and profit data demonstrate that the costs and damages, in the event that Defendants are found to have been wrongfully enjoined, is ███████ for the Liown Defendants (based solely on lost profits from sales to GKI and The Light Garden), ████████ for GKI, and ████████ for The Light Garden. In response, Plaintiff contends that the Court should not increase the bond value because the "new" evidence presented by Defendants "was available at the time of the preliminary injunction hearing and [Defendants] could have presented the evidence then." (See Pl.'s Mem. in Opp'n at 3 [Doc. No. 184].)

### A.  Standard of Review

"In modifying a preliminary injunction, a district court is not bound by a strict standard of changed circumstances but is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason." Movie Sys., Inc. v. MAD Minneapolis Audio Distribs., 717 F.2d 427, 430 (8th Cir. 1983);[3] see also Uncle B's Bakery, Inc. v. O'Rourke, 938 F. Supp.

---

[3]     Although this is a patent case, and the Court is guided by Federal Circuit case law for issues "unique to patent law," for procedural issues, regional circuit law applies. See Madey v. Duke Univ., 307 F.3d 1351, 1358 (Fed. Cir. 2002). As the Federal Circuit explained, regional circuit law is applied to:

1450, 1465 (N.D. Iowa 1996) (finding "other good reasons" to modify a preliminary injunction). "The [United States Court of Appeals for the] Eighth Circuit noted in <u>Movie Systems</u> that the showing required for modification of a preliminary injunction is less stringent than that required for modification of a permanent injunction or consent decree." <u>Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.</u>, 960 F. Supp. 2d 988, 994 (D. Minn. 2013) (citing <u>Movie Sys., Inc.</u>, 717 F.2d at 430). Thus, "the focus of the court's inquiry when determining whether modification of a preliminary injunction is warranted is . . . whether a modification is equitable, *for any reason*, in order to effectuate justice between the parties." <u>Pro Edge L.P. v. Gue</u>, 411 F. Supp. 2d 1080, 1091 (N.D. Iowa 2006) (emphasis original), [hereinafter <u>Pro Edge I</u>].

## B. Analysis

Here, Defendants have not presented any subsequent, or "new," evidence, since all of this data was available, and discoverable, when the Court initially considered Plaintiff's preliminary injunction motion. Rather, Defendants seek to persuade the Court to modify the bond value for another "good reason." <u>See</u> <u>Movie Sys., Inc.</u>, 717 F.2d at

---

procedural issues that are not themselves substantive patent law issues so long as they do not (1) pertain to patent law, (2) bear an essential relationship to matters committed to our exclusive control by statute, or (3) clearly implicate the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction.

<u>Int'l Nutrition Co. v. Horphag Research Ltd.</u>, 257 F.3d 1324, 1328 (Fed.Cir. 2001) (internal citations omitted). Because the standard applied for modifying a preliminary injunction is a procedural issue, Eighth Circuit case law controls. (<u>See</u> Liown Defs.' Mem. at 6 [Doc. No. 168]; Pl.'s Mem. in Opp'n at 3 [Doc. No. 184].)

430.  Defendants' argue that their "good reason" is that underlying sales data and profit reports indicate that the Liown Defendants, GKI, and The Light Garden will likely lose millions of dollars, if the injunction is ultimately deemed wrongful.

As the Court noted in its April 20, 2015 Order, "[t]he requirement of a security bond imposed by [Rule] 65(c) is left to the sound discretion of the district judge." Northwestern Bell Tel. Co. v. Bedco of Minnesota, Inc., 501 F. Supp. 299, 304 (D. Minn. 1980).  Therefore, it is within the Court's discretion to determine whether Defendants' untimely evidence is a "good reason" to modify the bond value and effectuate justice between the parties.

The Court holds that Defendants have not presented a "good reason" to modify the bond value set because (1) Liown, GKI, and The Light Garden could have presented financial evidence documenting their expected losses earlier in these proceedings; and (2) Liown's, GKI's, and The Light Garden's financial loss predictions are fundamentally flawed.

### 1.  Untimely Presentation of Evidence

First, the Court notes that all of the sales data and profit calculations offered by the Liown Defendants could have been presented when the Court was initially considering the value of the bond.  The Liown Defendants simply chose not to present the data at the time, and merely relied on a single declaration from the CEO of Liown, John Yang, who speculated that a preliminary injunction would cause Liown to suffer ███████ in lost sales.  (See 4/20/15 Order at 43 [Doc. No. 147].)  No evidence of lost profits was proffered.  Taking a second bite at the apple, now, the Liown Defendants submit

12

**A126**

purchase orders and profit calculations in an effort to substantiate their anticipated losses.

As to GKI and The Light Garden, although both Defendants were not served with a summons and a Second Amended Complaint until January 22, 2015 [Doc. No. 119], and January 26, 2015 [Doc. No. 120], respectively, they still had advance actual notice of the February 6, 2015 preliminary injunction hearing. The Court is confident that these Defendants had actual notice of the upcoming preliminary injunction hearing because GKI and The Light Garden hired the same counsel that is, and was, representing the Liown Defendants. Therefore, GKI and The Light Garden had approximately two weeks to inform the Court of any objections they had to the hearing proceeding as scheduled. Although the parties may not have been prepared to articulate their precise objections to the preliminary injunction itself, they could have requested an extension to respond to the preliminary injunction motion. Additionally, Defendants' counsel could have informed the Court at the preliminary injunction hearing of concerns specific to GKI and The Light Garden.

### 2. Insufficient Accuracy of Evidence

Regardless of when the Liown Defendants, GKI, and The Light Garden could have presented their evidence about prospective lost profits to the Court, the Court finds that this evidence lacks sufficient accuracy to constitute a "good reason" for the Court to modify the bond value. Below, the Court addresses the insufficiency of the evidence for each of the three entities.

### i. Liown Defendants

As a preliminary matter, the Court notes that the Liown Defendants' calculation of

**A127**

prospective lost profits in their brief erroneously included projected lost sales and profits from the Encandra candle, Liown's non-moving flameless candle. (See Pl.'s Mem. in Opp'n at 5 [Doc. No. 184].) As the Court's preliminary injunction only applies to Liown's moving flameless candles, Plaintiff aptly notes that sales and profits from the Encandra candle would not be affected. Defendants admitted at the hearing that their proposed calculation, which they included in their briefing, was incorrect. (Cf. Yang Decl. ¶ 11 [Doc. No. 173].) Although, at the hearing, the Liown Defendants subsequently recalculated the value of projected lost *sales* to GKI from this injunction, they did not recalculate the value of projected lost *profits*.

Regardless of the fact that the Liown Defendants did not recalculate their projected lost profits, excluding profits from Encandra candles, the Court finds that Defendants' analysis remains flawed. According to Federal Rule of Civil Procedure 65(c), security for a preliminary injunction should be in "an amount that the court considers proper to pay the costs and *damages* sustained by any party found to have been wrongfully enjoined or restrained." See Fed. R. Civ. P. 65(c) (emphasis added). Thus, a defendant's bond calculation "should be supported by evidence as strong as the evidence supporting a damage calculation submitted at trial." See Sean M. Berkowitz, et al., Provisional Remedies, 2 Bus. & Com. Litig. Fed. Cts. § 17:16 (3d ed. 2014).

Here, the Court finds that an accurate assessment of the Liown Defendants' prospective damages should take into account whether Liown reasonably mitigated its damages. Mitigation is an appropriate consideration in the Court's bond calculation because "generally, the amount of the bond posted is the limit that a wrongfully

14

**A128**

restrained party may recover," Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F.

Supp. 2d 525, 541 (S.D.N.Y. 2004), and parties seeking damages are often expected to

exercise reasonable diligence to lessen the damages caused. In fact, courts have held that

damages for a defendant, who was wrongfully enjoined, are limited by the "defendant's

failure to mitigate damages." See Sionix Corp. v. Moorehead, 299 F. Supp. 2d 1082,

1086 (S.D. Cal. 2003) (citing Coyne-Delany Co. v. Capital Dev. Bd. of the State of Ill.,

717 F.2d 385, 392 (7th Cir. 1983)). Thus, if a court set a bond value that exceeds a

defendant's actual damages, then the court may prohibit that defendant from recovering

the full value of the bond. See id.; Pro Edge L.P. v. Gue, 451 F. Supp. 2d 1026, 1030–31

(N.D. Iowa 2006) [hereinafter Pro Edge II]. In order to avoid setting an improperly high

bond value, the Court finds that Defendants should have presented evidence of their

prospective damages, which took into account their requirement to mitigate.

In this case, the Liown Defendants could potentially mitigate their damages by

purchasing, and then reselling, Luminara's Artificial Flame Technology candles.

Luminara stated in supplemental briefing to the Court that Counterclaim Defendant

Darice, Inc., which is now the exclusive distributor of Luminara's Artificial Flame

Technology candles, "is willing and able to supply moving flameless candles to [The]

Light Garden as a Luminara wholesaler." (See Pl.'s Supp. Mem. at 4 [Doc. No. 199].)

Similarly, Darice is also likely willing and able to supply Liown with moving flameless

candles. Alternatively, Liown could attempt to mitigate its damages by selling more

Encandra candles, or non-moving flameless candles. Regardless of how Liown chose to

mitigate its damages, in order to be entitled to *any* damages, Liown would be responsible

15

**A129**

for reasonably attempting to mitigate its damages in *some* way. Although these options may not ultimately reduce Liown's lost profits, Liown failed to present any evidence or calculations demonstrating the efficacy or inefficacy of these mitigation options. Because the Liown Defendants submitted untimely evidence, and, nonetheless, failed to present an accurate estimate of their lost profits, which took into account at least one avenue for mitigating damages, the Court is reluctant to raise the bond value.

### ii.    GKI and The Light Garden

The Court finds that GKI's and The Light Garden's damage calculations are also not sufficiently accurate for the Court to consider this evidence a "good reason" to alter the previously ordered bond value. Like the Liown Defendants, GKI and The Light Garden would be expected to exercise reasonable diligence to lessen the damages they incurred. And, as was the case with the Liown Defendants, GKI and The Light Garden could potentially mitigate their damages by purchasing Luminara's Artificial Flame Technology candles from Darice, rather than purchasing them from Liown. See Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 559 (2d Cir. 2011) (explaining that the wrongfully enjoined party must "properly substantiate the damages sought"); see also Intercapital Debt Trading Ltd. v. Cantor Fitzgerald Inc., No. 94 CIV 9275, 1996 WL 167820, *2 (S.D.N.Y. Apr. 10, 1996) (explaining that "'a good reason for not awarding damages against [a] Fed. R. Civ. P. 65(c) security would be that the defendant had failed to mitigate damages.'") (quoting Coyne-Delany, 717 F.2d at 392) (alterations omitted)). GKI and The Light Garden failed to present an estimate of lost profits that took into account the possibility of mitigating their damages. (See generally Central Garden & Pet

16

**A130**

Co.'s Mem. [Doc. No. 185]; The Light Garden's Mem. [Doc. No. 186]; Wenz Decl. ¶ 6

(estimating GKI's lost profits for 2015, without taking into account mitigation) [Doc. No.

172]; Elson Decl. ¶ 5 (estimating The Light Garden's lost profits for 2015, without taking

into account mitigation) [Doc. No. 169].)  While purchasing candles from Darice may not

ultimately reduce GKI's and The Light Garden's damages, the Court cannot determine

whether this is truly the case because the record is devoid of relevant calculations, which

take into account Darice as an alternate supplier.  Accordingly, in the absence of

sufficiently accurate evidence, the Court denies Defendants' request to increase the bond

value.

### 3.  Distinguishable Cases

This case is distinguishable from other cases cited by Defendants, in which courts

have held that a modification of a bond value was justified by a "good reason."  For

instance, in Uncle B's Bakery, a district court in Iowa held that modification of a

preliminary injunction was necessary in order to clarify which third party employers fell

within the scope of the injunction.  See 938 F. Supp. at 1464.  Specifically, the court held

that modification was "justified" for "prospective employers [to] have a clearer idea

whether or not they [fell] into the category of 'direct or indirect' competitors with whom

employment [was] prohibited."  See id.  In contrast, in this case, Defendants' request for

a bond modification is not justified because it does not stem from lack of clarity of the

Court's preliminary injunction order.  Rather, Defendants merely seek another bite at the

apple in an effort to substantiate a greater bond value.

This case is also distinguishable from Northern States Power Co. v. Federal

17

**A131**

Transit Administration, 270 F.3d 586 (8th Cir. 2001). In Northern States Power Co., the Eighth Circuit determined that it was necessary to modify the bond value from $50,000 to $8,000,000 because "at the oral argument, substantial uncertainties developed about where the money would come from if the [defendant] ultimately had to reimburse the plaintiff for the work." See 270 F.3d at 588. Thus, the "good reason" for modification stemmed from the court's concern about the ability of the defendant to satisfy a judgment, if one was ultimately rendered against it. See id. In contrast, here, Defendants have not presented any evidence to the Court about Luminara's inability to satisfy a judgment, if a court ultimately finds that Defendants were wrongfully enjoined.

### 4. Bond Value Does Not Limit Defendants' Potential Damages

Significantly, the Court notes that if Defendants are later found to have been wrongfully enjoined, then Defendants' damages are not limited to the amount of the bond set by the Court. See Minn. Min. & Mfg. Co. v. Rauh Rubber, Inc., 130 F.3d 1305, 1309 (8th Cir. 1997) (finding that "[t]he $100,000 bond is a security device, not a limit on the damages [that the defendants] . . . may obtain against [the plaintiff] if the facts warrant such an award."). Rather, Defendants "may recover additional damages in excess of the bond amount if such an award is warranted under the facts of this case." See Pro Edge II, 451 F. Supp. 2d at 1033; see also Sak v. City of Aurelia, Iowa, 832 F. Supp. 2d 1026, 1047–48 (N.D. Iowa 2011).

Therefore, although Defendants may be correct that Luminara may break the "promises it is presently making to the Court [about supplying Defendants with moving flameless candles]," (cf. Defs.' Joint Supp. Briefing at 6 [Doc. No. 201]), Luminara

18

**A132**

would still be liable for the resulting damages that those broken promises would cause Defendants to incur. In other words, even if Darice poorly services Defendants and fails to provide timely shipments or quality products, Defendants would be able to recover the difference between the profits they projected obtaining in 2015, and the profits they ultimately obtained while using Darice as their supplier. The Court also notes that because Defendants have not presented any evidence questioning Luminara's ability to pay damages greater than $100,000, the Court is not concerned with Plaintiff's ability to satisfy a significant judgment, if one is ultimately rendered against Luminara. See N. States Power Co., 270 F.3d at 588.

In sum, the Court holds that modification of the bond value is not warranted in this case, but notes that if Defendants are later determined to have been improperly enjoined, Defendants will have the opportunity to prove that their damages are greater than $100,000.

## VI.    MOTION TO STAY

The Liown Defendants also request this Court to enter a stay of the preliminary injunction that was granted on April 20, 2015. (See Liown Defs.' Mem. at 7–8 [Doc. No. 168].) "The party seeking a stay pending appeal must show (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury unless the stay is granted; (3) that no substantial harm will come to other interested parties; and (4) that the stay will do no harm to the public interest." Fargo Women's Health Org. v. Schafer, 18 F.3d 526, 538 (8th Cir. 1994) (internal quotations and citations omitted); see also Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 423 (8th Cir. 1996). While no factor alone is determinative, the

Eighth Circuit has indicated that "likelihood of success on the merits is most significant." S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992), cert. denied, 506 U.S. 863 (1992). Additionally, while the stay test does not formally include a balancing of the equities, the Eighth Circuit has interpreted the test as requiring a court to consider a "balance of equities." See James River Flood Control Ass'n v. Watt, 680 F.2d 543, 545 (8th Cir. 1982) (applying the stay test and holding that a stay was warranted in the case because "the balance of equities favor[ed] the [defendant]").

Because determining whether to grant a stay is a generally procedural issue, the parties appear to agree that Eighth Circuit case law controls. (See Liown Defs.' Mem. at 8 [Doc. No. 168]; Pl.'s Mem. in Opp'n at 12 [Doc. No. 184].) The Court notes, however, that the first factor in the stay analysis – likelihood of success on the merits – is an issue unique to patent law. See Madey, 307 F.3d at 1358. Therefore, this procedural stay analysis necessarily requires the Court to consider an issue that bears an essential relationship to matters committed to Federal Circuit control. See Int'l Nutrition Co., 257 F.3d at 1328.

Under Federal Circuit case law, this Court would apply a similar test to determine whether to grant a stay. As the Federal Circuit explained in E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., when determining whether to grant a stay, pending appeal, the court must "assess[] [the] movant's chances for success on appeal and weigh[] the equities as they affect the parties and the public." See 835 F.2d 277, 278 (Fed. Cir. 1987); see also Hilton v. Braunskill, 481 U.S. 770, 778 (1987)). Although this test is not precisely the same as the Eighth Circuit four-factor test, the two approaches are

A134

substantially similar.  The Court proceeds by analyzing the facts of this case under both Eighth Circuit and Federal Circuit case law and notes that the Court's holding is consistent regardless of which case law governs.

The Court has already considered factors, which are substantially similar to those in the stay analysis, when determining whether to grant the preliminary injunction in the first instance.  (See 4/20/15 Order at 8 [Doc. No. 147].)  Specifically, the Court determined that preliminary injunctive relief was warranted based on "(1) the likelihood of movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest."  (See id.) (citing Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)).  Thus, Defendants are asking the same Court that earlier found that *Luminara* was likely to succeed on the merits, to reverse its finding and determine that *Defendants* are likely to succeed on the merits.  Below, the Court considers each of the four factors required in the stay analysis, and finds that Defendants have failed to meet their burden.

## A.  Likelihood of Success on the Merits

Defendants must show that they are "likely" to succeed on the merits, or at least have a chance at success, in order for the Court to grant a stay.  See Iowa Utils. Bd., 109 F.3d at 423; Fargo Women's Health Org.,18 F.3d at 538; E.I. DuPont de Nemours & Co., 835 F.2d at 278.  Here, the Liown Defendants argue that they are likely to succeed on the merits because the claim at issue, claim 1 of United States Patent No. 8,696,166 ("the '166 patent"), is invalid.  (See Liown Defs.' Mem. at 8 [Doc. No. 168].)

21

**A135**

The Court already carefully considered evidence about the validity of claim 1 of the '166 patent in its April 20, 2015 Order, and determined that Defendants failed to raise substantial doubt about the validity of the '166 patent. (See 4/20/15 Order at 9–29 [Doc. No. 147].) Defendants take issue with the Court's claim construction in its April 20, 2015 Order, and contend that the Court improperly construed the term "pivot" in the '166 patent. (See Liown Defs.' Mem. at 9–11 [Doc. No. 168].) The Court disagrees, and rests on the claim construction reasoning in its April 20, 2015 Order.

Defendants also argue that the Court's determination about the validity of the '166 patent is flawed because the United States Patent and Trademark Office ("USPTO") rejected "another member of the same patent family" (United States Patent No. 8,534,869), explaining that it was anticipated by the '455 patent. (See id. at 11.) The Court does not find this evidence persuasive enough to change its holding about Plaintiff's likelihood of success on the merits. Regardless of what caused the USPTO to deny a patent for "another member of the same patent family," the Court notes that the USPTO specifically considered the '455 patent when examining and deciding to grant the '166 patent. (See 4/20/15 Order at 25–26 [Doc. No. 147].) Thus, the USPTO determined that the '455 patent did not anticipate the claims in the '166 patent. Accordingly, the Court disagrees with Defendants and does not find that "there is a substantial question" as to whether the '455 patent anticipated the '166 patent. (Cf. Liown Defs.' Mem. at 12 [Doc. No. 168].)

Additionally, the Liown Defendants contend that there is a substantial question as to the validity of the '166 patent given "recently obtained evidence [which] confirms that

Mr. Li developed the single-pendulum design before he ever met with Candella and suggests that if either party engaged in copying, it was [Plaintiff]."  (See id. at 21.) Defendants point to meta-data from Mr. Li's computer that allegedly shows that Mr. Li conceived and drew the single-pendulum LED candle invention by or around November 19, 2009. (See id.)

As an initial matter, the Court notes that this "new" evidence could have, and should have been presented earlier.  Defendants have been in contentious litigation about the validity of Liown's patents dating back to 2013.  Specifically, Defendants had the opportunity to present this evidence to the Court when the Court was initially considering the merits of the preliminary injunction motion.  Yet, Defendants failed to do so.

Regardless of Defendants' tardiness in submitting this meta-data evidence, the meta-data does not alter the Court's ruling about the validity of the '166 patent.  As Plaintiff's counsel aptly explained during oral argument, claim 1 of the '166 patent does not require a single-pendulum design.  Claim 1 provides as follows:

> 1. A pendulum member for generating a flickering flame effect, comprising:
>
> a [1] **body** with upper and lower portions;
>
> a [2] **flame silhouette** element extending outward from the upper portion of the body;
>
> and [3] **a hole** in the body below the flame silhouette element, wherein the hole is configured to receive [4] **a flame support** element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

(See Merrill Decl., Ex. 5, "'166 Patent" [Doc. No. 55-1].)  Nothing in the plain language of claim 1 requires the pendulum to be a single-stage pendulum.  Therefore, it is

A137

immaterial if Mr. Li created a design for a moving candle that utilized a single-pendulum design before the '166 patent issued.

Moreover, the specification in Disney's first Artificial Flame Technology patent, United States Patent No. 7,837,355 ("the '355 patent"), which claims a priority date of September 30, 2008,[4] clearly stated that the invention could be "implemented as a unitary, single stage body, in two stages as show in FIG. 1, or as three or more stages if desired." (See Merrill Decl., Ex. 2 "'355 Patent," Col. 4: 49–52 [Doc. No. 55-1].) Therefore, even if the single-pendulum design was relevant for the Court's inquiry, Plaintiff presented sufficient evidence demonstrating that Disney's patents encompass a single-stage design.

Other courts in this District have held that "[i]n the context of a stay motion, 'the likelihood of success on the merits factor focuses not necessarily on whether the applicant has shown a likelihood that its appeal will be successful, although this is relevant, but whether the order involves the determination of substantial and novel legal questions." Metro Networks Commc'ns Ltd. P'ship v. Zavodnick, No. 03-cv-6198 (RHK/AJB), 2004 WL 73591, *3 (D. Minn. Jan. 15, 2004) (internal quotations and

---

[4]     While a provisional patent application does not grant patent rights, according to 35 U.S.C. § 119 (e)(1), if a non-provisional patent application is filed no later than twelve months after the date on which the provisional application was filed and if it contains a specific reference to the provisional application, then the non-provisional application may claim the benefit of the provisional application's earlier filing date. See 35 U.S.C. § 119(e)(1). Here, Disney filed its '355 patent, its first non-provisional patent application based on the 2008 provisional application, on July 21, 2009, and the patent issued on November 23, 2010. (See Merrill Decl., Ex. 2 "'355 patent" [Doc. No. 55-1].) Thus, because the '355 patent was filed less than one year after the provisional application was filed, the '355 patent is entitled to the benefit of the 2008 filing date.

citations omitted); see also In re Workers' Comp. Refund, 851 F. Supp. 1399, 1401 (D.

Minn. 1994). Even under this standard, the Court finds that a stay is not merited.

Defendants have failed to demonstrate that this case involves the determination of

substantial and novel legal questions. Rather, Defendants simply disagree with the

Court's claim construction and interpretation of the factual evidence presented.

Finally, the Liown Defendants also argue that "Luminara lacks standing to sue

without Disney because Luminara does not hold all substantial rights in the '166 patent."

(See Liown Defs.' Mem. at 13 [Doc. No. 168].) The Court already held in an earlier

order that Luminara has standing to sue, without joining Disney. (See generally 4/3/15

Order [Doc. No. 143].) The Court need not reconsider the merits of Defendants'

argument as the Court fully addressed these arguments in its April 3, 2015 order. (See

id.)[5] In sum, the Court finds that the Liown Defendants did not show that they are likely

---

[5]       Nevertheless, the Court takes the opportunity to clarify Defendants' misreading of
the Court's April 3, 2015 Order. Defendants contend that the Court interpreted the term
"Affiliate" to mean that an entity would have to be both acquired by *and* licensed by
Disney in order to make the moving flameless candles. (See Liown Defs.' Mem. at 14
[Doc. No. 168].) Defendants misread the plain language of the Court's order.
          The Court outlined two ways in which an entity could be characterized as an
"Affiliate" of Disney. First, Disney could acquire 50% equity of the entity, or the right to
appoint a majority of the governing body of an entity. (See 4/315 Order at 36–37 [Doc.
No. 143].) Second, Disney could grant the entity the right to make the moving flameless
candles *for* Disney, as long as Disney also bundled that right with other licensing rights.
(See id. at 37.)
          The underlying Agreement between Disney and Luminara states that "Disney
expressly reserves for itself and its Affiliates the right throughout the world to . . . make,
have made, use, sell, offer for sale and import the Licensed Products" throughout the
world. (See id. at 39.) Given the substantial rights that Disney delegated to
Candella/Luminara, the Court interpreted this provision of the Agreement "to mean that
(1) Disney and its Affiliates could make, use, or sell the products, and (2) Disney and its
Affiliates could have the products made *for themselves*, but could not have the products

25

**A139**

to succeed on the merits or have a substantial case on the merits.

### B. Irreparable Harm to Defendants

Defendants must also show that they will suffer irreparable injury unless a stay is granted. See Fargo Women's Health Org., 18 F.3d at 538; see also E.I. DuPont de Nemours & Co., 835 F.2d at 278. In its April 20, 2015 Order, the Court already held that enjoining Defendants may cause them to suffer substantial harm. (See 4/20/15 Order at 45 [Doc. No. 147].) The additional evidence recently submitted about the Liown Defendants', GKI's, and The Light Garden's expected lost profits, only bolsters the Court's determination that the Defendants would suffer substantial harm if enjoined. However, the extent of this substantial harm is still unclear, given the fact that, as the Court explained above, see supra Part V, Defendants' estimates about lost profits and harm are insufficiently accurate. Therefore, when "balanc[ing] the equities," the Court is still not persuaded that Defendants' potential injury outweighs Plaintiff's injury. See James River Flood Control Ass'n, 680 F.2d at 545; E.I. DuPont de Nemours & Co., 835 F.2d at 278; (cf. Central Garden & Pet Co.'s Mem. at 5 [Doc. No. 185]).

### C. Substantial Harm to Luminara

In order to demonstrate that a stay is warranted, Defendants must also show that

---

made *for third parties* [such as Defendant Boston Warehouse]." (See id.) Therefore, an entity could only be an "Affiliate" if it (1) received a license from Disney to practice more patents than only the Artificial Flame Technology patents; *and* (2) made the Artificial Flame Technology products *for* Disney. As the Court noted in its April 3, 2015 Order, however, "nothing in the record before the Court indicates that Disney has asked, or intends on asking, Liown to make the products for Disney." (See id. at 37–38.) It was for this reason that the Liown Defendants were not considered an Affiliate.

In sum, Defendants misconstrued the Court's prior Order, and mischaracterized the Court's relevant holding.

**A140**

no substantial harm will come to interested parties.  See Fargo Women's Health Org., 18

F.3d at 538; see also E.I. DuPont de Nemours & Co., 835 F.2d at 278.  The Court finds

that Defendants plainly fail to meet this requirement.  The Court spent a significant

portion of its April 20, 2015 Order detailing the harm that Luminara would suffer if

Defendants were not enjoined.  (See 4/20/15 Order at 29–43 [Doc. No. 147].)

Defendants take issue with the Court's finding that Luminara will suffer

irreparable harm in the absence of a preliminary injunction.  Specifically, the Liown

Defendants argue that (1) Luminara did not present sufficient evidence documenting the

nexus between price erosion of Luminara's products and the entry of Liown's flameless

moving candles into the market; (2) Disney's reputation as an innovator does not

constitute irreparable harm because Disney is not a party to this case and Luminara's

evidence of causation was inadequate; and (3) evidence about confusion between the

"Luminara" and "Illuminaires" trademarks was also inadequate.  (See Liown Defs.'

Mem. at 15–20 [Doc. No. 168].)

Assuming, *arguendo*, that Defendants' arguments about price erosion, Disney's

reputation as an innovator, and trademark confusion are correct (cf. id.), the Liown

Defendants fail to address the fact that the Court held that without a preliminary

injunction Luminara would suffer loss of goodwill and harm to its reputation (see 4/20/15

Order at 33 [Doc. No. 147]).

Defendants correctly note that according to Apple, Inc. v. Samsung Electronics

Co., Ltd., "reputational injury cannot be presumed based on patent infringement."  (See

Liown Defs.' Mem. at 18 (citing Apple, Inc., 678 F.3d 1314, 1325 (Fed. Cir. 2012) [Doc.

No. 168].)  In <u>Apple, Inc.</u>, the Federal Circuit concluded that because the plaintiff had

only offered "conclusory statements and theoretical arguments . . . without, concrete

evidence to support its argument," the plaintiff had failed to establish that "harm to its

reputation for innovation [was] likely to occur."  <u>See</u> <u>Apple, Inc.</u>, 678 F.3d at 1325

(internal quotations omitted).

In this case, however, Luminara's loss of goodwill and reputational injury are

neither simply presumed, nor based on mere conclusory statements.  The President of

Luminara, Jerry Cain, stated that Luminara's goodwill was embodied in the proprietary

nature of Luminara's flameless candles that incorporated the Artificial Flame

Technology.  (<u>See</u> Cain Decl. ¶ 8 [Doc. No. 53].)  Cain explained that "Luminara's

goodwill includes customer association of the Artificial Flame Technology with

Luminara flameless candles."  (<u>See</u> <u>id.</u>)  Cain further explained that by permitting Liown

to sell candles that allegedly incorporate this patented technology, Luminara suffers loss

of goodwill.  (<u>See</u> <u>id.</u>)  Specifically, Luminara's goodwill will suffer because it will no

longer be the "exclusive source for the Artificial Flame Technology developed by

Disney."  (<u>See</u> <u>id.</u> ¶ 12.)  Therefore, the loss of goodwill and harm to Luminara's

reputation is material.  Before the Court granted the preliminary injunction, Luminara

was no longer the only source for customers and distributors seeking moving flameless

candles that allegedly incorporate Disney's Artificial Flame Technology.  Thus,

Luminara's exclusive license was rendered a "waste" when Liown began selling

allegedly infringing candles.  (<u>See</u> Pl.'s Mem. in Supp. of Preliminary Injunction at 32

[Doc. No. 52].)  This alleged infringement was a tangible violation of Luminara's

proprietary rights/goodwill, and was not merely presumed.

The Eighth Circuit addressed the loss of consumer goodwill in <u>Iowa Utilities Board v. F.C.C.</u>, 109 F.3d 418, 426 (8th Cir. 1996). When stating that "the petitioners' potential loss of consumer goodwill qualife[d] as irreparable harm," the court cited <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 552 (4th Cir. 1994), <u>abrogated on other grounds</u>, <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7 (2008), which in turn cited <u>Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.</u>, 550 F.2d 189, 196–97 (4th Cir. 1977), <u>abrogated on other grounds</u>, <u>Winter</u>, 555 U.S. 7 (2008).

In <u>Blackwelder</u>, the Fourth Circuit explained that "[w]ord-of-mouth grumbling of customers can convert [a plaintiff's] inability to honor . . . orders into a reputation for general unreliability as a merchant." <u>See</u> 550 F.2d at 197. For this reason, the Fourth Circuit explained that the harm posed to the plaintiff's general goodwill "[was] incalculable, not incalculably great or small, just incalculable." <u>See</u> <u>id.</u> In fact, the Fourth Circuit quoted Judge Learned Hand for his observation about irreparable harm. <u>See</u> <u>id.</u> In <u>Foundry Services, Inc. v. Beneflux Corp.</u>, Judge Hand stated that he "cannot see how the plaintiff [would] ever be able to prove what sales the defendant's competition [would] make it lose, to say nothing of the indirect, though at times far-reaching, effects upon its good will." <u>See</u> 206 F.2d 214, 216 (2d Cir. 1952) (Hand, J., concurring).

Similar to the Fourth Circuit's finding of irreparable harm in <u>Blackwelder</u>, here, Luminara's threat of irreparable harm stems from customers' perception of Luminara as

no longer the exclusive source for the Artificial Flame Technology developed by Disney. It would be difficult for Luminara to prove the monetary value of the "effects upon its good will" if Liown was permitted to continue selling allegedly infringing products. See Foundry Servs., Inc., 206 F.2d at 216. As the Eighth Circuit explained in Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." See 336 F.3d 801, 805 (8th Cir. 2003).

Moreover, Luminara's reputation and consumer goodwill could be irreparably damaged if its customers believed it did not enforce its intellectual property rights. As the exclusive licensee of Disney's Artificial Flame Technology, with the sole and exclusive right to enforce those patents, Luminara's reputation partially rests on its ability and willingness to enforce those patent rights.

Insofar as Defendants argue that Luminara has not adequately demonstrated that it will suffer irreparable harm because Luminara failed to show a causal nexus between the alleged infringements and the claimed harm, the Court disagrees. (Cf. Liown Defs.' Mem. at 17 [Doc. No. 168].) Assuming that Liown's candles infringe Plaintiff's Artificial Flame Technology patents, then Defendants' sale of these candles (pre-preliminary injunction) caused Luminara to no longer be the only source for customers and distributors seeking moving flameless candles that incorporated Disney's Artificial Flame Technology. Thus, a clear causal nexus exists between Luminara's harm and Liown's alleged infringement.

The Court also notes that Luminara presented sufficient evidence demonstrating that Liown's sale of allegedly infringing candles directly caused Luminara to have a loss

**A144**

in sales.  Plaintiff presented evidence showing that the contracts it had with GKI and The Light Garden prohibited these Defendants from purchasing moving flameless candles from any other manufacturer.  On the face of The Light Garden Distribution Agreement, The Light Garden was prohibited from purchasing moving flameless candles from a different manufacturer until December 31, 2014.  (See Cain Decl., Ex. B "The Light Garden Distribution Agreement" § 2.04 [Doc. No. 53-1].)  And, on the face of the GKI Distribution Agreement, GKI is still prohibited from purchasing moving flameless candles from a different manufacturer until December 31, 2016.  (See Cain Decl., Ex. A "GKI/Bethlehem Distribution Agreement" §§ 2.04, 10.01 [Doc. No. 53].)  Thus, the Court finds that if The Light Garden or GKI had wanted more moving flameless candles, pursuant to their contracts with Luminara, these Defendants would have been required to purchase those candles from Luminara, and not Liown.

Defendants aptly note that The Light Garden and GKI could have opted to not purchase any candles during their respective restrictive covenants, rather than purchase candles from Luminara.  The Light Garden specifically argues that it likely would not have purchased any more products from Luminara because of Luminara's alleged supply issues.  (See The Light Garden's Mem. at 8 [Doc. No. 186].)  However, at this stage in the proceedings, the Court plausibly assumes that Luminara would have received at least some of the sales that Liown obtained from The Light Garden and GKI.  See Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986) (explaining that a district court must construe all reasonable inferences from facts in a plaintiff's complaint, in the light most favorable to the plaintiff).  The Court's inference is reasonable because even though Luminara

31

**A145**

allegedly had performance and supply problems beginning in 2013, (see Elson Decl. ¶ 6 [Doc. No. 169]), The Light Garden continued to place purchase orders with Luminara through June 2014. Thus, this purchase behavior not only demonstrates that The Light Garden had a need for moving flameless candles in 2014, but it also shows that Luminara's alleged supply problems alone were, plausibly, not reason enough for The Light Garden to stop using Luminara as a supplier. Rather, it was only once The Light Garden realized it could use Liown as its supplier that The Light Garden stopped purchasing candles from Luminara. Accordingly, Plaintiff presented sufficient evidence demonstrating that Liown's entry into the moving flameless candle market was plausibly the direct cause of at least some of Luminara's lost sales.

In sum, just as Luminara would suffer irreparable harm stemming from loss of goodwill and harm to reputation had the Court not granted the preliminary injunction, so too would Luminara suffer this harm if the Court issues a stay of the preliminary injunction. Therefore, the Court finds that Defendants fail to show that no substantial harm will come to Luminara if a stay is issued. See Fargo Women's Health Org., 18 F.3d at 538.

### D. Stay Harms the Public Interest

Finally, Defendants were required to show that the stay would not harm the public interest. See id.; E.I. DuPont de Nemours & Co., 835 F.2d at 278. However, the Court already held in its April 20, 2015 Order that the public interest is served by a preliminary injunction in this case because it "protects a patent owner's property rights." (See 4/20/15 Order at 48 [Doc. No. 147].)

32

**A146**

Moreover, the Federal Circuit has noted that ordinarily, a district court "should not grant both a preliminary injunction and a stay." Procter & Gamble Co. v. Kraft Foods Global, Inc., 549 F.3d 842, 849 (Fed. Cir. 2008). The Federal Circuit explained that "[a] grant of a preliminary injunction followed by a stay of the district court proceedings could subject an accused infringer to unfair and undesirable delay in reaching a final resolution." See id. This explanation from the Federal Circuit bolsters the Court's finding that a stay of the preliminary injunction is not warranted in this case.

### E. Administrative Stay

At a minimum, Defendants request the Court to "stay the injunction long enough for Defendants to seek a longer stay from the Federal Circuit." (See Liown Defs.' Mem. at 27 [Doc. No. 168].) In Brady v. National Football League, the Eighth Circuit explained that the purpose of an "administrative stay is to give the court sufficient opportunity to consider the merits of the motion for a stay pending appeal." See 638 F.3d 1004, 1005 (8th Cir. 2011). In Brady, the Eighth Circuit granted an administrative stay for the sole purpose of allowing the court to further consider the merits of the underlying motion for a stay. See id. However, in dissent, Judge Bye explained that the "underlying purpose" of granting an administrative stay "is to address 'emergency situations.'" See id. (Bye, J., dissenting) (citing McClendon v. City of Albuquerque, 79 F.3d 1014, 1019 (10th Cir. 1996) (citing Arrow Transp. Co. v. S. Ry. Co., 372 U.S. 658, 662 n.4 (1963))).

Here, the parties have not presented an emergency situation meriting an administrative stay. Given Plaintiff's likelihood of success on the merits, the Court is reluctant to stay the case and permit Defendants to continue infringing the underlying

33

**A147**

patents.  Therefore, the request for an administrative stay is denied.

## VII.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. Liown Defendants' Motion to Modify and to Stay the Preliminary Injunction
   Pending Reconsideration or Appeal [Doc. No. 166] is **GRANTED, in part,** and
   **DENIED, in part**, as detailed within this Order**.**

2. Plaintiff's Motion to Strike Memoranda of Law Filed in Violation of Local Rule 7.1
   [Doc. No. 187] is **DENIED**.

3. The parties are ordered to show cause ten days from the date of this Order why the
   Order should not be unsealed, and to specify any portion warranting redaction.

Dated:  May 22, 2015                    s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge

'166 Patent

US008696166B2

(12) **United States Patent**
Patton et al.

(10) **Patent No.:** **US 8,696,166 B2**
(45) **Date of Patent:** *Apr. 15, 2014

(54) **KINETIC FLAME DEVICE**

(71) Applicant: **Disney Enterprises, Inc.**, Burbank, CA (US)

(72) Inventors: **Douglas M. Patton**, Irvine, CA (US); **Gary W. Schnuckle**, Altadena, CA (US)

(73) Assignee: **Disney Enterprises, Inc.**, Burbank, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/874,194**

(22) Filed: **Apr. 30, 2013**

(65) **Prior Publication Data**

US 2013/0242579 A1     Sep. 19, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/758,057, filed on Feb. 4, 2013, now Pat. No. 8,534,869, which is a continuation of application No. 13/709,292, filed on Dec. 10, 2012, which is a continuation of application No. 12/986,399, filed on Jan. 7, 2011, now Pat. No. 8,342,712, which is a continuation-in-part of application No. 12/851,749, filed on Aug. 6, 2010, now Pat. No. 8,070,319, which is a continuation-in-part of application No. 12/506,460, filed on Jul. 21, 2009, now Pat. No. 7,837,355.

(60) Provisional application No. 61/293,516, filed on Jan. 8, 2010, provisional application No. 61/101,611, filed on Sep. 30, 2008.

(51) **Int. Cl.**
*F21S 10/04*          (2006.01)
(52) **U.S. Cl.**
USPC ...................... **362/277**; 362/249.02; 362/810

(58) **Field of Classification Search**
USPC ..................................... 362/249.02, 277, 810
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 2,435,811 A | 2/1948 | Waters |
| 2,976,450 A | 8/1957 | Benoliel et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CN | 201010211402 | 10/2010 |
| DE | 1489617 | 11/1965 |

(Continued)

OTHER PUBLICATIONS

International Search Report PCT/US2009/054401, Aug. 20, 2009.

(Continued)

*Primary Examiner* — Laura Tso
(74) *Attorney, Agent, or Firm* — Marsh Fischmann & Breyfogle, LLP; Kent A. Lembke

(57)          **ABSTRACT**

An apparatus for creating flickering flame effects. The apparatus includes a housing with an interior space with first and second stages. A drive mechanism generates a time varying electromagnetic field extending into the first stage. A first pendulum member is pivotally mounted in the interior space of the first stage and includes first and second magnets on first and second ends, with the first end proximate to the drive mechanism such that the first magnet interacts with the varying electromagnetic field to cause movement of the pendulum member. The apparatus includes a second pendulum member pivotally mounted in the second stage with a magnet on a first end proximate to the second end of the first pendulum member. A flame silhouette element extends from the second pendulum member, and a light source transmits light onto the flame silhouette, which is moving due to the magnetic coupling of the pendulum members.

**26 Claims, 10 Drawing Sheets**



**US 8,696,166 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,233,093 A | 2/1966 | Gerlat |
| 3,384,774 A | 5/1968 | English |
| 3,514,660 A | 5/1970 | Kopelman |
| 3,639,749 A | 2/1972 | Beckman |
| 3,681,588 A | 8/1972 | Lee |
| 3,814,973 A | 6/1974 | Thouret et al. |
| 4,026,544 A | 5/1977 | Plambeck et al. |
| 4,328,534 A | 5/1982 | Abe |
| 4,477,249 A | 10/1984 | Ruzek et al. |
| 4,550,363 A | 10/1985 | Sandell |
| 4,551,794 A | 11/1985 | Sandell |
| 4,777,571 A | 10/1988 | Morgan |
| 4,866,580 A | 9/1989 | Blackerby |
| 5,097,180 A | 3/1992 | Ignon et al. |
| 5,381,325 A | 1/1995 | Messana |
| 5,707,282 A | 1/1998 | Clements et al. |
| 6,257,755 B1 | 7/2001 | Sevelle |
| 6,302,555 B1 | 10/2001 | Bristow |
| 6,312,137 B1 | 11/2001 | Hsieh |
| 6,454,425 B1 | 9/2002 | Lin |
| 6,461,011 B1 | 10/2002 | Harrison |
| 6,511,219 B2 | 1/2003 | Sevelle |
| D486,924 S | 2/2004 | Skradski et al. |
| 6,688,752 B2 | 2/2004 | Moore |
| 6,712,493 B2 | 3/2004 | Tell et al. |
| 6,757,487 B2 | 6/2004 | Martin et al. |
| 6,953,401 B2 | 10/2005 | Starr |
| 7,080,472 B2 | 7/2006 | Schroeter et al. |
| 7,083,315 B2 | 8/2006 | Hansler et al. |
| 7,093,949 B2 | 8/2006 | Hart et al. |
| 7,111,421 B2 | 9/2006 | Corry et al. |
| 7,125,142 B2 | 10/2006 | Wainwright |
| 7,159,994 B2 | 1/2007 | Schnuckle et al. |
| 7,261,455 B2 | 8/2007 | Schnuckle et al. |
| 7,686,471 B2 | 3/2010 | Reichow |
| 2002/0080601 A1 | 6/2002 | Meltzer |
| 2003/0041491 A1 | 3/2003 | Mix |
| 2003/0053305 A1 | 3/2003 | Lin |
| 2004/0165374 A1 | 8/2004 | Robinson |
| 2005/0097792 A1 | 5/2005 | Naden |
| 2005/0285538 A1 | 12/2005 | Jaworski et al. |
| 2006/0034079 A1 | 2/2006 | Schnuckle et al. |
| 2006/0034100 A1 | 2/2006 | Schnuckle et al. |
| 2006/0101681 A1 | 5/2006 | Hess et al. |
| 2008/0130266 A1 | 6/2008 | DeWitt et al. |
| 2009/0135586 A1 | 5/2009 | Yang |
| 2012/0134157 A1 | 5/2012 | Li |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0138786 | 4/1985 |
| EP | 2587127 | 1/2013 |
| GB | 2323159 | 2/1997 |
| GB | 2379731 | 9/2002 |
| JP | 06052709 | 2/1994 |
| JP | 2000284730 | 10/2000 |
| JP | 2008180755 | 1/2007 |
| WO | 8202756 | 8/1982 |
| WO | 8704506 | 7/1987 |
| WO | 9625624 | 8/1996 |
| WO | 2012000418 | 5/2012 |

OTHER PUBLICATIONS

EP Search Report for EP12185984.7-2423 mailed Dec. 14, 2012.



FIG.1



FIG.2



FIG.3



FIG.4



FIG.5

FIG.6



FIG.7



FIG.8

UP POSITION (ON)



FIG.9

DOWN POSITION (OFF)



FIG.10



FIG.11



FIG.12

**A160**

US 8,696,166 B2

**1**

## KINETIC FLAME DEVICE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/758,057, filed Feb. 4, 2013, which is a continuation of U.S. patent application Ser. No. 13/709,292, filed Dec. 10, 2012, which is a continuation U.S. patent application Ser. No. 12/986,399, filed Jan. 7, 2011, issued as U.S. Pat. No. 8,342,712, and also claims the benefit of U.S. Provisional Application No. 61/293,516, filed Jan. 8, 2010, and is also a continuation-in-part of U.S. patent application Ser. No. 12/851,749, filed Aug. 6, 2010, issued as U.S. Pat. No. 8,070,319, which is a continuation-in-part of U.S. patent application Ser. No. 12/506,460, filed Jul. 21, 2009, issued as U.S. Pat. No. 7,837,355, which claimed the benefit of U.S. Provisional Application No. 61/101,611, filed Sep. 30, 2008, all of which are incorporated herein by reference in their entireties.

### BACKGROUND

1. Field of the Description

The present description relates, in general, to methods and systems for animated lighting, and, more particularly, to systems, devices, and methods for simulating a flickering flame providing kinetic light movement.

2. Relevant Background

A difficult challenge for a special effects artist is the simulation of a single candle flame. Simulated flames in large fires such as fireplaces or stage sets are comparatively easy to design because they are normally viewed from a distance, and much of the effect of a large fire involves glow and embers, which can be readily simulated. A single candle, however, is often viewed at short distances with the focus of the effect falling on the flickering light of the solitary flame moving kinetically or randomly on a wick.

Flames are the visible, light-emitting part of a fire. Solitary flames are complex kinetic interactions of fuel, temperature gradients, convection, and ambient airflow. These interactions produce a continuously and randomly moving light having loosely defined regions of various colors where the regions change size and shape kinetically or in unpredictable manners in space. Despite the complexity, people are so familiar with the appearance of natural flames that it is very difficult to provide a convincing simulation that appears real or natural to a viewer, especially at short viewing distances of several feet or less.

Combustion-based candles create safety issues in many environments because of the presence of flame and heat. These conventional candles are high-maintenance and, so, are not suitable for long-term usage such as in religious buildings, theme parks, memorials, window displays, museums, and the like without continuous maintenance. On the other hand, conventional wax candles produce a light that appeals to many people and can be readily manufactured for a wide variety of applications such as table lighting, room lighting, wall sconces, spiritual ceremonies, theatrical lighting, decorative lighting, and lighting for holidays and special events. Hence, a continuing need exists for an artificial flame simulator that can be used more safely and with less maintenance than conventional wax or combustion candles, and the artificial flame simulator or device should produce a pleasing and realistic simulation of solitary flames and be adaptable to a variety of form factors.

There are a variety of flame imitation novelty products that utilize various methods to simulate a real flame for display

**2**

purposes such as those disclosed in U.S. Pat. Nos. 7,125,142, 6,454,425 and 4,550,363. Specifically, U.S. Pat. No. 7,125,142 describes a device that uses multiple colored lights affixed to a translucent shell where the lights are energized according to a computer program that attempts to animate the light without moving parts. U.S. Pat. No. 6,454,425 discloses a candle flame simulating device that includes a blowing device for generating an air flow and for directing the flowing air toward a flame-like flexible member, in order to blow and oscillate or to vibrate the flame-like flexible member so as to simulate a candle. U.S. Pat. No. 4,550,363 discloses an electric-light bulb fitted with a light permeable and light-scattering lamp casing. These and other attempts result in flame displays that are relatively poor imitations of a real flame and have not been widely adopted by the commercial or retail markets. In addition, such devices typically require substantial energy inputs and require frequent battery replacement, which can drive up purchase and operating costs and require undesirable levels of maintenance for ongoing use.

### SUMMARY

The present description addresses the above and other problems by providing kinetic flame devices that create lighting effects driven by real but chaotic physical movements and by providing methods for making and using such kinetic flame devices. Some embodiments of the present invention may include a drive mechanism that stimulates and/or perturbs a complex interaction between gravity, mass, electromagnetic field strength, magnetic fields, air resistance, and light to achieve a kinetic or random flame effect, but, interestingly, the complex interaction is not directly modulated or controlled so as to reduce control and/or driving requirements or components. The motion and light generated by the kinetic flame devices produce light that convincingly reproduces the kinetic light output of a solitary flickering flame such as may be provided by a conventional combustion or wax candle.

More particularly, an apparatus is provided for simulating a flame such as a flame of a candle or the like. The flame simulating apparatus may include a housing with one or more sidewalls (or housing portions) that define an interior space with a first stage and a second stage (or upper and lower spaces). A drive mechanism such as an electric coil may be provided for generating a time varying electromagnetic field that extends into the first stage. The apparatus may also include a first stage pendulum member that is pivotally mounted within the interior space of the first stage. The first stage pendulum member may include a first magnet on a first end (e.g., embedded or attached permanent magnet) and a second magnet on a second end (e.g., embedded or attached permanent magnet). In some cases, the first end is positioned proximate to the drive mechanism such that the first magnet interacts with the time varying electromagnetic field to kinetically displace (or displace in a random pattern) the first stage pendulum member over time (or over/during an operating period for the drive mechanism).

The apparatus may also include a second stage pendulum member that is pivotally mounted within the interior space of the second stage. The second stage pendulum member includes a magnet on a first end (e.g., a permanent magnet attached or embedded to the member), and this end of the second stage pendulum member is positioned proximate to the second end of the first stage pendulum member. In other cases, ferromagnetic materials are provided in place of the magnets, e.g., the drive mechanism may apply a force on a tag or element of ferromagnetic material with the other end of this first stage pendulum having a magnet or another ferromag-

US 8,696,166 B2

3

netic material (with the second stage pendulum having either a ferromagnetic or a ferromagnetic tag/element depending on the first stage pendulum's inclusion of a magnet or ferromagnetic material as one of these two proximate components would be a magnet). In some cases, the two ends of the pendulum members are spaced apart to avoid physical/mechanical interference but close enough that their magnets interact to transmit the kinetic movement of the first stage pendulum member to the second stage pendulum member. The second stage pendulum member may further include a flame silhouette element extending from a second end of the second stage pendulum member. The apparatus also may include a light source adapted to selectively transmit light onto the flame silhouette element. The drive mechanism may include a coil of wire and a signal generator providing time-varying current to the coil to create the time-varying magnetic field.

During use, in response to the interaction between the first magnet and the time-varying magnetic field, the first stage pendulum member may be displaced in a random pattern over time. Further during use, in response to the displacement of the first stage pendulum member in the random pattern, the second stage pendulum member may be displaced in another random pattern, whereby the flame silhouette element has kinetic motion concurrently with receiving the light from the light source.

In some embodiments of the apparatus, the first and second stage pendulum members each comprise an elongated, planar body. The body of the first stage pendulum member may be pivotally supported by a first support element at a first location proximate to the second end of the first stage pendulum member while the body of the second stage pendulum member may be pivotally supported by a second support element at a second location proximate to the second end of the second stage pendulum member. The first support member may include a rigid body (such as a wire, rod, shaft, or the like) that extends across the interior space of the housing and through a hole at the first location in the first stage pendulum member. Similarly, the second support member may include a rigid body that extends across the interior space of the housing and through a hole at the second location in the first stage pendulum member. In other embodiments the first (and, in some cases, the second) support member may be a flexible member such as a thread or the like so as to allow a more chaotic movement of the lower pendulum such as by allowing a side-to-side movement of the flexible member relative to its tethered ends. The first location in the first stage pendulum member may be disposed between the first and second magnets and more proximate to the second magnet than to the first magnet.

In some embodiments of the apparatus, the first and second support members each extend, at a central portion mating with the first and second stage pendulum members, respectively, a distance toward the drive mechanism. According to some embodiments, the apparatus includes a base that is mated with or a part of the housing and is located adjacent the first stage. In such embodiments, the base houses the drive mechanism and may be configured to electrically couple to a light socket to provide a power source for the drive mechanism and for the light source. In other embodiments, the electrical coupling may be provided with the base having a plug such as for a standard wall socket to allow the base to be plugged directly into a wall socket (e.g., similar to a night light but with a flame effect).

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a cut-away perspective view of an embodiment of a kinetic flame effect device in accordance with the present invention;

4

FIG. 2 shows an exemplary drive mechanism in accordance with an embodiment of the present invention as may be used with the device of FIG. 1, for example;

FIG. 3 shows a cross section of an alternative embodiment of a kinetic flame device in accordance with the present invention;

FIG. 4 shows the embodiment of FIG. 3 at a different perspective such as rotated about 90 degrees;

FIG. 5 shows a cross section of another alternative embodiment of a kinetic flame device in accordance with the present invention; and

FIG. 6 shows the embodiment of FIG. 5 at a different perspective such as rotated about 90 degrees;

FIG. 7 shows a cut-away perspective view of another embodiment of a kinetic flame effect device similar to that shown in FIG. 1 with a single stage providing kinetic movement of a flame silhouette element;

FIG. 8 shows a cut-away perspective view of an embodiment of a kinetic flame effect device similar to that shown in FIGS. 1 and 7 (and its aspects may be used in a single stage or two or more stage device) showing use of housing-contained lighting as well as the use of sidewall magnets to shape and/or effect kinetic movement of the flame body or upper pendulum member;

FIG. 9 illustrates one embodiment of a kinetic flame effect device similar to that shown in FIG. 8 further including an outer casing (or candle body) used, in part, to enclose the drive mechanism and its power source (here, a battery) and also showing a retractable flame feature for displaying the candle when it is not operating (e.g., with an unlit wick as expected for a conventional candle), with FIG. 9 showing the device operating (e.g., with the cover/cap in the up position);

FIG. 10 illustrates the kinetic flame effect device of FIG. 9 in the off mode with the cover/cap in the down position (e.g., with the flame body or upper pendulum member retracted into the second pendulum housing or simply housing when the two stages are provided in a unitary housing/body);

FIG. 11 illustrates one particular implementation of the upper pendulum member or flame body that utilizes an "hour glass" body along with a concave or recessed flame silhouette element to provide a desired kinetic movement of the silhouette element and light reflection/absorption effects; and

FIG. 12 is a partial view similar to that of FIG. 9 showing schematically the inclusion of two or more light sources/engines along with a light engine controller to selectively operate the light sources to provide an enhanced flame effect device.

DETAILED DESCRIPTION

The present description involves devices that create lighting effects driven by real, chaotic, and physical movements and methods for making and using such devices. Prior devices that attempted to simulate flickering flames generally used modulated or controlled motion to mimic a flame, but these devices produced less than ideal results in part because the complexity of a natural flame is difficult to mimic or simulate. Alternatively, some prior devices attempted to control or modulate the intensity, color, and/or other characteristics of a light source such as by blinking, which also produced a less than realistic result. In contrast, the present invention stimulates and/or perturbs a complex interaction between gravity, mass, electromagnetic field strength, magnetic fields, air resistance, and light, but the complex interaction is not directly modulated or controlled. Accordingly, the motion and light generated by the system in accordance with the

5

present invention produces light that convincingly reproduces the kinetic or random light output of a flickering flame.

The present invention can be adapted to a wide variety of form factors to meet the needs of particular applications. FIG. 1 shows a single-flame candle implementation whereas the implementations of FIGS. 3-6 demonstrate lamp-base form factors that can be used as a bulb alternative with many conventional lighting fixtures. Embodiments of the invention can vary in scale to meet the functional and aesthetic needs of a particular application. Power supplies described herein may be provided by batteries, AC/DC power supplies, solar cells, or other available power sources. Although the invention involves complex interactions between many forces, it is typically preferred that the elements of the invention be implemented simply to enhance reliability and longevity of the product. Accordingly, although specific examples of particularly robust construction and components are described herein, actual implementations may vary in complexity.

FIG. 1 shows a cut-away perspective view of an embodiment of a kinetic flame device 100 in accordance with the present invention that resembles a conventional wax candle such as a pillar, taper, container candle, votive, tea light and the like depending on the scale and dimensions of the particular application. FIG. 1 shows a two stage assembly for convenience in manufacture, but the invention can be implemented as a unitary, single stage body, in two stages as shown in FIG. 1, or as three or more stages if desired. Additional stages affect both the form factor as well as the range, speed and variability of the light produced. A stage may damp or amplify these characteristics depending on the particular geometry of the elements within the particular stage.

A drive mechanism (or electrically driven motion engine) 101 is provided that acts to create a time-varying magnetic field, $M_1$, and this mechanism may take a variety of forms such as a coil as shown in FIG. 1. Drive mechanism or coil 101 at the base of the embodiment in FIG. 1 includes a wound wire coil, which may be formed, for example, using a conductive wire coated with an insulator. The windings of coil 101 may be held in place with tape, adhesive, epoxy or other material (not shown) that holds the wire together in a desired shape. The coil 101 may be generally circular as shown in FIG. 1 or any other convenient shape such as oval, square, triangular, or an irregular shape. Coil 101 may have an air core or hollow space/void as shown in FIG. 1, or may use a magnetic core such as iron, iron alloys, ferrite, permalloy and other available magnetic core materials. The core may be substantially centrally located within coil 101 with a generally cylindrical shape or may be off-center in particular applications with a differing or similar shape.

In some embodiments, permanent magnets (not shown) may be integrated in, placed on the surface of, or otherwise placed in proximity to coil 101 to provide a static magnetic field that is cumulative with the time varying electromagnetic field produced when coil 101 is energized (as shown in FIG. 2). Although a single coil 101 is shown in FIG. 1, it is contemplated that two or more independently or synchronously energized coils may also be used that are distributed symmetrically or asymmetrically about a central axis of the candle device (e.g., an axis that extends upward through the first and second stage housings 102, 104 and in some cases through pendulums or pendulum members 111, 121) so as to produce more complex magnetic fields; however, this complexity and attempt to explicitly control the magnetic field shape may offer diminishing returns or even detrimentally effect the convincing result produced by the single coil implementation shown in FIG. 1.

6

In operation, coil 101 is energized by a time-varying electric current to produce a time-varying magnetic field, $M_1$, in the vicinity of coil 101. In some embodiments, core material is used to focus and direct the magnetic field that is produced and to alter the power requirements for the operation of the present invention. In the same or other embodiments, permanent magnets are used in or near the coil 101 to superimpose a static magnetic field on top of the time-varying field, $M_1$, created by energizing coil 101. The additional static magnetic field may be used to alter power requirements as well as to selectively modify or define the shape of the magnetic field, $M_1$, in the vicinity of coil 101.

The first stage 103 serves to translate the time varying electromagnetic field, $M_1$, produced by coil 101 into kinetic motion, $D1_{Kinetic}$. The first stage 103 is positioned such that at least its base is within the electromagnetic field, $M_1$, produced from coil 101 and elements within first stage 103 are magnetically coupled to coil 101 when its electromagnetic field, $M_1$, is present. Specifically, a magnet 114 positioned or mounted at a lower end of pendulum or first stage pendulum member 111 is within the time varying electromagnetic field, $M_1$. Magnet 114 is preferably a small permanent magnet with sufficient magnetic field strength to be moved in response to either repulsive or attractive forces resulting from interaction with the time varying electromagnetic field, $M_1$, produced by coil 101 such that the pendulum member 111 is displaced in a random or kinetic manner as shown with arrows $D1_{Kinetic}$. For example, the pendulum member 111 may have an elongate body such as a thin planar design with a rectangular, elliptical, or other shape that may be formed of plastic or other non-ferrous material (e.g., a plastic rectangle with a width of about 0.25 to 2 inch width, a length of about 0.5 to 4 inches, and a thickness of 0.2 inches or less). The displacement, $D1_{Kinetic}$, may vary widely to practice the invention but may be a random pattern with movements of up to 0.5 inches or more in any direction from an original or at rest position.

While the present invention operates with any polar alignment of magnet 114, the polar alignment of magnet 114 and that of the electromagnetic field produced by coil 101 is coordinated or selected to produce desired results or kinetic movement/displacement, $D1_{Kinetic}$, of the lower or first stage pendulum member 111. For example, when coil 101 produces a north pole facing upward then aligning magnet 114 (which may be termed as a first or lower magnet of the lower pendulum member herein) with a south pole facing downward will increase the net attractive coupling force, whereas aligning magnet 114 with a north pole facing downward will increase the net repulsive coupling force, and either arrangement may be useful in some embodiments of the device 100. Aligning magnet 114 at an angle will have a predictable effect on the mix between attractive and repulsive coupling forces and may be suitable or desirable in particular applications. Rare earth permanent magnets, ferrite magnets, ceramic magnets and the like are suitable for magnet 114. It is also possible to replace magnet 114 with a ferrous material that is attractively coupled to the electromagnetic field.

First stage or lower housing 102 may be generally tubular in shape with a sidewall defining an interior space or void for containing the lower pendulum member 111 and an interaction space or area for the magnetic field/forces, $M_1$, and the lower magnet 114 of pendulum member 111. The housing 102 may have a sidewall formed of plastic, glass, ceramic, molded epoxy, or other material that can be formed into a desired shape for the particular application. Housing 102 may in some cases, include metal, however, some metals may affect the electromagnetic field. Housing 102 may be open at each end as shown or on one end, or, in some cases, it may be

US 8,696,166 B2

7

sealed at upper and/or lower ends with a magnetically permeable material such as glass, plastic, or the like. First stage or lower housing 102 may be sealed with a vacuum and/or may be sealed and contain air or fluid so as to manipulate or control the damping of pendulum 111 to obtain a desired responsive kinetic or random displacement/motion, $D1_{Kinetic}$, in response to the input magnetic field, $M_1$, from coil 101. In some cases, the first stage housing 102, pendulum 111, and the support 113 may also be considered or called a coupling member that is provided in the drive mechanism or motion engine 101 (or coupled to such mechanism, engine, or coil), and, additionally, the second pendulum member 121 along with its flame silhouette 125 may be considered a flame body.

Lower or first stage pendulum member 111 is pivotally mounted within or pivotally supported by a support element 113 provided within first stage housing 102. Such pivotal support may be provided in a variety of ways to allow the pendulum to be kinetically displaced, $D1_{Kinetic}$, about the pivot point or mounting location. For example, but not as a limitation, the pendulum member 111 may have a pivot hole 112 formed to allow a pendulum support 113, such as a rod, axle, wire, string, or the like, to pass through. In some embodiments, the support 113 is flexible and/or has a range or span of travel to allow it to move with the pivotally supported member 111, e.g., a string or thread that is flexible and is able to move side-to-side some amount (not completely taut) to introduce more chaotic movement to the lower pendulum member 111. For example, the support element 113 may be a flexible wire, line, or thread with a length greater than a diameter of the housing (or the distance between the sidewalls of housing 102) such that it has a bit of play or slack that allows it to move in any direction from an at rest or original position (e.g., move 360 degrees from an at rest position a distance or displacement such as up to 0.5 inches or more but often less than about 0.25 inches). In other embodiments, though, it is preferable that the support element 113 is rigid or semi-rigid and does not move with the pendulum member 111.

Hole 112 is formed in the upper half of pendulum 111 such that more of the mass of pendulum 111 is below the pivot hole 112 than is above pivot hole 112 (e.g., at 0.1 to 0.45 times the length of the pendulum member 111 as measured from the top edge or the like). Note, as the location of pivot point approaches equilibrium near the center of pendulum 111, pendulum 111 becomes increasingly unstable and exhibits increasingly chaotic motion. With this in mind, in the exemplary embodiment shown in FIG. 1, the pivot point or location of hole 112 is moved upward with respect to the midpoint of pendulum 111 (e.g., in the range of 0.1 to 0.3 of the pendulum length), which increases stability and decreases the movement, $D1_{Kinetic}$, of the flame illusion, but this positioning of the pivot point or hole 112 decreases the range of motion of the upper end of pendulum 111, which may be desirable in some embodiments. The location of pivot point 112 can be selected to meet the needs of a particular application. This arrangement allows pendulum 111 to hang in a stable position absent the affects of the electromagnetic field and allows gravity to act on the mass of pendulum member 111 and lower magnet 114 attached to pendulum 111. Other mechanisms, such as a gimbal or other joint(s), allowing multi-axis movement may be used as an alternative to the pivotal mounting provided by the combination of the pivot hole 112 and support element 113.

Pendulum support wire 113 is attached to the walls of housing 102 for support at locations selected to place pendulum 111 generally in the center of the hollow space defined by walls of housing 102 so that support wire 113 spans a diameter when housing 102 has a circular cross section. In some

8

preferred embodiments, support element 113 may include a rigid or semi-rigid wire such as a steel or steel alloy wire or rod and is preferably bent to form a low spot at a location where it is desired for pendulum 111 to rest (e.g., the mounting locations for the ends of the wire 113 may be about 0.1 to 0.5 or more inches above the low, center point or pivotal supporting portion of the wire 113). Hole 112 in pendulum member 111 is sufficiently larger than the diameter of support wire 113 such that pendulum 111 swings or pivots freely about support wire 113 but at the same time is held in generally the same location and orientation unless pendulum 111 is perturbed by the electromagnetic field, $M_1$. In this manner, the top portion of pendulum member 111 is able to move back and forth with pendulum movement, $D1_{Kinetic}$, within a generally cone-shaped extent having hole 112 as an apex, as well as flutter.

A small permanent magnet 115, which may be similar in composition and alignment to magnet 114, is positioned at the upper end of pendulum 111, e.g., between the hole 112 and an upper side or edge of the pendulum member 111. Pendulum member 111 is sized with respect to housing 102 such that it moves freely within housing 102 about the pivot location defined by the apex, dip, low point, or valley in support wire 113. In the particular embodiment, the length of pendulum 111 is selected such that when assembled as shown in FIG. 1 the lower portion of pendulum 111 is above the lowest portion of wall 102 and the upper portion of pendulum 111 is below the highest portion of wall 102. This arrangement inhibits or prevents the mechanical interaction between elements in the first and second stages 103 and 105 as well as mechanical interaction between pendulum 111 and coil 101. Although some mechanical interaction can be tolerated, by preventing mechanical interaction the end result or kinetic flame effect is believed to be smoother while more kinetic/random and realistic.

In operation, the electromagnetic field causes magnet 114 to move either repulsively or attractively. That motion, $D1_{Kinetic}$, is translated through pendulum 111 to which magnet 114 is affixed. The extent of motion of the lower end of pendulum 111 is greater than the extent of motion of the upper end of pendulum 111 to a degree determined by the position of hole 112 (e.g., $D1_{Kinetic}$ for the pendulum 111 may be thought of as having a lower component that is greater than an upper component such as two to four times as much in the lower component or the like). Gravity tends to return pendulum 111 to an upright position whereas the time varying electromagnetic field, $M_1$, may continuously perturb pendulum 111 and may be used to prevent a steady state return to the upright position. In a particular example of using a sinusoidal varying electromagnetic field, pendulum 111 dances about quite energetically and in random directions with varying magnitudes of displacement,

Air resistance acting on the surface area of pendulum 111 damps the motion of pendulum 111. Accordingly, the size and shape of pendulum 111 can be altered to provide the speed and degree of kinetic movement desired for a particular application. In some embodiments, air resistance is controlled by using a more irregular shape such as an hour glass shaped member 111 and in other cases air dampening is controlled by providing one or more mesh or porous sections to allow air flow through the body of member 111. ha other cases, the lower portion of the pendulum member 111 may be made heavier with more surface area/mass or with addition of weights to achieve a desired and tunable kinetic movement/displacement, $D1_{Kinetic}$, of the member 111.

Second stage 105 comprises a housing 104 that preferably has a composition and size that is substantially similar to

**A164**

9

housing 102 so that the stages 103 and 105 (or the corresponding houses 102, 104) can be mated or coupled together to form a candle or device body with solitary or unitary appearance. Second stage 105 generally serves to couple to the kinetic energy in the moving upper end of pendulum 111 and translate that kinetic energy into motion of flame silhouette element or extension 125. The construction and operation of second stage 105 is similar to that of first stage 103. Upper stage pendulum member 121, which is slightly shorter than the length of housing 104, is pivotally mounted via a pivot hole 122 on a pendulum support element 123, e.g., a rigid or semi-rigid wire or the like in some embodiments with a lower supporting portion or area in the center of the element 123. The support element 123 is mounted at each end to the sidewall of the housing 104 (such as at the upper edges of the sidewall at opposite locations to stretch across the space or void defined within the sidewall of housing 104). A first or lower magnet 124 (similar in composition, size, and alignment to the first or lower magnet 114 of the first stage pendulum member 111 and second or upper magnet 115 of the first stage pendulum member as described hereinbefore) is mounted at a lower (or first) portion or end of pendulum member 121. Magnet 124 is positioned so as to be magnetically coupled to magnet 115 or influenced by magnetic field or forces, $M_2$. The magnetic coupling, $M_2$, is preferably repulsive, but it may also be attractive or a mix between attractive and repulsive coupling. For example, in one useful implementation, the magnetic couplings are attractive, and gravity is used to bring the pendulum members back to a central or neutral position. In use, the coil in such a case may provide a donut shaped magnetic field such that attractive magnetic coupling provides an auto-start upon power up as it moves the nearby pendulum away from the neutral position.

Flame silhouette element 125 comprises a flat or dimensional body of material preferably formed with a flame-shaped outline or peripheral pattern. Flame silhouette element 125 extends outward from an edge or side of the upper (or second) portion/end of the second stage pendulum member 121. Element 125 may include a sheet of material such as paper or plastic and/or is formed of the same or differing material as the body of pendulum member 121. Flame silhouette element 125 may be two dimensional or a distorted sheet material that extends in three dimensions, or may be a fully three dimensional object. The mass and air resistance of flame silhouette 125 adds to the mass and air resistance of pendulum 121 and so its configuration is typically taken into consideration when locating pivot hole 122 relative to the upper or second end of the pendulum member 121.

In operation, the magnetic field, $M_2$, produced by magnet 115 causes magnet 124 to move either repulsively or attractively. That motion is translated through pendulum 121 to which flame silhouette 125 is affixed as shown with second kinetic or random motion or displacement, $D2_{Kinetic}$. As with the pendulum member 111 of the first stage 103, the extent or magnitude of motion or kinetic displacement of the lower end of pendulum 121 is greater than the extent of motion of the upper end of pendulum 121 to a degree determined by the position of hole 122 relative to the edge of the upper portion of pendulum 121 (e.g., the kinetic displacement, $D2_{Kinetic}$, has a larger component in the lower or first end/portion of the pendulum 121 than in the upper or second end/portion of the pendulum 121 such as 2 to 4 times as much movement or the like in the lower or first end/portion). In one embodiment, the first stage or lower pendulum member 111 is longer ranging while the upper pendulum 121 is shorter ranging, and this may be controlled by selecting the distance of each of these pendulum members 111, 121 from their pivot point (e.g.,

10

make the lower pendulum 111 have more movement by having pivot hole 112 farther away from magnet/ferromagnetic material component 114 than pivot hole 122 from component 124).

In some embodiments, pivot hole 122 is provided at a location comparable to the base of a wick in a combustion candle (e.g., 0.1 to 1 inch or more below upper lip or edge of the second stage housing 104). Gravity tends to return pendulum 121 to an upright position whereas the magnetic influence, $M_2$, of moving magnet 115 continuously perturbs pendulum 121 and inhibits a steady state return to the upright position. Air resistance acting on the surface area of pendulum member 121 and flame silhouette element 125 damps the motion, $D2_{Kinetic}$, of pendulum member 121. Accordingly, the size and shape of pendulum member 121 can be altered to provide the speed and degree of kinetic movement, $D2_{Kinetic}$, desired for a particular application or embodiment of device 100. Note, that the components 114, 115, 124 may be magnets or ferromagnetic material with one embodiment providing a ferromagnetic tag for element 114 and then a ferromagnetic tag for element 115 or 124 while another embodiment uses a magnet for element 114 and ferromagnetic material for element 115 or 124 (e.g., only one of each magnetic coupling pair of components is a magnet to provide desired driving forces).

Although the arrangement described hereinbefore produces kinetic motion in flame silhouette 125, it is not this motion or the shape of element 125 alone that produces a convincing flame simulation. The nature of the light reflected from or produced by the device 100 is also significant in producing the convincing effect, not the motion and shape of its elements. To this end, some embodiments of the device 100 may include a flame silhouette element 125 that is shaped as a simple geometrical shape such as a triangle, circle, or arbitrary shape to produce a desirable effect while the illustrated element 125 has a shape or peripheral pattern similar to a candle or solitary flame.

In the particular implementation 100 of FIG. 1, a spotlight 107 mounted above flame silhouette 125 is aimed to direct light 108 toward the element 125 to produce a spot of light 127 on the surface of flame silhouette element 125. One or more light sources 107 may be used, and, when used, the multiple light sources may be aligned so that their produced spots of light 127 are aligned with each other in the vicinity of silhouette element 125 even as silhouette element 125 moves in normal operation with the kinetic movement, $D2_{Kinetic}$, of upper or second stage pendulum member 121.

Light source 107 includes, for example, a light emitting diode(s) (LED(s)) or other efficient low power light source coupled with a converging lens to optically direct the produced light into a desired size and shape. An incandescent light, organic light emitting diode (OLED), or other device is also suitable for light source 107. Alternatively, a narrow beam light source, even a laser, may be used with a diverging lens to produce the desired shape and size of light spot 127, e.g., a shape similar to the pattern/shape of the element 125 and size similar to or smaller than the element 125 to control blow by. The light source 107 may also include fiber optic light pipes to transport light from a remote light-emitting device to a desired location and angle. Light source 107 may project downward as shown in FIG. 1, or upward, or at any angle to meet the needs of a particular application or implementation of device 100. In some cases, flame silhouette 125 can be bent slightly out of a vertical alignment or alignment with pendulum 121 so as to reflect light from light source 107 to an expected location of a viewer.

US 8,696,166 B2

11

Light source **107** may be colored using a colored light source or filters. Light source **107** may comprise multiple light sources to produce several colors, and the light sources may be energized statically or dynamically to provide color variation. These types of controlled light production may enhance the effect of the present invention but are not necessary in most instances and may actually detract from the effect in certain applications because, as noted hereinbefore, simulating flame effects with direct modulation and control by itself does not produce suitable results in many instances. However, as an augmentation of the basic kinetic light movement principle in accordance with the present invention such direct manipulation and control of the light output may produce desirable results in particular applications.

Alternatively, or in addition, the surface of flame silhouette **125** is colored with a single color, gradient color, or a color pattern including yellows, oranges, reds, and/or blues used alone, together, or in addition to white light emitting devices in source **107**. In some cases, the coloring may be a fluorescent color (e.g., a day glow type color(s)) to achieve a desired result such as a feel of heat or raised temperature associated with a real flame. White or colored light spot **127** on element **125** reflects light having a color dependent on both the color of the light produced by light source **107** and the color of the surface of silhouette element **125** where the light spot **127** falls. As silhouette element **125** moves in space with kinetic displacement, $D2_{Kinetic}$, of pendulum member **121**, its angle with respect to light source **107** continuously changes and, in response or concurrently, the intensity of the reflected light changes in a complex, kinetic manner. This effect can be modified when silhouette element **125** is distorted or three dimensional in configuration. To get front and back lighting with one source **107**, the element **125** (and its coloring/materials) may be chosen such that a portion of the received light **108** is reflected and a portion is allowed to pass through to an opposite or back side. For example, the texture, color, and/or material of the element **125** may be such that about 40 to 60 percent of the light (e.g., about half) is reflected while the remaining light (e.g., about half) is passed through with the element **125** being at least partially translucent. In this manner, both the front and back of the display element **125** is lighted by light **108** from a single source **107**.

FIG. **2** schematically illustrates a simple drive device **200** in accordance with an embodiment of the present invention such as for use with kinetic flame device **100** (with components of flame device **100** having like numbers in drive **200**). In the implementation of FIG. **2**, a power source **201** is provided that may include batteries, an AC/DC power supply, solar power supply, or a combination or variant thereof that produces power of sufficient voltage, current, and frequency content for use by light source or engine **107** and signal generator **203**. In some exemplary embodiments, both light engine **107** and signal generator **203** are driven by direct current and are not explicitly managed or controlled. Alternatively, a controller circuit (not shown) may be included and operated to vary the output to light engine **107** and/or signal generator **203** to produce varied results.

In one embodiment, signal generator **203** generates a sinusoidal output in the exemplary embodiments, but, in other cases, it may produce a square wave, pulse modulated, amplitude modulated, frequency modulated, or other output form with expected effect on the electromagnetic field, $M_1$, produced by coil **101**. In one preferred embodiment, the generator **203** provides a square wave that is intermittently interrupted (e.g., every so many pulses (such as 32 pulses) it drops off and then restarts after a pause/interruption to enhance the chaotic effect). In another exemplary implementation, signal

12

generator **203** is similar to a conventional clock circuit producing a 60 Hz sinusoidal output coupled to coil **101**. When multiple coils **101** are used, signal generator **203** may be adapted to produce multiple outputs that may be synchronous or asynchronous. It is contemplated that when power source **201** is coupled to AC mains or a line source that a simple transformer may be used to produce a desired waveform for coil **101** and eliminate need for signal generator **203**.

FIG. **3** and FIG. **4** show an alternative embodiment of kinematic flame device **300** in which a mechanism in accordance with the present invention is embodied in a form factor that is compatible with standard light fixtures with standard light sockets. As such, the embodiment **300** shown in FIG. **3** and FIG. **4** enables a screw-in replacement for conventional bulbs that transforms a conventional lighting fixture into a bulb or device with a flickering candle-like flame appearance. FIG. **3** and FIG. **4** show the same embodiment of device **300** from perspectives that differ approximately orthogonally. Like numbered elements correspond to similar elements in the two figures. In general, the materials, construction and operation of the embodiment shown in FIG. **3** and FIG. **4** are analogous to that described in reference to the stand-alone candle implementation of FIG. **1** (e.g., with interaction of magnets and an electrically generated magnetic field used to create a first kinematic motion/displacement that is then passed to a second stage pendulum member via interaction between two permanent magnets).

A bulb base **305** is configured to electrically couple to a light socket such as a standard screw-in type bulb base. However, the invention is readily adapted to other types of bulb bases including two prong press fit, bayonet, candelabra base, miniature screw, and varieties of bases used for halogen and low voltage lighting systems. Housing **302** comprises a transparent or translucent material, such as plastic or glass and is used to provide the first and second stages described with reference to device **100** of FIG. **1**. Unlike conventional bulbs it is not necessary to maintain reduced pressure within the bulb (within housing **302**), so a wider variety of materials and construction technology can be used for the present invention as compared to conventional bulb technology. However, it may be desirable in some implementations to contain a gas within housing **302** or its sidewall(s) or to contain reduced pressure within bulb **302**. In such an embodiment of device **300**, an air-tight seal between base **305** and housing **302** may be provided. Housing **302** (or at least its translucent sidewalks)) may be coated with a colored film, a fluorescent or phosphorescent film, or other coating either in whole or in part, in a gradient, as well as in a regular or irregular pattern to meet the needs of a particular application **300**.

Although not shown in FIG. **3** and FIG. **4**, devices to implement the functionality of power source **201** and signal generator **203** can be embedded in base **305**. A typical embodiment in accordance with the invention uses low power as compared to conventional light bulbs, and the components necessary to implement that functionality can be very small and readily assembled within or integrated with base **305** and coupled to drive coil **301**. Lower or first stage pendulum member **311** moves about a pendulum support **312** that extends through hole **313** in member **311**. The pendulum member **311** has a lower magnet **314** and an upper magnet **315** that are analogous in position, function, composition, and construction to lower magnet **114** and upper magnet **115** described in reference to FIG. **1**. Operation of pendulum member **311** is analogous to the movement and operation of pendulum **111** shown in FIG. **1**, with lower magnet **314** being driven by magnetic field, $M_1$, by coil/components embedded in base **305**. A magnetic field, $M_2$, produced by upper or

**A166**

US 8,696,166 B2

13

second magnet 315 is coupled to a lower magnet 324 on upper pendulum member 321. Upper pendulum 321 is attached to or integrated with a flame silhouette 325 and operates in a manner akin to upper pendulum 121 in FIG. 1 with a support element 322 extending through hole 323 to pivotally move the pendulum member 321.

In operation, a light source 307 such as an LED receives power from conductors (not shown) running up from power supply 201 in base 305. These conductors may run along the interior or exterior wall of housing 302. Light output from light source 307 is formed into a spot of desired size and directed downward onto a surface of flame silhouette 325 (as discussed, for example, with reference to device 100) such as with lens/concentrator 317. Alternatively, the light output from light source 307 can be redirected using reflectors formed on the interior surface of housing 302 so that the light reflects and is directed towards flame silhouette 325 at an angle. Light source 307 may also be located in base 305 and directed upward either directly or using reflectors to form a spot on the surface of flame silhouette 325. For example, by making the upper end of housing 302 reflective with a parabolic or other convex shape it will have a focal point which can be adjusted to occur at a location where the light spot is desired. A relatively diffuse light source 307 located in the vicinity of base 305 will transmit diffuse light upward which is then concentrated into a spot occurring at flame silhouette 325.

FIG. 5 and FIG. 6 show an alternative embodiment in which a mechanism/device 500 in accordance with the present invention is embodied in a form factor that is compatible with standard light fixtures with standard light sockets, but in which the mechanism 500 is arranged so that the base 505 is above the kinetic movement mechanism (first and second stage arrangement for transmitting kinetic motion via magnetic field interactions through pivotally mounted pendulum members) that provides driving motion of a flame silhouette element 525. FIG. 5 and FIG. 6 show the same embodiment that differ approximately orthogonally. Like numbered elements correspond to similar elements in FIG. 5 and FIG. 6. Like the embodiment shown in FIG. 3 and FIG. 4, the embodiments of FIG. 5 and FIG. 6 desirably enable a screw-in replacement for conventional bulbs that transform a conventional lighting fixture into a flickering candle-like flame appearance. In general, the materials, construction and operation of the embodiment shown in FIG. 5 and FIG. 6 are analogous to that described in reference to the stand-alone candle implementation of FIG. 1 and the bulb implementations of FIG. 3 and FIG. 4.

A bulb base 505 is configured to electrically couple to a light socket such as a standard screw in type bulb base, although the invention is readily adapted to other types of bulb bases including two prong press fit, bayonet, candelabra base, miniature screw as well as varieties of bases used for halogen and low voltage lighting systems. Housing 502 includes a transparent or translucent material such as plastic or glass. Unlike conventional bulbs, it is not necessary to maintain reduced pressure within the bulb housing 502, so a wider variety of materials and construction technology can be used for the present invention as compared to conventional bulb technology. However, it may be desirable in some implementations to contain a gas or to contain reduced pressure within bulb 502 in which case an airtight seal between base 505 and housing 502 may be provided. Housing 502 may be coated with a colored film, a fluorescent or phosphorescent film, or another coating either in whole or in part, in a gradient, as well as in a regular or irregular pattern to meet the needs of a particular application.

14

Devices to implement the functionality of power source 201 and signal generator 203 may be embedded in base 505 in some embodiments, e.g., to selectively generate driving magnetic field, $M_1$. A typical embodiment 500 in accordance with the invention uses low power as compared to conventional light bulbs, and the components necessary to implement that functionality can be very small and readily assembled within or integrated with base 505 and coupled to drive coil 501. First stage pendulum 511 moves about a pendulum support 512 extending through hole 513 to pivotally mount or support pendulum 511. The pendulum 511 has a first or "lower" magnet 514 and a second or "upper" magnet 515 that are analogous in position, function, composition, and construction to lower magnet 114 and upper magnet 115 described in reference to FIG. 1, e.g., first magnet 514 interacts with magnetic field, $M_1$, to create kinetic displacement or motion, $D1_{Kinetic}$, of pendulum 511. Operation of pendulum 511 is analogous to the movement and operation of pendulum 111 shown in FIG. 1. A magnetic field, $M_2$, produced by upper magnet 515 is coupled to a lower magnet 524 on upper pendulum 521 to cause it to move chaotically or with kinetic/random displacement or motion, $D2_{Kinetic}$. Upper pendulum 521 is attached to or integrated with a flame silhouette element 525 and operates in a manner akin to upper pendulum 121 in FIG. 1 as it is pivotally mounted via hole 523 through which support element 522 extends. Flame silhouette element 525 may include an inverted cone that may be, for example, a hollow blow molded part (e.g., a 3D body in this example).

In operation, a light source 507 such as an LED receives power from conductors (not shown) running down from power supply in base 505. These conductors may run along the interior or exterior wall of housing 302. Light output from light source 507 is formed, such as by lens/concentrator 517, into a spot 518 of desired size and directed upward onto a surface of flame silhouette 525. Alternatively, the light output from light source 507 can be redirected using reflectors (not shown) formed on the interior surface of housing 502 so that the light reflects and is directed towards flame silhouette 525 at an angle. Light source 507 may also be located in base 505 and directed downward either directly or using reflectors to form a spot on the surface of flame silhouette element 525.

The present invention is amenable to many variations in implementation to meet the needs of a particular application. The form factor, for example, can be altered to serve as a nightlight, table light, wall sconce, or any form factor where a flickering flame light output is desired. The invention may be applied in fixed and portable outdoor lighting, ceiling mounted fixtures, wall mount fixtures, landscape lighting, holiday lighting, handheld lighting, and the like. Additionally, a number of the kinetic flame elements such as 100 in FIG. 1 may be driven by a single assembly that includes a signal generator and power source and that may be plugged into a wall socket or other power source.

Multiple light sources may be used, and the effect in accordance with the present invention may be enhanced by light sources on or in the flame silhouette element to directly emit light in addition to or in place of light projected onto the silhouette element. Other optical elements may be included in the light path from the light source such as scattering devices, reflectors and masks to shape the light source. Similarly, the device housing can be augmented with scattering devices, reflectors, and masks to alter the light reflected from the flame silhouette.

In one embodiment, the kinetic flame assembly 100 is positioned within an outer housing or cup that supports the first and second stage housings 102, 104. These housings may be replaced by a single internal support such as a candle-

US 8,696,166 B2

15

shaped column that may be useful when the outer housing or cup is formed of optically clear/translucent material such that the "candle" is visible to a user, and the candle-shaped support may have an inner shaft or channel in which the pendulums 111, 111 are supported as shown in FIG. 1 or at some offset, e.g., the support 123 may be rotated relative to the support 113 such these supports 113, 123 are not generally parallel but are at some angular offset such as being transverse or even orthogonal when viewed from above or below. In some implementations, the magnetic/ferromagnetic tags/ components 114, 115, 124 are provided on the body of the pendulums 111, 121 while in some cases it may be useful to have these extend from the pendulum bodies such as by having a magnet holder that is rigidly or pivotally supported by a bottom portion of the upper pendulum 121 or the like. The light source 107 may be an LED or similar device, and one or more lenses may be positioned between the light source 107 and the flame 125 to shape the light 108 to achieve a particular effect (e.g., to be about the size and/or shape of the flame 125). The cup/outer housing may include a valance above the candle-shaped column to support the light source/ lens 107 and to also hide these from view from a user (e.g., this valance may be opaque such as with a decorative chrome or other exterior coloring so as to disguise the presence of light source 107).

As discussed above with reference to FIG. 1, the invention can be implemented as a unitary, single stage body instead of using two stages as shown in FIG. 1. Generally, this may be achieved by removing the first stage 103 from the assembly 100. FIG. 7 shows a cut-away perspective view of a single stage embodiment of a kinetic flame device 700 in accordance with the present invention that resembles a conventional wax candle such as a pillar, taper, container candle, votive, tea light and the like depending on the scale and dimensions of the particular application. In the device 700, a single pendulum member 121 is provided with a magnet (or ferrous member) 124 on one end (the lower end) and with a flame silhouette element 125 on the other end (or upper end). This device may derive more of its motion from the nature of the varying electromagnetic field, M$_1$, and, as a result, the device 100 may benefit from a more complex EM field and driver 101. However, the device 100 may be useful for providing a more robust and less expensive assembly.

As with the device 100, a drive mechanism 101 is provided that acts to create a time-varying magnetic field, M$_1$. Drive mechanism 101 at the base of the embodiment in FIG. 1 includes a wound wire coil, for example. In some embodiments, permanent magnets (not shown) may be integrated in, placed on the surface of, or otherwise placed in proximity to coil 101 to provide a static magnetic field that is cumulative with the time varying electromagnetic field produced when coil 101 is energized (as shown in FIG. 2). Although a single coil 101 is shown in FIG. 7 (and as discussed with reference to FIG. 1), it is contemplated that two or more independently or synchronously energized coils may also be used that are distributed symmetrically or asymmetrically about a central axis of the candle device (e.g., an axis that extends upward through the single stage housing 104 and in some cases through pendulums or pendulum member 121).

In operation, coil 101 is energized by a time-varying electric current to produce a time-varying magnetic field, M$_1$, in the vicinity of coil 101. In some embodiments, core material is used to focus and direct the magnetic field that is produced and to alter the power requirements for the operation of the present invention. In the same or other embodiments, permanent magnets are used in or near the coil 101 to superimpose a static magnetic field on top of the time-varying field, M$_1$,

16

created by energizing coil 101. The additional static magnetic field may be used to alter power requirements as well as to selectively modify or define the shape of the magnetic field, M$_1$, in the vicinity of coil 101.

The single stage 105 serves to translate the time varying electromagnetic field, M$_1$, produced by coil 101 into kinetic motion, D1$_{Kinetic}$. The stage 105 is positioned such that at least its base is within the electromagnetic field, M$_1$, produced from coil 101 and elements within single stage 105 are magnetically coupled to coil 101 when its electromagnetic field, M$_1$, is present. Specifically, a magnet 124 positioned or mounted at a lower end of pendulum or single stage pendulum member 121 is within the time varying electromagnetic field, M$_1$. Magnet 124 is preferably a small permanent magnet with sufficient magnetic field strength to be moved in response to either repulsive or attractive forces resulting from interaction with the time varying electromagnetic field, M$_1$, produced by coil 101 such that the pendulum member 121 is displaced in a random or kinetic manner as shown with arrows D1$_{Kinetic}$. For example, the pendulum member 121 may have an elongate body such as a thin planar design with a rectangular, elliptical, or other shape that may be formed of plastic or other non-ferrous material (e.g., a plastic rectangle with a width of about 0.25 to 2 inch width, a length of about 0.5 to 4 inches, and a thickness of 0.2 inches or less). The displacement, D1$_{Kinetic}$, may vary widely to practice the invention but may be a random pattern with movements of up to 0.5 inches or more in any direction from an original or at rest position.

Single stage housing 104 may be generally tubular in shape with a sidewall defining an interior space or void for containing the pendulum member 121 and an interaction space or area for the magnetic field/forces, M$_1$, and the magnet 124 of pendulum member 121. The housing 104 may have a sidewall formed of plastic, glass, ceramic, molded epoxy, or other material that can be formed into a desired shape for the particular application. Single stage 105 generally serves to translate the magnetic field/forces, M1, (that cause its lower end via magnet/ferrous tag 124 to move chaotically) into kinetic energy or motion of flame silhouette element or extension 125.

Single stage pendulum member (or flame body) 121, which is slightly shorter than the length of housing 104, is pivotally mounted via a pivot hole 122 on a pendulum support element 123, e.g., a rigid or semi-rigid wire or the like in some embodiments with a lower supporting portion or area in the center of the element 123. The support element 123 is mounted at each end to the sidewall of the housing 104. The magnet 124 (similar in composition, size, and alignment to the first or lower magnet 114 of the first stage pendulum member 111 and second or upper magnet 115 of the first stage pendulum member as described hereinbefore with regard to FIG. 1) is mounted at a lower (or first) portion or end of pendulum member 121. Magnet 124 is positioned so as to be magnetically coupled to or influenced by magnetic field or forces, M$_1$. The magnetic coupling, M$_1$, is preferably repulsive, but it may also be attractive or a mix between attractive and repulsive coupling. For example, in one useful implementation, the magnetic couplings are attractive, and gravity is used to bring the pendulum members back to a central or neutral position. In use, the coil in such a case may provide a donut shaped magnetic field such that attractive magnetic coupling provides an auto-start upon power up as it moves the nearby pendulum away from the neutral position.

Flame silhouette element 125 includes a flat or dimensional body of material preferably formed with a flame-shaped outline or peripheral pattern. Flame silhouette element 125 extends outward from an edge or side of the upper

US 8,696,166 B2

17

(or second) portion/end of the second stage pendulum member 121. Element 125 may include a sheet of material such as paper or plastic and/or is formed of the same or differing material as the body of pendulum member 121. Flame silhouette element 125 may be two dimensional or a distorted sheet material that extends in three dimensions, or may be a fully three dimensional object. The mass and air resistance of flame silhouette 125 adds to the mass and air resistance of pendulum 121 and so its configuration is typically taken into consideration when locating pivot hole 122 relative to the upper or second end of the pendulum member 121.

In operation, the extent or magnitude of motion or kinetic displacement of the lower end of pendulum 121 is greater than the extent of motion of the upper end of pendulum 121 to a degree determined by the position of hole 122 relative to the edge of the upper portion of pendulum 121 (e.g., the kinetic displacement, $D1_{Kinetic}$, has a larger component in the lower or first end/portion of the pendulum 121 than in the upper or second end/portion of the pendulum 121 such as 2 to 4 times as much movement or the like in the lower or first end/portion). In some embodiments, pivot hole 122 is provided at a location comparable to the base of a wick in a combustion candle (e.g., 0.1 to 1 inch or more below upper lip or edge of the second stage housing 104).

Gravity tends to return pendulum 121 to an upright position whereas the magnetic influence, $M_1$, continuously perturbs pendulum 121 and inhibits a steady state return to the upright position. Air resistance acting on the surface area of pendulum member 121 and flame silhouette element 125 damps the motion, $D1_{Kinetic}$, of pendulum member 121. Accordingly, the size and shape of pendulum member 121 can be altered to provide the speed and degree of kinetic movement, $D1_{Kinetic}$, desired for a particular application or embodiment of device 700. The device 700 may include a flame silhouette element 125 that is shaped as a simple geometrical shape such as a triangle, circle, or arbitrary shape to produce a desirable effect while the illustrated element 125 has a shape or peripheral pattern similar to a candle or solitary flame.

In the particular implementation 700 of FIG. 7, a spotlight 107 mounted above flame silhouette 125 is aimed to direct light 108 toward the element 125 to produce a spot of light 127 on the surface of flame silhouette element 125. One or more light sources 107 may be used, and, when used, the multiple light sources may be aligned so that their produced spots of light 127 are aligned with each other in the vicinity of silhouette element 125 even as silhouette element 125 moves in normal operation with the kinetic movement, $D1_{Kinetic}$, of single stage pendulum member 121. As silhouette element 125 moves in space with kinetic displacement, $D1_{Kinetic}$, of pendulum member 121, its angle with respect to light source 107 continuously changes and, in response or concurrently, the intensity of the reflected light changes in a complex, kinetic manner.

In the above description, it was explained that it may be useful in some embodiments or applications to have the light source project upward (or from within the device body or housing interior) onto the flame silhouette element. It was also discussed that some embodiments may utilize additional magnet elements to shape or alter the movements of the pendulum elements such as by providing permanent magnets near the drive mechanism 101 or by placing magnets at one or more locations within the interior of the housings 102, 104. Briefly, some embodiments may include a pillar-style or bulb-style kinetic flame device where the flame member is lit from below (or from within the housing). A downside of such an implementation may be blow by of light that is visible from

18

above, but, for a wall sconce or lighting that is above the viewer, such from-below lighting may provide a useful or even more pleasing effect.

FIG. 8 illustrates a kinetic flame device 800 that includes components similar to those shown in the device 100 of FIG. 1 but modified to utilize a from-below or in-housing lighting assembly 807 and to also include side-mounted (or interior-placed) magnetic elements 840, 842 to alter the movement of pendulum member 121. In some embodiments, only one of these two new aspects may be utilized and the number or specific location of these components may be varied to practice the device 800 (e.g., only use one magnet 840, 842 or use more magnets, place the magnets either higher or lower in the housing 104 or within housing 102, use more than one light source 808, use the light source 808 in combination with the light source 107 of FIG. 1, and so on).

In the embodiment shown in FIG. 8, the device 800 lights flame silhouette element 125 from below (or from the interior space defined by housings 102, 104) using a lighting assembly 807 that is mounted within the interior space of housings 102, 104. The lighting assembly 807 includes a lighting source 808 (such as a monochromatic LED or multiple color LED or the like) that is mounted on the inner surface of first stage housing 102 (but may, in some embodiments, be placed apart from the housing sidewall or in second stage housing 104). The lighting source 808 projects light 809 upward (e.g., in a funnel or light source housing as shown) where it is focused in this embodiment by lens 810 to provide focused light 811, which may be focused to provide a beam(s) of light 811 about the size/shape of spot 127 (e.g., smaller in size than about the size/shape of element 125 to limit blow by out of the device 800).

The lighting assembly 807 may also include a reflector or mirror 814 that is configured to reflect or redirect the light 811 as shown at 815 on to the element 125 to provide illuminated spot 127. The mirror 814 may be positioned near the top of the second stage housing 104 such that the light 815 is striking the flame silhouette element 125 at an incidence angle that is nearer orthogonal to further limit blow by such as at an angle over 45 degrees such as 60 to 80 or more degrees. In some embodiments, though, the mirror 814 is not included and the light 811 is focused by the lens 810 directly onto the element 125.

In addition to the drive mechanism 101 (e.g., an EM coil) providing time-varying magnetic field, $M_1$, the kinetic flame device 800 includes magnets 840, 842 positioned within the interior of device 800 defined by housings 102, 104. As shown, the magnets 840, 842 are side-mounted magnets (e.g., permanent magnets, electromagnetic devices, or the like) that generate magnetic fields $M_3$ and $M_4$ to effect the kinetic movements, $D2_{Kinetic}$, of the upper pendulum member 121. The magnets 840, 842 may be affixed to the inner surfaces of second stage housing 104 proximate to the lower end of the pendulum 121 and magnetic member or ferrous tag 124.

The magnets 840, 842 may be positioned opposite each other as shown or offset to achieve a desired result. In some embodiments, the magnetic fields, $M_3$ and $M_4$, are of equal strength but in opposite directions such that the magnetic fields, $M_3$ and $M_4$, both act to similarly repel (or attract) the magnet 124, which may have a north (or south) pole facing one magnet 840 and a south (or north) pole facing another magnet 842. In this manner, the kinetic movement, $D2_{Kinetic}$, may be dampened (or amplified) when compared to its magnitude in response only to magnetic field, $M_2$. In other embodiments, three or more magnets are positioned on the inner surfaces or in the interior of housing 104 to create a desired movement, $D2_{Kinetic}$, of upper pendulum 121 and

US 8,696,166 B2

19

20

flame element **125**, with the strength of the magnets being similar in some cases and differing in others. In other embodiments, a single magnet **840** or **842** is used in the device **800**. The magnets **840**, **842** may be permanent magnets in some embodiments while others may utilize electromagnetic coils similar to that used for drive mechanism **101** such that the fields, $M_3$ and/or $M_4$, may be varied over time and/or turned completely on or off to change the movement, $D2_{Kinetic}$.

As shown, the kinetic flame device **800** includes magnets **840**, **842** on sides of a candle body such as on second stage housing **104**. The inclusion of magnets **840**, **842** creates static magnetic fields, $M_3$ and $M_4$, when the magnets **840**, **842** are permanent magnets or a non-time varying EM device is used. The static magnetic field(s) can be used to aid the chaos and to interact with the dynamic magnetic field, $M_2$. Static magnets **840**, **842** may be shaped (or selected so as) to produce a shaped magnetic field, $M_3$ and $M_4$, to more effectively dampen, heighten, or otherwise modify the magnitude of the kinetic movement, $D2_{Kinetic}$, or its chaotic nature (e.g., make the movement, $D2_{Kinetic}$, more unpredictable). The use of permanent magnets for magnets **840**, **842** may allow the drive mechanism **101** to only be operated periodically such as to initiate kinetic movement, $D2_{Kinetic}$, followed by a period where movement, $D2_{Kinetic}$, is only caused by the momentum of the pendulum **121** and fields, $M_3$ and $M_4$, on magnet/tag **124**. After a period of time, the drive mechanism **101** may be restarted to bring kinetic movement, $D2_{Kinetic}$, back up to some desired maximum amount and the drive mechanism **101** then shut down again (and this process repeated on a regular or irregular cycle).

FIGS. **9** and **10** illustrate a particular implementation of a kinetic flame effect device **900**, with FIG. **9** showing the device **900** in an operating or on mode and FIG. **10** showing the device in a non-operating or off mode. The device **900** makes use of components of device **100** of FIG. **1** and device **800** of FIG. **8**, and these components have like numbers. For example, the device **900** includes first and second stage housings **102**, **104** that may be provided as a unitary, cylindrical structure as shown and are used to define an interior space or volume for containing the lower or first stage pendulum member **111** on support **113** and upper or second stage pendulum member **121** on support **123** (which may be part of flame retraction bar or member **974**). Also, the device **900** includes a drive mechanism **101** with power source or battery **902** driving or powering coil **904** to selectively produce time-varying magnetic field, $M_1$, which moves pendulum **111** chaotically (which then uses magnetic field, $M_2$, to couple with pendulum **121** and cause it and flame silhouette element **125** to move chaotically on support **123**).

The device **900** further includes an outer casing or candle body **950** to support and hide the other working components/parts of the device **900**. The outer casing **950** includes a tubular sidewall **952** that supports the drive mechanism **101** and a housing **102**/**104** platform such that the stage housings **102** and **104** are centrally positioned within the casing **950**. The housings **102** and **104** extend upward from the drive mechanism **101** toward a candle top or cover **954** that may have irregular sidewalls (as shown) simulating melted wax of a conventional wax candle and further include a planar portion with a centrally located opening or hole **955** through which the flame silhouette element **125** may extend. In this manner, of the kinetically moving components, only the flame silhouette element **125** extends outward from the casing **950** and is readily visible by a viewer.

The device **900**, as shown for device **800**, includes a light assembly or engine **807** positioned within the casing sidewall **952** to illuminate a surface or side **916** of the flame element

**125** from below or from within the casing **950** (e.g., from above if a bulb implementation as shown in FIGS. **5** and **6**). The light engine **807** includes an LED or other light source **808** operable (as shown) to generate light **809** that is focused by lens **810** to provide focused light **811** to illuminate a spot or all/most of flame silhouette element **125** as it moves with pendulum element **121** in response to varying magnetic field, $M_2$. The hole/opening **955** may be sized and shaped to allow the light **811** to reach the element **125**, but small enough that blow by is controlled or limited.

The hole/opening **955** may also purposely block all or portions of the light **811** in a range of positions of the element **125** to further vary lighting of element **125** to cause more of a flickering light effect (e.g., such as to at least partially block light **811** when the silhouette element **125** moves "forward" or to the left from a vertical position as shown in FIG. **9**). Hence, the flame element **125** may be more dimly lit (or unlit) in one third to half of its range of movement and brightly lit in the other half to two thirds of its range of movement.

The device **900** is also adapted to allow the flame silhouette element **125** to be retracted below the cover **954** and an unlit wick to be displayed when the device **900** is turned off (or no power is provided to the coil **101** and LED/light source **808** (as shown in FIG. **10**)). FIG. **9** illustrates the device **900** with a cover/cap assembly **980** removed from the casing **950**. In this position, the retracting assembly **970** uses spring **972** on second stage housing **104** to swing the retraction/positioning bar **974** to an up or raised position where a trailing end or stop may contact the outer sidewall of housing **104** (as shown). A slot (not shown) may be provided in the sidewall of housing **104** to allow the bar **974** to move through a range of movement between the up/raised position shown in FIG. **9** and the down/retracted position shown in FIG. **10**. The support member **123** for the flame element **125** may be provided as an integral portion of the bar **974**, with the bar **974** being linked to (or farmed with) the return/positioning spring **972**.

When the device **900** is turned off, the cover/cap assembly **980** may be used to manually retract the flame element **125** and cover/plug the hole/opening **955** of the casing **950**. The cap assembly **980** includes an elongated cylindrical body **982** formed with a sidewall that may extend only part way about circumference so as to leave an opening for receiving the flame element **125** and/or pendulum member **121** and retraction bar **974** (e.g., similar in shape to many tent/camping stakes or the like). The cap assembly **980** also includes a cap or top portion **984** extending orthogonally out from body **982**, and a wick **986** extending upward or vertically from cap **984**. The cap assembly **980** is manually positionable as shown with arrow **981** in FIG. **9** to be inserted into (or removed from) the casing **950**.

When the cap body **982** is inserted into the hole **955**, its tip or end contacts the retraction bar **974** and pushes the bar **974** downward or into the housing **104**. This causes the spring/hinge **972** to rotate **973** about its axis or mounting locations on housing **104**. As the retraction bar **974** is moved into the housing **104**, the pendulum **121** also is pushed into the housing **104**, which causes the attached flame element **125** to be pulled through the hole **955** (or at least partially as it may be desirable for at least a tip or portion of the flame element **125** to extend out of the hole **955** to avoid binding upon removal of cap assembly **980**). As shown, the cap **984** has its sides or edges abutting the sides of opening **955** to provide relatively tight/press fit into top **954** of casing **950**. In this position, the wick **986** is visible on the top **954** so as to appear as an unlit wick as found in conventional wax candles rather than an unlit flame element **125** (which may diminish the overall candle simulation). The retracting functionality is manual in the

21

device **900** and the cap assembly **980** is removable, but, in other embodiments, the cap assembly **980** is automatically positioned upon powering off of the drive **101** and is retained when not used in the casing **950** such as opposite the light assembly **807**.

FIG. **11** illustrates a particular implementation of an upper pendulum member (or single stage pendulum member) **1121** that may be used in the devices **100**, **700**, **800**, and **900**. The body of the member **1121** is hour glass in shape. The member **1121** includes a lower, wider portion **1122** that contains the magnet/ferrous tag **124**, a narrower middle portion **1123**, and an upper wider portion **1124** that may provide the flame silhouette element illuminated by a light engine. The support hole **122** may be provided in the middle portion **1123** or in the end of the lower, wider portion **1122** near the middle portion **1123**. The thickness of the element **1121** may be relatively constant throughout in some embodiments or be varied, e.g., to provide a thicker and heavier lower, wider portion **1122**. In some cases, the upper, wider portion **1124** that provides the flame silhouette element is concave and/or includes a recessed surface **1125** to provide a more desirable light receiving surface (e.g., to provide a curved portion to receive/reflect light from a light engine/source).

In some embodiments, it may be desirable to simulate a scented candle. In such cases, a scent reservoir or solid scent component (not shown) may be positioned within the housing **102** or in casing sidewall **952**. The scent may be released more rapidly when the kinetic flame device such as device **900** is operating as waste heat from the drive mechanism **101** may be used to heat the scent reservoir/component. In other words, the scent component may be positioned on or near the drive mechanism platform or near the coil such that when these components become warmer they also heat the scent component to more rapidly release scented fumes. The scented fumes may also be disseminated by movements of the pendulum members such as lower and upper pendulums **111**, **121** with their kinetic movements, D1$_{Kinetic}$ and D2$_{Kinetic}$, fanning the scented fumes about and upward out of the housing **102**, **104**.

As discussed above, some embodiments of kinetic flame effect devices may utilize two, three, or more light sources to achieve a desired flame animation or simulation. FIG. **12** illustrates one such embodiment of a device **1200** that includes a first light source or engine **807** and a second light source or engine **1207**. The device **1200** may be considered a modification of the devices **800** and/or **900** of FIGS. **8-10** such that similar elements are labeled with like numbers. In other case, the components of device **1200** such as the light engine controller **1250** may be used in the flame effect devices **100**, **300**, and/or **500**. Generally, the device **1200** is useful for providing two or more lighting assemblies **807**, **1207** (such as LEDs) that allow an improved illumination of the flame paper or pendulum member **121** to better or differently simulate a real flame.

For example, the device **1200** may be operated through controller **1250** to vary the intensity (brighter/dimmer) of one or both of the lighting assemblies or engines **807**, **1207** or to turn one or both of the engines **807**, **1207** off (alternating which is on/off, for example) to create a chaotic lighting of the moving flame element **125** of pendulum member **121**. The addition of the second lighting assembly **1207** also achieves a desirable effect by lighting both sides **1233**, **1235** of the body of pendulum **121**. In some cases, one or both of the lighting assemblies **807**, **1207** includes an LED or other light source **808**, **1208** that is capable of changing colors and the controller

22

**1250** may control this color changing to achieve a desired coloring of the flame element **125** or of the light reflected from its surfaces **1233**, **1235**.

As shown, the device **1200** lights flame silhouette element **125** from below (or from an interior space defined by a housing such as housings **102**, **104** or **950**) using a first lighting assembly **807** and also a second lighting assembly **1207**. These assemblies **807**, **1207** may both be mounted within the interior spaces of a housing on opposite sides of the housing's interior walls or in other positions to light opposite sides **1233**, **1235** of the flame silhouette **125** of pendulum member **121**. In some embodiments, though, one or both of the assemblies **807**, **1207** is positioned to light the silhouette **125** from above and/or to cause light **811**, **1211** to strike a same side **1233** or **1235** (which may be flat/planar or concave).

The light assemblies **807**, **1207** each are shown to include a lighting source **808**, **1208** that projects light **809**, **1209** that is focused or diffused by lens **810**, **1210** to provide light **811**, **1211** that is projected upon opposite surfaces **1233**, **1235** of flame silhouette **125**. Each of the light sources **808**, **1208** may be LEDs. The LEDs **808**, **1208** may be of the same color, e.g., a monochromatic LED, or may be different in color, which may be useful in cases where the body of flame element/silhouette **125** is at least partially translucent (e.g., up to about half (or more) of the light **811**, **1211** is transmitted through the material of the element **125**) to mix the colors of the two light streams **811**, **1211**.

In other cases, one or both of the light sources **808**, **1208** is a bi-color or multi-color source such as an LED capable of providing light **809**, **1209** of two or more colors. In these cases, the sources **808**, **1208** may be controlled or operated to switch between the colors to vary the color of the illumination of surface **1233**, **1235** over time. For example, the source **808** and/or **1208** may be a bi-color LED that has any two of yellow, orange, or red (or other colors that may even include blue, green, white, purple, turquoise, or the like, which may be flickered more briefly to achieve a particular coloring/lighting effect) LEDs housed near the lens **810**, **1210**, and each of these colored LEDs may be selectively used to provide light **809**, **1209**. In other cases, one or both light sources **808**, **1208** may be a multi-color LED light bulb that can transition in response to control/driver signals **1266**, **1267** through a plurality of color (and brightness) combinations (e.g., the controller **1250** can select an individual color or brightness for light **809**, **1210** (which may be the same or different at any particular operating time of device **1200**)).

Further, it is typically preferable that the brightness or intensity of the light **809**, **1209** may be controlled by the controller **1250** over time to vary the lighting of the surfaces **1233**, **1235**. For example, one or both of sources **808**, **1208** may be switched between on and off (e.g., to flicker or flash or pop). Also, the sources **808**, **1208** may be selectively operated to have other brightness transition effects such as strobing, fading in and out in a smooth manner from a minimum (or first) intensity to a maximum (or second) intensity, and the like.

To provide these varying lighting effects, the device **1200** is further shown to include a light engine controller **1250** that is connected to the sources **808**, **1208** to provide driving or control signals **1266**, **1267** (or may be connected to LED drivers or the like to affect such control over assemblies **807**, **1207**). The controller **1250** is shown to include a processor **1252** (e.g., a microchip or the like) and a power supply **1254** (which may be the same or different from that used to drive sources **808**, **1208**). The processor **1252** manages memory **1256** of the controller **1250**, which may contain a flame lighting program **1260**. The controller **1250** typically is con-

23

24

tained within the housing with the lighting assemblies **807**, **1207** (such as within the base of a housing proximate to a power source such as a battery).

The program **1260** may take the form of code or software in nearly any programming language that is executed by the processor **1252** to cause it to selectively transmit control signals **1266**, **1267** to drive or operate the light sources **808**, **1208**. For example, the program **1260** may include a simulation algorithm(s) **1264** that is useful for simulating or emulating a real flame with light **809**, **1209** by causing the controller **1250** to issue signals **1266**, **1267**. In some embodiments, the controller **1250** may be replaced with or include manual controls that allow an operator to manually tune the color and/or intensity of the light sources **808**, **1208** or to select among algorithms **1264** (e.g., a rapidly flickering candle, a dim and slowly moving flame, a bright and larger flame effect, and so on).

In one embodiment, the pendulum member **121** and its flame element **125** take the form of a sheet of Mylar (e.g., BoPET) or the like that is colored (e.g., plum or the like). Such a metalized film provides reflective surfaces **1233**, **1235** that reflect received light **811**, **1211** to a viewer or observer of the kinetic flame effect device **1200** in a desirable manner. In this or other embodiments, the simulation algorithm **1264** acts to randomly (or seemingly randomly) transition at least the intensity/brightness of one and, more preferably, both sources **808**, **1208** over time.

Typically, one or both sources **808**, **1208** provides light **809**, **1209** of two or more colors and the control signals **1266**, **1267** are generated by controller **1250** to switch the color of light **809**, **1209** over time, too, such as transition between orange and white over time. The transitions of sources **808**, **1208** may occur concurrently or these transitions may differ over time. For example, the source **1208** may be providing a light **1209** of a first color varying based on a first transition pattern (e.g., rapid flickering white or light blue light) while the source **808** is operated with signals **1266** to provide a light **809** of second and third colors that vary based on a second transition pattern (e.g., a slow fade in and out between yellow and red).

We claim:

**1**. A pendulum member for generating a flickering flame effect, comprising:

a body with upper and lower portions;

a flame silhouette element extending outward from the upper portion of the body; and

a hole in the body below the flame silhouette element, wherein the hole is configured to receive a flame support element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

**2**. The pendulum member of claim **1**, further comprising a magnet or ferrous tag mounted on the lower portion of the body and wherein the hole is positioned at a location on the body between the magnet or ferrous tag and the flame silhouette element.

**3**. The pendulum member of claim **2**, wherein the hole is located in the body at a location selected such that the pendulum member hangs in a stable position due to gravity absent effects of an electromagnetic field on the magnet or ferrous tag to move the body.

**4**. The pendulum member of claim **1**, wherein the body is elongated and planar.

**5**. The pendulum member of claim **1**, wherein a surface of the flame silhouette element comprises a color pattern.

**6**. The pendulum member of claim **1**, wherein a surface of the flame silhouette element is at least partially translucent.

**7**. The pendulum member of claim **1**, wherein a surface of the flame silhouette element is recessed.

**8**. The pendulum member of claim **1**, wherein the body is hour glass shaped with a middle portion between the upper and lower portions that is narrower in width than the upper and lower portions.

**9**. The pendulum member of claim **8**, wherein the lower portion has a weight that is greater than a weight of the upper portion.

**10**. The pendulum member of claim **8**, wherein the hole is provided in the middle portion of the body.

**11**. The pendulum member of claim **1**, wherein the hole is provided in the body at a location that is 0.1 to 0.45 times the length of the body as measured from a top edge of the body.

**12**. The pendulum member of claim **1**, wherein the hole is provided in the upper portion at a location that is a distance of 0.1 to 0.3 times a length of the body from the midpoint of the body.

**13**. An apparatus for generating a flickering flame effect, comprising:

a housing including an interior space;

a flame body including a pivot hole through the flame body; and

a support element provided extending across the interior space and through the pivot hole, wherein the flame body is pivotally supported within the interior space by the support element.

**14**. The apparatus of claim **13**, wherein the pivot hole is larger in diameter than an exterior dimension of the support element, whereby the flame body swings or pivots freely about the support element.

**15**. The apparatus of claim **13**, wherein the support element is flexible or has a range of travel, whereby the support element is adapted to move with the flame body.

**16**. The apparatus of claim **15**, wherein the support element has a length greater than a distance across the interior space and wherein the support element comprises a flexible wire, line, or thread.

**17**. The apparatus of claim **15**, wherein the range of travel is less than 0.25 inches.

**18**. The apparatus of claim **13**, wherein the support member is substantially rigid, whereby the support member is stationary when the flame body moves within the interior space.

**19**. The apparatus of claim **18**, wherein the support member includes a shaped to include a low spot or valley between first and second ends coupled to the housing, whereby the flame body rests within the low spot or valley of the support member.

**20**. The apparatus of claim **13**, wherein the flame body is elongated and planar, wherein the flame body includes upper and lower portions and a flame silhouette element extending from the upper portion, wherein the lower portion includes a magnet or ferrous tag, and wherein the pivot hole is provided in the upper portion between the lower portion and the flame silhouette element.

**21**. The apparatus of claim **20**, wherein the pivot hole is provided in the flame body at a location that is 0.1 to 0.45 times the length of the flame body as measured from a top edge of the flame body.

**22**. The pendulum member of claim **20**, wherein the pivot hole is located in the flame body at a location selected such that the flame body hangs in a stable position in the interior space absent effects of an electromagnetic field on the magnet or ferrous tag to move the flame body.

**23**. The apparatus of **13**, wherein the flame body is hour glass shaped with a middle portion between upper and lower

US 8,696,166 B2

25

26

portions and wherein the middle portion is narrower in width than the upper and lower portions.

**24**. The apparatus of claim **23**, wherein the lower portion has a weight that is greater than a weight of the upper portion.

**25**. The apparatus of claim **23**, wherein the pivot hole is 5 provided in the middle portion of the flame body.

**26**. An apparatus for generating a flickering flame effect, comprising:

a housing including an interior space;

a pendulum member with an upper and a lower portion, 10 with a flame silhouette element extending from the upper portion, with a hole extending through the upper portion, and with a magnet or ferrous tag provided on the lower portion; and

a support element coupled at first and second ends to the 15 housing and extending through the hole to support the pendulum member in the interior space,

wherein the support member is shaped to include a low spot or valley between first and second ends coupled to the housing, whereby the pendulum member rests in the low 20 spot or valley of the support member.

\*    \*    \*    \*    \*

**A173**

'455 Patent



US007261455B2

(12) **United States Patent**
Schnuckle et al.

(10) Patent No.: **US 7,261,455 B2**
(45) Date of Patent: **Aug. 28, 2007**

(54) **SYSTEM AND METHOD FOR GENERATING A FLICKERING FLAME EFFECT**

(75) Inventors: **Gary Schnuckle**, Altadena, CA (US);
**Holger Irmler**, Studio City, CA (US);
**Alfredo Ayala**, West Covina, CA (US);
**Jamie Robertson**, Wayland, MA (US);
**Bryan S. Tye**, Canyon Country, CA (US)

(73) Assignee: **Disney Enterprises, Inc.**, Burbank, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 380 days.

(21) Appl. No.: **11/035,653**

(22) Filed: **Jan. 13, 2005**

(65) **Prior Publication Data**
US 2006/0034100 A1     Feb. 16, 2006

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/915,794, filed on Aug. 10, 2004, now Pat. No. 7,159,994.

(51) **Int. Cl.**
*F21V 33/00*         (2006.01)

(52) **U.S. Cl.** ..................... **362/569**; 362/810; 362/605; 362/555; 362/161; 362/319

(58) **Field of Classification Search** ................. 362/810, 362/605, 555, 569, 161, 319, 362
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,435,811 A | 2/1948 | Waters |
| 2,976,450 A | 3/1961 | Benoleil et al. |
| 3,233,093 A | 2/1966 | Gerlat |
| 3,384,774 A | 5/1968 | English |
| 3,514,660 A | 5/1970 | Kopelman |
| 3,639,749 A | 2/1972 | Beckman |
| 3,681,588 A | 8/1972 | Lee |
| 4,328,534 A | 5/1982 | Abe |
| 4,477,249 A * | 10/1984 | Ruzek et al. ............... 431/253 |
| 4,551,794 A | 11/1985 | Sandell |
| 4,617,614 A | 10/1986 | Lederer |
| 4,777,571 A | 10/1988 | Morgan |
| 4,866,580 A | 9/1989 | Blackerby |
| 4,965,707 A | 10/1990 | Butterfield |
| 5,097,180 A | 3/1992 | Ignon et al. |
| 5,381,325 A | 1/1995 | Messana |
| 6,257,755 B1 | 7/2001 | Sevelle |
| 6,302,555 B1 | 10/2001 | Bristow |
| 6,312,137 B1 | 11/2001 | Hsieh |
| 6,454,425 B1 | 9/2002 | Lin |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 06052709 | 2/1994 |

*Primary Examiner*—Sandra O'Shea
*Assistant Examiner*—Anabel Ton
(74) *Attorney, Agent, or Firm*—Marsh Fischmann & Breyfogle LLP; Kent A. Lembke

(57)         **ABSTRACT**

A system for creating a flickering effect comprising a simulated candle housing, a simulated communicating channel on the housing, a source of ultraviolet light disposed in the channel, and a simulated flame having ultraviolet material thereon movable back and forth from its vertical axis mounted in the housing, the light focused on the simulated flame simulating a flickering flame.

**18 Claims, 11 Drawing Sheets**



**US 7,261,455 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,461,011 B1 * | 10/2002 | Harrison ...................... 362/96 | | |
| 6,511,219 B2 | 1/2003 | Sevelle | | |
| D486,924 S | 2/2004 | Skradski et al. | | |
| 6,688,752 B2 | 2/2004 | Moore | | |
| 6,712,493 B2 * | 3/2004 | Tell et al. ................... 362/565 | | |

| | | |
|---|---|---|
| 2002/0080601 A1 | 6/2002 | Meltzer |
| 2003/0041491 A1 | 3/2003 | Mix |
| 2003/0053305 A1 | 3/2003 | Lin |
| 2004/0165374 A1 | 8/2004 | Robinson |

* cited by examiner



*FIG. 1*

*FIG. 2*

A1397

CASE Case 1:05-cv-03073-SRD-JMD Document 72-2 Filed 09/06/19 Page 254 of 19 of 19



FIG. 5

FIG. 3

FIG. 4



*FIG. 6*



*FIG. 7*

*FIG. 8*



*FIG. 9*

*FIG. 10*



CASE Case c1s4ec1-5031673-SRN-Ful-mehDtoc30umeRage225FiledFil/ed0F9i0l6ed1972OQ159 of 19



*FIG. 11*

**A1402**

CASE 0:14-cv-01631-SRN Document 30 Filed 09/05/14 Page 259 of 19



*FIG. 12*



*FIG. 13*

*FIG. 14*



FIG. 15

FIG. 23

FIG. 16

A1405

CASE 0:14-cv-01631-SRN Document 30 Filed 09/05/14 Page 262 of 270



FIG. 17

FIG. 18

FIG. 19

FIG. 20

CASE 0Case:v4631673-SRNDDcument Doc300enPage2 263ed Fil609/06/19/20454 of 19



*FIG. 21*



*FIG. 22*

US 7,261,455 B2

1

**SYSTEM AND METHOD FOR GENERATING
A FLICKERING FLAME EFFECT**

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application is a continuation-in-part of application
Ser. No. 10/915,794 filed Aug. 10, 2004 now U.S. Pat. No.
7,159,994.

BACKGROUND

The present disclosure relates generally to the creation of
artificial light effects for entertainment and novelty applica-
tions.

DESCRIPTION OF THE BACKGROUND ART

The generation of a flickering flame effect is important in
entertainment applications, since it provides a mechanism
for simulating the flicker of a candle without actually using
a candle. This is important since it provides numerous safety
benefits as well as an ability to keep the artificial flame
"burning" in the presence of significant air pressure varia-
tions.

One type of device that generates an artificial flame is
commonly known as a "wiggle wire ball." Specifically, this
device is a relatively large ball that has a flat filament,
wherein the current in the filament takes a random path
which alters from time to time, thereby simulating a flick-
ering flame effect.

Another such device includes a series of orange and white
LEDs that are cast in resin having a flame shaped surface. A
current supplied to the LED's in a particular sequence gives
rise to a flickering flame effect.

Yet another device is commonly referred to as a "silk
flame." The silk flame includes a piece of silk that is blown
upwards by a fan, causing it to undulate. A light projected on
the silk piece is reflected off of the silk while it is moving,
thereby creating a flickering flame effect. Another device for
generating an artificial flickering flame effect is a lamp
having a flicker circuit, wherein the flicker circuit is used to
modulate the glowing light source within the bulb, thereby
giving an appearance of a candle burning inside a lantern or
a sconce.

Another flickering flame device is a light bulb inside a
flame shaped plastic object, which has wires incorporated
into it. The wires interact with electromagnets causing the
flame shaped object to tilt from side to side under control of
an electronic circuit.

SUMMARY

The foregoing devices are either bulky, unsafe or do not
provide a realistic flickering flame effect. Thus, the system
discussed below includes an apparatus and a method for
synthesizing an artificial flame that provides a realistic
flickering flame effect that is safe and easy to manufacture.

In U.S. patent application Ser. No. 10/915,794, there is
disclosed an artificial flickering effect that simulates the
flickering of a candle flame. In this aspect, the apparatus
comprises: (i) at least one light communicating channel, (ii)
a flame shaped surface in communication with a first end of
the at least one light communicating channel, (iii) a mount
for rotatably securing the at least one channel, (iv) a fiber
optic cable spaced from the at least one channel for deliv-
ering the light signal to a second end of the at least one

2

channel, wherein the rotation of the at least one channel
about at least one axis of the mount creates an artificial
flickering flame on the flame shaped surface. Additionally,
the at least one channel may be designed to rotate about the
orthogonal axes of the mount. The apparatus may further
comprise a thin rod in communication with the flame shaped
surface, wherein the rod is sensitive to air pressure varia-
tions, thereby causing the flame shaped surface to rotate
about the orthogonal axes of the mount.

In still another aspect of the invention, in application Ser.
No. 10/915,794 a flame portion simulating a candle flame is
provided with an ultraviolet coating and, under illumination
from an ultraviolet LED light source, oscillates back and
forth at the top of a simulated candle.

In another aspect of the system, disclosed in application
Ser. No. 10/915,794, a method for generating diffused light
is disclosed comprising: (i) receiving a light signal at a first
end of an at least one fiber optic channel, wherein the at least
one channel is rotatably secured on a mount and wherein the
at least one fiber optic channel rotates about at least one axis
of the mount, (ii) delivering the light signal to a diffuser
surface which is in communication with a second end of the
at least one channel, wherein the rotation of the at least one
fiber optic channel about an least one axis of the mount
creates diffused light about the diffuser surface. Addition-
ally, the method may further include the steps of rotatably
securing the ring to a cylindrical enclosure surrounding the
ring and providing a light signal from a light source, wherein
the light source is a light-emitting diode (LED).

In the instant application, ultraviolet LEDs are used to
focus ultraviolet light and a simulated flame having ultra-
violet material thereon which oscillates back and forth to
simulate a flickering candle flame.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a candelabrum holding
several artificial flame devices according to an embodiment
of the disclosure, appearing as candles;

FIG. 2 is a cut away perspective view of one of the
artificial flame devices of FIG. 1;

FIG. 3 is a view taken along line 3-3 of FIG. 2;

FIG. 4 is a view similar to the FIG. 3 illustrating the
displacement of the flame shaped surface and associated
components of the device of FIG. 2 during a flicker event;

FIG. 5 is a cross sectional view of the device of FIG. 3
taken along line 5 of FIG. 3;

FIG. 6 is a view taken along line 6-6 of FIG. 2;

FIG. 7 is an exploded view of an artificial flame candle
according to another embodiment of the disclosure;

FIG. 8 is a view taken along lines 8-8 of FIG. 7;

FIGS. 9 and 10 are exploded views of a portion of the
candle of FIG. 7 showing two modifications thereof;

FIG. 11 is an elevational view, partly in section, of another
embodiment of the candle of FIG. 7;

FIG. 12 is a perspective cutaway view of another modi-
fication of a flame device in accordance with the invention.

FIG. 13 is an elevational view of another type of candle
in accordance with the teachings of the invention;

FIG. 14 is an exploded view of the candle of FIG. 13;

FIG. 15 is a top plan view of the candle of FIG. 13;

FIG. 16 is a cross-sectional view of the candle of FIG. 13;

FIG. 17 is a cross-sectional view of the candle of FIG. 13
taken 90° from the cross-sectional view of FIG. 16;

FIGS. 18 through 20 are detailed views of 3 different
embodiments of the flame assembly alone of the candle of
FIGS. 13 to 17;

A1408

US 7,261,455 B2

3

FIG. 21 is another embodiment of the cover alone of the candle of FIGS. 13 to 17;

FIG. 22 is an elevational view of a candelabra incorporating the candle of FIGS. 13 to 17; and

FIG. 23 is a view similar to FIG. 16 illustrating an added feature of the invention.

## DESCRIPTION OF THE EMBODIMENTS

Although specific embodiments of the present disclosure will now be described with reference to the drawings, it should be understood that such embodiments are by the way of example only and merely illustrative of but a small number of the many possible specific embodiments which can represent applications of the principles of the present disclosure. Various changes and modifications obvious to one skilled in the art to which the present disclosure pertains are deemed to be within the spirit, scope and contemplation of the present disclosure as further defined in the appended claims.

FIG. 1 is an exemplary depiction of a candelabrum 4 holding several artificial flickering flame devices 6 mounted on a table 2. The devices 6 are shown as candle shaped and are positioned on individual supports 8 of the candelabrum 4. Of course, the devices 6 may be other shapes, and need not resemble cylindrical candles per se, but can be any whimsical or geometric shape, just as candles can be found in myriad shapes, such as cartoon figures, pyramids, motor vehicle shapes, flowers, sculptures etc. Furthermore, the candelabra and table 2 are not necessary and any suitable support may be used. An artificial flame device 6 may also be fully or partially enclosed within a surrounding structure, such as in a globe or other container.

FIG. 2 is a view of one of the artificial flicker flame device 6 of FIG. 1. In this embodiment, the artificial flickering flame effect is created through air-pressure variations applied to the reflecting surfaces 13, 15 (see also FIG. 3) of element 12, which may be somewhat flame shaped, FIG. 2, and/or to the stem 10 attached to element 12 and extending generally upwardly therefrom. In other words, air moving against the components, such as airflow created by a fan, or air injected upwardly through the open bottom of the candle housing in any suitable manner, such as an air tube, which thus causes the components to move on a gimbal mechanism, as described below.

The device in FIG. 2 may comprises a generally cylindrical housing 32 open at both ends 31, 33, respectively (see also FIG. 3). A light conduit 30, such as a fiber optic cable, FIG. 2, is positioned near a light source 34, and is held in position in open end 31 by a support frame 28. Support frame 28 includes a central hub 27, through which conduit 30 extends, and at least two outwardly oppositely extending arms 28 fixed to hub 27 and the inner wall of housing 32.

A gimbal mechanism is mounted in the open end 33 of housing 32 having a ring-shaped member 20. Ring-shaped member 20 is supported within housing 32 by a pair of pins 22, 23, respectively, each pin 22, 23 being fixedly secured to the outer periphery of member 20 and rotatably secured to the inner wall of housing 32. The pins 22 and 23 thus permit the member 20 of the gimbal mechanism to rotate about the longitudinal axes of the pins 22 and 23.

The member 20 includes a pair of spaced grooves 24 and 24' on its upper surface. A rod 18 is disposed in the grooves 24, 24' and acts as a support for mutually communicating cables that are designed to carry a light signal, such as optical cables 14 and 16.

4

The cables 14, 16 rotate about at least one axis (viz., the longitudinal horizontal axis passing along the length of the rod 18, as seen in The cables 14 and 16 (FIG. 2) may be coupled together by a connector 26 through which they extend (see also FIG. 2). Positioned in between the two cables 14 and 16 is a teardrop shaped element 12, simulating a flame. Element 12 may be made of plastic, rubber, or any other composite material, either substantially transparent or opaque material, and may be appropriately colored to heighten the perception of a flickering flame effect. Additionally, a substantially long thin wire or stem 10 may be attached by any suitable means to the flame shaped element 12 to create a wispy smoke effect.

As seen in FIG. 3, a gap 35 separates the light carrying cable 30 from the light carrying cables (14, 16), the flame shaped element 12, the member 20 and pins 22, 23.

The rotation of the gimbal mechanism 20, 22, 23 and the mutually connected light carrying cables (14, 16), along with the flame shaped element 12 and member 20 about rod 18, causes the lower end of the mutually connected cables (14, 16) to be displaced from their stationary position of FIG. 3 to the positions illustrated in the dotted lines in FIG. 4.

FIG. 5 illustrates how element 12 is bonded to the stem 10 which is in the form of a thin rod, by any suitable adhesive 39.

FIG. 6 illustrates the rotation of the structure comprising the gimbal mechanism (20, 22, 23), and the mutually connected light carrying cables (14, 16), and the flame shaped element 12 about an horizontal axis passing through pins 22 and 23. This causes the lower end 37 of the connected cables (14, 16) to be displaced from the stationary position of FIG. 3. As heretofore mentioned, the same effect occurs along the axis of rod 18 as discussed with respect to FIG. 4.

Thus, in summary, there are at least two degrees of rotation in the artificial candle (viz., rotation of the flame shaped element 12 about rod 18, and rotation of the flame shaped element 12 about the pins 22, 23).

The operation of the artificial candle 6 for creating a flicker flame effect is described as follows. A light signal, generated by a light source 34, propagates through the optical cable 30, and is emitted at one end 29 of the cable 30 into the air gap 35, which may be about 80 thousandths of an inch wide. In a stationary condition (i.e., when there is substantially no displacement of the thin rod 10), the light arriving from cable 30 is delivered to at least one of the two mutually connected cables (14, 16). The light carried by at least one of the two cables (14, 16) is then delivered to at least one face 13 or 15 of the flame shaped element 12 presenting the perception of a flame. In the condition where air-pressure variations induce motion of the structure comprising (i) the gimbal mechanism (20, 22, 23), (ii) the mutually connected light carrying cables (14, 16), and (iii) the flame shaped element 12, movement of the lower end 37 of the cables (14, 16) away from the stationary state will cause light to reflect or diffuse, completely or partially, on at least one of the faces of the flame shaped surface, thereby creating an artificial flickering flame effect.

Specifically, FIG. 3 shows a stationary state situation where light arriving via the optical cable 30 is delivered to both of the mutually connected cables (14, 16) via the gap 35. Subsequently, the light signal propagates through both of the mutually connected cables (14, 16) towards the flame shaped element 12 to be reflected or diffused about both faces 13 and of element 15, thereby giving the appearance of a flame.

US 7,261,455 B2

5

As shown in FIG. 4, when there is a substantial rotational movement by an angle □ about rod 18 (i.e., the angle between the vertical and thin stem 10) 18, of the structure comprising: (i) the gimbal mechanism (20, 22, 23), (ii) the mutually connected light carrying cables (14, 16), and (iii) the flame shaped element 12, the lower portion of the mutually connected cables is displaced from its stationary position (FIG. 3) in a manner that light from the cable 30 is reflected off face 13 of the flame shaped element 12. In the case where the rotational angle □ is large, the light is attenuated significantly (as it does not propagate through cable 14) and hence there is a lower reflection off of face 13.

In another exemplary embodiment, an artificial candle 300, as shown in FIG. 7, includes a control board 302 having suitable electronics (e.g., current pulsing circuits, memory module, micro-controller, portable power source, power converter, etc.), represented by microcontroller 408, a solid state device (e.g., an LED) 308 positioned on a mount 306, and a heat sink 304 for efficient extraction of heat from the LED 308. At least one lens system (shown herein as two separate lenses, such as condenser lens 310 and ball lens 312 in one exemplary aspect) is positioned on the mount 306 to allow optimal focusing of the LED light output. Electromagnets 316 may be positioned on a base 314 for generating an electromagnetic field. A tube 318, which may be of a composite material of nylon and aluminum, provides a guiding means for the light arriving from the LED system. In one aspect, the combination of the control board 302, the heat sink 304, the solid state device 308 (including mount 306 and lenses 310, 312), and the electromagnets 316 may be housed inside the tube 318.

A gimbal structure 324, having a cylindrical housing 322, may be in contact with a spacer 320 for substantially separating the gimbal structure 324 from the tube 318, in order to allow optimal projection of the light output from the LED system onto the flame shaped element 326 (similar to element 13 of FIG. 1). A rod 328 which may be solid or hollow, with a base 330, is in communication with the flame shaped element 326 and allows light to be conducted or delivered onto the reflecting surfaces of element 326. It is to be understood that housing 322 has a pair or outwardly extending pins 400, 401 (see FIG. 8) rotatably secured to both the inner wall 402 of cylindrical housing 322 and inner cylindrical member 403 having rod 328 extending therethrough and reciprocal therein. Thus, rod 328, and element 326, move about the elongated axes of pins 400, 401 and up and down within member 403.

A thin member 10, FIG. 7, similar to member 10 of FIG. 1, may be fixed to element 326 extending upwardly therefrom.

The operation of the artificial flame candle 300 is as follows. The desired movement pattern of the flame shaped surface 326 may be encoded and stored in the memory module 408 of the control board 302 in the form of digital data or control signals. The control board 302 may include a micro-controller (not shown), which excites the electromagnets 316 based on the encoded digital data arriving from the memory module 408 on the control board 302. Specifically, the electromagnets 316 are arranged on the base 314 and are excited by the signal from the control board 302 to create a field with a certain polarity around the electromagnets 316. In one aspect, the digital data may be programmed from an external computer (not shown). Furthermore, the control board 302 may be either battery operated (e.g., with a 5V battery) or it could be energized through an AC power supply.

6

The magnetic base 330 will either move away or towards the electromagnets 316 depending on whether the electromagnetic field is of the same polarity as the base 330 or not. The movement of the magnetic base 330 towards or away from the electromagnets 316 will induce a rotational motion of the gimbal structure 324 about the horizontal (or vertical) plane. Due to this rotational motion of the gimbal structure 324, light arriving from the LED 308 will be reflected, completely or partially, off at least one of the faces of the flame shaped surface 326, thereby creating an artificial flicker flame effect.

In another embodiment, a dichroic filter 404 (FIG. 9-like numerals referring to like parts of FIG. 7) may be positioned between the LED 308 and the condenser lens 310. The dichroic filter 404 alters the wavelength of the LED light output signal, rendering the light output to be of arbitrary color, thereby allowing the artificial flickering flame to be of any color. Alternatively, as seen in FIG. 10, wherein like numerals refer to like parts of FIGS. 7 and 8, an array 405 of LED's having different operating wavelengths may be housed on the LED mount 306, and electronic switching (not shown) of the array 405 of the LED's may permit arbitrary an color flickering flame effect.

It is to be understood that other embodiments may be utilized and structural and functional changes may be made without departing from the respective scope of the disclosure. Possible modifications to the system include, but are not limited to, including the solid-state device 308, the condenser lens 310 and ball-lens 321 of FIG. 7 in the embodiment of FIG. 2. This is shown in the candle 406 of FIG. 11 wherein like numerals refer to like parts of FIGS. 2 and 7. Although particular embodiments have been disclosed, variations thereof may occur to an artisan and the scope of the disclosure should only be limited to the scope of the appended claims. The artificial candle 406 may have the control board 302 within a unitary structure inside of candle 406 or the control board 302 may be external to the artificial candle (not shown). The artificial candle 406 could also have a light bulb screw end 407 to secure the candle 406 to a base (not shown).

Although the flame device in FIG. 2 shows a pair of cables or light transmitting channels, a single light transmitting channel may be used. Thus, as seen in FIG. 12, wherein like numerals refer to like parts of the embodiment of FIG. 2, a single light transmitting or light carrying channel 500 is shown in place of cables 14, 16. A teardrop shaped element 502, identical to element 12 in FIG. 2, is secured in any suitable manner to the upper end of channel 500. Rod 18 now passes through hole 503 in channel 500. The operation of channel 500 is otherwise identical to the movement of cables 14, 16.

It can be seen that there is disclosed a flame shaped reflector or diffuser integrated with a light pipe (single or multi-channel) which is articulated by a natural and chaotic external or internal force (such as wind, magnetism); above one or more collimated light sources (e.g. fiber optic, LED, incandescent). The reflector or diffuser is balanced with its center of gravity (or movement between the reflector/diffuser and the light source) on a gimbal mechanism allowing movement on a minimum of two axes. The reflector or diffuser moves randomly simulating blowing in the wind.

In another embodiment of the invention, as shown in FIG. 13, a single candle 600 is shown having an outer translucent base cover 601 (see FIG. 14), open at both ends and generally cylindrical, an inner candle base 602, and a flame assembly 603. Base 602 is preferably opaque and preferably

7

of a dark material and open at bottom 604. Base 602 is also generally cylindrical and press fit into base cover 601.

As seen in FIGS. 13 and 14, a plurality, such as two, of elongated channels or grooves 605, 606 are formed along the outer external surface 607 of candle base 602. Both grooves 605, 606 terminate at bottom before the terminal end of base 602 to provide exit at open slots 608 for electrical wires (not shown) as will be discussed.

The upper end or upper wall 609 of base 602 (see FIG. 15) has a generally T-shaped slot 610 therethrough. Wall 609 is of a thickness to accommodate two spaced angular holes 611, 612 extending from the upper ends of each groove 605, 606. That is, each groove 605, 606 has an enlarged opening 613 (FIG. 14) at its upper end with holes 611, 612 extending upwardly therefrom (see also FIG. 16) at an angle to the longitudinal axis of base 602 opening at top as seen in FIG. 15.

An ultraviolet LED, such as LEDs 613, 614, is mounted in each hole 611, 612, respectively (see FIG. 16). These LEDs are angled upwardly to project cones of ultraviolet light when activated. Electrical wires 615, 616 are connected to LEDs 613, 614, respectively, and are trapped between the outer wall 607 of base 602 and the inner wall 617 (FIG. 14) of cover 601. Both wires 615, 616 extend out their respective slots 608 and are coupled to a suitable source of electrical power 618, such as a battery assembly. Of course, an external source of power may be used, such as the light source 34 in FIG. 2.

Referring again to FIG. 14, a flame rod or pin 618, which may be cylindrical and of a metallic material, such as brass, extends through a hole 619 through the wall of base 602 between holes 611, 612 and transverse to the central axis of base 602. As seen in FIG. 15, pin 618 extends across the wider portion of T-shaped slot 610 to generally the midpoint thereof.

Flame assembly 603 includes an upper flame portion 619 (FIG. 14), simulating a flame, an integral curved portion 620, and a downwardly extending elongated portion 621.

Portions 620, 621 may be of one piece material, such as plastic, and may be black in color. As can be seen in FIG. 16, portions 620, 621 may also be of a flat material. Flame portion 619 is secured to curved portion 620 in any suitable manner, as by gluing, and is also relatively thin as seen in FIG. 16. Flame portion 619 is preferably of an ultraviolet material, such as a plastic material, or may be of a suitable material, such as plastic, coated with an ultraviolet material.

As seen in FIG. 18, the lowermost end of flame portion 619 terminates in a pointed end 622 which is adapted to enter a groove 623 in pin 608. Alternatively, as seen in FIG. 19, wherein like parts refer to like parts of the embodiment of FIG. 18, curved portion 620 may terminate in a downwardly extending point 624 with flame portion 625 being straight along its bottom 626. Point 624 is adapted to rest in groove 623 as seen in FIG. 18. In still another embodiment of the invention, as seen in FIG. 20 wherein like numerals refer to like parts of the embodiment of FIGS. 18 and 19, instead of a groove 623, a small magnet 626 is provided in pin 625 at the terminal end of a pin 627 extending upwardly and, secured to flame portion 625. Magnet 626 may be disposed on top of pin 625 or in a small cavity therein.

As seen in FIG. 17, it can be appreciated that the pointed end 622 of flame portion 619 rests in groove 623 with curved portion 620 extending about pin 618 and down to portion 621. The width of flame portion 619 and curved portion 620 is such that the same will abut against the inner walls of slot 610 (FIG. 15) when they oscillate back and forth under air

8

currents, wind, external fans, air from the bottom etc. The embodiments of FIGS. 19 and 20 will oscillate in like manner.

The LEDs, when illuminated, will focus on flame portions 619, 625 as they oscillate creating an ultraviolet light effect suggesting a flame.

Any suitable ultraviolet LEDs can be used, such as LEDs 5 mm in size and 385 nonometer UV LEDs. Any suitable materials may be used for the base 202 and cover 601. For example, Debrin translucent plastic, a trademarked plastic of E. I. du Pont de Nemours and Company, Corp. of Wilmington Del., may be used.

Angling of the LEDs as disclosed catches more reflected light.

As seen in FIG. 21, instead of cover 601, a cover 700 may be used of the same configuration and dimensions and material as cover 601. However, protrusions 701 and 702 of varying lengths and configurations may be provided on the outer surface 703 to simulate dripping wax. The simulated drippings ;may be of the same translucent material as cover 700.

Although candles 600 may be used as self-supporting or standalone candles, as shown previously in FIG. 1, the candles 600 may be incorporated in a candelabra 704 having a base 705 and a plurality of upstanding spaced arms 706 to 708 terminating in candle holders 709, as shown, each supporting a candle 600. Normal air currents will cause the simulated flame to flicker. If desired, a source of air currents (Not shown), such as a fan, may be provided remote from candelabra 704 to "blow" the flame portions 619 as previously discussed. For example, as seen in FIG. 23, wherein like numerals refer to like parts of FIG. 16, a small air tube 800, coupled to a suitable source of air, such as an electrically activated blower 801, may be provided for blowing air upwardly through the interior of base 602. Of course, such a source of air may be provided in any one of the candles in this application. The wires (not visible in FIG. 22) may extend through the arms 706 to 708 to base 705 and may there be coupled to a suitable source of electricity (not shown in FIG. 22), and to a remote electrical outlet.

Although particular embodiments of the disclosure have been discussed, variations thereof may occur to an artisan and the scope of the invention should only be limited by the scope of the appended claims.

We claim:

1. A flickering flame simulation device comprising:

an outer base cover;

an inner candle base having an interior and an inner and outer wall, said base being disposed internally of said base cover, said base having an upper wall and a longitudinal axis;

at least one elongated channel extending along the outer wall of said base;

a slot extending through the upper wall of said base;

a simulated flame assembly having a simulated flame portion having an upper end and a lower end;

a source of light mounted in said channel focused on said flame portion;

a pin extending through the outer wall of said base past the inner wall thereof into the interior of said base; and

said simulated flame portion having a longitudinal axis and mounted on said pin so that said flame portion is movable toward and away from its longitudinal axis when subjected to air currents.

2. The device of claim 1 wherein said flame portion includes an ultraviolet material.

US 7,261,455 B2

9

**3**. The device of claim **1** wherein said flame portion terminates at its lower end in a point resting in a groove in said pin.

**4**. The device of claim **1** wherein said pin is of a metallic material.

**5**. The device of claim **1** wherein said lower end of said flame portion is magnetically attached to said pin.

**6**. The device of claim **1** wherein air insert means is mounted internally of said base for blowing air upwardly within said base.

**7**. The device of claim **1** wherein said source of light in a light emitting diode (LED).

**8**. The device of claim **7** wherein said LED emits ultra-violet light.

**9**. The device of claim **1** wherein said source of light is at least one light emitting diode (LED) mounted in said channel angled inwardly toward the longitudinal axis of said base and focused on said flame portion.

**10**. The device of claim **9** wherein at least 2 channels with an LED mounted in each channel are provided on said base.

**11**. The device of claim **1** wherein said flame assembly includes a curved portion connected to said flame portion curving about said pin and extending downwardly within the interior of said base coincident generally with the longitudinal axis thereof.

**12**. The device of claim **11** wherein said slot has an inner wall and is generally T-shaped having a first wide end and

10

a second narrow end, said pin extending generally along said wide end to generally the intersection of said wide end with said narrow end, said flame portion mounted to said pin at generally the intersection of said wide end with said narrow end.

**13**. The device of claim **11** wherein said flame portion is movable within said slot from a first position abutting against a first point on the inner wall of said slot at said narrow end to a second position abutting against a second point on the inner wall of said slot opposite said first point.

**14**. The device of claim **10** wherein said base cover is of a translucent material.

**15**. The device of claim **14** wherein said base cover has an outer surface with irregularly shaped protrusions on its outer surface simulating wax drippings.

**16**. The device of claim **15** wherein said protrusions are of translucent material.

**17**. The device of claim **1** wherein a plurality of said devices are mounted on a candelabra.

**18**. The device of claim **17** wherein said devices are vertically mounted on said candelabra at differing heights thereof.

\* \* \* \* \*

### CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,680 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 and 14-point Times New Roman type.

Dated:  June 19, 2015.                         _____/s/Dan L. Bagatell_____

                                                            Dan L. Bagatell

                                                     Attorney for Intel Corporation

## CERTIFICATE OF AUTHORITY AND PROOF OF SERVICE

I certify that I have the authority of Devan V. Padmanabhan to include his electronic signature on this document.

In accordance with Federal Rule of Appellate Procedure 25 and Federal Circuit Rule 25, I certify that I caused this brief to be served via the Federal Circuit's CM/ECF system on counsel of record for the appellee.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  June 19, 2015.


      /s/Dan L. Bagatell

      Dan L. Bagatell